1
2
3
4
5
6
7
8

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Andrew D. Skale (SBN 211096)
adskale@mintz.com
Randy K. Jones (SBN 141711)
rkjones@mintz.com
Courtney Rockett (*pro hac vice*)
crockett@mintz.com
Kara M. Cormier (*pro hac vice*)
kmcormier@mintz.com
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone:  (858) 314-1500
Facsimile:  (858) 314-1501

9   *Attorneys for Plaintiff*

10
11
12

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

13
14
15
16
17
18
19
20
21

STITCH EDITING LTD.,

            Plaintiff,

      v.

TIKTOK INC., TIKTOK LLC, TIKTOK
LTD., and BYTEDANCE LTD.,

            Defendants.

Case No. 2:21-cv-06636-SB-SK

**JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES**

**Discovery Document: Referred to Magistrate Judge Steve Kim**

Date:  September 14, 2022
Time: 10:00 AM
Location: 255 E. Temple Street, Courtroom 540, 5th Floor

Discovery Cutoff: September 15, 2022
Pretrial Conference: January 20, 2023
Trial: February 6, 2023

22
23
24
25
26

1

2

**TABLE OF CONTENTS**

3    I.  INTRODUCTORY STATEMENTS.........................................................................4

4         A.   Plaintiff's Introductory Statement and Requests for Relief......................4

5         B.   Defendants' Introductory Statement .........................................................7

6    II.  DISCOVERY IN DISPUTE.............................................................................10

7         1A.  Plaintiff Seeks to Compel the Assignment of a Neutral Third Party to
8              Facilitate the Production of Documents from Defendants, or at the
               Very Least, an Order Compelling Production of Responsive
9              Documents from All Key Custodians ......................................................10

10        1B.  Defendants' Response:  Plaintiff's Request to Have a Third Party
               Conduct Searches of Defendants' Systems Should Be Summarily
11             Rejected. ...............................................................................................28

12             1.   Plaintiff's 11th Hour Motion—Noted For Hearing the Day
                    Before Fact Discovery Closes—Should Be Denied. ....................28

13             2.   Plaintiff's Motion Should Also Be Denied for Violating L.R.
14                  37-2.1 and Failing to Confer on All Claims for Relief as
                    Required Before Bringing a Discovery Motion. ..........................30

15             3.   There is Absolutely No Valid Basis for The Court to Order
16                  That a Third-Party Vendor Verify or Re-Conduct Defendants'
                    Comprehensive Searches of its Systems. .....................................33

17        2A.  The Court Should Order Defendants to Produce Documents
18             Embedded in Links .................................................................................40

19        2B.  Defendants' Position:  Plaintiff Misstates the ESI Order, Ignores
               Potential Redundancies, and Simply Assumes All Links are
20             Responsive When They Clearly Are Not..................................................42

21        3A.  The Court Should Order Defendants to Disclose within Seven Days,
               When Miwa Tachibana and Michael Buzinover Ran Search Terms.......44

22        3B.  Defendants' Position:  Plaintiff Already Has This Information so
23             an Order Compelling Its Disclosure is Unnecessary ..............................45

24        4A.  The Court Should Order Defendants to Provide Information
               Concerning a Custodian's Ability to Delete Lark Documents and a
25             Written Declaration Concerning its Document Preservation and
               Search Process........................................................................................45

26        4B.  Defendants' Position:  Plaintiff's Request is Premature, Calls for
27             Attorney/Client Communications, and is Wholly Unnecessary. .............46

28        5A.  The Court Should Order Defendants to Produce a Privilege Log ..........48

2

5B.     Defendants' Position:  There Are No Documents To Place
        on a Privilege Log. .....................................................................49

6A.     The Court Should Require Defendants to Produce Herman Chou
        for a Deposition..........................................................................50

6B.     Defendants' Position:  The Court Should Reject Plaintiff's Request
        to Force Mr. Chou to Travel Internationally For a Deposition That
        Will Be Cumulative and Redundant. .........................................52

7A.     Defendants Should Be Compelled to Produce Lists of: (i) all
        Advertising Agencies with which They Work or Have Contracts,
        (ii) All Music Labels with which they Work or Have Contracts,
        (iii) all Companies with which they have trademark licensing
        agreements, incorporating the affiliated royalty rate for each
        agreement, and an indication of what was licensed to or by
        Defendants; and (iv) a damages metric reflecting the average
        CPM on a monthly basis across all advertising sales, delineated
        by the US and the UK from September 1, 2020 to the present...............54

7B.     Defendants' Position ...................................................................57

        (i) and (ii) – Plaintiff's Request for a List of Advertising Agencies and
        Music Labels with which Defendants have Contracts or do Business Is
        Irrelevant and Disproportionate to the Needs of This Case. .................57

        (iii) and (iv) – These Remaining Grab-Bag of Requested Information is a
        Fishing Expedition that Should be Rejected by the Court. ....................59

8A.     Plaintiff Requests Sanctions Under Rule 37 for Defendants'
        Refusal to Participate in Discovery............................................63

8B.     Defendants' Position: Plaintiff's Requested Sanctions Simply
        Underscore Its Oppressive and Burdensome Litigation Tactics............633

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY
DISPUTES

1   Plaintiff Stitch Editing Ltd. ("Plaintiff") and Defendants TikTok Inc., TikTok

2   LLC, TikTok Ltd., and ByteDance Ltd. (collectively, "Defendants" or "TikTok")

3   submit this Joint Stipulation Regarding Discovery Disputes pursuant to Local Rule

4   37-2.

5   The parties have met and conferred on each of the issues, except as otherwise

6   noted by Defendants.  The parties have also utilized the Court's Informal Discovery

7   Conference ("IDC") process per Chamber Rule 2, including IDC conferences on June

8   1, 2022, and July 5, 2022.  After the July IDC, the parties met and conferred again on

9   July 25, 2022 at 10:30 am (PST) via Webex video conferencing and August 1, 2022 at

10   10:30 am (PST) via Webex video conferencing in accordance with L.R. 37-1.

11   Plaintiff also emailed a L.R. 37-1 letter to Defendants outlining their position on the

12   issues below on July 28, 2022, after several attempts at resolution were unfruitful.[1]

13   To eliminate or narrow the disputed discovery issues, counsel of record for the

14   parties discussed not only the merits of their dispute(s) but also addressed compliance

15   with the discovery procedures explained in Judge Kim's Modified and Supplemental

16   Local Rule 37-1 Requirements.  Counsel of record for the parties agree, except as

17   otherwise noted by Defendants below, that the remaining disputed discovery issues

18   cannot be eliminated or narrowed either by further discussion of their merits or by

19   ensuring compliance with the discovery procedures explained in Judge Kim's

20   Modified and Supplemental Local Rule 37-1 Requirements.

21   **I.   INTRODUCTORY STATEMENTS**

22   **1A.   Plaintiff's Introductory Statement and Requests for Relief**

23   This is a trademark infringement action alleging that Defendants infringed

24   Plaintiff's trademark when they launched TikTok's video-editing feature using the

25   brand name "Stitch" (the "Stitch Editing Feature").  At its core, this motion is focused

26   on Defendants' failure to meaningfully engage in the discovery process.  As one

27

28   [1] *See* Declaration of Kara M. Cormier ("Cormier Decl.") ¶¶ 3, 4 filed herewith.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY
DISPUTES

1  example, Plaintiff has propounded seventy six (76) requests for production ("RFPs"),

2  spanning over seven (7) sets of requests for production, in accordance with FRCP 26

3  and 34. Yet to date Defendants have produced only ***twenty-one (21) unique internal***

4  ***documents***. Unlike typical discovery disputes where a handful of requests might be at

5  issue, nearly all discovery requests here are at issue. Nevertheless, Plaintiff has done

6  its best to narrow the scope for the sake of judicial efficiency.

7  Plaintiff needs this Court's assistance compelling Defendants to produce

8  documents and ordering a neutral third party to facilitate the production of documents

9  from Defendants, compelling Defendants to provide information concerning their

10  search efforts to date, compelling Defendants to produce a witness for deposition, and

11  compelling Defendants to produce a privilege log. Plaintiff also requests that the

12  Court impose FRCP 37 sanctions for Defendants' failure to engage in discovery in

13  good faith. Plaintiff asks that these issues be resolved as quickly as possible because

14  discovery closes on September 15, 2022. Although Plaintiff is filing a motion with

15  the Court to extend the discovery cutoff, that motion might not be granted.

16  In sum, Defendants have had several opportunities to cooperate in good faith

17  with Plaintiff's discovery requests and have failed to do so, despite Plaintiff's attempts

18  to simplify the requests. There is little time left to resolve these issues because fact

19  discovery closes on September 15, 2022. Plaintiff thus asks the Court to award the

20  following relief:

21  1) An order requiring that a neutral third-party vendor be brought in to

22  collect and produce documents responsive to Plaintiff's seven sets of RFPS, including

23  at least requests for production 1, 6, 9, 13, 15, 18, 23, 37-40, 55, 57, 62-65, 67-68, and

24  71-76 or, in the alternative, an order compelling Defendants to produce documents

25  responsive to those RFPS from at least the 14 stakeholders identified on

26  BYTE_00002035;

27  2) An order compelling Defendants to produce all documents that appear as

28  links within the documents that have been produced to date (and to continue doing so

for any further productions);

3)    An order compelling Defendants to provide the dates on which their two custodians, Miwa Tachibana and Michael Buzinover, ran the search terms disclosed in the June 24, 2022 letter from Defendants to Plaintiff[2];

4)    An order compelling Defendants to: (i) disclose the date TikTok turned off its employees' ability to delete Lark documents, and (ii) provide a written declaration from someone in the legal department outlining the search process conducted to date and if any legal holds were issued and confirmed by employees;

5)    An order compelling Defendants to draft and produce a document-by-document, not categorical, privilege log;

6)    An order compelling Mr. Herman Chou to appear for a deposition; and

7)    An order compelling Defendants to produce lists of: (i) all advertising agencies with which they work or have contracts, (ii) all music labels with which they work or have contracts, (iii) all Companies with which they have trademark licensing agreements, incorporating the affiliated royalty rate for each agreement, and an indication of what was licensed in each instance either to or by Defendants; and (iv) a damages metric reflecting the average CPM[3] on a monthly basis across all advertising sales, delineated by the US and the UK, from September 1, 2020 to the present; and

8)    FRCP 37(a)(4)(A) sanctions requiring Defendants to compensate Plaintiff for the cost and fees related to bringing this motion and related to all the meet and confers and attorney time expended to compel Defendants to comply with their discovery obligations in this case.   Plaintiff further requests a conditional order providing that if Defendants fail to comply in full with the Court's order arising from this motion, that the Court will (i) dismiss Defendants' counterclaim and affirmative defenses; (ii) preclude Defendants from challenging Plaintiff's damages calculations; and/or (iii) issue a jury instruction for an adverse inference that the documents

---

[2] *See* Cormier Decl. ¶ 6.
[3] Cost per mile (CPM) is the average amount of money TikTok has spent per 1,000 impressions, Plaintiff is requesting this information for **all** advertisers.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1    Defendants have failed to produce would have supported Plaintiff's claims.

2    **1B.    Defendants' Introductory Statement**

3    This is a garden-variety U.S. trademark infringement case—and a baseless one

4    at that.  Plaintiff claims *exclusive* trademark rights in the words "Stitch Editing," and

5    "Stitch"—terms used by countless individuals and companies for decades to describe

6    the process of combining (or "stitching") video clips together.  (Dkt. No. 19 ¶¶ 143-

7    164.)  Just like numerous others have done and continue to do with the word "Stitch,"

8    TikTok uses the term for the name of an in-app tool (also called a "button" or an

9    "icon") that allows users to "stitch" together video clips inside the TikTok app.[4]  To

10   put this discovery dispute into context, and to demonstrate the grossly

11   disproportionate information Plaintiff seeks in this case, a very brief illustration of

12   how TikTok's Stitch icon works is necessary.

13   Suppose a TikTok user wanted to "Stitch" with a video posted by another

14   TikTok user.  The user that wanted to use the Stitch button would generally follow a 3

15   step process:

| **Step 1**: Navigate to the video that the user wants to "Stitch" with. | **Step 2**:  Tap the "Arrow" Button at the bottom right corner (circled in red below). | **Step 3**: Then Tap the "Stitch" Button to add a video clip to the existing video. |
|---|---|---|
|  |  |  |

---

[4] Curiously, Plaintiff has apparently not sued *any* of the other numerous companies or individuals using the term "Stitch" related to their various video editing software products or services.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1   Importantly, TikTok doesn't charge a fee to download the TikTok app.   TikTok
2   doesn't charge a fee for a user to use the Stitch button on the TikTok app.   TikTok
3   doesn't generate revenue from brands or companies using the Stitch button because
4   they are **not allowed** to use it in creating their paid-for advertisements on TikTok.
5   (Declaration of J. Michael Keyes ("Keyes Decl.") ¶ 25, Ex. J ("Reggio Trans.") at
6   72:7-9 ("[W]e don't allow stitch videos or we don't allow an advertiser to stitch
7   videos in their advertisements.")).

8   Based on this little button called "Stitch" within the TikTok app—a feature that
9   generates no revenue to TikTok—Plaintiff launched a global, take-no-prisoners
10  litigation campaign.   And every step along the way, Plaintiff has demanded
11  indiscriminate access to vast amounts of Defendants' business information and data
12  that has **no** logical or factual connectivity to the small Stitch button inside the TikTok
13  app.  Plaintiff at one point even demanded that Defendants produce commercial data
14  related to activity in more than 30 foreign countries.   (Keyes Decl. ¶ 2, Ex. B.)
15  Plaintiff also makes baseless and demonstrably false accusations that Defendants (and
16  their counsel) are somehow trying to skirt their discovery obligations with respect to
17  this Stitch button dispute.  Defendants are not trying to hide the ball.  Far from it. As
18  set forth herein, Defendants have been diligent in their efforts and have complied with
19  their obligations. (*See infra* Section II.1B.3.)  Defendants have produced documents
20  on a rolling basis and anticipate producing all remaining documents within the coming
21  days—and well before the discovery cut-off.  (*Id.*)  There is absolutely no basis for
22  this motion to compel and it should be denied in its entirety for numerous reasons,
23  including but not limited to the following:

24  - **Plaintiff's Motion Ignores This Court's Scheduling Order.** Plaintiff's
25    motion ignores this Court's scheduling order. (Dkt. No. 45).  That order states,
26    in pertinent part, that: "[t]he parties should plan to complete discovery far
27    enough in advance of the discovery deadline to allow for the filing of a
28    discovery motion if necessary and ***complete the discovery allowed if relief is***

8

_**granted**_" (emphasis supplied).  Even if Plaintiff was entitled to relief (it isn't),
its 11th hour motion should be denied.  This case was filed on April 12, 2021.
(Dkt. No. 1).  Plaintiff did not serve its first set of document requests until
**nearly 7 months thereafter**.  (Keyes Decl. ¶ 7.)  Even after Plaintiff got off the
dime, instead of pursuing meritorious discovery, it decided to fuss around for
months on things such as: (i) subpoenaing (unsuccessfully) 3rd parties that have
no logical connection to this dispute; (ii) fighting (unsuccessfully) to dismiss
Defendants' counterclaim for cancellation (Dkt. No. 86); and (iii) ginning up
(unsuccessfully) patently-absurd demands related to TikTok's business
operations in more than 30 foreign markets.  (Keyes Decl. ¶¶ 2-3.)  As
Magistrate Judge Kim has previously noted: "Untimeliness is sufficient ground,
standing alone, to deny a discovery motion." _KST Data, Inc. v. DXC Tech. Co._,
344 F. Supp. 3d 1132, 1136 n.1 (C.D. Cal. 2018) (internal citation omitted).
That admonition applies with powerful force here.  The motion should be
denied in its entirety for this reason alone.

- **<u>A Third-Party Should Not Be Given Access to Defendants' Systems</u>**.  This
type of extraordinary relief is only available in limited circumstances where
there is "technical incompetence" or facts showing that a party is attempting to
"hide" evidence.  The actual facts (largely ignored by Plaintiff in its
submission) demonstrate no such impropriety.  This request to give a third-
party unfettered access to Defendants' electronic systems in a case such as this
underscores—once again—the grossly disproportionate discovery requests that
are a hallmark of Plaintiff's litigation campaign.

- **<u>There is No Basis to Compel a Chinese Citizen to Appear for a Deposition</u>**
**<u>over The Small Stitch Button</u>.**  Mr. Herman Chou is a Chinese citizen. (Keyes
Decl. ¶ 17_).  He cannot be deposed in China—either in person or remotely.
The information sought from Mr. Chou was already provided in previous
depositions by TikTok witnesses, including Mr. Michael Buzinover—the

individual that was ultimately responsible for approving the name "Stitch." (*Id.* ¶ 23, Ex. I ("Buzinover Trans.") at 66:16-67:13; 117:11-22.) Forcing Mr. Chou to travel outside of China so he can reiterate what Mr. Buzinover previously said is wildly disproportionate and oppressive—especially given the severe lockdowns and quarantines Mr. Chou would likely face upon returning home to the "zero Covid" policy adopted by the Chinese government. (*Id.* Exs. E-F.)

## II.  DISCOVERY IN DISPUTE

### 1A.  Plaintiff Seeks to Compel the Assignment of a Neutral Third Party to Facilitate the Production of Documents from Defendants, or at the Very Least, an Order Compelling Production of Responsive Documents from All Key Custodians

Despite Plaintiff having propounded 76 different document requests, Defendants have produced ***only 21 distinct internal documents*** and entire categories of documents remain unproduced. In fact, Defendants have failed to provide any documents whatsoever in response to 54 out of 76 (or 71%) of the requests for production. Moreover, despite the fact that there are four defendants – who are reported by the Harvard Business Review to have over 110,000 employees – Defendants asked only ***two custodians*** – Miwa Tachibana and Michael Buzinover – to search for documents, one of whom (Ms. Tachibana) testified to having only the smallest tangential role with no knowledge of the vast bulk of relevant facts in this case, including with respect to the naming of the feature.[5]

Further, this was not an administrative level search. Nor did the attorneys conduct the search. The search was led by the custodians themselves. Ms. Tachibana testified during her July 7, 2022 deposition that there were multiple document sources that she did not search, including parts of Google-Suite.[6] She also testified that she could only search her own Lark documents and those that were either publicly

---

[5] Ms. Tachibana professed a lack of knowledge no less than 114 occasions ("I don't know") and professed a lapse in memory no less than 29 times ("I don't recall"- 17; "I don't remember" – 12).

[6] "Q. How about your Google Drive? A. I did not. Not from what I remember."

available or specifically shared with her.[7]   She had no ability to search Lark documents that were private or otherwise not shared with her.[8]   She also testified that she was never served with a litigation hold or otherwise told not to destroy documents.[9]

Mr. Buzinover also testified during his July 27, 2022 deposition that there were multiple document sources that he did not search.[10]   He likewise confirmed that he would not have access to a Lark document that was not his or was not otherwise shared with him.[11]   He further testified that it was he, and not in-house counsel, who made relevancy determinations in the first instance.[12]   In other words, he sorted through his documents to determine what he thought was relevant and then handed only those documents over to counsel.  This is highly improper.[13]

---

[7] "Q. All right. Thank you. So when I asked you whether or not you had searched Lark, that would have covered -- and you said you did -- that would have covered any documents that were publicly saved within Lark; correct? A. They could be private and my own as well."

"Q. So when you searched Lark are you able to search someone else's private documents if those private documents have not been shared with you? A. No. I'm not."

[9] "Q. Did you ever receive a notice telling you not to delete documents because of this litigation? A. I don't believe so, no. But I have no reason to delete documents."

[10] "Q. Okay.  Did you search the Figma in connection with this litigation? A.  I did not. . . . Q. Okay. What about Dropbox? A. I would not search drop Dropbox."

[11] "Q. If there were Lark documents that Esther An created, but did not share with you, you would not be able to pull those in your search; is that correct? A. Technically, yes."

[12] "Q. Who -- who made the decision as to whether or not documents were relevant? A. I suppose I did."

[13] *See MGA Entm't, Inc. v. Nat'l Prods.*, No. CV 10-07083 JAK (SSx), 2012 U.S. Dist. LEXIS 196271, at *8 (C.D. Cal. Jan. 26, 2012) (requiring new attorney-supervised search to be conducted and an attorney declaration certifying the completeness of the production after a custodian "conducted her [own] search without guidance or supervision from an attorney on how to conduct a search")*; Optrics Inc. v. Barracuda Networks Inc.*, No. 17-cv-04977-RS (TSH), 2021 U.S. Dist. LEXIS 21738, at *23-24 (N.D. Cal. Feb. 4, 2021) ("Optrics has both unreasonably delayed and also prevented the completion of full discovery by, among other things, initially attempting . . .discovery by having its own partners determine what documents were responsive, and then individually culling data using basic search functions which often times wouldn't even search the content of emails or files and thus would almost certainly have missed responsive data … *A client-led search like the one here, where Optrics had no experience with electronic discovery, was not reasonable*.") (Emphasis added); *Rhea v. Wash. Dep't of Corr.*, No. C10-0254 BHS/KLS, 2010 U.S. Dist.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1         Opposing counsel also claimed that they had no ability to directly oversee the

2 search for documents because they are not permitted any visibility into the

3 Defendants' internal systems. *See* Cormier Decl. ¶ 3. In fact, when Plaintiff's

4 counsel asked for Defendants' counsel to agree to have a neutral third party come in to

5 conduct a document search, Defendants' counsel stated: "I'm positive that won't

6 happen. ByteDance won't even give us, their attorneys, access to their internal system.

7 So they're not going to have a third party come in. We proposed that to *them* as a way

8 of us helping *them* find documents as well. And they're, they're very closed off to

9 any third party access to their systems." *See* Cormier Decl. ¶ 3.

10         But the systems Defendants are allegedly pulling data from are located in the

11 U.S., from U.S. Defendants who are well aware of their and U.S. attorneys' duties to

12 conduct good-faith searches of their clients files and as this Court already recognized,

13 these Defendants are some of the most prolific litigants in U.S. courts. These are not

14 valid excuses. Nor would such a policy justify the fact that Defendants' counsel

15 claimed not to know the name of Defendants' internal document system ("Lark") until

16 ***June 24, 2022 – nearly 8 months into discovery***. Indeed, when Plaintiff asked

17 Defendants' original counsel at a meet and confer on June 17, 2022, "do you know, as

18 you sit here [today] what the name of that [proprietary] system is called?" Defendants'

19 counsel responded, "I don't know for sure." *See* Cormier Decl. ¶ 2. Instead,

20 Defendants raised concerns about getting documents from China.[14] However, given

21 LEXIS 138152, at *17-18 (W.D. Wash. Dec. 27, 2010) ("Attorneys are required to

22 make a reasonable inquiry before certifying that a discovery response is complete.

23 Fed. R. Civ. P. 26(g). DOC's counsel 'has an obligation to not just request documents of his client, but to search for sources of information.' 'Counsel must communicate

24 with the client, identify all sources of relevant information, and 'become fully familiar with [the] client's document retention policies, as well as [the] client's data retention architecture.'"); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2016 U.S. Dist.

25 LEXIS 139305, at *10-11 (N.D. Cal. Oct. 6, 2016) (finding client led search with no assistance from counsel or IT insufficient and objectively unreasonable).

26 [14] During the Parties' September 24, 2021 initial scheduling conference, Judge

27 Blumenfeld made clear that the parties needed to "immediately [start] propounding and disclosing or serving the discovery and get going on [their] initial disclosures and

28 the like." Rather than address any concerns regarding the Lark system, Defendants raised concerns regarding obtaining documents from China. *See* Cormier Decl. ¶ 5.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

the productions to date, it does not even appear that Defendants have searched for documents located in China. This despite their having explicitly raised the issue at the initial scheduling conference.

In short, there is no way that Defendants' counsel could have met their obligations under FRCP Rule 26(g). That rule requires every discovery response and objection to "be signed by at least one attorney of record in the attorney's own name." *Id.* as noted in the rule:

> By signing, an attorney . . . certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" that the disclosure made "is complete and correct as of the time it is made; and []with respect to a discovery request, response, or objection, it is: (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

*Id.*

This Court has held that "certification under Rule 26(g) signifies 'that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.'" *MGA Entm't, Inc.*, 2012 U.S. Dist. LEXIS 196271, at *8 (quoting Fed. R. Civ. P. 26(g) Advisory Committee Notes to 1983 Amendment). It simply is not possible for that to have happened here, where Defendants' counsel did not even familiarize themselves with Defendants' systems and storage locations, or identify proper custodians, much less directly oversee the collection of responsive documents.

In short, Defendants have only produced ***twenty-one (21)*** distinct internal documents in response to Plaintiff's seventy-six (76) Requests for Production. Defendants' failure to abide by their discovery obligations is obvious from this clear

13

deficiency, combined with the facts that:

- Defendants have over 100,000 employees and the Stitch Editing Feature is used by hundreds of millions of people generating hundreds of billions of views on the platform to date;

- The meager production to date identifies 14 "Stakeholders" in the Stitch Editing Feature and dozens of other relevant custodians involved with the subject matter of this action;

- TikTok only had two custodians (Miwa Tachibana and Mike Buzinover) search for documents, one of which had no involvement in the bulk of relevant business activities and decisions at issue;

- Those custodians could only access Lark documents that were shared with them;

- Those custodians themselves made the determination as to what was and was not relevant, without legal assistance;

- Defendants have allegedly precluded their own outside counsel from supervising or otherwise verifying the propriety of the search for documents.

In light of these deficiencies, and due to the fact that opposing counsel itself is not allegedly permitted access to Defendants' internal systems to directly oversee the collection of responsive documents, **Plaintiff requests that the Court order the Defendants to bring in a neutral third-party vendor to go into Defendants systems, search for and produce documents responsive to the outstanding seven sets of requests for production – or at least those responsive to RFP Nos. 1, 6, 9, 13, 15, 18, 23, 37-40, 55, 57, 62-65, 67-68, and 71-76 (set forth below) – within seven days of the date of the Court's order**. That vendor should be required to produce non-duplicative responsive documents within one week thereafter in a form that satisfies the requirements of the parties' so-ordered ESI stipulation.

This remedy is the only way to ensure that Defendants and Plaintiff are on a level playing field in this litigation. Defendants have repeatedly stonewalled Plaintiff, refused to produce clearly responsive documents, made woefully incomplete

14

productions, included documents that contain links to other documents that were not produced, and in some cases have made repeated false assertions about the existence of documents.  The following are but a few examples:

- Defendants claimed from February to July 2022 that no beta testing was done on the Stitch Editing Feature, despite Plaintiff's production of TikTok posts, blogs, and articles referring to the existence of beta testing and despite Defendants' production of several documents alluding to the existence of beta testing.  Then, the night before the noticed deposition of Michael Buzinover, Defendants produced one document showing that up to 30%-45% of TikTok users were included in a beta test that lasted no less than 60 days.  That same document also shows that posts were both created and viewed using the Stitch Editing Feature.  Nevertheless, as of August 2, Defendants were still claiming that no posts or views of videos created using the Stitch Editing Feature exist prior to the official launch on September 1, 2020.

- In a June 17, 2022 meet and confer, Defendants' counsel led Plaintiff to believe that they had no means of running search terms on Defendants' propriety document management system.[15]  Even after Plaintiff's counsel expressed incredulity as to the claim that Defendants "couldn't run search terms," Defense counsel maintained this position in a June 24, 2022 letter conveying these purported "review terms."  That letter stated that "Defendants do not have a central network or database through which it can search for documents. . . . The custodians provided all documents identified using these [review] terms to counsel." *See* Cormier Decl. ¶ 6.  But that turned out not to be true.  As Defendants' witnesses admitted in deposition and their Lark technical person confirmed, the Lark system ***can*** be searched with search terms, as can dozens of the other systems used by Defendants.

- Mr. Buzinover testified that the Stitch Editing Feature was cleared through legal, yet Defendants have produced no documents showing this occurrence and claim they are not withholding any documents on the basis of privilege.  If Defendants are withholding documents from their outside counsel, it is Defendants' counsel's obligation to remedy the situation and bring it to the

---

[15] Defense counsel described that they provided the two custodians a list of what they called "review terms because [] our clients internal communications system, or network isn't really set up really to carry out a standard or normal keyword searches, it's just not set up that way, but our custodians use these, uh, review terms to review the document [], before they were pulled to us or given to us." *See* Cormier Decl. ¶ 2.

Court's attention so the issue can be addressed.

- When Plaintiff noticed that linked documents were not produced, it called specifically for the production of one such document: the Stitch Promo Schedule. Outside counsel emphatically maintained that the apparent link (appearing in blue, underlined text, with a little document image next to it: 🗎 Stitch Promo Schedule ) was not a link at all and that the promo schedule followed thereafter in the produced document. Despite multiple explanations from Plaintiff's counsel as to how the content in the remainder of the document clearly did ***not*** constitute a "promo schedule," Defendants' counsel maintained the argument that the link was not a link. Yet, counsel later did an about-face and produced the Stitch Promo Schedule, which was, in fact, a link.

There are countless other examples like the above; these simply highlight Defendants' modus operandi for discovery in this case and the reason why this remedy is warranted here. Defendants have made outright false assertions of fact about what has or has not been done or what does or does not exist. And even if prior false statements were the result of false information from in-house counsel, these and the multitude of other similar occurrences should have led Defendants' counsel to demand access to client personnel with knowledge to promptly remedy the bad-faith discovery tactics to date. Courts in similar circumstances have not hesitated to order similar relief.[16]

Should the Court find that such a remedy is not warranted here, Plaintiff

---

[16] *See, e.g.*, *Maletta v. Woodle*, No. 2:20-cv-1004-JES-MRM, 2022 U.S. Dist. LEXIS 131193, at *12 (M.D. Fla. Jan. 12, 2022) ("the Court has no confidence that Defendants' document production in response to Plaintiff's document requests was even remotely adequate. Thus, the Court will require Defendants to revisit their entire document production with the able assistance of an appropriate third-party vendor of Defendants' counsel's choosing"); *Tera II, LLC v. Rice Drilling D, LLC*, No. 2:19-cv-2221, 2022 U.S. Dist. LEXIS 68892, at *14 (S.D. Ohio Apr. 14, 2022) (ordering third-party vendor to search emails to collect documents, noting that "self-collections by custodians may give rise to questions regarding the accuracy and completeness of collections if directions and oversight by legal counsel or forensics experts are poor or non-existent. [] Such is the case here."); *Delta T, LLC v. Williams*, 337 F.R.D. 395, 401 (S.D. Ohio 2021) (finding the scope of compelled production not unduly vague where the plaintiff proposed tailoring a search through use of an independent forensic examiner that would create a forensic image of the electronic devices, search the devices by predetermined and limited search terms, and provide the documents generated by the search to the defense before production).

requests, in the alternative, that the Court at least compel Defendants to produce documents and certify the completeness of the production based on their own in-depth investigation and confirmation, from the 14 identified stakeholders responsive to at least the following RFPs:

**RFP No. 1:** All Documents concerning Defendants' conception, creation, selection, adoption, and release of the name "Stitch" in affiliation with the Editing Feature, including Documents sufficient to identify all Persons who were responsible for, participated in, have information about, or were consulted concerning the conception, creation, selection, adoption, and release of the word "Stitch" in affiliation with the Editing Feature.

**Defendants' Objections:** Defendants object to this request as overly broad and undue burdensome with respect to the language "*All* documents" and "*all* persons" (emphasis added) as it is not limited in time, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Defendants object to this request as overly broad and undue burdensome with respect to the language "*concerning* the … *release* of the word 'Stitch' *in affiliation with* the Editing Feature (emphasis added)" on the grounds that it is vague, ambiguous, overbroad and seeks information not relevant to the claims or defenses of this case. Defendants additionally object to this request on the ground that some of the Persons requested may no longer be employed by Defendants. Defendants further object to this request on the grounds that it calls for production of attorney-work product and/or attorney-client privileged documents. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non-privileged documents responsive to this request.

**RFP No. 6:** All Documents concerning consumer surveys related to the term "Stitch", including but not limited to, individual questionnaires, pilot studies, and focus groups.

**Defendants' Objections:** Defendants object to this request on the grounds that it calls for production of attorney-work product and/or attorney-client privileged documents. Subject to and without waiving the above general and specific objections, Defendants will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non-privileged documents responsive to this request, to the extent any such documents exist.

**RFP No. 9:** All Documents concerning Defendants' advertising, marketing, or promotion of the goods or services offered in connection with the word "Stitch".

**Defendants' Objections:** Defendants object to this request on the grounds that it assumes that Defendants use the word "stitch" as a trademark to offer or provide any goods or services. Defendants additionally object to the phrase "in connection with the word 'Stitch'" as vague and ambiguous on the grounds that it relies on a word or term that is undefined. Defendants further object to this request as overbroad, undue burdensome and seeks information not relevant to the claims or defenses of this case. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with

17

this request to produce any non- privileged documents responsive to this request, to the extent any such documents exist.

**RFP No. 13:** All Documents concerning Defendants' advertising or promotion of the Editing Feature.

**Defendants' Objections:** Defendants object to this request as overly broad and unduly burdensome with respect to the language "All documents (emphasis added)," which is not limited in time, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Defendants additionally object to this request on the grounds that it assumes that Defendants have used the word "stitch" as a trademark to offer or sell any goods or services. Defendants object to this request as vague, ambiguous, overly broad, and unduly burdensome with respect to the language "advertising or promotion", as it is undefined and unlimited in time, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Defendants object to this request as duplicative of other discovery requests. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non- privileged documents responsive to this request, to the extent any such documents exist.

**RFP No. 15:** All agreements concerning the Stitch Editing Feature.

**Defendants' Objections:** Defendants object to this request as vague, ambiguous, overly broad, and unduly burdensome with respect to the language "All agreements," because it is undefined and unlimited in time, jurisdiction, and subject matter, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Defendants additionally object to this request on the grounds that it may request information not in the possession, custody or control of Defendants. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have made a diligent search and reasonable inquiry to comply with this request, however, despite a careful investigation, Defendants did not locate any responsive document to this request. Defendants expressly reserve the right to supplement, clarify, revise, or correct any or all of the responses and objections herein pending its ongoing review and investigations of Defendants' documents and records.[17]

**RFP No. 18:** All Documents concerning Defendants' marketing of the TikTok platform for use as an advertising platform.

**Defendants' Objections:** Defendants object to this request because this request bears no relation to their use of the term "stitch", the request is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Defendants further object to this request as overly broad and unduly burdensome because the requested information is not limited in time, jurisdiction, or subject matter. Defendants will not be producing documents in response to this request.

---

[17] As seen above, the Defendants denied the existence of documents responsive to RFP No. 15, but they produced documents showing that TikTok entered into agreements with influencers to create promotional videos for the Stitch Editing Feature and invoices from certain influencers, which also refer to the Stitch Editing Feature.  Thus, that denial is inaccurate.

1

2

**RFP No. 23:** Documents sufficient to identify all markets in which the Stitch Editing Feature is currently available globally.

3

4

5

6

7

**Defendants' Objections:** Defendants object to this request as overly broad and unduly burdensome because the requested information is not limited in time, jurisdiction, or subject matter, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Defendants' use of the stitch editing feature outside the United States is irrelevant to this action. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non-privileged documents responsive to this request.

8

9

**RFP No. 37:** All Documents concerning Plaintiff.

10

11

12

13

14

15

**Defendants Objections:** Defendants object to this request on the grounds that it is duplicative of other discovery requests, calling for documents equally available to Plaintiff or its counsel; and/or documents already within Plaintiff's or its counsel's knowledge, possession, custody, or control. Defendants additionally object to this request as overly broad and undue burdensome with respect to the language "All documents (emphasis added)," which is not limited in time, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non- privileged documents responsive to this request.

16

**RFP No. 38:** All Documents concerning Plaintiff's STITCH Mark.

17

18

19

20

21

22

23

24

**Defendants Objections:** Defendants object to this request on the grounds that it is duplicative of other discovery requests, calling for documents equally available to Plaintiff or its counsel; and/or documents already within Plaintiff's or its counsel's knowledge, possession, custody, or control. Defendants additionally object to this request on the grounds that it assumes that Plaintiff owns any trademark rights in the term "stitch editing" or the word "stitch." Defendants further object to this request as overly broad and undue burdensome with respect to the language "All documents (emphasis added)," which is not limited in time, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non- privileged documents responsive to this request.

25

**RFP No. 39:** All Documents concerning Plaintiff's goods or services.

26

27

28

**Defendants Objections:** Defendants object to this request as vague and ambiguous as to the language "Plaintiff's goods or services" as it is undefined. Defendants additionally object to this request on the grounds that it is duplicative of other discovery requests, calling for documents equally available to Plaintiff or its counsel; and/or documents already within Plaintiff's or its counsel's knowledge, possession, custody, or control. Subject to and without

waiving the above general and specific objections, Defendants respond that Defendants have produced and will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non- privileged documents responsive to this request.

**RFP No. 40:** All Documents concerning any potential, claimed, or actual confusion or likelihood of confusion between Plaintiff and Defendants, or Plaintiff's and Defendants' respective goods and services, as a result of either party's use of the word "Stitch."

**Defendants' Objections:** Defendants object to this request in on the grounds that it assumes that Defendants have used the word "stitch" as a trademark to offer or sell any products or services. Defendants additionally object to this request in on the grounds that it assumes that Plaintiff owns any trademark rights in the term "stitch editing" or the word "stitch." Defendants further object to this request on the grounds that it prematurely seeks identification or designation of witnesses or exhibits for trial. Defendants object to this request as overly broad and undue burdensome with respect to the language "All documents (emphasis added)," which is not limited in time, and is not relevant to the claims or defenses asserted in this action or proportional to the needs of this case. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have made and will continue to make a diligent search and reasonable inquiry to comply with this request, however, no responsive documents to this request exist.

**RFP No. 55:** Documents concerning any beta or pre-commercial-launch testing of the Stitch Editing Feature sufficient to show the time of the testing; the geographic and temporal scope of the testing, by country; the number of users participating in such testing; the location of such users; the name or names given to the feature during such testing; and the type of data collected during such testing.

**Defendants' Objections:** Defendants object to this request on the grounds that it seeks documents and information about Defendant's activities outside the United States, which is not relevant to the claims or defenses in this case. Defendants additionally object to this request on the ground that "pre-commercial launch testing" is not relevant to the claims or defenses in this case, because use of a term in any pre-commercial launch testing does not constitute use of a trademark in the United States. Defendants further object to this request on the grounds that it is premature pending entry of any protective order, Plaintiff's threatening motion to dismiss, and that the Court may decline to find any trademark infringement. Defendants object to this request as it calls for production of confidential and proprietary information and documents absent entry of a stipulated protective order. Defendants object to this request as vague and ambiguous with respect to the language "temporal scope" as it is undefined. Subject to and without waiving the above general and specific objections, Defendants respond that despite a careful investigation, Defendants did not locate any documents related to beta testing of Defendants' stitch editing feature but will continue to make a diligent search and reasonable inquiry to comply with this request and will produce any other non-privileged testing documents responsive to this request to the extent that any exist. Defendants expressly reserve the right to supplement, clarify, revise, or correct any or all of the responses and objections herein pending its ongoing review and investigations of Defendants' documents and records.

**RFP No. 57:** Documents concerning any pre-September-2020 launch or release of the Stitch

20

Editing Feature (whether or not it was called the Stitch feature at the time) sufficient to show the time of the release; the geographic and temporal scope of the release, by country; the number of users participating in the release; the location of such users; the name or names given to the feature during such release; and the type of data collected during the release.

**Defendants' Objections:** Defendants object to this request on the grounds that it seeks documents and information regarding Defendants' activities not tied to the stitch product feature, and therefore is overly broad and not relevant to the claims or defenses in this case. Defendants additionally object to this request on the ground that "pre-September-2020 launch (whether or not it was called the Stitch feature at the time)" is not relevant to the claims or defenses in this case, and because use of a term in any pre-commercial launch testing does not constitute use of a trademark in the United States. Defendants further object to this request on the grounds that it seeks document and information regarding Defendants' activities outside the U.S. Defendants object to this request as vague and ambiguous with respect to the term "data" as it is undefined. Subject to and without waiving the above general and specific objections, Defendants respond that Defendants have produced all documents related to testing that Defendants have in their possession, control, or custody that referenced the stitch product feature offered on the TikTok platform. Defendants will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non- privileged documents responsive to this request, to the extent any additional responsive documents exist.

**RFP No. 62:** All Documents Concerning Defendants' "Measuring Success" of the Stitch Editing Feature by, *inter alia*, "incremental increase in publish rates," "adoption of the feature within creation," and "% of Total For You VV" as referenced in the document beginning with bates number BYTE_00002035.

**Defendants' Objections:** Defendants object to this request on the grounds that it is overly broad, unduly burdensome, and vague and ambiguous, based on the grounds that the request is unlimited in time and scope and does not contain any ending Bates number. Defendants interpret this request as referring to the page produced as BYTE_00002044. Defendants object to this request based on the grounds that it assumes that the phrases shown in Bates Number BYTE_00002044 refer to the stitch editing feature or that Defendants actually used any metrics to measure any "success" attributable to the stitch editing feature used by TikTok platform users. Subject to and without waiving the above general and specific objections, Defendants respond that to the extent that Plaintiff intended to reference BYTE_00002044, Defendants are not aware of any document responsive to this request other than BYTE_00002044. Without conceding that the following categories of information are used for "Measuring Success", Defendants will produce documents sufficient to show the following information: (a) the number of users in the U.S. who have used the stitch editing feature to create a video; (b) the number of videos created using the stitch editing feature in the U.S.; and (c) the number of views by U.S. users of videos created using the Stitch feature. Defendants will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non- privileged documents responsive to this request, to the extent any such documents exist.

**RFP No. 63:** Documents Concerning any way in which Defendants measured the success of the Stitch Editing Feature.

**Defendants' Objections:** Defendants object to this request as overly broad and unduly burdensome with respect to the phrases "in any way" and "the success." These phrases are vague and ambiguous to the extent they are undefined, and they are unlimited in time and scope. Defendants additionally object to this request on the grounds that it assumes that Defendants in in any way measure the "success" of the stitch editing feature. Defendants object to this request on the grounds that it calls for production of attorney-work product and/or attorney-client privileged documents. Subject to and without waiving the above general and specific objections, and without conceding that the following categories of information are used to measure the success of the stitch editing feature, Defendants will produce documents sufficient to show the following information: (a) the number of users in the U.S. who have used the stitch editing feature to create a video; (b) the number of videos created using the stitch editing feature in the U.S.; and (c) the number of views by U.S. users of videos created using the Stitch feature. Defendants will continue to make a diligent search and reasonable inquiry to comply with this request to produce any non-privileged documents responsive to this request, to the extent any such documents exist.

**RFP No. 64:** Documents Concerning the "mitigation measures and strategies" that Defendants "design[ed]" to combat users who "create entire accounts dedicated to sexualizing another user" as referenced in the document beginning with bates number BYTE_00002049.

**Defendants' Objections:** Defendants object to this request on the grounds that it is irrelevant to the claims or defenses of this case. Defendants additionally object to this request on the grounds that this request is irrelevant to any trademark matter. Defendants further object to this request on the grounds that it is overly broad and unduly burdensome to the extent the request is unlimited in time and scope and does not contain any ending Bates number. Defendants further object to this request based on the grounds that it assumes that the phrases shown in referenced document refer to the stitch editing feature. Defendants object to this request on the grounds that it calls for production of attorney-work product and/or attorney-client privileged documents. Defendants object to this request to the extent the substantive value of the requested information is substantially outweighed by a danger of unfair prejudice to Defendants. Subject to and without waiving the above general and specific objections, Defendants will not produce documents in response to this request.

**RFP No. 65:** All Documents Concerning Defendants' decision to change the name of the "Clips Feature" to the "Stitch Feature," including Documents Concerning the reason why Defendants chose the brand "Stitch" over the other names proposed in the document beginning with bates number BYTE_00002082.

**Defendants' Objections:** Defendants object to this request on the grounds that it falsely assumes that Defendants used, use, intended to use, and/or "chose" the word stitch as a trademark or "brand." Defendants object to this request on the grounds that it falsely assumes that Defendants at any time used, intended to use, adopted, and/or chose the name "Clip Feature" or changed the name to "Stitch Feature." Defendants further object to this request on the grounds that it calls for production of attorney-work product and/or attorney-client privileged documents. Defendants object to this request on the grounds that it is overly broad and unduly burdensome based on the grounds that the request is unlimited in time and scope

1 and does not contain any ending Bates number. Subject to and without waiving the above
2 general and specific objections, Defendants respond that Defendants are not aware of any
3 document responsive to this request other than BYTE_00002082 and BYTE_00002083,
which state that "'Clip' is the current placeholder name" for an upcoming feature.
4 Defendants will continue to make a diligent search and reasonable inquiry to comply with
5 this request to produce any non-privileged documents responsive to this request, to the extent
any such documents exist.

6 **RFP No. 67:** All Documents Concerning the number of posts created using the Stitch Editing
7 Feature, globally. **[As narrowed, the RFP is for documents sufficient to show the**
**number of posts in the US and in the UK.]**

8 **Defendants' Objections:** Defendants object to this request on the grounds that it is
9 overbroad, irrelevant, and not tied to any claims or defenses of this case, because it seeks
Documents and information relating to Defendants' global user information that has no
10 connection to this domestic dispute. Defendants additionally object to this request on the
11 grounds that it is overly broad and unduly burdensome because the request is not limited in
time or jurisdiction. Defendants further object to the phrase "number of posts" as vague, and
12 ambiguous on the grounds that it relies on words or terms that are undefined. Subject to and
13 without waiving the above general and specific objections, Defendants will produce
documents sufficient to show the following information: (a) the number of users in the U.S.
14 who have used the stitch editing feature to create a video; (b) the number of videos created
using the stitch editing feature in the U.S.; and (c) the number of views by U.S. users of
15 videos created using the Stitch feature.

16 **RFP No. 68:** All Documents Concerning the number of views of posts created using the
17 Stitch Editing Feature, globally. **[As narrowed, the RFP is for documents sufficient to**
**show the number of views in the US and in the UK, regardless of the country of origin**
18 **of the post viewed, regardless of the language in which the Stitch Editing Feature**
**appears.]**

19 **Defendants' Objections:** Defendants object to this request on the grounds that it is
20 overbroad, irrelevant, and not tied to any claims or defenses of this case, because it seeks
Documents and information relating to Defendants' global user information that has no
21 connection to this domestic dispute. Subject to and without waiving the above general and
22 specific objections, Defendants will produce documents sufficient to show the following
information: (a) the number of users in the U.S. who have used the stitch editing feature to
23 create a video; (b) the number of videos created using the stitch editing feature in the U.S.;
and (c) the number of views by U.S. users of videos created using the Stitch feature.

24 **RFP No. 71:** All documents concerning how the Stitch Editing Feature should be
25 referenced or depicted, including without limitation, branding guidelines.

26 **Defendants' Objections:** Defendants object to this request based on the grounds that it
27 contains the vague and ambiguous phrase "should be referenced or depicted (emphasis
added)" that seeks information, Documents, or Things subject to the attorney-client privilege,
work product doctrine, or other applicable privilege, rule, or duty of confidentiality that
28 precludes or limits the disclosures of such information and Documents. Defendants

1  additionally object to this request as overly broad and burdensome based on the grounds that
2  the phrases "All documents" and "without limitation" (emphasis added) are overbroad,
   unlimited in scope, time, jurisdiction, and not tied to the claims or defenses in this case.
3  Defendants further object to the language "referenced or depicted" based on the ground that
4  it is vague and ambiguous because it relies on a term that is undefined. Subject to and
   without waiving the above general and specific objections, Defendants further respond that
5  after a diligent search and reasonable inquiry to comply with this request to produce any non-
   privileged documents responsive to this request, Defendants did not locate any documents
6  responsive to this request.

7  **RFP No. 72:** Documents sufficient to show every advertisement that has run or is planned to
8  run on the TikTok platform (or any other platform offering the Stitch Editing Feature) that
   references the Stitch Editing Feature in its caption, such as:

9  https://www.tiktok.com/@nba/video/6936242493725904133?referer_url=https%3A%2F%2F
10 neilpatel.com%2F&referer_video_id=6936242493725904133&refer=embed

11 which directs users to "Stitch your reply to this video!"

12 **Defendants' Objections:** Defendants object to this request to the extent that it seeks
   information that is not limited in geographic scope or time. Defendants object to this request
13 as overly broad, unduly burdensome, and not proportional to the needs of this case to the
14 extent it seeks "every advertisement" (emphasis added) including any advertisement "that
   has run or is planned to run." Defendants further object to the term "advertisement" based on
15 the ground that it is vague and ambiguous because it is undefined. Defendants further object
   to this request because it mischaracterizes the NBA video at the hyperlink as an
16 advertisement. Defendants further object to this request as vague and ambiguous to the extent
17 it assumes Defendants have any input, direction, or control over users posting a video that
   "references the Stitch Editing Feature in its caption." Defendants additionally object to this
18 request on the grounds that it calls for production of Documents and Things which
   disclosures are prohibited by the Stored Communications Act, 18 U.S.C. Chapter 121 §§
19 2701–2710. Defendants additionally object to this request on the grounds that it calls for
20 documents that contain proprietary and confidential business and financial information,
   including information constituting or pertaining to trade secrets, personnel information
21 and/or other commercially sensitive product research and development information.
   Defendants further object to this request as duplicative of other discovery requests. Subject to
22 and without waiving the above general and specific objections, Defendants will not produce
   documents responsive to this request.[18]
23
24 **RFP No. 73:** Documents sufficient to show the amount of revenue that Defendants have
   received from the advertisements referenced in Request No. 72.
25

_____

26 [18] Defendants denied the existence of responsive documents and so on July 28, 2022,
   Plaintiff provided four more links to TikTok ads calling for use of the Stitch Editing
27 Feature, including two with Adidas calling for use of the Stitch Editing Feature, one
   where Bartleby actually says #ad in the caption along with #stitch and one from Urban
28 Decay using #stitchthis in the caption.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY
DISPUTES

**Defendants' Objections:** Defendants object to this request to the extent that it seeks information that is not limited in geographic scope or time and not tied to the claims or defenses in this case. Defendants further object to this request on the grounds that it falsely assumes Defendants generate revenue directly from or as a result of user posts and/or views. Defendants additionally object to this request as duplicative of other discovery requests. Defendants additionally object to this request on the grounds that it calls for production of Documents and Things which disclosures are prohibited by the Stored Communications Act, 18 U.S.C. Chapter 121 §§ 2701–2710. Defendants additionally object to this request on the grounds that it calls for documents that contain proprietary and confidential business and financial information, including information constituting or pertaining to trade secrets, personnel information and/or other commercially sensitive product research and development information.   Subject to and without waiving the above general and specific objections, Defendants further respond that after diligent search and reasonable inquiry to comply with this request that to produce any non-privileged documents responsive to this request, Defendants did not locate any documents responsive to this request.

**RFP No. 74:** Documents showing the number of videos created utilizing the Stitch Editing Feature that have been removed from the TikTok platform (or any other platform that offers the Stitch Editing Feature) by content moderators for violating TikTok's rules, from the time of the beta release of the Stitch Editing Feature to current.

**Defendants' Objections:** Defendants object to this request on the grounds that it is irrelevant to the claims or defenses of this case. Defendants further object to this request on the grounds that this request is irrelevant to any trademark matter. Defendants additionally object to this request on the grounds that it is overly broad and unduly burdensome to the extent the request is unlimited in time and scope. Defendants object to this request to the extent it assumes there was a public "beta release of the Stitch Editing Feature." Defendants further object to this request to the extent the substantive value of the requested information is substantially outweighed by a danger of unfair prejudice to Defendants. Subject to and without waiving the above general and specific objections, Defendants will not produce documents in response to this request.

**RFP No. 75:** Representative samples of posts created using the Stitch Editing Feature that Defendants removed (or that Defendants had removed by content moderators) from the TikTok platform (or any other platform that offers the Stitch Editing Feature) for depicting child sexual abuse, rape, torture, bestiality, beheadings, suicide, and murder.

**Defendants' Objections:** Defendants object to this request on the grounds that it is irrelevant to the claims or defenses of this case. Defendants further object to this request on the grounds that this request is irrelevant to any trademark matter. Defendants additionally object to this request on the grounds that it is overly broad and unduly burdensome to the extent the request is unlimited in time and scope. Defendants additionally object to this request on the grounds that it calls for production of Documents and Things which disclosures are prohibited by the Stored Communications Act, 18 U.S.C. Chapter 121 §§ 2701– 2710. Defendants further object to this request to the extent the substantive value of the requested information is substantially outweighed by a danger of unfair prejudice to Defendants. Subject to and without waiving the above general and specific objections, Defendants will not produce documents in response to this request.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RFP No. 76:** Documents showing the amount of time or the average amount of time that the videos described in Request Nos. 74 and 75 were publicly available prior to being removed.

**Defendants' Objections:** Defendants object to this request on the grounds that it is irrelevant to the claims or defenses of this case. Defendants further object to this request on the grounds that this request is irrelevant to any trademark matter. Defendants additionally object to this request on the grounds that it is overly broad and unduly burdensome to the extent the request is unlimited in time and scope. Defendants further object to this request to the extent the substantive value of the requested information is substantially outweighed by a danger of unfair prejudice to Defendants. Subject to and without waiving the above general and specific objections, Defendants respond that after diligent search and reasonable inquiry to comply with this request to produce any non-privileged documents responsive to this request, Defendants did not locate any documents responsive to this request.

According to FRCP 26(b)(1), "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Courts have found that "to the extent responsive documents exist in [a party's] possession, custody, or control, [that party] […] has a duty to undertake a diligent search and reasonable inquiry in order to adequately respond to requests for production." *Burnett v. United States*, No. EDCV 15-1707-CAS (KKx), 2016 U.S. Dist. LEXIS 77503, at *16 (C.D. Cal. June 14, 2016).[19]  Furthermore, parties "ha[ve] an ongoing obligation to supplement or correct discovery responses in a timely manner." *Id*. at 18.

On March 1, 2022, the court entered an Order setting forth the parties' protocol for the production of hard copy documents and electronically stored information ("ESI Protocol").  The parties' obligations under the ESI Protocol include the following, which Defendants have failed to abide by, as discussed under each bullet:

- Cooperation and a commitment to cooperate in good faith throughout the matter (ESI Order at I(B))
  - Defendants have failed to abide by the cooperation requirement of the ESI Protocol as Defendants continue to unreasonably delay discovery at every step.

---

[19] Courts construe this provision broadly to include "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

- An obligation to take reasonable and proportional steps to preserve discoverable information in the parties' possession, custody, or control (ESI Order at I(E))
  - o Defendants' refuse to share the date on which their two custodians ran search terms and have not specified whether and to what extent a litigation hold was implemented, its substance or recipients; Defendants also have not provided information concerning the date on which a lock on deletion of Lark documents was implemented.

- Sources – Parties shall make reasonable efforts to identify documents and ESI potentially relevant to this Action from all identified sources of potentially responsive information (ESI Order at II(B))
  - o Based on the limited number of documents produced by Defendants and testimony from the two custodians who have searched for responsive documents, it is clear that Defendants have not complied with this requirement.

- Preservation of ESI created or received between February 2020 and April 12, 2021 with the understanding that electronic documents relating to damages should be preserved throughout the litigation (ESI Order at II(D)(a))
  - o As mentioned above, Defendants refuse to confirm the date a litigation hold was put into place (if it ever was), the substance of the litigation hold, the recipients of the litigation hold, and how that litigation hold was distributed.

- The Parties shall use best efforts to collect ESI in a manner that does not alter metadata or other file attributes (ESI Order at II(F))
  - o Defendants produced documents that contained embedded links to other documents and information, yet Defendants failed to produce the majority of documents corresponding to those embedded links; Defendants also refused to produce native files and produce documents as PDFs stripped of the required metadata.

- Embedded files, except for images and logos embedded in emails, are to be produced as family groups (ESI Order at IV(J))
  - o Defendants failed to produce documents linked or embedded within other documents and, for the few linked documents that were produced, they were not produced as family groups.

At its core, Defendants have taken no meaningful steps to either abide by the Federal Rules of Civil Procedure or the ESI protocol document they signed. Defendants' goal

27

is clearly to "run out the clock" on discovery.  As such, Defendants should at minimum be ordered to produce these documents within seven days of the Court's order.  That said, Plaintiff strongly believes that the only way to efficiently and effectively obtain the evidence to which it is entitled, is for the Court to order Defendants to contract with a third-party vendor within seven days to have the vendor collect and produce documents from Defendants' systems in response to all RFPs (or at least in response to RFP Nos. 1, 6, 9, 13, 15, 18, 23, 37-40, 55, 57, 62-65, 67-68, and 71-76).

**1B.   Defendants' Response:  Plaintiff's Request to Have a Third Party Conduct Searches of Defendants' Systems Should Be Summarily Rejected.**

For multiple procedural and substantive reasons, Plaintiff's extraordinary claim for relief should be rejected.

**1.  Plaintiff's 11th Hour Motion—Noted For Hearing the Day Before Fact Discovery Closes—Should Be Denied.**

Plaintiff's motion ignores this Court's scheduling order. (Dkt. No. 45).  That order states, in pertinent part, that: "[t]he parties should plan to complete discovery far enough in advance of the discovery deadline to allow for the filing of a discovery motion if necessary and ___*complete the discovery allowed if relief is granted*.__" (emphasis supplied).  Even if Plaintiff was entitled to relief (it isn't), there is no way it can obtain what it seeks in the 24 hours left in the fact discovery period.  There are several, key facts illustrating Plaintiff's lack of diligence in this case or otherwise wasting time on discovery frolics. As Magistrate Judge Kim has previously noted: "Untimeliness is sufficient ground, standing alone, to deny a discovery motion." *KST Data, Inc.*, 344 F. Supp. 3d at 1136 n.1 (internal citation omitted).  That sentiment applies here.

For starters, this case was filed on April 12, 2021.  (Dkt. No. 1.)  Plaintiff did not serve its first set of document requests until November 2021, **nearly 7 months thereafter**.  (Keyes Decl. ¶ 8.)  But even after Plaintiff finally got discovery underway, it wasted mountains of time pursuing groundless discovery that was not

germane to a U.S.-based trademark dispute.

As just one example, take Plaintiff's very first set of document requests (RFP Nos. 1-49) served on November 9, 2021.  (*Id.*)  Many of them are overbroad, have no geographic restrictions, and seek information that has no relevant connection to TikTok's alleged "Stitch" button infringement or its defenses:

**RFP No. 18:** All Documents concerning Defendants' marketing of the TikTok platform for use as an advertising platform.

**RFP No. 23:** Documents sufficient to identify all markets in which the Stitch Editing Feature is currently available globally.

**RFP No. 37:** All Documents concerning Plaintiff.

(*See supra* Section II.1A.)  Despite having served these and other overbroad RFPs shortly before Thanksgiving 2021, Plaintiff waited until shortly before Fall 2022 to tee up a hearing with respect to these requests that Defendants have objected to all along the way.

As another example, Plaintiff fussed around for months on subpoenaing various third-parties.  On approximately March 16, 2022, Plaintiff served Microsoft, Oracle, and Walmart with subpoenas, notwithstanding the reality that those entities have no connection to this lawsuit whatsoever.  (Declaration of B. Brett Heavner ("Heavner Decl.") ¶ 11.)  Plaintiff's counsel spent time negotiating with all of those parties—and Defendants' counsel—trying to cajole them into producing TikTok's documents that had only been provided to them in the first instance by TikTok pursuant to non-disclosure agreements. (*Id.* ¶¶ 11-12.)  Plaintiff's inordinate amount of time on this issue culminated in Plaintiff ultimately *withdrawing the subpoenas* at the discovery hearing on June 1, 2022.  (*Id.* ¶ 12.)  This is another example of Plaintiff's discovery dalliances.

Plaintiff's counsel also spent time ginning up patently-absurd demands related to TikTok's business operations in more than 30 foreign markets.  (Keyes Decl. ¶¶ 2-3.).  At the June 1 hearing, Magistrate Judge Kim indicated that Plaintiff could obtain discovery related to TikTok's use of the Stitch button in other countries so long as

29

1    "Stitch Editing has some kind of presence" in those foreign markets.  (*Id*. ¶ 2, Ex. A

2    ("June 1 Hearing Trans.") at 14:6-8.)   Plaintiff's counsel then made a series of

3    demands for TikTok to produce information in over 30 foreign countries without any

4    explanation of Plaintiff's actual business interests in those countries.   We know

5    Plaintiff's requests for foreign business information was baseless because Stitch

6    Editing's exclusive licensee in the U.S. testified under oath that he did not have a

7    *single customer* in any of those countries.  (Swietlik Trans. at 224:10–226:18).  This

8    was just another maneuver by Plaintiff and its counsel to gum up the discovery

9    process and waste time and energy tilting at windmills.

10         While the foregoing is by no means a complete exposition of Plaintiff's lack of

11   diligence and running amok in discovery, it certainly illustrates Plaintiff's penchant

12   for wasting time and spinning its wheels on needless discovery pursuits.  The motion

13   should be denied for this reason alone.

14            **2.  Plaintiff's Motion Should Also Be Denied for Violating L.R. 37-2.1
                  and Failing to Confer on All Claims for Relief as Required Before
15                Bringing a Discovery Motion.**

16         Plaintiff's motion also violates this Court's Local Rules.  Specifically, L.R. 37-

17   2.1 requires that the moving party reproduce "**<u>verbatim</u>**" both the discovery request at

18   issue "and the allegedly insufficient answer, followed by each party's contentions as

19   to that particular" discovery requests.  L.R. 37-2.1.  Here, Plaintiff alleges Defendants

20   failed to produce documents with respect to 54 Requests for Production.  (*See supra*

21   Section II.1A.)  Nowhere does Plaintiff identify those 54 Requests.  Rather, Plaintiff

22   lists 25 Requests and Defendants' Responses thereto. (*Id.*) With respect to the 29

23   unidentified Requests, the Court should deny Plaintiff's requested relief for failure to

24   comply with the local rules.  *See Tri-Valley CAREs v. Dep't of Energy*, 671 F.3d

25   1113, 1131 (9th Cir. 2012) ("Denial of a motion as the result of a failure to comply

26   with local rules is well within a district court's discretion.").

27         Similarly, even for the 25 Requests that are reproduced above, Plaintiff did not

28   include these in their July 28 letter and the Parties did not meet and confer regarding

these requests on either July 25 or August 1.  (*See* Keyes Decl. Ex. C.)  This motion is the first time Plaintiff has identified the 25 Requests.  Further, Plaintiff fails to address Defendants' specific objections and responses to these Requests or explain why it believes Defendants' production to be deficient with respect to each Request.  Rather, Plaintiff seems to assume that its Requests are non-objectionable, that responsive documents exist with respect to each Request, and that Defendants necessarily failed to produce responsive documents due merely to the relatively small number of documents that exist relating to the stitch feature.

The reality is that many of Plaintiff's Requests are hopelessly overbroad and seek irrelevant information or seek information that does not exist.  As the Court knows, Plaintiff has sought global discovery necessarily alleging that Defendants' free, non-revenue producing "Stitch" button infringed Plaintiff's **U.S.** trademark rights in every foreign country where the TikTok app is available.   (Keyes Decl. ¶ 2.) Because there is no basis in fact, law, or common sense for this concocted liability theory, Defendants objected to nearly every Request for Production as overly broad, unduly burdensome, and disproportionate.  At the June 1 hearing, the Court ordered Plaintiff to limit its discovery requests to "countries where Stitch Editing has some kind of presence."   (June 1 Hearing Trans. at 14:6-8.)    Nonetheless, Plaintiff continued to seek discovery relating to over 30 foreign countries.  (Keyes Decl. ¶ 3, Ex. B.)  The Court again considered this issue on July 5, and limited discovery to the US and UK, including content created outside of but accessible in the US and UK. (*Id*. ¶ 4.)

Beyond Plaintiff's unreasonable global requests, several of the Requests for Production are objectionable and Plaintiff fails to present any argument to suggest otherwise.  In particular, Defendants lodged several objections to Request Nos. 18, 64, 72, 74, and 75 and indicated it would not be producing any documents and lodged several objections to Request Nos. 40, 71, 73, and 76 and responded that no responsive documents exist in response to those requests.

31

1      For other Requests, Defendants *did* produce responsive documents and are

2  unable to ascertain why Plaintiff alleges otherwise.  For example, Request No. 1 seeks

3  "all documents concerning Defendants' conception, creation, selection, adoption, and

4  release of the name 'Stitch'. . . ."  Defendants produced "namestorming" documents

5  showing alternative names Defendants considered for the stitch tool and documents

6  showing why Defendants abandoned the alternative names.  Plaintiff is well aware of

7  these documents and asked both Ms. Tachibana and Mr. Buzinover about them during

8  their depositions.  (*See* Buzinover Trans. at 79:6-13 (line of questioning relating to

9  "exhibit 4 from the deposition of Ms. Tachibana" which is a "name storm"

10 document).)  Plaintiff even references one of these documents in Request No. 65.

11     As another example, Defendants made a supplemental production on August 2,

12 that contained updated information relating to the use of the Stitch tool, such as the

13 number of users who have created stitched videos in the US and UK, the number of

14 views of stitch videos in the US and UK, and the number of videos created using the

15 Stich tool in the US and UK.  (Keyes Decl. ¶ 5.)  This is responsive to Request Nos.

16 67 and 68.  Mr. Reggio even provided testimony about the updated August 2 metrics

17 in his deposition.  (Reggio Trans. at 121:16-23.)

18     The same could be said for the remaining Requests for Production.  Defendants

19 have produced responsive documents and Plaintiff's conclusory assertion that

20 Defendants' production with respect to the 25 Requests is deficient comes nowhere

21 close to satisfying its burden under Local Rule 37-2.1.  "While Plaintiff may be

22 disinclined to trust Defendants' discovery responses, he is in a position no different

23 than any other civil litigant:  in the absence of legal or fact-based substantive

24 deficiencies, he is required to accept the responses provided.  Mere distrust and

25 suspicion regarding discovery responses do not form a legitimate basis" for a Motion

26 to Compel.  *Daniels v. Securitas Sec. Servs. USA, Inc.*, No. 8:18-cv-265-CJC (SK),

27 2021 U.S. Dist. LEXIS 251232, at *2 (C.D. Cal. Nov. 4, 2021) (Kim, M.J.).

28     In short, Plaintiff's motion flaunts L.R. 37 and otherwise fails to address why or

how Defendants' responses, objections, or productions are deficient with respect to each of the 25 Requests for Production.  Its Motion to Compel should be denied for this reason as well.

### 3. There is Absolutely No Valid Basis for The Court to Order That a Third-Party Vendor Verify or Re-Conduct Defendants' Comprehensive Searches of its Systems.

For multiple, independent reasons, this Court should flatly reject Plaintiff's request to give an unidentified third-party access to Defendants' systems.  As set forth below, Plaintiff's request is riddled with inaccuracies and misstatements.

<u>First</u>, courts only order third-party vendors to search a party's electronic records in very limited circumstances, such as if there is "technical incompetence" on the part of the producing party, "demonstrated attempt[s] to secrete evidence;" *Lifeguard Licensing Corp. v. Kozak*, No. 15 Civ. 8459 (LGS) (JCF), 2016 U.S. Dist. LEXIS 68724, at *12 (S.D.N.Y. May 23, 2016), or evidence that the party is "willfully hiding information from Plaintiff's and the Court." *Engeling v. Bashlin Indus., Inc.*, No. 4:14-cv-210-HLM, 2018 U.S. Dist. LEXIS 233474, at *17 (N.D. Ga. Sept. 20, 2018). Merely having a "hunch" that more responsive documents exist fails to meet that standard.  As Magistrate Judge Kim previously observed, "speculation that *more* documents must is exist is no basis for a compulsory discovery order of any kind." *Happy Place, Inc. v. Hofesh, LLC*, No. 2:15-cv-6915-ODW (SKx), 2019 WL 4221400, at *2 (C.D. Cal. May 17, 2019) (emphasis in original); *see also Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008) ("Courts supervising discovery are often confronted by the claim that the production made is so paltry that there must be more that has not been produced or that was destroyed.  Speculation that there is more will not suffice; if theoretical possibility that more documents exist sufficed to justify additional discovery, discovery would never end.").

The only case Plaintiff relies on from this District to support its claim for third-party access to Defendants' systems similarly provides that Plaintiff's mere belief "that additional communications and other documents exist" is necessarily "based

33

1    only on **speculation** and lacks conclusive proof that responsive documents are

2    actually being withheld." *MGA Entm't, Inc.*, 2012 U.S. Dist. LEXIS 196271, at *6-7

3    (emphasis in original).  Indeed the Court did *not* require third-party verification or

4    access in that case.  *Id.* at *7 ("Plaintiff's request for an Order compelling a forensic

5    examination of Defendants' computers is DENIED.")

6        Second, the actual facts show that Defendants took reasonable steps to ensure

7    responsive information was preserved, that adequate searches were performed, and

8    that responsive documents were produced (and will continue to be produced in the

9    coming days).  Defendants issued a litigation hold on April 15, 2021, three days after

10   the Complaint was filed.  (Heavner Decl. ¶ 2.)  In addition, nearly a year before the

11   Complaint was filed, Defendants disabled auto-delete functions in its primary

12   communication and document management system, Lark. (Solow Decl. ¶ 13.)

13       Plaintiff served eight sets of Requests for Production on the following dates:

14   November 9, 2021, and earlier this year on January 26, March 16, April 14, May 5,

15   May 19, June 13, and July 20.  (Keyes Decl. ¶ 7.)  Defendants began searching its

16   systems in September 2021, over a month before Plaintiff served its first set of

17   discovery requests.  (Heavner Decl. ¶ 9.)  Defendants produced responsive documents

18   on September 30, 2021, November 8, 2021, and then again this year on February 7,

19   March 16, March 22, March 23, April 4, May 3, May 31, June, 24, and August 9.

20   (Keyes Decl. ¶ 8.)  It also provided updated metrics regarding "stitched" videos on

21   August 2.  (*Id.* ¶ 5.)  Contrary to Plaintiff's assertion, Defendants have produced 505

22   distinct documents.  Included in the 505 documents are at least 134 "internal"

23   documents and 65 emails.  (*Id.* ¶ 8.)  Defendants have been diligent.

24       Third, Plaintiff is simply wrong that Defendants' e-discovery practice was

25   custodian-led with no oversight from counsel.  Outside counsel met with in-house

26   counsel repeatedly throughout discovery to discuss Plaintiff's Request for Production

27   and to frame search questions designed to locate responsive documents.  (Heavner

28   Decl. ¶ 8.)  The relevant custodians then conducted searches to locate any potentially

responsive documents, using the questions developed by in-house and outside counsel as a guide.  (*Id.* ¶ 9.)  Later, to ensure that all potentially responsive documents had been captured, counsel provided search terms to Defendants' custodians.  (*Id.* ¶ 14.)  Plaintiff's counsel has confirmed that the search terms were appropriately tailored to capture responsive information.[20]  Any potentially responsive information found by the custodians was captured by Defendants' experienced e-discovery and Forensics teams, as discussed below, and provided to outside counsel for review and production.  (Solow Decl. ¶ 8.)

The cases that Plaintiff relies on are readily distinguishable.  For example, in *Optrics Inc. v. Barracuda Networks Inc.*, the client performed all searches, with no supervision, and the client has "no experience with electronic discovery."  2021 U.S. Dist. LEXIS 21738, at *23-24.  Similarly, in *Rodman v. Safeway, Inc.*, the one custodian only searched for responsive documents by looking at the file name of documents, not their contents, and had no assistance from either "in-house or outside counsel or IT personnel."  2016 U.S. Dist. LEXIS 139305, at *10.  Here, in-house and outside counsel provided the custodians with questions and search terms to guide their search and Defendants' e-discovery and Forensics teams captured all identified information.

<u>Fourth</u>, Plaintiff's motion also fails to acknowledge what Plaintiff has known for months: that Defendants have relatively few responsive documents because they use a collaborative, proprietary system called Lark for all of its internal communications and documents.[21]  (Solow Decl. ¶¶ 2-4.)  Lark has a built in chat feature, which is the primary means of communication between Defendants' employees.  (*Id.* ¶ 2.)  Lark also has a document creation, sharing, and editing feature, which is the primary word processing system used by Defendants' employees.  (*Id.*)

---

[20] Plaintiff's lead counsel, Mr. Skale, confirmed at the Informal Discovery Conference on July 5, 2022, that the search terms were appropriate.
[21] Plaintiff claims to have only learned of Lark on June 24, 2022.  To the contrary, Lark is referenced in several documents and emails produced by Defendants as early as May 5, 2022.  (Heavner Decl. ¶ 13.)

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1   Any employee with access to a Lark chat thread or Lark document may send or
2   receive a message in the Lark chat thread or contribute to a Lark document.  (*Id*. ¶¶ 3-
3   4.)

4          There are no administrative or back-end search capabilities in the Lark system,
5   meaning administrators cannot perform a search across multiple custodians.  (*Id*. ¶ 5.)
6   However, individual users can search within Lark using keywords and terms.  (*Id*.)
7   When a user performs a search in Lark, the results will show all chat threads and
8   documents containing a given search term within the content of the chat or document,
9   even if the person conducting the search did not create or is not the current owner of
10  the chat thread or document.  (*Id*.)  Lark also does not have native capabilities to
11  export data or documents.  (*Id*. ¶ 6.)  Due to the search and export limitations, during
12  e-discovery, relevant custodians have to search for documents and then provide links
13  or identifying information to Defendants' e-discovery and forensics team.  (*Id*. ¶ 7.)
14  The e-discovery and forensics teams can then generate copies of documents (for
15  example, by printing them to PDF) and provide them to outside counsel for review.
16  (*Id*. ¶ 6.)  For Lark chats, the process is even more laborious.  Defendants engineering
17  teams had to create a solution to allow the chats to be exported in a legible format.
18  (*Id*. ¶ 9.)

19         <u>Fifth</u>, While preparing the ESI stipulation for this case (Dkt. No. 67)
20  Defendants' counsel informed Plaintiff's counsel that its systems did not preserve
21  metadata in the way that Plaintiff was demanding and that it was not searchable in the
22  same manner as most systems.  (Heavner Decl. ¶ 3.)  Specifically, Defendants
23  proposed edits to the ESI order on January 20, 2022 to reflect the complications
24  Defendants expected due to the limitations of its systems, such as that Lark cannot be
25  searched using key words at an administrative level.  (*Id*. ¶ 4.)  On approximately
26  February 1, 2022, counsel for the Parties had a meet and confer.  (*Id*. ¶ 5.)  During the
27  meet and confer, Defendants' counsel explained that Defendants' systems did not
28  create the metadata that Plaintiff was seeking and that they did not store documents in

36

1   the same way that most systems store documents. (*Id.*)  On February 15, 2022,

2   Defendants' counsel met with Plaintiff's e-discovery expert.  (*Id.* ¶ 6.)   At this

3   meeting, Defendants' counsel again informed Plaintiff of the unique limitations of

4   Defendants' systems and informed Plaintiff again that Defendants' systems could not

5   generate the metadata that Plaintiff was seeking.  (*Id.*)  This is why the ESI order is

6   subject to the parties "best efforts" to collect ESI in a manner that does not alter

7   metadata or other file attributes.  (Heavner Decl. ¶ 7; ESI Order at II(F).)  Plaintiff has

8   known of the limitations of Defendants' systems since at least as early as January

9   2022.

10       Sixth, In this case, Mr. Michael Buzinover, the Product Manager for the Stitch

11  feature, and Ms. Miwa Tachibana, the Product Operations lead for the Stitch feature,

12  conducted searches within Lark.  (Heavner Decl. ¶ 9.)  As discussed above, they were

13  given specific questions, relating to Plaintiff's Requests for Production, to guide their

14  search and subsequently used very broad search terms, including "stitch" and "stitch

15  editing" to ensure they captured all potentially responsive information.  (*Id.* ¶ 14; *see*

16  *also* Cormier Decl. Ex. B.)  They testified that, between them, they would have access

17  to all stitch-related Lark chats and documents.  (Buzinover Trans. at 98:9-14.)  Mr.

18  Buzinover also testified that Lark is the only place documents relating to the stitch

19  feature would be located.  (Buzinover Trans. at 78:5-11 ("Q.  Okay. If you needed to

20  locate electronic documents relating to the naming of the Stitch Editing feature, where

21  would you look?  A. Lark.  Q. Anywhere else?  A. E-mail, but I can only imagine

22  Lark being the place that those documents would exist.").)  He also testified that

23  sources such as Figma[22] and Meego[23] would not contain any additional responsive

24  information that is not reflected in Lark.  (Buzinover Trans. at 59:21-60:4 ("there

25  wouldn't be anything really different from Lark documents [in Figma]. . . . I searched

27  [22]  Figma is a design software used to create screens showing what a product would
look like.  (Buzinover Trans. at 59:21-25.)
28  [23]  Meego is a task manager used to assign tasks to team members.  (Buzinover Trans.
at 60:1-4.)

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY
DISPUTES

1   Meego but it's like a task manager, so it's no different, really, there's no

2   documentation in it.").

3       <u>Seventh</u>, Defendants' e-discovery and Forensics team has been diligently

4   processing Lark documents identified by the custodians and providing copies to

5   counsel for review.  (Solow Decl. ¶¶ 8-9.)  Defendants' counsel has reviewed Lark

6   documents upon receipt from the e-discovery and Forensics teams and produced any

7   they deemed responsive.  (Heavner Decl. ¶ 10.)  As for the Lark chats, the engineering

8   team has been diligently working on an extraction software solution and expects to

9   provide the chat threads to counsel in the coming days.  (Solow Decl. ¶ 9.)

10      Although Lark is the primary means of communication, Defendants

11  occasionally use Gmail and the suite of Google products, such as Google Drive and

12  Google Documents, as well as Dropbox.  (<i>Id</i>. ¶ 10.)  For this case, the custodians

13  searched their Gmail accounts and the Google administrator conducted searches

14  across sixteen custodians identified by counsel, using the same search terms that

15  Plaintiff's counsel confirmed were adequate. (<i>Id</i>.) Outside counsel then reviewed the

16  located emails and documents and produced those it deemed relevant.   (<i>Id</i>.)

17  Defendants' production of documents from the Google suite will be complete in the

18  next week.  (Solow Decl. ¶ 10.)

19      <u>Eighth</u>, Plaintiff makes a number of spurious accusations that Defendants have

20  supposedly made "repeated false assertions about the existence of documents."

21  Plaintiff's contentions are demonstrably wrong.

22  • Plaintiff takes issue with Defendants' accurate representation that there was no

23      "beta" release of the stitch feature.  As was explained to Plaintiff several times,

24      and as Ms. Tachibana testified, Defendants did enable "beta for ambassadors

25      and design" for purposes of creating a "Stitch" button tutorial video.  (Keyes

26      Decl. ¶ 22, Ex. H ("Tachibana Trans.") at 181:1-9.)  And Defendants produced

27      emails and documents relating to that "beta" enablement as early as May 5,

28      2022, including the documents referenced by Plaintiff above. (Keyes Decl.

38

¶ 12.)  Defendants also conducted "A/B testing" and confirmed to Plaintiff at least as early as June 21, 2022 that A/B testing occurred.  (*Id.*)  Both Ms. Tachibana and Mr. Buzinover testified about the A/B testing.  Defendants have not been hiding any of this information from Plaintiff.

- Plaintiff claims that Defendants have misrepresented the search capabilities of the Lark system.  Not so.  As Plaintiff correctly notes, Defendants told Plaintiff months ago that there is "no central network or database through which [Defendants] can search for documents."  (Cormier Decl. Ex. B.)  This is because there is no back-end search capability for the Lark system.  (Solow Decl. ¶ 5.)  However, as Plaintiff notes, relevant custodians *did* search for information in Lark.

- Plaintiff alleges Defendants are withholding documents relating to clearing the Stitch feature through legal review.  However, as discussed below, the only Requests that arguably seek this information are Requests directed to trademark clearance reports or legal review relating to the name "Stitch."  (*See infra* Section II.5B.)  When asked "did you run the name [stitch] through legal?"  Mr. Buzinover responded "I don't believe so. . . . I know I ran the *feature concept* through legal, but I can't recall any discussion about the name."  (Buzinover Trans. at 67:14-19)  Defendants have repeatedly confirmed to Plaintiff that there was no trademark clearance search relating to "Stitch" and that the name was not run through legal.  Defendants are not withholding any responsive documents or misrepresenting any facts.

- Plaintiff complains that when it asked Defendants to locate a specific document—the Stitch Promo Schedule—Defendants located and produced that document.  Due to the limitations with exporting information from the Lark system, the metadata was not linking the Stitch Promo Schedule with the previously produced document.  (Keyes Decl. ¶ 14.)  And because elements from other documents and systems are populated in Lark documents,

39

Defendants believe the Stitch Promo Schedule to be populated in the previously produced document. (*Id.*)  Yet, Defendants investigated the issue and located and produced the Stitch Promo Schedule.

The alleged "false assertions" are in reality examples of Plaintiff's counsel misunderstanding the issues or examples of Defendants' good faith attempts to address Plaintiff's concerns.

In short, Defendants' search was reasonable and calculated to capture all potentially responsive information.  This satisfies Defendants' discovery obligations. *See Lauris v. Novartis AG*, No. 1:16-cv-00393-LJO-SAB, 2016 U.S. Dist. LEXIS 170203, at *12-14 (E.D. Cal. Dec. 7, 2016) (a "reasonably comprehensive search" of "key custodians" is adequate) (citing *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006)).  The Plaintiff's requested relief should be denied.

### 2A.   The Court Should Order Defendants to Produce Documents Embedded in Links

As discussed in section 1A, Defendants have an obligation to collect ESI in a manner that does not alter metadata or other file attributes (ESI Order at II(F)) and also have an obligation to produce embedded links.  Defendants have failed to produce the embedded links on the majority of the internal documents that they have produced to date.  These links, along with accompanying metadata, are necessary for Plaintiff to understand the information contained within the documents.  Moreover, the documents themselves are plainly responsive.  The following chart shows all of the linked documents that have yet to be produced (from the meager 21 internal-document production):

| Bates Number | Description of link/name |
|---|---|
| BYTE_00002036 | Meego:<br>https://meego.bytedance.net/aweme/story/detail/111529 |
| BYTE_00002044 | Stitch (Hero) Tutorial Video (Complete script for tutorial video)<br>Video |
| BYTE_00002044 | UGC Stitch Walkthrough |
| BYTE_00002045 | A: No, the UGC feature will be released first. No estimated deadline for the PGC feature yet. |

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

| Bates Number | Description of link/name |
|---|---|
| BYTE_00002049 | http://vm.tiktok.com/5CSQTX/<br>http://vm.tiktok.com/5CyXgP/<br>http://vm.tiktok.com/54k285/<br>http://vm.tiktok.com/5CBkvE/<br>http://vm.tiktok.com/fbHkbb/ |
| BYTE_00002051 | Link to Figma: Figma |
| BYTE_00002069 | Link to Starling:<br>https://starling.bytedance.net/project_detail/385/demand/3581 |
| BYTE_00002074 | Template for A/B Testing on Doyin&TikTok |
| BYTE_00002077 | Link for Legal review result:<br>https://legal.bytedance.net/complaince/detail?id=155 |
| BYTE_00002077 | Comprehensive Review |
| BYTE_00002082 | "Clip" is the current placeholder name for our upcoming video splicing feature. |
| BYTE_00002082 | "Clip" is commonly used in our app UI. Live Strings: Clips |
| BYTE_00002318, BYTE_00002321 | We're creating a tutorial video to promote a new upcoming feature, UGC Stitch. |
| BYTE_00002324 | The marketing team finished the list of existing UGC that we'd like to get permission to use in the Stitch tutorial. We'd only need to use 1 video from the list:<br>https://bytedance.feishu.cn/docs/doccnl4hRQsqxWS6JrUbR5o947f |
| BYTE_00002325, 2327, 2330, 2334, 2338, 2342, 2345, 2348, 2350, 2354, 2357, 2360, 2363, 2366, 2370, 2375, 2377, 2381, 2384, 2388, 2393, 2400, 2405, 2407, 2411, 2416, 2419, 2423, 2427 | We're creating a 30-60sec tutorial video to promote a new upcoming feature, UGC Stitch. We want to ask creators to make content for this tutorial video, similar to how we did for Pinning Stickers. |
| BYTE_00003122 | Design:<br>https://www.figma.com/file/JCXC5qUqpVvJ26aPblpzma/In-Design-%Ryan?node-id=1592%3A9639 |
| BYTE_00003122 | PRD: Product Strategy: Splice UGC clips within user videos |
| BYTE_00003122 | Overview: Quick design sketch-up |
| BYTE_00003122 | https://www.filmsite.org/filterms.html |

   Plaintiff requests that Defendants be ordered to produce the linked documents, as a complete family with their parent documents, with all metadata intact, within

1
2

seven days, and that they be ordered to continue producing any embedded documents in this fashion.

3
4

**2B.**   <u>Defendants' Position</u>:  **Plaintiff Misstates the ESI Order, Ignores Potential Redundancies, and Simply Assumes All Links are Responsive When They Clearly Are Not.**

5
6
7
8
9
10
11

The Court should also reject this request for relief.  Plaintiff makes no argument as to why the information in the above links is relevant or otherwise suggests that there is any discoverable information contained therein.   The only thing Plaintiff points to is the ESI order, which provides that "embedded files, except for images and logos embedded in email, are to be produced as family groups."  (Dkt No. 67 § II.J.) The ESI order does <u>*not*</u> state that any documents referenced in or hyperlinked in a document must be produced.

12
13

In fact, courts have recognized that producing linked documents is not as simple as it sounds:

14
15
16
17
18
19
20

> At first glance, this process may seem fairly straightforward and analogous to producing email attachments in family relationships. Nevertheless, linked documents can present unique challenges that make them different from email attachments. For example, a responding party may not be able to collect the precise linked document referenced in a message if the document has been modified or deleted. In some instances, users have made linked documents inaccessible by revoking access to files, thus disabling the responding party's ability to collect that information. Finally, linked documents can also create review challenges and inefficiencies given the complexity of connecting those documents to the communications which reference them.

21
22
23
24
25
26
27

*Porter v. Equinox Holdings, Inc.*, No. RG19009052, 2022 WL 887242, at *2 (Super. Ct. Cal. Mar. 17, 2022); *see also Nichols v. Noom*, No. 20-cv-3677 (LGS) (KHP), 2021 U.S. Dist. LEXIS 46860, at *11-12 (S.D.N.Y. Mar. 11, 2021) ("When a person creates a document or email with a hyperlink, the hyperlinked document/information may or may not be necessary to the communication. . . . The Court does not consider the hyperlinked cases to be attachments. A document also may contain a hyperlink to another portion of the same document. That also is not an attachment. A document

28

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1    might have a hyperlink shortcut to a SharePoint folder. The whole folder would not be

2    an attachment. These are just examples.").

3          In addition, producing all linked documents is likely to lead to unnecessary and

4    unduly burdensome redundancy and duplication.  For example, in the table above,

5    Plaintiff identifies *31* documents that link to "UGC Stitch," and the UCG Stitch

6    document *has already been produced* in this matter.  (Keyes Decl. ¶ 11.)  As the Court

7    in *Nichols* noted, "one email thread may contain multiple hyperlinks to the same

8    document that already was flagged for production.  The same underlying hyperlinked

9    document may be pulled tens if not hundreds of times in some cases.  This additional

10   collection would certainly increase the review population and . . . complicate

11   deduplication, delay production, and impose additional costs."   2021 U.S. Dist.

12   LEXIS 46860, at *14.

13         Additionally, Plaintiff simply assumes that the information in every link is

14   responsive and relevant to this case.  Plaintiff's assumption is wrong.  The links

15   relating to comprehensive and legal review are not responsive to any Requests for

16   Production.  As discussed below, Plaintiff requested information relating to trademark

17   clearance reviews, but not other legal reviews.  (*See infra* Section II.5B.)  The

18   "Template for A/B Testing on Doyin&TikTok" generates a blank email template used

19   to request A/B testing.  (Keyes Decl. ¶ 13.)  It is irrelevant.  Defendants have

20   produced the email relating to A/B testing for the Stitch feature, which is the template

21   populated with information relating to Stitch.  (*Id*.)  There is no need for a blank

22   template.

23         Likewise, Mr. Buzinover testified that many links will have no information at

24   all.  Mr. Buzinover testified that he "searched Meego" but because it is "a task

25   manager . . . there's no documentation in it."  (Buzinover Trans. at 60:1-4.)  He also

26   testified that Figma "is a sandbox for designers to make screens, so there wouldn't be

27   anything really different from Lark documents in terms of writing."  (Buzinover

28   Trans. at 59:21-25.)  He also testified that Starling is translation software and that

43

1
2

documents are created in English and then uploaded to Starling for translation. (Buzinover Trans. at 63:14-24.)

3

For all of these reasons, this request should be denied.

4
5

### 3A.   The Court Should Order Defendants to Disclose within Seven Days, When Miwa Tachibana and Michael Buzinover Ran Search Terms

6
7
8
9
10

During her July 7, 2022, deposition Miwa Tachibana testified that she originally only conducted a search based on a list of questions and that she did not run any search terms until much more recently.[24]  Mr. Buzinover testified similarly.[25]  Plaintiff believes that the two custodians did not actually run search terms until after Plaintiff's counsel requested that Defendants produce a list of search terms.

11
12
13
14
15
16
17
18
19
20

Defendants previously agreed to provide the date on which these two custodians ran the search terms that Defendants later provided to Plaintiff in the June 24 letter, but they have not provided this information.  If it turns out that search terms were run six months ago, but documents were only recently produced (or never produced) it supports Plaintiff's arguments that Defendants are knowingly evading discovery, in accordance with FRCP 26.  If it turns out that the custodians did not run searches until Plaintiff's counsel requested proof of good faith searching and compliance with discovery obligations, then that too shows Defendants' failure to meaningfully fulfill their obligations.  In short, Defendants' failure to comply with discovery requests is impeding Plaintiff's ability to prepare for trial.

21
22
23

Plaintiff requests that this Court order Defendants to provide the dates on which Defendants ran the list of search terms that Defendants' counsel provided to Plaintiff within seven days from the date of the discovery hearing.

24
25
26
27
28

---

[24] "Q: [C]an you recall when you got that list of search terms? A: I don't recall the month? Q: Was it last month? A: It was recently."

[25] "Q. And at any point in time were you given a list of search terms to -- to search for? A.  Yes. Q.  When did that happen? A.  More recently, but I don't remember the exact date."

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**3B.   Defendants' Position:  Plaintiff Already Has This Information So an Order Compelling Its Disclosure is Unnecessary**

Defendants' counsel provided a list of search terms to the custodians in June 2022.  (Heavner Decl. ¶ 14.)  The purpose of this was to ensure that the custodians' initial searches captured all potentially responsive documents and to have them perform additional searches using any terms that they did not use during the initial search.  (*Id.*)  Each custodian performed additional searches in June 2022 using the search terms and confirmed that no additional documents were located when they searched using the list of search terms.  (*Id.*)  The only exception is that Michael Buzinover did find an additional document.  It was produced before his deposition and he was questioned about it. (*Id.*)

At the July 5 Informal Discovery Conference, Plaintiff's counsel confirmed that the search terms used by Defendants were adequate.  Contrary to Plaintiff's assertion, the fact that Defendants addressed Plaintiff's concerns by providing search terms to the custodians does not show Defendants failed to meet their discovery obligations.  If anything, it shows that the custodians' initial searches, guided by questions from in-house and outside counsel, was comprehensive and reasonable.  There is nothing to compel.

**4A.   The Court Should Order Defendants to Provide Information Concerning a Custodian's Ability to Delete Lark Documents and a Written Declaration Concerning its Document Preservation and Search Process**

Plaintiff is concerned about the possibility of spoliation and as Defendants admitted during the parties' July 25, 2022 meet and confer call, they have little insight into how documents are being collected for production.  Due to the extremely low volume of internal documents produced, Plaintiff believes that Defendants' document collection has been inadequate to date and that Defendants have failed to fulfill their discovery obligations under the federal rules, including FRCP 37(e).  It remains unclear if and when Defendants' counsel (internal or external) notified Defendants' employees of a litigation hold, the substance of any litigation hold, the method of such

distribution, and the recipients.  Ms. Tachibana, the person Defendants' counsel have inaccurately held out as a custodian with knowledge in this case, testified during her deposition that she did not receive a notice telling her not to delete documents because of litigation. Moreover, it appears that despite the purported existence of a document hold in the Lark System, Defendants' custodians were still able to delete emails and other types of documents.

As such, Plaintiff requests an order that Defendants provide a declaration containing the date on which the ability for custodians to delete Lark documents was halted, the date of any litigation holds issued, the substance of the litigation hold, the systems to which it applied, to whom they were issued, the date and type of any other mitigation measures taken, and a detailed description and history of Defendants' search for, collection, and production of documents, within seven days from the date of the discovery hearing. This information is crucial because there are serious spoliation concerns given the remarkably low volume of documents produced by Defendants and the testimony given to date.

The significant deficiencies in Defendants' production to date indicate that Defendants have either failed to adequately search their records, or the records were never saved despite the on-going litigation.   Under FRCP 37(e), sanctions are warranted if a party fails to preserve or intentionally destroys electronically stored information that should have been preserved and that information is lost "because a party failed to take reasonable steps to preserve it."

**4B.   Defendants' Position: Plaintiff's Request is Premature, Calls for Attorney/Client Communications, and is Wholly Unnecessary.**

Once again, Plaintiff fails to identify which discovery requests Defendants have allegedly not answered.  That's because Plaintiff requested "Documents sufficient to show Defendants' policies concerning document retention, storage, filing, and destruction of electronic documents, email, and hard copy files," and "Documents sufficient to show Defendants' litigation hold notice relating to this action, including

the recipients of such notice" in its eighth set of Requests for Production.  (Keyes
Decl. ¶ 7.)  The eighth set was served on *July 20, 2022* and Defendants' response is
due on August 19.  Fed. R. Civ. P. 34(b)(2).  "Under Rule 37, a party may move for
an order compelling production of documents if a party fails to produce documents or
fails to respond . . . as requested under Rule 34."  *McRae v. Dikran*, No. 1:16-01066-
NONE-GAS-PC, 2021 U.S. Dist. Lexis 93220, at *5 (E.D. Cal. May 14, 2021) (citing
Fed. R. Civ. P. 37(a)(3)(B)(iv)).  Because Defendants' response is not yet due, "it is
premature for a motion to compel."  *Id.*

Even if this this issue were not premature (which, of course, it is), there is
nothing to compel here.  Plaintiff's counsel had an informal discussion with a
representative from Defendants' e-discovery team on July 12, 2022.  (Solow Decl.
¶ 12.)   The representative answered Plaintiff's questions relating to Defendants'
search capabilities and its document storage, retention, and deletion practices for 2
hours.  (*Id.*)   During the discussion, the representative indicated that sometime
between 18 months to 2 years ago, Defendants disabled an auto-delete function in the
Lark system.  (*Id.* ¶ 13)   The function was disabled due to ongoing, unrelated
litigation at that time.  Defendants have since confirmed that the auto delete function
was disabled sometime between May 9, 2020 and May 15, 2020, nearly a year before
the Complaint was filed in this matter.  (*Id.*)

In addition, "the litigation hold is an attorney-client communication."  *Al Otro
Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC, 2021 U.S. Dist. LEXIS
31414, at *8 (S.D. Cal. Feb. 19, 2021).  An exception to this rule exists when there is
evidence of "spoliation."  *City of Colton v. Am. Promotional Events, Inc.*, No. CV 09-
06630 PSG (SSx), 2011 U.S. Dist. LEXIS 163984, at *226 (C.D. Cal. Nov. 22, 2011).
"Spoliation is the destruction or significant alteration of evidence, or the failure to
preserve property for another's use as evidence in pending or reasonably foreseeable
litigation."  *Id.* (citing *Major Tours, Inc. v. Colorel*, No. 05-3091 (JBS/JS), 2009 U.S.
Dist. LEXIS 68128, at *8 (D. N.J. Aug 4, 2009)).

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY
DISPUTES

1    Plaintiff's baseless assertion that there are "spoliation concerns" does not justify
2    breaking this privilege.   Plaintiff alleges that Ms. Tachibana testified she did not
3    receive a litigation hold notice—in reality, when asked if she received a "notice telling
4    [her] not to delete documents because of this litigation," Ms. Tachibana said "I don't
5    believe so . . . but I have no reason to delete documents." (Tachibana Trans. at 68:19-
6    22.) Mr. Buzinover testified that he *did* receive a "notice in this case telling [him] not
7    to delete documents" and that he did not "delete any documents related to the Stitch
8    Editing feature." (Buzinover Trans. at 248:22–249:8.) Mr. Solow confirmed to
9    Plaintiff's counsel that the auto-delete feature in Lark was deactivated nearly a year
10   before the Complaint was filed, that there is no auto-delete in Defendants' email
11   system, and that there is a litigation hold notice in effect for the relevant period.
12   (Solow Decl. ¶¶ 13-14.) Further, both Ms. Tachibana and Mr. Buzinover testified that
13   it is not normal practice to delete Lark documents. (Tachibana Trans. at 72:24-73:9;
14   Buzinover Trans. at 249:6-18.) Plaintiff has not identified anything to suggest that
15   responsive documents have been deleted or altered or that Defendants failed to retain
16   documents.

17         Because this issue is not ripe, it seeks privileged information, and because there
18   is nothing to suggest that Defendants have failed to retain documents, Plaintiff's
19   motion should be denied.

20   ### 5A.   The Court Should Order Defendants to Produce a Privilege Log

21         Defendants have repeatedly refused to produce a privilege log and refused to
22   put into writing whether they are withholding any documents on privilege grounds.
23   Plaintiff requests that this Court order Defendants to draft a detailed, document-by-
24   document privilege log (as opposed to a categorical log).

25         Defendants' failure to produce a privilege log violates the spirit of discovery
26   and FRCP 26(b)(5)(A), which states that, when claiming privilege, a party must "(i)
27   expressly make the claim; and (ii) describe the nature of the documents,
28   communications, or tangible things not produced or disclosed--and do so in a manner

1
2
3

that, without revealing information itself privileged or protected, will enable other parties to assess the claim." *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196-DOC (JPRx), 2015 U.S. Dist. LEXIS 186557, at *32 (C.D. Cal. May 8, 2015).

4
5
6
7
8
9
10

While in their opposition Defendants might profess they have no privileged documents, it is evident from the testimony and documents produced in this case that a legal review was done for the Stitch Editing Feature specifically. Yet no relevant documents have been produced. Thus, it appears that Defendants' in-house counsel may have privileged documents that they have not provided to outside counsel. As such, Defendants should be ordered to produce a detailed, document-by-document privilege log, within seven days from the discovery hearing.

11
12

**5B.** **Defendants' Position: There Are No Documents to Place on a Privilege Log.**

13
14
15
16
17

This is another red herring. Plaintiff assumes that the "legal review" done for the Stitch feature is responsive. However, Plaintiff has not issued any Requests for Production relating generally to legal reviews associated with the Stitch feature. The only Requests for Production that are potentially relevant here are those relating to *trademark clearance*, which are Request Nos. 3 and 4.

18
19
20
21
22

**Request No. 3:** All Documents concerning any research (whether factual or legal, and including investigations and trademark searches) conducted by or on behalf of Defendants with regard to the word "Stitch" for use in connection with the Editing Feature, including without limitation any research conducted by or on behalf of Defendants concerning whether Plaintiff's STITCH Marks are available for use or registration and whether registration would conflict with any prior registered or used mark.

23
24
25

**Request No. 4:** All Documents concerning any legal opinions that Defendant obtained, received or commissioned analyzing or clearing any Defendants' use of the word "Stitch" in connection with the Editing Feature or any other goods and services offered or provided by Defendants.

26
27
28

In response to each of the above, Defendants clarified that there are no trademark clearance searches for Stitch prior to its adoption. Mr. Buzinover also testified that the name did not go through legal review because Stitch is a common

term used by many others in a similar manner.  (Buzinover Trans. at 67:14-15; 70:17-23.)  Notably, Plaintiff does not allege in this Motion that Defendants' responses or document production are deficient as to these Requests.  Plaintiff has otherwise not issued any Requests for Production seeking information related to legal review associated with the Stitch feature.  The legal review referenced by Mr. Buzinover relates to legal review that is simply not responsive to any issues or discovery requests in this action.

"It is axiomatic that courts do not compel the production of materials that were not sought in a propounded discovery request."  *Herndon v. City of Henderson*, No. 2:19-cv-00018-GMN-NJK, 2020 U.S. Dist. LEXIS 185954, at *2 (D. Nev. Oct. 7, 2020).  The only allegedly withheld information that Plaintiff has identified is not responsive to any discovery requests and are irrelevant to the facts at issue in this case.  Defendants are not withholding any responsive, privileged information.  The request should be denied.

### 6A.  The Court Should Require Defendants to Produce Herman Chou for a Deposition

Mr. Chou is a TikTok managing agent and Product Manager at TikTok who was actively involved in the development and release of the Stitch Editing Feature.  Despite his role, TikTok refused to produce Mr. Chou for a properly-noticed deposition on July 28, 2022. Defendants' primary objection is that Mr. Chou is located in China and that depositions allegedly are not permitted in China.  However, Defendants have offices all over the world, including in Singapore and they never sought a protective order.   Plaintiff's counsel has also taken multiple video depositions of Chinese defendants, from China, and thus finds Defendants' unsupported assertion of this prohibition to be incredible.

Moreover, courts have found that "where a corporation is a party, a notice of deposition compels it to produce the officer, director or managing agent named in the notice."  *Goddard v. City of Inglewood*, No. CV 07-05458-SJO (AGRx), 2009 U.S.

1   Dist. LEXIS 150200, at *3 (C.D. Cal. Apr. 7, 2009).   Furthermore, "when an

2   individual named in a deposition notice is a director, officer, or managing agent of [a

3   corporate party], such employee will be regarded as a representative of the

4   corporation." *In re Air Crash at Taipei*, No. MDL 1394-GAF(RCx), 2002 U.S. Dist.

5   LEXIS 29590, at *6 (C.D. Cal. Nov. 6, 2002) (citation and quotations omitted).  Here,

6   it is undisputed that Mr. Chou is a managing agent and as such he may be deposed.

7          Given that Mr. Chou has information about claims and defenses that are central

8   to this matter, such as the development of the Stitch Editing Feature and changes

9   made to the Stitch Editing Feature, Plaintiff requests an order directing that Mr. Chou

10  either be deposed in a country acceptable to both parties or to be deposed in the

11  United States.   Simply stated, Mr. Chou is a critical witness and Plaintiff would be

12  prejudiced if his deposition is not permitted.   *Zhizheng Wang v. Hull*, No. C18-

13  1220RSL, 2020 U.S. Dist. LEXIS 108944, at *5 (W.D. Wash. June 22, 2020); *JUUL*

14  *Labs Inc. v. Chou*, No. 2:21-cv-03056-DSF PD, 2022 U.S. Dist. LEXIS 25460, at *20

15  (C.D. Cal. Feb. 11, 2022) (ordering defendant in China to travel to Singapore for a

16  deposition).

17         Further, Defendants should be taken to have waived any request for a protective

18  order.  Mr. Chou failed to appear for his properly-noticed deposition on July 28, 2022,

19  but Defendants did not seek a protective order at any time.   Plaintiff is therefore

20  entitled to sanctions under Rule 37(d).   Moreover, Defendants' failure to go through

21  the appropriate legal channels to seek a protective order are grounds for this Court to

22  compel the deposition of Mr. Chou. *Salazar v. San Bernardino Cty. Sheriff's Dep't*,

23  No. EDCV 16-2595-FMO-KKx, 2017 U.S. Dist. LEXIS 173586, at *6 (C.D. Cal. Oct.

24  19, 2017) (ordering deposition for party who failed to appear at a properly noticed

25  deposition).

26         For these reasons, Mr. Chou should be ordered to be deposed within 14 days of

27  the date of the discovery hearing, either in the United States or another country agreed

28  upon by both parties.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1
2
**6B.   Defendants' Position:  The Court Should Reject Plaintiff's Request to Force Mr. Chou to Travel Internationally for a Deposition That Will Be Cumulative and Redundant.**

3
4
Mr. Herman Chou should not be compelled to sit for a deposition in this case for multiple reasons.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
<u>First</u>, Mr. Chou is a Chinese citizen who resides in Shanghai.  (Keyes Decl. ¶ 17.)  According to the U.S. State Department Bureau of Consular Affairs, "China does **not** permit attorneys to take depositions in China for use in foreign courts."  (*Id.* Ex. D.) (emphasis supplied).  The only way to take a deposition in China is "through requests to its Central Authority under the Hague Evidence Convention." (*Id*.)  Failure to follow this protocol appears to be grounds for severe sanctions according to the U.S. Government: "Participation in such activity could result in the arrest, detention or deportation of the American attorneys and other participants." (*Id.*)  Plaintiff's counsel's cavalier, devil-may-care attitude of taking remote depositions in China in prior cases should obviously not be the standard adopted by this Court here.  (*See supra* Section II.6A. ("Plaintiff's counsel has also taken multiple video depositions of Chinese defendants, from China, and thus finds Defendants' unsupported assertion of this prohibition to be incredible."));  *Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 500 (N.D. Ill. 2021) (Article 277 extends to bar *remote depositions* when any of the participants are located in mainland China) (emphasis supplied); *see also JUUL Labs Inc.*, 2022 U.S. Dist. LEXIS 25460, at *18 n.1 (observing that "Defendants do not dispute Plaintiff's contention that taking the depositions in mainland China, *even remotely,* without the permission of the Chinese government would violate Article 277 of Civil Procedure Law of the People's Republic of China and subject participants to criminal liability") (emphasis supplied).

25
26
27
28
<u>Second</u>, the only way Mr. Chou can be legally deposed is if he travels to another country.  That is severe in the extreme.  It is well-documented that the Chinese government instituted a "zero Covid" policy and has enacted strict lockdowns, isolation, and other restrictions on personal freedoms to further this

1   policy. (*See* Keyes Decl. Ex. E.) In fact, China's National Immigration Administration
2   has apparently restricted international travel for "non-essential reasons." (*Id.*) And,
3   even those that are able to travel internationally are subjected to a 14-day quarantine
4   upon return, according to the U.S. Embassy & Consulates in China website. (*Id.* ¶ 20,
5   Ex. F.) This would be extremely burdensome.

6   <u>Third</u>, Plaintiff's "legal authority" does not support compelling Mr. Chou to
7   travel internationally for a deposition in a case such as this. *JUUL* was a trademark
8   counterfeit case where the Chinese citizens sold fake JUUL products through their
9   website. By the time the Plaintiff wanted to depose the Chinese witnesses, the Court
10  had already entered: (i) a temporary restraining order; (ii) an accounting; (iii) an asset
11  freeze; and (iv) summary judgment on counterfeit liability. There was evidence
12  presented to the Court that the prospective witnesses had violated court orders,
13  including withdrawing money from bank accounts after the freeze was issued, and
14  failed to provide a proper accounting as required by the Court. *JUUL Labs Inc.*, 2022
15  U.S. Dist. LEXIS 25460, at *5. Given the "unique circumstances," *JUUL* held that in
16  person depositions were appropriate because: (1) the prospective testimony was
17  "highly relevant" on willfulness (the key issue on damages in that case); and (2) there
18  was "an exceedingly high level of distrust among all parties." *Id.* at *16. The unique
19  circumstances that existed in *JUUL* are nowhere to be found here. This is not a
20  counterfeit case where liability has already been established. There is no TRO or
21  other order that Mr. Chou has allegedly violated. There is no legitimate reason to
22  force him to travel outside of China for a deposition that relates to the name of the
23  Stitch button on the TikTok app.

24  <u>Fourth</u>, Mr. Chou's testimony would also be cumulative and wholly
25  unnecessary. *Lickerish, Inc. v. PicClick, Inc.*, No. 5:22-mc-80152-WHO, 2022 U.S.
26  Dist. LEXIS 126851, at *6 (N.D. Cal. July 18, 2022) ("District courts may limit
27  discovery when it is unreasonably cumulative or duplicative, or can be obtained from
28  some other source that is more convenient, less burdensome, or less expensive").

Plaintiff is apparently desperate to depose Mr. Chou because he has information about the "development" and "changes" made to the stitch button. (*See supra* Section II.6A.) But Plaintiff has already deposed Michael Buzinover, the witness that was ultimately responsible for selecting the "Stitch" name.   (Buzinover Trans. at 66:16-67:13; 117:11-22.)  He testified at length about how the feature was created, and the obvious reasons why the name was selected (*See id*.).  There is simply no valid basis to drag Mr. Chou out of China—much less halfway across the globe to the U.S.—so that he can reiterate the obvious reasons why the name "Stitch" was used for the button that allows users to "stitch" together videos on the TikTok app.

**7A.   Defendants Should Be Compelled to Produce Lists of: (i) All Advertising Agencies with Which They Work or Have Contracts, (ii) All Music Labels with Which they Work or Have Contracts, (iii) All Companies with Which They Have Trademark Licensing Agreements, Incorporating the Affiliated Royalty Rate for Each Agreement, and an Indication of What Was Licensed to or by Defendants; and (iv) a Damages Metric Reflecting the Average CPM on a Monthly Basis Across All Advertising Sales, Delineated by the US and the UK from September 1, 2020 to the Present.**

**(i) and (ii)**: Plaintiff initially sought production of all contracts that Defendants have with advertising agencies or marketing platforms (like Shopify and WPP) and all contracts that Defendants have with music labels because such documents related to Defendants' expansion into the advertising industry and the music industry, which are industries in which Plaintiff has a large presence, and thus where the parties have significant customer overlap.   Defendants objected and refused to produce any documents.

Plaintiff sought an IDC on this topic and the Court converted the motion to a formal discovery motion and heard arguments on June 1, 2022.  While the Court determined that Plaintiff could not discover the contracts themselves or "[t]he underlying confidential parts of their business dealings," it did order that Plaintiff was entitled to "the fact of business relationships with certain entities."  On June 3, 2022, Plaintiff requested, among other things, "[a] list of music labels with which

Defendants have contracts," [a] list of advertising agencies or marketing companies, such as WPP, with which Defendants have contracts," and "[a] list of advertising or marketing platforms, such as Shopify, with which Defendants have contracts." Plaintiff reiterated that request several times by email and in a formal letter dated June 17, 2020.  Defendants have not produced these lists to date.

This information is plainly relevant.  Plaintiff's Complaint explicitly alleges that although the Stitch Editing Feature was initially released as a program for editing videos appearing on TikTok, TikTok "aggressively markets itself to brands and businesses as an advertising platform and has been increasing its push into the advertising market."  Compl.  ¶ 50; *see also id.*  ¶¶ 51-52.  To that end, TikTok recently partnered with WPP, one of the world's largest advertising agencies, and with Shopify, an e-commerce platform, to market TikTok as an application for creating advertisements.  *See id.* ¶¶ 53-56.  As a result, Defendants have and will continue to encroach into markets that overlap with Plaintiff's advertising agency clients, producers, directors, brands, and artists.  This expansion is thus highly relevant to the likelihood of confusion analysis.  *See Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1168 (9th Cir. 2021).

Moreover, John Reggio, Defendants' Head of Sales operations for North and Latin America, testified on August 4, 2022 that TikTok has contracts with thousands of advertising agencies who place advertisements for brands on the TikTok platform.[26] In other words, these advertising agencies are customers of TikTok's. Plaintiff also works with many advertising agencies in the US and in the UK. As such, Plaintiff is entitled to the list of advertising agencies.  Plaintiff is also entitled to the list of music labels with which Defendants work or have contracts because Plaintiff edits music

---

[26] "Q:  Are you prepared to provide a list of advertising agencies or of marketing companies such as WPP with which TikTok has contracts? . . . .A: I don't know every advertising agency we have a contract with because there are thousands.  Q.  And what is the purpose of those contracts of which you're aware? A.  We sell them advertising. Q.  So you place advertisements for brands through advertising agencies? A.  Correct."

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1  videos for many prominent musicians, represented by many prominent music labels.

2  This overlap in market is also relevant.   As such, Plaintiff requests an order

3  compelling Defendants to provide these first two lists.

4         **(iii) and (iv):** Plaintiff propounded a number of requests for documents that

5  were necessary for its expert to calculate damages in this case.  Defendants flat out

6  refused to provide any financial information whatsoever.  Plaintiff filed an IDC on

7  this topic and the Court converted the motion to a formal discovery motion and heard

8  arguments on June 1, 2022.  During that hearing, the Court ordered Defendants to

9  produce the metrics that Plaintiff's expert "says he wants," regardless of whether

10 Defendants agree with whether Plaintiff's expert "need[s] that data point or not."  The

11 Court also ordered: "I don't want a lot of haggling over, that they have a reasonable

12 basis to ask for it if their expert needs it. You need to provide the metrics. And if you

13 can't do it yourself, give access to the system so that they can get it themselves."

14        On June 3, 2022, Plaintiff requested several metrics, including CPMs and a list

15 of the companies with which any of the Defendants have trademark licensing

16 agreements, the affiliated royalty rate for each agreement, and an indication of what

17 was licensed to or by Defendants.  Plaintiff reiterated that request several times by

18 email and in a formal letter dated June 17, 2022.  Defendants have not produced these

19 items to date.

20        Plaintiff's expert requested this information for purposes of calculating

21 damages.  *See* Cormier Decl. ¶ 7.  Moreover on August 4, 2022, John Reggio testified

22 that the data is available to calculate the average CPM on a monthly basis across all

23 advertising sales, delineated by the US and the UK, in a given time period.  Thus,

24 Plaintiff is entitled to this metric from September 1, 2020 (the date of release of the

25 Stitch Editing Feature) to the present.  The mere fact that Defendants do not track this

26 metric in the normal course of business is not a reason that the information should not

27 be provided.  Therefore, Plaintiff requests an order compelling Defendants to produce

28 the average CPM on a monthly basis across all advertising sales, delineated by the US

and the UK, from September 1, 2020 (the date of release of the Stitch Editing Feature) to date, and to supplement this metric on a monthly basis through trial.

Plaintiff's expert has also requested a list of the companies with which any of the Defendants have trademark licensing agreements, the affiliated royalty rate for each agreement, and an indication of what was licensed to or by Defendants.  *See* Cormier Decl. ¶ 7.  To be clear, Plaintiff is not requesting the production of the underlying contracts.  Plaintiff is simply requesting a list of the entities that are parties to such contracts, an indication of the royalty rate, and what was licensed.  Plaintiff believes that the June 1, 2022 order entitles them to such information.

However, despite repeated requests, Defendants have not produced this information.  Therefore, Plaintiff requests an order compelling Defendants to produce a list of the companies with which any of the Defendants have trademark licensing agreements, the affiliated royalty rate for each agreement, and an indication of what was licensed to or by Defendants.

**7B.   Defendants' Position**

**(i) and (ii) – Plaintiff's Request for a List of Advertising Agencies and Music Labels with which Defendants have Contracts or do Business Is Irrelevant and Disproportionate to the Needs of This Case.**

Plaintiff may only seek discovery that is "relevant to any party's claim or defenses and proportional to the needs of the case" considering several factors including "the importance of the issues at stake in the action," "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  The Requests for Production at issue here are Request Nos. 19, 20, and 21.  Notably, while Plaintiff takes issue with Defendants' responses and production with respect to twenty-five Requests in this Motion, it does not claim any deficiencies with respect to Request Nos. 19, 20, and 21.  (*See supra* Section II.1A.)  Defendants objected to each of these Requests on various grounds, including that each "request bears no relation to their

1   use of the term 'stitch', thus the request is not relevant to the claims or defenses
2   asserted in this action or proportional to the needs of this case." Defendants stand by
3   this objection.

4          As Mr. Reggio testified, the advertising agencies "have contracts with brands
5   and then the brands allow agencies to purchase advertising for them" on the TikTok
6   platform.  (Reggio Trans. at 100:4-6.)  As is directly relevant here, Mr. Reggio also
7   testified that "we don't allow stitch videos or we don't allow an advertiser to stitch
8   videos in their advertisements."  (*Id.* at 72:7-9; *see also id.* at 61:14-23 ("Stitch ads
9   actually violate our ad policy in the US you're not allowed to use stitch as an
10  advertisement.").)   Accordingly, the advertising agencies that have placed ads for
11  brands are irrelevant to any claims or defenses at issue in this case.

12         Further, as Plaintiff notes, Mr. Reggio testified that there are potentially
13  *thousands* of advertising agencies that contract with or do business with Defendants.[27]
14  Compiling a list of the thousands of third-party advertising agencies, who work with
15  third-party advertisers, to create advertisements that *cannot use the Stitch feature* for
16  paid-for ads on TikTok would impose an enormous burden on Defendants that is
17  disproportionate to the needs of this case.  This is particularly true here because
18  Plaintiff has not limited the request in time or geographic scope.

19         Defendants' agreements with music labels are similarly irrelevant.   First,
20  Plaintiff does not claim to work with any music labels.  In fact, Plaintiff's exclusive
21  U.S. licensee testified in a 30(b)(6) deposition that they have not edited a music video
22  in at least 3 years.  (Keyes Decl. ¶ 21, Ex. G ("Swietlik Trans.") at 65:9-66:2.)
23  Second, these agreements generally relate to obtaining copyright permission from the
24  music labels so that users may use licensed music when creating videos.  (Keyes Decl.
25  ¶ 15.)  They have nothing to do with the Stitch button and compiling a list of music

---

[27] It should be noted that Mr. Reggio was Defendants' designee under Rule 30(b)(6) and Defendants counsel objected to the line of questioning as "outside the scope" of the deposition topics.  Plaintiff's counsel claims that the list of advertising agencies and music labels is somehow a relevant "metric."

labels is disproportionate to the needs of this case.

Finally, the Court already considered this issue at the June 1 hearing. The Court proposed that Plaintiff identify its clients and ask Defendants via Requests for Admission whether they have the same clients. (June 1 Hearing Trans. at 27:11-14 ("[J]ust do an RFA. . . . I mean, maybe the better way to start is—you know who your clients are, and you can ask them if any of your clients are clients of theirs in some way or customers. But that's as far as you can go really."). The Court also noted that the agreements with advertising agencies and music labels "has nothing to do with Stitch" and cautioned Plaintiff's to "tread carefully." (June 1 Hearing Trans. at 28:10-12.) Yet, Plaintiff continues to dive headlong into these baseless, disproportionate discovery requests.

Plaintiff's motion to compel these lists should be denied.

**(iii) and (iv) – These Remaining Grab-Bag of Requested Information is a Fishing Expedition that Should be Rejected by the Court.**

Defendants do not have any trademark license agreements relating to the Stitch feature or the term "Stitch." (Keyes Decl. ¶ 16.) Yet, Plaintiff is seeking information relating to *all* trademark licensing agreements that any Defendant has with any third party. Plaintiff's request that Defendants provide "an indication of what was licensed to or by Defendants" pursuant to each agreement shows that Plaintiff is not even attempting to limit this request to information relating to the stitch feature or the term stitch. (*See supra* Section II.7A). Plaintiff's request for licensing information unrelated to the Stitch feature is divorced from any issues in dispute in this matter and hopelessly overbroad.

Further, Plaintiff has no claim to damages based on a reasonable royalty in this case. Damages based on a reasonable royalty "must be established with reasonable certainty" and cannot be "remote" or "speculative." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407-08 (9th Cir. 1993). A "reasonable royalty analysis most often is applied in a trademark context where the parties had a prior licensing arrangement . . .

or at least where the plaintiff previously had engaged in the practice of licensing the mark to a third-party." *Quia Corp. v. Mattel, Inc.*, No. c 10-1902 JF (HRL), 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011).  Where there is no evidence of Plaintiff's prior royalty rates, "a reasonable royalty analysis necessarily is speculation." *Id.* at *6; *see also Tokidoki, LLC v. Fortune Dynamic, Inc.*, No CV 07-1923 DSF, 2009 WL 2366439, at *15 (C.D. Cal. July 28, 2009) (finding no evidence to support a reasonable royalty award where "there was no prior licensing relationship" between the parties and "no evidence of an agreement in which [Plaintiff] had licensed use" of the asserted mark).

Here, the Parties have no prior licensing arrangement and there is nothing to suggest that Plaintiff has a history of licensing the Stitch Marks to third parties. Plaintiff has identified only one third-party licensee—Swietlik, Inc.—however, Plaintiff and Swietlik have confirmed that Swietlik does not pay any royalty for use of the Stitch Marks.  (*See* Swietlik Trans. at 56:16-23 ("Q. Do you pay to Stitch Editing Ltd. to use the Stitch name and logo? . . . A. No.  Q. Have you ever?  A. No.").) Regardless, the basis for a reasonable royalty is *Plaintiff's* prior licensing arrangements *relating to the mark*, not Defendants' licensing of completely unrelated trademarks.  Plaintiff's request for Defendants' licenses with third parties unrelated to "stitch" is wholly irrelevant and disproportionate to the needs of this case.

Plaintiff's request for the "average CPM" for "all advertising sales" in the US and UK is likewise irrelevant, overbroad, and disproportionate to the needs of this case.  As an initial matter, a CPM is one metric an advertiser can use to form its ad campaign when placing advertisements on the TikTok platform.  (Reggio Trans. at 36:21-37:3.)  As discussed above, advertisers are *not* permitted to use the stitch tool to create any of these paid-for advertisements.  (*Id*. at 72:7-9.)  CPM is unrelated to any claims or defenses at issue here.

During the June 1 Hearing, Plaintiff's counsel asked the Court to order Defendants to produce information showing TikTok's "revenue per click."  (June 1

60

1     Hearing Trans. at 14:19-20.)  The Court found this was not specific enough:[28] As this

2     Court succinctly stated:

3           I'm giving you the approach because I don't know what your expert's
      going to say he needs.  But I can tell you that, to the extent that he
4           maintains a general position like, 'I want clicks per revenue or downloads
      globally' for things that aren't really, you know, ascertainable in some
5           way, you're just sort of shooting yourself in the foot. . . . I don't think
      clicks-per-revenue is an example that's specific enough.
6

7           (June 1 Hearing Trans. at 16:110-17.)

8           Plaintiff's request for CPM is similarly not specific enough.

9           First, despite several discussions and Mr. Reggio's testimony, Plaintiff still does

10    not understand what CPM is.  Plaintiff claims that "Cost per mile (CPM) is the

11    average amount of money TikTok has spent per 1,000 impressions."  (*See supra* FN

12    3.)  To the contrary, CPM is the cost per 1,000 impressions that any one advertiser

13    pays when creating an ad campaign.  (Reggio Trans. at 36:21–37:3.)  Second, the

14    CPM for any one ad campaign varies depending on the type of advertisement

15    purchased, such as a top view ad (a top view ad is placed such that the first video a

16    user sees when opening the TikTok app is the ad) or an in-feed ad (an in-feed ad is

17    placed such that the ad is mixed in with other videos).  (*Id.* at 64:6-9.)  Third, the

18    CPM varies greatly for different advertisers and advertising campaigns.  Mr. Reggio

19    testified that the CPM for any one top view advertisement "varies based upon

20    inventory availability and supply and demand."  (*Id.* at 37:18-20.)  Similarly, the CPM

21    for any one in-feed advertisement varies greatly because they are sold through an

22    auction, the CPM there is whatever the highest bidder is willing to pay.  (*Id.* at

23

24    ─────────────────

25    [28] Plaintiff reads the Court's June 1 hearing as permitting it to seek any information
      "Plaintiff's expert 'says he wants' regardless of whether Defendants agree with
26    whether Plaintiff's expert 'need[s] that data point or not.'"  However, the court was
      clear that Plaintiff needs to request specific, targeted information and "can't just sort
      of say 'I want this; I want that' and foresaw that if Plaintiff is not specific, it would
27    lead to a dispute such as this Motion.  (June 1 Hearing Trans. at 17:14-17 ("But the
      point of this that you be specific about what you need; not general, 'we want
28    information that we know our experts are going to want,' and then later you all come
      back and fight to me.").)

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1   114:20-24.)   Third, advertisers can purchase multiple CPMs when structuring an ad
2   campaign and the number purchased by any one advertiser also varies.  (*Id.* at 56:5-
3   22.)

4          In short, CPM varies wildly depending on the advertiser, type of advertisement,
5   and structure of the ad campaign.  Further, there are thousands of advertisers on the
6   platform, determining an "average CPM" would require determining which
7   advertisements were placed using the CPM metric, compiling information from each
8   of those advertisements, determining what the CPM was for each advertisement, and
9   calculating an average CPM.  While Mr. Reggio testified that average CPM *could* be
10  calculated, he also testified that it "could be calculated in various ways that give
11  different answers" due to "lots of variables in this kind of data" and that he does not
12  "think it's possible to come up with the—just one number that says this is the
13  average."  (Reggio Trans. at 146:15-147:7.)   Because there are multiple ways to
14  determine an average, Defendants are left to guess what Plaintiff wants, and any
15  computed average is likely to be useless.

16         "Even assuming that such information is needed for Plaintiff's expert's analysis
17  . . . the burden and expense of compiling this information" coupled with the
18  irrelevance and unreliability of the information "makes the request disproportionate to
19  the needs of this case."  *See Blanton v. Torry Pines Prop. Mgmt.*, No. 15-cv-0892 W
20  (NLS), 2017 U.S. Dist. LEXIS 72381, at *12-13 (S.D. Cal. May 10, 2017).

21         Defendants have produced several metrics relating to the use of the Stitch tool,
22  such as the number of users who have created stitched videos in the US and UK, the
23  number of view of stitched videos in the US and UK, and the number of videos
24  created using the Stitch tool in the US and UK.  (Keyes Decl. ¶ 5.)  Further, Plaintiff's
25  damages expert was present during the entirety of Mr. Reggio's deposition.  (*Id.* ¶ 25.)
26  This information is directly related to the extent of use of the stitch button and any
27  supposed "damages" associated therewith.

28         Trademark licenses unrelated to this case and unreliable, burdensome averages

62

of CPMs will be worthless to Plaintiff's expert and are disproportionate to the needs of this case in any event.

Plaintiff's motion to compel this information should be denied.

### 8A.    Plaintiff Requests Sanctions Under Rule 37 for Defendants' Refusal to Participate in Discovery

Pursuant to FRCP 37(a)(4)(A), sanctions should be imposed to compensate Plaintiff for the costs and fees associated with this motion and with all the meet and confers and IDC's in which Plaintiff has had to engage to extract responsive documents from Defendants clutches.  None of this would had to have been done had Defendants timely produced documents and met their obligations under the Federal Rules of Civil Procedure.  Plaintiff has made repeated, good-faith efforts to obtain responses to its discovery requests without this Court's intervention, but have been rebuffed at every turn.  Given Defendants' actions, Plaintiff should be reimbursed for the costs associated with drafting several meet and confer letters, attending meet and confer conferences leading up-to this briefing, and filing this brief, along with any other sanctions the Court deems appropriate.

Plaintiff further requests a report and recommendation recommending a conditional order providing that if Defendants fail to comply in full with the Court's order arising from this motion, that the Court will (i) dismiss Defendants' counterclaim and affirmative defenses; (ii) preclude Defendants from challenging Plaintiff's damages calculations; and (iii) issue a jury instruction for an adverse inference that the documents that Defendants have failed to produce would have supported Plaintiff's claim.

### 8B.    Defendants' Position: Plaintiff's Requested Sanctions Simply Underscore Its Oppressive and Burdensome Litigation Tactics.

The Court should reject all of Plaintiff's requested sanctions.

For starters, an award of fees and costs is obviously improper here.  Plaintiff failed to establish that there was any violation by Defendants.  In fact, Plaintiff failed to comply with the Scheduling Order and Rule 37 by failing to detail the alleged

63

deficiencies as required.  (*See supra* Section II.1B.)

Next, dismissal of Defendants' counterclaim—a procedural move already denied by the Court—is baseless.  Dismissal of claims for relief based on discovery violations requires two things: (1) "willfulness, bad faith, and fault" on the offending party's behalf; and then (2) the Court must weigh the 5 *Malone*[29] factors to determine if dismissal is appropriate.  Plaintiff failed to make any such showing.  *Smith v. Gaulding*, No. 2:19-09174 SVW (ADS), 2022 U.S. Dist. LEXIS 119156, at *4-5 (C.D. Cal. July 5, 2022).  "Dismissal is a harsh penalty and is to be imposed only in extreme circumstances."  *Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir. 1987).  Plaintiff's motion shows it is significantly concerned about the merits of this counterclaim for cancellation, but that certainly is not the type of "showing" that results in terminating sanctions.

Additionally, Plaintiff is not entitled to shield its supposed forthcoming "damages calculations" report from substantive attack.  Expert opinions on damages are subject to scrutiny under *Daubert*, and trial courts must exercise their gate-keeping function to ensure jurors are not polluted with wayward opinions based on garbage science.  *Crane-McNab v. City of Merced*, 2011 U.S. Dist. LEXIS 4276, at *3 (E.D. Cal. Jan. 10, 2011) ("<u>Daubert</u> requires the court to act as a 'reliability gatekeeper' to keep unreliable testimony away from the jury, essentially protecting the jury from junk science.").  Given that TikTok generates **no revenue** from the Stitch button (*see* Reggio Decl. at 117:11-22), it appears that Plaintiff is poised to submit a report that will make for a target-rich environment for a *Daubert* motion.  The admissibility of this forthcoming report should turn on the methods used by Plaintiff's expert, not on the phantom discovery violations conjured up by Plaintiff.

Finally, the request for an "adverse inference" instruction should be summarily

---

[29] The *Malone* factors are (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

rejected.  "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence[,] in pending or reasonably foreseeable litigation." *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 625 (C.D. Cal. 2013) (internal quotation marks and citation omitted). The party seeking the adverse inference instruction must establish that: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party having control over the evidence failed to preserve the evidence with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Ruderman v. Rolls Royce Motor Cars NA, LLC*, No. CV 20-4529-KS, 2022 U.S. Dist. LEXIS 136528, at *5 (C.D. Cal. May 26, 2022).   Plaintiff's wild speculations are not a proxy for proof.  The Court should reject this request.

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES

1

2    Dated: August 16, 2022                    Respectfully submitted,

3                                              MINTZ LEVIN COHN FERRIS
4                                              GLOVSKY AND POPEO, P.C.

5                                              By: */s/Andrew D. Skale*
6                                              Andrew D. Skale (SBN 211096)
                                               Randy K. Jones (SBN 141711)
7                                              Courtney Rockett (*Pro Hac Vice*)
                                               Kara Cormier (*Pro Hac Vice*)
8                                              *Attorneys for Plaintiff Stitch Editing Ltd.*

9

10   Dated:  August 16, 2022                   DORSEY & WHITNEY LLP

11                                             By:   */s/ J. Michael Keyes*
12                                             J. Michael Keyes (SBN 262281)
                                               keyes.mike@dorsey.com
13                                             Bruce R. Ewing (Pro Hac Vice)
                                               ewing.bruce@dorsey.com
14                                             Connor J. Hansen (Pro Hac Vice)
                                               hansen.connor@dorsey.com
15

16                                             FINNEGAN, HENDERSON, FARABOW,
                                               GARRETT & DUNNER, LLP
17                                             B. Brett Heavner (Pro Hac Vice)
                                               b.brett.heavner@finnegan.com
18                                             Yinfei Wu (Pro Hac Vice)
                                               yinfei.wu@finnegan.com
19

20                                             KENDALL BRILL & KELLY LLP
                                               Philip M. Kelly (SBN 212174)
21                                             pkelly@kbkfirm.com
                                               Nary Kim (SBN 293639)
22                                             nkim@kbkfirm.com
                                               10100 Santa Monica Blvd., Suite 1725
23                                             Los Angeles, California 90067
                                               Telephone:   310.556.2700
24                                             Facsimile:   310.556.2705

25                                             *Attorneys for Defendants and Counterclaim-
                                               Plaintiffs TikTok Inc., TikTok LLC, TikTok
26                                             Ltd., & ByteDance Ltd.*

27

28

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY
DISPUTES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION OF COMPLIANCE

I, Andrew D. Skale, am the ECF user whose ID and password are being used to file this document. In compliance with the local rule of this Court, I hereby attest that the above signatory(ies), counsel for Defendant, concurred in this filing.

*/s/Andrew D. Skale*

Andrew D. Skale

JOINT STIPULATION PURSUANT TO LOCAL RULE 37 RE: PLAINTIFF'S DISCOVERY DISPUTES