1                       UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
2                          WESTERN DIVISION

3

4    STITCH EDITING LTD,        )
                             )
5              Plaintiff,     )
                             )
6            vs.           )   Case No.  CV 21-06636-SB(SKX)
                             )
7    TIKTOK, INC., ET AL.,    )   Los Angeles, California
                             )   August 31, 2022
8            Defendants.   )

9

10

11

12

13                           HEARING
            BEFORE THE HONORABLE STEVE KIM
14         UNITED STATES MAGISTRATE JUDGE

15

16    APPEARANCES:            See Next Page

17    COURT REPORTER:       Recorded, Court Smart

18    COURTROOM DEPUTY:     Connie Chung

19    TRANSCRIBER:           Dorothy Babykin
                             Courthouse Services
20                          1218 Valebrook Place
                             Glendora, California  91740
21                          (626) 963-0566

22

23
    PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
24    TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

25

1    APPEARANCES:

2

3    FOR PLAINTIFF STITCH EDITING LTD.

4    MINTZ LEVIN COHN FERRIS GLOVSKY & POPCO PC
     BY:  ANDREW SKALE
          ATTORNEY AT LAW
5    3580 CARMEL MOUNTAIN ROAD
     SUITE 300
6    SAN DIEGO, CALIFORNIA  92130

7    MINTZ LEVIN COHN FERRIS GLOVSKY & POPCO PC
     BY:  COURTNEY R. ROCKETT
8         ATTORNEY AT LAW
     CHRYSLER CENTER
9    666 THIRD AVENUE
     NEW YORK, NEW YORK  10017

10

11   MINTZ LEVIN COHN FERRIS GLOVSKY & POPCO PC
     BY:  KARA M. CORMIER
          ATTORNEY AT LAW
12   ONE FINANCIAL CENTER
     BOSTON, MASSACHUSETTS  02111

13

14   FOR DEFENDANT TIKTOK, INC., ET AL.

15   DORSEY & WHITNEY LLP
     BY:  J. MICHAEL KEYES
16        CONNOR HANSEN
          ATTORNEYS AT LAW
17   COLUMBIA CENTER
     701 5TH AVENUE
18   SUITE 6100
     SEATTLE, WASHINGTON  98104

19

20

21

22

23

24

25

1                          I N D E X

2    CV 21-06636-SB(SKX)                        AUGUST 31, 2022

3    PROCEEDINGS:   HEARING ON MOTION TO COMPEL COMPLIANCE WITH
                    DISCOVERY
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              LOS ANGELES, CALIFORNIA; AUGUST 31, 2022

2              THE CLERK:  PLEASE COME TO ORDER.

3              THIS UNITED STATES DISTRICT COURT IS NOW IN SESSION.

4              THE HONORABLE STEVE KIM, UNITED STATES MAGISTRATE

5    JUDGE, PRESIDING.

6              ALL ATTENDEES ARE REMINDED THAT BY PARTICIPATING IN THIS

7    HEARING, THEY HAVE READ, UNDERSTOOD AND ACCEPTED THE BANNER

8    WARNING PRESENTED AT LOG-IN PROHIBITING ANY RECORDING,

9    STREAMING, BROADCASTING OR SCREEN CAPTURING.

10             THE COURT HAS MEASURES TO DETECT UNAUTHORIZED

11   RECORDING OF ANY KIND.  AND SANCTIONS MAY BE IMPOSED FOR THOSE

12   FOUND IN VIOLATION.

13             CALLING CASE NUMBER CV 21-6636, STITCH EDITING VERSUS

14   TIKTOK.

15             COUNSEL, PLEASE STATE YOUR APPEARANCES.

16             MS. ROCKETT:  GOOD MORNING, YOUR HONOR.

17             COURTNEY ROCKETT, ANDREW SKALE AND KARA CORMIER OF

18   MINTZ LEVIN ON BEHALF OF PLAINTIFF STITCH EDITING.

19             MR. KEYES:  GOOD MORNING, YOUR HONOR.

20             THIS IS MIKE KEYES.  AND WITH ME IS MY COLLEAGUE CONNOR

21   HANSEN.  WE'RE BOTH OF DORSEY & WHITNEY IN SEATTLE ON BEHALF OF

22   THE DEFENDANTS TIKTOK.

23             THE COURT:  OKAY.

24             ALL RIGHT.  GOOD MORNING, EVERYONE.

25             AGAIN, WE'RE NOW ON THE RECORD.  MY APOLOGIES THAT I

1   HAVE WASTED 35 MINUTES OF YOUR TIME TRYING TO GET THIS SET UP

2   THIS WAY.

3          EVERYTHING YOU HEARD BEFORE WE WENT ON THE RECORD IS

4   CLASSIFIED FRUSTRATION SO YOU CAN'T REPEAT WHAT I – YOU MAY

5   HAVE OVERHEARD.

6          WE'RE HERE ON THE MOTION TO COMPEL BY STITCH.

7          AND I'VE REVIEWED ALL THE RELEVANT BRIEFS.  AND I'VE ALSO

8   JUST TO SORT OF KEEP MYSELF ABREAST OF THE SITUATION REVIEWED

9   THE VARIOUS BRIEFS YOU FILED IN FRONT OF JUDGE BLUMENFELD

10  FOR THE EXTENSION OF THE DISCOVERY CUT-OFF.  AND I'M SURE THAT

11  HE'S DONE THE REVERSE AS WELL IN TERMS OF LOOKING AT THE

12  MOTIONS HERE.

13         WHAT I'LL SAY IS I -- WELL, FIRST THE GRATUITOUS

14  COMMENTARY, AND THEN I'LL KIND OF GO INTO HOW I'M SORT OF

15  APPROACHING TODAY'S HEARING.

16         THIS WILL BE THE FIRST TIME THAT I'VE HAD INFORMAL

17  DISCOVERY CONFERENCES THAT HAVE NOT SATISFACTORILY GIVEN

18  DIRECTION TO THE PARTIES AND, THUS, AVOIDED DISCOVERY MOTION

19  PRACTICE THAT WAS ABOUT THE SUBJECT OF THE INFORMAL DISCOVERY

20  CONFERENCES.

21         SO, THE REASON I DENIED THE THIRD REQUEST FOR AN IDC WAS

22  BECAUSE I SEEMED TO BE MISERABLY FAILING AT THE FIRST TWO.

23         SO, AT THIS POINT I THINK GIVING DIRECTION DOESN'T WORK SO

24  I'M JUST GOING TO GIVE DIRECTIVES, ESPECIALLY GIVEN THE WAY THAT

25  THE TIME IS NOW SET UP.

1          BIG PICTURE – THE MOTION AND THE PARTIES' BRIEFS IS VERY --

2     IT'S VERY CONFUSING.  AND I THINK PART OF THAT IS BECAUSE I THINK

3     WE'RE NOT KEEPING CLEAR IN OUR MINDS SOME ANALYTICALLY DISTINCT

4     AREAS OF DISCOVERY.

5          AND I IMAGINE IT IF IT'S HELPFUL AS LIKE A VENN DIAGRAM WITH

6     THREE CIRCLES.  AND THEY OVERLAP IN A DEGREE, BUT THEY'RE ALSO

7     SEPARATE AREAS.

8          SO, ONE IS SCOPE OF DISCOVERY. TWO IS COMPLIANCE WITH

9     DISCOVERY OBLIGATIONS OR ORDERS.  AND THREE ARE REMEDIES IN

10    DISCOVERY.

11         AND, SO, YOU CAN HAVE A FIGHT ABOUT SCOPE OF DISCOVERY

12    WITHOUT HAVING ANY ARGUMENT ABOUT COMPLIANCE, RIGHT.

13         AND YOU CAN HAVE AN ARGUMENT ABOUT COMPLIANCE THEY

14    MISSED A DEADLINE WITHOUT ANY ARGUMENT ABOUT SCOPE.

15         AND WE CAN SOMETIMES TALK ABOUT REMEDIES AS A WAY TO

16    HELP US DEFINE SCOPE.  BUT MORE OFTEN THAN NOT, A REMEDY IS

17    SOMETHING THAT WE ONLY GET TO AFTER WE TALK ABOUT SCOPE OR

18    COMPLIANCE.

19         AND WHEN WE TALK ABOUT REMEDIES THERE IS A DIFFERENCE

20    BETWEEN MORE DISCOVERY AS A MOTION TO COMPEL VERSUS

21    MONETARY THINGS WHICH ARE JUST REPAYMENT OF LITIGATION

22    EXPENSES.  AND THEN SANCTIONS.  THEY'RE ACTUALLY MEANT TO BE

23    SOMEWHAT PUNITIVE AS A DETERRENT AND AS A SORT OF RETRIBUTIVE

24    ELEMENT.

25         SO, ALL THESE THINGS ARE DISTINCT.  AND EVERYTHING IS

1    SORT OF MISH-MASHED A LITTLE BIT IN THE MOTION.

2            SO, I HAVE DIVIDED THIS UP INTO SORT OF FOUR AREAS, AND I'M

3    GOING TO SORT OF PROCEED THAT WAY.

4            THE FIRST IS THE EASIEST, WHICH IS --

5            IS IT MR. CHOU OR MR. CHU?

6            MR. KEYES:  YOUR HONOR, YES.  I BELIEVE IT'S MR. CHOU.

7            THE COURT:  OKAY.

8            ALL RIGHT.  THE FIRST WILL BE THE DEPOSITION OF MR. CHOU.

9            SECOND WILL BE DISCOVERY DAMAGES.  THAT DEALS WITH

10   LICENSED TRADEMARKS, REVENUE CPMS, MUSIC STUDIOS, AGENCIES, ET

11   CETERA.

12           THE THIRD BUCKET WILL BE FORM OF PRODUCTIONS, WHICH

13   YOU'RE TALKING ABOUT THE PRIVILEGE LOG AND THE HYPERLINKS.

14           AND THEN THE FOURTH AREA IS THE COMPLIANCE ISSUE WHICH

15   SORT OF REVOLVES AROUND PRESERVATION AND REASONABLENESS OF

16   THE SEARCH COLLECTION -- SEARCH AND PRODUCTION EFFORTS.  OKAY.

17           I KNOW IT'S SORT OF BEEN COUCHED AS AN OVERARCHING

18   SORT OF COMPLIANCE ISSUE, BUT WE NEED TO SORT OF BE VERY CLEAR

19   ABOUT WHAT WE'RE TALKING ABOUT AND WHEN.

20           SO, LET ME START WITH MR. CHOU'S DEPOSITION.

21           AS I HEAR WHAT YOU'RE SAYING IN THE PAPERS, MR. KEYES, IS

22   THAT -- IT'S A COMBINATION OF THINGS THAT -- IT'S CAUSING YOUR

23   RESISTANCE.  IT'S CHINESE CITIZEN, CHINESE SOIL, REDUNDANT

24   WITNESS.  AND OTHER THINGS MAKE IT A BURDEN SO THAT ON BALANCE

25   THAT WE SHOULD NOT HAVE MR. CHOU'S DEPOSITION.

1        I DON'T READ YOU TO BE SAYING THAT SOMEHOW JUST

2    BECAUSE OF HIS CHINESE CITIZENSHIP THAT ALONE CATEGORICALLY

3    PROTECTS HIM AND IMMUNIZES HIM FROM ANY POTENTIAL DEPOSITION.

4        AM I READING YOU CORRECTLY?

5        MR. KEYES:  YOU'RE READING VERY CORRECTLY, YOUR HONOR.

6        THE COURT:  OKAY.

7        SO, I THINK THAT -- IS THERE A WAY TO BALANCE THIS?

8    BECAUSE I --  ONE APPROACH THAT I WOULD SUGGEST IS THAT I THINK

9    THAT -- YOU KNOW, IF MR. CHOU WERE JUST IN THE UNITED STATES, I

10   WOULD SORT OF EASILY SAY HAVE HIM BE DEPOSED.

11       TO BE SENSITIVE TO SOME OF THE CONCERNS HE HAS BASED

12   ON WHERE HE IS AND THE CHINESE PRIVACY LAW ISSUES, MY

13   COMPROMISE TO YOU ALL WOULD BE WE CAN FIGURE OUT A WAY TO GET

14   HIM DEPOSED EITHER REMOTELY OR IN PERSON, WHICHEVER SEEMS

15   MORE FEASIBLE, BUT DO IT AT STITCH'S EXPENSE.

16       SO, I DON'T KNOW IF THAT MEANS MR. CHOU SHOULD COME TO

17   THE UNITED STATES AT STITCH'S EXPENSE AND BE DEPOSED NORMALLY.

18   IF IT MEANS SENDING HIM TO MAKAU OR SINGAPORE TO HAVE HIM BE

19   REMOTELY DEPOSED.  PROBABLY LESS EXPENSES.

20       BUT MY INCLINATION IS I THINK HE'S RELEVANT AND

21   PROPORTIONAL ENOUGH.  I DON'T THINK THAT THE BURDEN ISSUES ARE

22   INSURMOUNTABLE.  AND I THINK THE WAY TO BALANCE THESE THINGS A

23   BIT IS TO HAVE HIM BE DEPOSED WHEREVER YOU ALL THINK MAKES

24   SENSE.  IF YOU NEED TO TAKE HIM OFF CHINESE SOIL, SO BE IT.  OR

25   BRING HIM TO THE UNITED STATES AT STITCH'S EXPENSE.

1          MS. ROCKETT:  YOUR HONOR --

2          THE COURT:  MR. KEYES.

3          MR. KEYES:  YOUR HONOR, I THINK THAT THAT'S A -- THAT'S A

4    SENSIBLE COMPROMISE.  YOU KNOW, IT STRIKES ME AS -- YOU KNOW,

5    WE ASKED FOR A PRODUCTION OF DOCUMENTS IN THIS CASE RELEVANT

6    TO STITCH -- THE USE OF STITCH INTERNALLY.

7          THE COURT:  UH-HUH.

8          MR. KEYES.  AND YOU INDICATED TO US, YOU KNOW, YOU

9    THOUGHT THAT IT WAS POTENTIALLY RELEVANT.  BUT IF WE WANTED

10   THEM, WE'D HAVE TO PAY FOR THE PRODUCTION AT COSTS ASSOCIATED

11   WITH THAT IN TERMS OF THE REVIEW.

12         SO, IT STRIKES ME VERY MUCH IN LINE WITH YOUR PRIOR --

13         THE COURT:  RIGHT.

14   MR. KEYES:  -- RULING ON THAT ISSUE.

15         THE COURT:  LET ME  -- LET ME JUST ASK STITCH THEN.

16         HOW DO YOU WANT TO DO IT?  IF YOU WANT MR. CHOU, WHAT

17   DO YOU WANT TO DO?  DO YOU WANT TO HAVE HIM --

18         I MEAN, MR. KEYES, CAN HE JUST DO IT FROM  -- IS THERE

19   ANOTHER OFFICE IN MAKAU, SINGAPORE, OR IT IS BETTER FOR HIM TO GO

20   -- COME TO THE UNITED STATES?

21         MR. KEYES:  YOUR HONOR, I WOULD HAVE TO CHECK ON THAT

22   FOR SURE.

23         THE COURT:  YOU CAN WORK OUT SOME SORT OF  -- SOME

24   LOCATION.  OKAY.

25         SO, THAT'S WHAT I'M GOING TO ASK YOU TO DO.

1          MS. ROCKETT, WHAT DO YOU HAVE?

2          MS. ROCKETT:  YOUR HONOR, THE INVENTIS POWER CASE THAT

3     THE DEFENDANT CITED IN THEIR BRIEF ACTUALLY FULLY SUPPORTS THE

4     PLAINTIFF'S POSITION IN THIS CASE.  AND THE HOLDING WAS

5     MISREPRESENTED TO YOUR HONOR IN THE FOLLOWING.  THAT COURT DID

6     NOT FIND THAT THE CHINESE DEFENDANT IS PRECLUDED FROM

7     PARTICIPATING IN DISCOVERY OR THAT THE HAGUE CONVENTION HAD TO

8     APPLY.

9          BUT, RATHER, IN THAT CASE UNDER THOSE CIRCUMSTANCES

10     THE FEDERAL RULES OF CIVIL PROCEDURE GOVERNED BECAUSE THE

11     WITNESS AT ISSUE WAS A SENIOR OFFICER.  AND HERE WE ARE DEALING

12     WITH A MANAGING PARTY OF THE DEFENDANT ENTITY WHO HAS CRITICAL

13     INFORMATION.  THEY WERE OBLIGATED -- THE COURT CAN ORDER THEM

14     TO APPEAR IN A JURISDICTION SUCH AS SINGAPORE, WHICH WE'RE  -- WE

15     BELIEVE TIKTOK --

16          THE COURT:  I KNOW, MS. ROCKETT.  I GUESS EVERYTHING

17     YOU'RE SAYING IS CONSISTENT WITH WHAT I'M ORDERING.  I'M JUST

18     ASKING YOU TO PICK UP THE TAB.

19          MS. ROCKETT:  I DON'T KNOW THAT THAT'S --

20          THE COURT:  WELL, BUT THAT'S HOW I'M BALANCING THE

21     REDUNDANCY OF HIS TESTIMONY WITH THE OTHERS.  IF HE'S WORTH IT

22     FOR YOU, THEN, YOU'LL PAY FOR IT.

23          MS. ROCKETT:  CAN WE ADDRESS THE --

24          THE COURT:  YES.

25          MS. ROCKETT:  -- REDUNDANCY THEN.

1      SO, MR .BUZINOVER WHO TESTIFIED,  HE CLAIMED THAT MR.

2  CHOU, NOT --

3      THE COURT:  MS. ROCKETT, ARE WE MISCOMMUNICATING.  I AM

4  PERMITTING -- I'M GOING TO ORDER THE DEPOSITION OF MR. CHOU TAKE

5  PLACE WITHIN SEVEN DAYS OF TODAY.  YOU ALL PICK A PLACE THAT

6  ALLOWS HIM TO DO IT.  AND YOU COVER HIS REASONABLE TRAVEL

7  EXPENSES, WHETHER IT'S TO MAKAU, TO SINGAPORE, OR TO THE UNITED

8  STATES.

9      MS. ROCKETT:  THANK YOU, YOUR HONOR.

10     WE WILL LET THE COURT KNOW BY TOMORROW MORNING IF WE

11  --

12     THE COURT:  WELL, YOU DON'T NEED TO LET ME KNOW

13  ANYTHING.  IF YOU'RE GOING TO DO THE CHOU DEPOSITION, IT HAS TO

14  HAPPEN WITHIN SEVEN DAYS OF TODAY.  MR. KEYES HAS TO PRODUCE

15  HIM AT SOME LOCATION THAT IS AGREEABLE TO YOU ALL.

16     IF YOU CAN'T AGREE, THEN BRING HIM TO THE UNITED STATES.

17     BUT PRESUMABLY COMING -- GOING TO SINGAPORE OR MAKAU

18  IS PROBABLY BETTER THAN COMING TO THE UNITED STATES.  IT'S LESS

19  TRAVEL EXPENSES AS WELL.  AND I THINK AT THAT POINT YOU CAN MAYBE

20  EVEN DO IT REMOTE BECAUSE YOU CAN DO IT REMOTE FROM THERE.

21     SO, IF YOU WANT HIM, YOU'LL PAY THE DEPOSITION --

22  OBVIOUSLY THE REPORTER'S COST ANYWAY.  BUT PAY FOR HIS TRAVEL

23  EXPENSES TO GET TO WHEREVER YOU NEED HIM TO BE.  AND IF YOU

24  WANT TO DO THAT IT HAS TO BE DONE WITHIN SEVEN DAYS.  AND MR.

25  KEYES HAS TO MAKE SURE THAT HE'S PRODUCED AT THAT LOCATION.

1       IF YOU CAN'T AGREE ON LOCATION, MR. KEYES, YOU'VE GOT TO

2   BRING HIM TO THE UNITED STATES.

3       MS. ROCKETT:  THANK YOU, YOUR HONOR.

4       AND REASONABLE TRAVEL EXPENSES, DOES THAT INCLUDE

5   FIRST CLASS OR PRIVATE?

6       THE COURT:  YEAH.  RIGHT.  REASONABLE COACH EXPENSES.  IF

7   HE WANTS TO UPGRADE ON HIS OWN POINTS, HE CAN.

8       ALL RIGHT.  BUCKET TWO.  DISCOVERY DAMAGES.

9       ON THE FIRST TWO ISSUES ABOUT THE LIST OF AD AGENCIES

10  AND MUSIC STUDIOS, I THOUGHT THAT EARLY ON -- AND MR. SKALE

11  WOULD HAVE BEEN THE ONE THERE.  I THOUGHT WE  -- I SAID, YOU KNOW,

12  IF YOU HAVE AD AGENCIES OR MUSIC LABELS THAT ARE YOUR CLIENTS  --

13  STITCH EDITING'S CLIENTS TO USE AN RFA AND FIND OUT IF THEY ALSO

14  ARE USED -- OR CLIENTS OR ADVERTISERS WITH TIKTOK.  AND THEN FROM

15  THERE YOU COULD DO FOLLOW-ON DISCOVERY AS NEEDED.

16      WHY ARE WE STILL AT A PLACE WHERE WE'RE ASKING FOR A

17  LIST OF EVERY AGENCY AND EVERY MUSIC LABEL THAT TIKTOK WORKS

18  WITH?

19      MS. ROCKETT:  I'M GOING TO ADDRESS THE – AND LET MR.

20  SKALE JUMP IN, YOUR HONOR.

21      THE COURT:  UH-HUH.

22      MS. ROCKETT:  AT PREVIOUS HEARINGS AND PREVIOUS

23  REQUESTS WE HAD BEEN ASKING FOR CONTRACTS RATHER THAN LISTS.

24  AND WE REDUCED IT TO LISTS.  AND THESE ARE -- THIS IS NOT UNDULY

25  BURDENS0ME.  THE DEFENDANTS COULD PROBABLY PRESS A BUTTON

1    AND GENERATE THE LIST OF MUSIC LABELS --

2              THE COURT:  NO, BUT THAT'S NOT THE QUESTION.  I MEAN, AS A

3    SCOPE MATTER I NEVER SAID THAT YOU'RE ENTITLED TO -- YOU KNOW,

4    THAT'S KIND OF A FISHING EXPEDITION.

5              BUT WHERE THERE ARE OVERLAPPING CLIENTS -- AND THE

6    EASIEST WAY TO DETERMINE THAT IS STITCH EDITING HAS SOME SET OF

7    CLIENTS THAT IT FEELS MIGHT BE COMPETITORS -- IN OTHER WORDS, IF

8    YOU'RE -- YOU KNOW, YOU HAVE A TOUGH ARGUMENT.  BUT TO THE

9    EXTENT THAT YOU HAVE AN ARGUMENT THAT YOU ARE DEALING IN A

10   COMPETITIVE SPACE WITH TIKTOK, YOU HAVE YOUR AGENCIES AND

11   MUSIC LABELS THAT STITCH EDITING WORKS WITH.

12             ALL YOU NEEDED TO DO IS AN RFA.  THIS CAME UP IN THE FIRST

13   HEARING WITH MR. SKALE BACK IN JUNE OR WHENEVER I DID IT.  THAT

14   SAY HERE THE LIST OF OUR MUSIC LABEL AND AD AGENCY CLIENTS.  AND

15   YOU COULD EVEN DO IT AS TWO SEPARATE RFAS.  YOU DON'T HAVE TO

16   MAKE MULTIPLE RFAS.

17             ARE THEY YOUR CLIENTS OR NOT?  YES OR NO.

18             AND THEN BASED ON THAT YOU COULD DO FOLLOW-ON

19   DISCOVERY.  BUT THERE'S NO REASON THAT THEY NEED TO BE GIVING

20   YOU A LIST OF ALL OF THEIR AGENCIES AND MUSIC LABELS.  IT'S A

21   PROPORTIONALITY THING AS FAR AS I'M CONCERNED NOT A BURDEN

22   ISSUE.

23             MS. ROCKETT:  IS --

24             THE COURT:  SO, WHY HASN'T THAT PROCESS BEEN USED?  I

25   MEAN, THAT'S BEEN AVAILABLE TO YOU SINCE JUNE.

1        MS. ROCKETT:  AMONG -- FOR THE REASONS WE HAD TAKEN THE

2    POSITION AS A LEGAL MATTER THAT THE RELEVANT INFORMATION IS AN

3    OVERLAP IN THE CUSTOMER BASE OR USER BASE.  AND THAT THE

4    PLAINTIFFS ARE NOT REQUIRED TO PROVE THAT THE CONFLICTING

5    PARTIES HAVE THE EXACT SAME CUSTOMERS.  IT'S --

6        THE COURT:  I'M NOT SUGGESTING THAT YOU NEED TO HAVE

7    THE EXACT SAME CUSTOMERS.

8        BUT THE POINT ON THE PROPORTIONALITY SIDE IS I DON'T

9    KNOW WHAT A LIST OF ALL AD AGENCIES AND MUSIC LABELS THAT TIKTOK

10   -- HAS ANYTHING TO DO WITH YOUR CLAIMS.

11       AND TO LIMIT THAT A LITTLE BIT YOU NEEDED TO JUST SAY

12   WHERE ARE THEIR AD AGENCIES AND MUSIC STUDIOS THAT ARE

13   RELEVANT BECAUSE THEY ARE CLIENTS OF YOURS  -- CUSTOMERS.  OR IN

14   SOME WAY -- YOU NARROWED THE FIELD.  YOU NARROWED THE FIELD

15   AND YOU GOT THE DISCOVERY.  AND YOU COULD FOLLOW ALONG WITH

16   THAT.

17       BUT YOU HAVEN'T DONE THAT.  AND YOU JUST KEEP DOING THIS

18   SORT OF BLANKET GIVE US LISTS.  GIVE US LISTS.

19       SO, AT THIS POINT THE REQUEST FOR AD AGENCIES AND MUSIC

20   STUDIOS IS DENIED.

21       IF YOU WANT TO TRY TO DO WHAT I SUGGESTED BACK IN JUNE

22   AND USE RFAS AND SEEK FOLLOW-ON DISCOVERY AND SEE IF YOU CAN

23   GET THAT DONE IN TWO WEEKS, I WILL LEAVE THAT TO YOU.

24       BUT I'M NOT COMPELLING ANY MORE DISCOVERY WITH RESPECT

25   TO AD AGENCIES AND MUSIC STUDIOS BEYOND WHAT I INSTRUCTED

1    BEFORE AT THE FIRST HEARING.  BUT I'M NOT JUST GOING TO CARTE

2    BLANCHE SAY PROVIDE THE LIST OF AGENCIES AND MUSIC STUDIOS AS IT

3    STANDS NOW.

4           THE THIRD DAMAGES ISSUE DEALS WITH TRADEMARK

5    AGREEMENTS OR OTHER ROYALTY AGREEMENTS THAT TIKTOK HAS.

6           I AM AGAIN CONFUSED ABOUT THIS.  AND MAYBE THIS RELATES

7    TO THE AVERAGE AD REVENUE ISSUE.

8           CAN YOU ARTICULATE FOR ME AT THIS POINT -- YOU KNOW,

9    BACK IN JUNE WHEN I TALKED WITH MR. SKALE AT THE  -- EARLY ON -- IT

10   WAS THE BEGINNING OF THE CASE.

11          ARTICULATE FOR ME RIGHT NOW WHAT ARE YOUR DAMAGE

12   REMEDIES THEORIES.  IT SOUNDS TO ME LIKE YOU ARE PURSUING

13   PERHAPS DAMAGES IN THE FORM OF LOST ROYALTIES THAT YOU WOULD

14   HAVE BEEN ENTITLED TO HAD TIKTOK PROPERLY LICENSED THE USE OF

15   THE TRADEMARK STITCH WITH STITCH EDITING.

16          AND, THEN, NUMBER TWO WOULD BE INDIRECT INFRINGER

17   PROFITS FOR USE OF STITCH EDITING.  AND THAT'S NOT AN ACTUAL

18   DAMAGE ISSUE TO YOU.

19          ARE THOSE YOUR TWO THEORIES THAT YOU ARE PURSUING IN

20   DISCOVERY?

21           MS. ROCKETT:  I'LL LET MR. SKALE AND MS. CORMIER RESPOND,

22   YOUR HONOR.

23          THE COURT:  OKAY.

24          MR. SKALE:  YES.  THANK YOU, YOUR HONOR.

25          FIRST OF ALL,  ON ONE BRIEF QUESTION ON THE RFA.

1          SO, ARE YOU ALLOWING US TO FILE  -- TO GET THOSE RFAS

2     SERVED.  AND THEY HAVE TO BE ANSWERED EVEN THOUGH IT WOULD BE -

3     -

4          THE COURT:  YOU BETTER DO IT -- YOU BETTER DO IT

5     COOPERATIVELY BECAUSE THERE'S NO TIME LEFT FOR DISCOVERY

6     MOTIONS.

7          MR. SKALE:  WE'LL DO IT COOPERATIVELY, YOUR HONOR.

8          THE COURT:   YOU KNOW, IF YOU GET THE  -- IF YOU GET IT --

9          MR. KEYES, YOU STILL SHOULD ANSWER YES, NO.  IF THEY SAY

10    DO THE FOLLOWING AD AGENCIES, DO THE FOLLOWING MUSIC LABELS,

11    ARE THEY CUSTOMER OR CLIENTS OF YOURS.

12         RELEVANCE ASIDE.  IT SHOULD JUST BE A YES, NO, YES, NO,

13    RIGHT.

14         SUBJECT TO THAT, IF MR. SKALE WANTS TO PURSUE SOME KIND

15    OF FOLLOW-ON DISCOVERY, AGAIN, AT THAT POINT MAYBE YOU GET TIME

16    FROM JUDGE BLUMENFELD.  MAYBE YOU DON'T.

17         BUT IT'S BASICALLY TWO MINUTES LEFT ON THE CLOCK.  AND

18    IT'S WHATEVER YOU ALL GET DONE COOPERATIVELY.  THERE'S NO MORE

19    COURT INTERVENTION ON THIS ISSUE.

20         MR. KEYES:  UNDERSTOOD.  THANK YOU, YOUR HONOR.  WE'LL --

21         THE COURT:  AND THEN -- MR. KEYES, I WOULD SAY DON'T

22    STONEWALL BECAUSE, YOU KNOW, IT DOESN'T PREVENT THEM FROM

23    SEEKING SANCTIONS AFTER THE DISCOVERY CUT-OFF FOR SIMPLY --

24    THAT GOES INTO THE CIRCLE I TOLD YOU ABOUT COMPLIANCE ISSUES.

25    REGARDLESS OF SCOPE, COMPLIANCE IS A SEPARATE MATTER, SO.

1          BUT I HAD MADE THIS RFA OPTION AVAILABLE TO YOU SEVERAL

2     MONTHS AGO.  I SAID THERE'S NO NEED TO DO A FISHING EXPEDITION

3     WITH EVERY AD AGENCY AND MUSIC LABEL THAT TIKTOK HAS.  AND YOU

4     HAD THIS AVENUE AVAILABLE TO YOU.

5          AND, SO, IF YOU HAVEN'T USED IT AT THIS POINT, I'M NOT GOING

6     TO DO ANYTHING MORE ON THAT.

7          MR. KEYES:  WE'LL GET IT DONE RIGHT AWAY, YOUR HONOR.

8          THE COURT:  ON THE ROYALTY AGREEMENT, ARE YOUR TWO

9     THEORIES THAT IT'S ROYALTIES THAT WERE LOST HAD A LICENSING

10    AGREEMENT BEEN EXECUTED BETWEEN TIKTOK AND STITCH EDITING.

11    AND THEN ALTERNATIVELY, OR MAYBE BOTH, I DON'T KNOW -- I CAN'T

12    REMEMBER IN TRADEMARK IF YOU CAN PURSUE BOTH.  YOU HAVE

13    INDIRECT INFRINGER PROFITS FOR THE USE OF -- THE INFRINGING USE OF

14    THE TRADEMARK AND INDIRECT INFRINGER OF PROFITS.

15         IT'S BOTH OF THOSE, RIGHT?

16         MR. SKALE:  CORRECT -- IT'S -- EXACTLY, YOUR HONOR.  IT'S OUR

17    CLIENT'S LOST PROFITS IN THE FORM OF A REASONABLE ROYALTY AND

18    THEN DISGORGEMENT OF PROFITS --

19         THE COURT:  OKAY.

20         MR. SKALE:  -- WHICH IS –

21         THE COURT:  SO, IT'S -- AND ON THE TRADEMARK LICENSE

22    AGREEMENTS -- AGAIN, THIS GOES BACK TO --

23         I'M -- THEY DON'T NEED TO PRODUCE TO YOU ALL THE

24    LICENSING AGREEMENTS THAT THEY HAVE DONE WITH RESPECT TO THAT.

25         BUT –

1    MR. SKALE:  CORRECT --

2    THE COURT:  -- WHAT ARE INSTANCES OF ROYALTY

3  AGREEMENTS THAT STITCH EDITING HAS ENTERED INTO ITSELF TO

4  LICENSE THE USE OF THE TRADEMARK "STITCH EDITING" OR "STITCH."

5    MR. SKALE:  THEY HAVE, YOUR HONOR, LICENSED -- ENTERED

6  INTO SUCH A LICENSE.

7    BUT OUR DAMAGES EXPERT IS – NOTED THAT THE CASE LAW

8  PROVIDES FOR THE REASONABLE ROYALTY BE CALCULATED BASED ON

9  ROYALTIES THAT THE DEFENDANT HAS USED.  AND SO THAT'S WHERE

10  WE'RE MEETING.  WE DON'T NEED THE CONTRACTS, JUST THE RATE AND

11  WHO THE --

12    THE COURT:  BUT WHETHER YOUR EXPERT WANTS THAT OR NOT

13  IS A DIFFERENT ISSUE.  I MEAN, WHEN WE'RE TALKING ABOUT

14  PROPORTIONALITY -- I MEAN, LOOK, IF YOU WERE SNAPCHAT –

15    MR. SKALE:  RIGHT.

16    THE COURT:   -- AND YOU HAD A SET OF AGREEMENTS BY WHICH

17  YOU LICENSED ANY PART OF YOUR TRADEMARKS.  AND THEN TIKTOK IS

18  ALSO DOING SOMETHING.  THERE'S MORE ROOM I CAN GIVE YOU ON THAT

19  BECAUSE IT MAKES SENSE.  YOU BOTH USE REASONABLE ROYALTY

20  AGREEMENTS IN SUFFICIENT QUANTITY THAT IT MAKES SENSE THAT YOU

21  CAN COMPARE THINGS.

22    BUT I HAVEN'T SEEN, AND YOU HAVEN'T TOLD ME ABOUT,

23  ANYTHING THAT COMPELS ME TO THINK THAT STITCH EDITING WAS

24  REALLY LICENSING THE USE OF THE WORD "STITCH" IN ANY APPRECIABLE

25  WAY SUCH THAT THE PROPORTIONATE DISCOVERY YOU SHOULD GET

1    FROM TIKTOK IS ALL OF THEIR LICENSING AGREEMENT WITH ALL FAIR

2    VARIOUS, YOU KNOW, CUSTOMERS OR CLIENTS.

3          GIVEN THAT -- AGAIN, THIS GOES BACK TO THE ORIGINAL

4    THEORY OF THE CASE.  YOU ALL ARE NOT EXACTLY TIKTOK VERSUS

5    SNAPSHOT.  IT'S STITCH EDITING VERSUS TIKTOK.  OKAY.

6          I'M NOT PREJUDGING THE MERITS, BUT THAT HAS TO AFFECT

7    RELEVANCY.

8          SO, IF YOU COULD NARROW THE SCOPE OF THIS SOMEWHAT, I'M

9    WILLING TO HEAR YOU OUT.   BUT JUST SIMPLY GIVE US ALL YOUR

10   LICENSING AGREEMENT FOR ANY TRADEMARK LICENSING AGREEMENTS

11   YOU HAD TO TIKTOK, THAT'S WAY TOO BROAD.  WAY TOO BROAD.

12         MR. SKALE:  WELL, UNDERSTOOD.  WE'RE HAPPY TO NARROW

13   THE REQUEST.

14         WHAT --

15         THE COURT:  DO YOU WANT ME TO TRY TO HELP YOU NOW?  I

16   MEAN, I DON'T KNOW.

17         MR. SKALE:  SURE.

18         THE COURT:  I MEAN, MR. KEYES, IS THERE -- YOU KNOW, THE

19   OTHER PROBLEM WITH YOU, AND THIS GOES INTO THE COMPLIANCE

20   ISSUE A LITTLE BIT.  WHEN YOU SAY OVERBROAD, THAT NECESSARILY

21   MEANS THAT THERE'S SOME SUBSET IN THERE THAT IS RESPONSIVE BUT

22   IT'S NOT OVERBROAD.

23         OKAY.

24         SO, ONE WAY TO CUT THROUGH THIS IS TO SAY, LOOK, THE

25   ONLY COMPARABLE TRADEMARK LICENSING AGREEMENTS THAT WE HAVE

1    THAT COULD HAVE ANY POTENTIAL BEARING -- EVEN GIVING STITCH

2    EDITING ALL THE BENEFIT OF THE DOUBT -- IS THIS SUBSET OF

3    AGREEMENTS THAT WE HAVE WITH X ENTITIES.

4         SUBJECT TO THE PROTECTIVE ORDER WE WILL PRODUCE

5    THOSE AGREEMENTS AND THOSE AGREEMENTS ALONE.  EVERYTHING

6    ELSE WE BELIEVE IS NOT PROPORTIONATE TO THE CASE, EVEN IF

7    RELEVANT.  AND THEREFORE, WE'RE NOT.

8         I MEAN, THAT'S -- YOU KNOW, YOU CAN ALSO DICTATE THE

9    SCOPE OF THIS RATHER THAN JUST SIMPLY SAYING NO, OVERBROAD.

10   WHICH WE'RE GOING TO TALK ABOUT ON THE COMPLIANCE SIDE OF

11   THINGS.

12        BUT, YOU KNOW, WHEN YOU SAY OVERBROAD, THAT MEANS

13   THERE'S SOMETHING WITHIN THERE.

14        SO, FIND THAT KERNEL, WHATEVER IT IS, AND THAT'S THE

15   OTHER WAY TO SORT OF GET TO THIS.  OTHERWISE, AGAIN, YOU ALL ARE

16   GOING TO HAVE A FIGHT.

17        I MEAN, I THINK THAT THERE'S AN ARGUMENT THAT STITCH CAN

18   MAKE ABOUT WHAT THEY WANT THAT MAY -- YOU KNOW, MAY COVER

19   SOME LICENSING AGREEMENTS YOU HAVE.

20        I AGREE WITH YOU THAT THE WAY THAT IT'S PHRASED NOW IS

21   OVERBROAD.  BUT THE RECIPROCAL DISCOVERY RESPONSE OBLIGATION

22   YOU HAVE IS TO BE CLEAR ABOUT WHAT YOU ARE OBJECTING ON.

23        NOW, IF YOU'RE SAYING IT'S ALL IRRELEVANT, AND WE'RE NOT

24   GOING TO PRODUCE ANYTHING, A DIFFERENT THING, RIGHT.  THEN, I CAN

25   HEAR YOU OUT AS TO WHETHER ANYTHING SHOULD BE PRODUCED.

1       BUT IF YOU'RE JUST SAYING "OVERBROAD" WHERE YOU'RE

2   THROWING IN JUST A LITANY OF ALL THE BOILERPLATE OBJECTIONS SUCH

3   THAT I CAN'T REALLY TELL WHAT REALLY MATTERS TO YOU AND WHAT

4   DOESN'T.  BUT OVERBREADTH BY ITSELF DOESN'T IMMUNIZE YOU FROM

5   COMING BACK AND THEREFORE SAYING, "SUBJECT TO THAT OBJECTION,

6   WHAT WE WILL PRODUCE TO YOU ARE THE FOLLOWING TWO TRADEMARK

7   LICENSING AGREEMENTS THAT ARE SOMEWHERE WITHIN THE UNIVERSE

8   OF ONES THAT MIGHT BE RELEVANT TO THIS CASE.  AND THEN YOU'VE

9   CONTROLLED THE NARRATIVE.  AND FRANKLY AT THAT POINT YOU

10  PRETTY MUCH WIN.

11      BUT NOT HAVING DONE THAT YOU SORT OF -- YOU KEEP A LOT

12  OF THIS STUFF IS SELF-INFLICTED WOUNDS AS FAR AS I'M CONCERNED.

13      SO, I DON'T -- YOU GUYS DON'T HAVE ANY TIME LEFT.

14      SO, YOU KNOW, MR. SKALE, IF THERE IS A THEORY BY WHICH

15  YOU THINK THERE'S AN IDENTIFIABLE WAY OF SHOWING SOME OF

16  DESCRIBING TRADEMARK LICENSING AGREEMENTS THAT TIKTOK HAS

17  THAT COULD HAVE A BEARING ON CALCULATING YOUR REASONABLE

18  ROYALTIES, SO BE IT.  BUT JUST ALL THEIR TRADEMARK LICENSING

19  AGREEMENTS IS NOT GOING TO CUT IT.

20      SO, EITHER YOU TRY TO DEFINE IT.  OR MR. KEYES CAN

21  CONTROL IT AND SAY THIS IS THE ONLY THING THAT WE COULD HAVE

22  THAT COULD ARGUABLY FIT WITHIN THOSE PARAMETERS, AND WE'LL

23  PRODUCE THAT SUBJECT TO OUR OVERBREADTH OBJECTION.

24      MR. SKALE:  I'M HAPPY --

25      THE COURT:  IS THAT THE WAY YOU WANT TO DO IT, OR DO YOU

1    WANT US TO HASH IT OUT MORE OR WE HEAR IT TODAY AT THE HEARING.

2    BECAUSE THIS IS OUR LAST HEARING ON ALL THESE THINGS, FOLKS.

3    BECAUSE I DON'T KNOW IF YOU'RE GOING TO GET MORE TIME OR NOT.

4    SO, TODAY IS WE'RE FIGURING IT OUT.

5            MR. SKALE:  I HAVE --

6            MS. ROCKETT:  I HAVE ONE POINT OF CLARIFICATION IS WE HAD

7    TRIED TO DRAMATICALLY NARROW THE SCOPE AND BURDEN BY ASKING

8    THEM NOT TO PRODUCE THEIR ACTUAL AGREEMENT BUT A LIST OF

9    COUNTER PARTIES, WHAT WAS LICENSED, AND THE AVERAGE.

10           THE COURT:  YEAH.  BUT, AGAIN, THAT JUST FEELS LIKE A

11   FISHING EXPEDITION TO ME.

12            UNLESS THEY – WE ARE TALKING TRADEMARK LICENSE

13   AGREEMENTS THAT COULD SOMEHOW HAVE SOME BEARING ON HOW

14   STITCH EDITING IN A COMPARABLE POSITION WOULD HAVE ALSO

15   LICENSED ITS TRADEMARK.

16           MS. ROCKETT:  WE AGREE WITH YOU.  AND WE --

17           THE COURT:  YOU'RE ASKING THEM TO NEEDLESSLY PROVIDE

18   YOU INFORMATION THAT -- THAT DOESN'T, YOU KNOW, MOVE THE BALL.

19           AND, FRANKLY, ONCE YOU GET THAT, WHAT ARE YOU GOING TO

20   DO WITH IT?  IT'S JUST FOLLOW-ON DISCOVERY.  YOU'RE GOING TO THEN

21   SAY, OKAY, NOW WE WANT THIS.

22           SO, I STILL THINK THE WAY THAT YOU FRAMED IT, MS. ROCKETT,

23   THAT THAT'S STILL WAY TOO OVERBROAD.

24           MR. SKALE:  YOUR HONOR, I'M HAPPY TO EITHER AFTER THIS

25   CALL OR TOMORROW HAVE A CONVERSATION WITH MR. KEYES ABOUT

1    LIMITING IT, OR WE COULD DO IT NOW.  BUT SUCH THINGS COULD BE

2    TRADEMARK LICENSES RELATED TO A FEATURE SUCH AS STITCH OR AS

3    TO A PARTICULAR BRAND THAT IS USED WITHIN -- TIKTOK HAS FOR A

4    CERTAIN FEATURE WITHIN GAP OR AN ADDITIONAL TYPE OF SOFTWARE

5    ELEMENT THAT'S USED.

6            SO, WE'RE NOT GOING TO NARROW IT IF IT'S SOMETHING LIKE

7    THAT, WHICH IS PROBABLY JUST AMPLE LICENSES --

8            THE COURT:   YEAH.

9            MR. SKALE:   -- THAT WOULD  --

10           THE COURT:   I MEAN, IF THAT'S TRUE  -- BUT I WANT YOU TO

11   HAVE A TWO-WAY DIALOGUE ABOUT THAT, MR. KEYES, AND SAY YES, NO.

12   NOT JUST EVERYTHING YOU'RE ASKING FOR IS TOO BROAD GIVEN HOW

13   YOU FRAMED THE ORIGINAL REQUEST.  I'M PAST THAT.  YOU'VE WON THAT

14   ARGUMENT.  OKAY.

15           NOW I'M BASICALLY SAYING WITH THE TIME THAT YOU HAVE

16   LEFT, YOU KNOW, IF THERE IS SOMETHING WITHIN THERE THAT IS

17   ARGUABLY A ROYALTY LICENSING AGREEMENT THAT MR. SKALE CAN

18   MAKE A PLAUSIBLE CASE TO YOU WOULD BE, YOU KNOW, IN THE REALM

19   OF A COMPARABLE TYPE OF LICENSING AGREEMENT, THEN, YOU SHOULD

20   PRODUCE THAT, RIGHT.

21           BUT, YOU KNOW, IT'S VERY LIMITED IN SCOPE.  I REALIZE IT'S

22   STILL A SQUISHY DEFINITION, MR. KEYES.  BUT WHAT I'M SAYING IS IS I

23   GET THAT IT CAN'T BE EVERYTHING.  BUT YOU HAVEN'T CONVINCED ME

24   THAT IT'S NOTHING EITHER.

25           AND YOU CONTROL THE NARRATIVE BY DEFINING IT IN A WAY

1    THAT SAYS HERE'S WHAT WE CAN PRODUCE TO YOU SUBJECT TO THE

2    PROTECTIVE ORDER.

3              CAN WE DO THAT?

4              MR. KEYES:  YES, YOUR HONOR.  I'M HAPPY TO WORK WITH MR.

5    SKALE.  HE AND I ARE BOTH IN LONDON, AND WE'LL BE SPENDING QUITE A

6    BIT OF TIME TOGETHER FOR THE NEXT TWO DAYS.  BUT WE'LL – WE'LL

7    DISCUSS THIS EITHER RIGHT AFTER THE HEARING OR TOMORROW

8    MORNING.

9              I'M CONFIDENT THAT WE CAN COME TO  --

10             THE COURT:  RIGHT.

11             MR. KEYES:   -- A REASONABLE LIMITATION AS YOUR HONOR

12   SUGGESTED.

13             THE COURT:  YEAH, YEAH, YEAH.

14             SO, ALL I'M BASICALLY SAYING IS ALL LICENSING AGREEMENTS,

15   NO.  IT'S PROBABLY NOT ZERO.

16             DOES TIKTOK HAVE AN EXACT TRADEMARK AGREEMENT THAT

17   WOULD FIT THE FOUR CORNERS OF THIS SITUATION.  PROBABLY NOT.

18   BUT THERE'S SOMETHING PROBABLY, YOU KNOW, ONE DEGREE REMOVED

19   FROM THAT THAT FALLS WITHIN THE PARAMETERS OF POTENTIALLY

20   LIKELY TO LEAD TO DISCOVERABLE EVIDENCE THAT CAN BE PROVIDED.

21   OKAY.

22             MR. KEYES:  OKAY.

23             THE COURT:  ALL RIGHT.  CPMS, AVERAGE AD REVENUE.

24             SO, NOW ON INDIRECT INFRINGER PROFITS HERE, MR. SKALE, I

25   AM -- AGAIN, WE NEED TO LIMIT THE SCOPE HERE.  I'M NOT QUITE -- MAYBE

1     YOU CAN ARTICULATE FOR ME.  WHAT IS THE THEORY OF INDIRECT

2     INFRINGER PROFITS FROM THE USE OF THE STITCH EDITING FEATURE IN

3     THE TIKTOK APP?

4              BECAUSE THE WAY YOU'RE ASKING FOR THE INFORMATION NOW

5     IT'S FOR ALL AD REVENUES.  AND THEY HAVE DIFFERENT WAYS IN WHICH

6     THEY GET REVENUES.

7              I GET THE POINT THAT FROM THEIR MARKETING OR THEIR

8     EITHER – THAT WHOEVER THEIR SALESPERSON IS, FOR THEM TO SAY AD

9     REVENUES GENERATED FROM SPONSOR CONTENT, AD REVENUES

10    GENERATED FROM THE FIRST PAGE THAT COMES UP ON THE TIKTOK APP,

11    AD REVENUE GENERATED FROM FOR YOUR PAGE THAT YOU DO SCROLL

12    THROUGH – IN THEIR DIFFERENT STREAMS OF AD REVENUES THAT I

13    SUPPOSE IN THEORY THEY COULD JUST ADD IT ALL UP AND DIVIDE BY X

14    AND SAY THAT'S THE AVERAGE.

15             A, I DON'T KNOW HOW HELPFUL THAT IS TO YOUR EXPERT.

16             B, IT IS SORT OF MISLEADING.  AND I DON'T KNOW HOW

17    REPRESENTATIVE THAT WOULD BE AND WHICH WAY THAT WOULD CUT.

18             THAT SAID, AS YOU RIGHTLY POINT OUT FROM THE BEGINNING, I

19    TOLD MR. KEYES THEY CANNOT SORT OF SAY BECAUSE WE CAN'T PUSH A

20    BUTTON AND GIVE YOU A NUMBER, THAT WE'RE NOT GOING TO BE ABLE

21    TO GIVE YOU ANY NUMBER.

22             BUT WE'RE NOW AT THE PLACE AND THE TIME WHERE I'M STILL

23    NOT SEEING HOW YOU ARE DEFINING SOME PRINCIPAL WAY THAT TIKTOK

24    CAN GO AND GET YOU SOME FIGURES THAT ISN'T JUST VERY BLANKET

25    COVERING ALL AD REVENUES, ALL CPMS.  I MEAN, YOU KNOW, THAT'S

1    JUST NOT A WAY THAT THEY CAN HOLD DATA IN A WAY THAT'S

2    MEANINGFUL TO YOU, A.  AND TO MANIPULATE IT IN A WAY THAT I THINK

3    YOU'RE SIMPLIFYING IT, OVERSIMPLIFIES IT TO THE POINT WHERE I DON'T

4    KNOW WHO THAT HURTS OR HELPS.  BUT JUST SAY AVERAGE CPM

5    ACROSS ALL YOUR AD REVENUE MODELS, YOU KNOW, THAT'S -- I DON'T

6    KNOW WHAT THAT WOULD YIELD AS AN ANSWER.  BUT, YOU KNOW, I

7    DON'T KNOW THAT IT'S GOING TO BE A RELIABLE METHOD OF

8    CALCULATING ANYTHING THAT MAY EVEN PASS DAUBERT AT THAT POINT.

9            SO, TELL ME A THEORY OF INFRINGER -- INDIRECT PROFITS

10   FROM THE USE OF THE STITCH EDITING FEATURE ON THE TIKTOK APP

11   FROM SEPTEMBER 20, 2020 TO THE PRESENT DAY THAT ALLOWS YOUR

12   EXPERT TO GET SOME KIND OF DATA POINT THAT HE NEEDS TO

13   CALCULATE, HOWEVER HE WANTS TO CALCULATE, INDIRECT INFRINGER

14   PROFITS.

15           MR. SKALE:  HAPPY TO, YOUR HONOR.

16           SO -- SO, WHAT OUR EXPERT OF DAMAGES -- SAID IS EVERY TIME

17   HASHTAG STITCH IS BEING SHOWN ON A VIDEO, IT'S AKIN TO ADVERTISING

18   THAT HASHTAG STITCH FEATURE.

19           AND, SO, IT'S OUT THERE THE SAME AS IF LIKE NIKE WANTED TO

20   RUN AN AD ON TIKTOK, NIKE WOULD PAY SOMETHING PER A CPM TO HAVE

21   ITS AD RUN THERE.

22           AND, SO, INSTEAD TIKTOK IS ADVERTISING ESSENTIALLY ITSELF

23   BY HAVING ITS HASHTAG STITCHES BE CONTINUOUSLY VIEWED.  AND, SO,

24   OUR EXPERT HAS SAID I'M GOING TO TAKE WHAT THAT VALUE IS,

25   ESSENTIALLY THAT ADVERTISING AND MARKETING VALUE OF THEM

1    HAVING PUT HASHTAG STITCH ON SO MANY VIEWS AND SO MANY

2    EYEBALLS AND ESSENTIALLY ADVERTISING FOR ITSELF AND WHAT THEY

3    WOULD HAVE HAD TO PAY IF THEY WERE SOMEONE OTHER THAN TIKTOK.

4    IF THEY WERE NIKE.  PUTTING HASHTAG NIKE ON ALL THESE VIDEOS AND

5    LETTING ALL THESE PEOPLE SEE IT.  WHAT WOULD THAT BE IN USING --

6              THE COURT:  I MEAN, I GUESS THEN THE QUESTION FOR ME IS  --

7    I MEAN, TO ME THAT LOGIC DOESN'T TRACK.  AND TIKTOK WOULDN'T PAY

8    ITSELF ANYTHING FOR ADVERTISING ITS OWN SERVICES.  I MEAN, THAT

9    COMES AT A DIFFERENT LINE ITEM AS TO ITS OWN COST OF DOING

10   BUSINESS.  AND THEN TO SAY THAT THAT CAN BE ANALOGIZED TO WHAT

11   IT WOULD PAY ADVERTISERS IS ALSO GOING TO BE WILDLY ALL OVER THE

12   PLACE.

13             MR. KEYES:  WELL  --

14             THE COURT:  AND, SO, A, I GUESS  -- I DON'T KNOW HOW THAT

15   GETS YOU A RELIABLE FIGURE THAT GIVES YOU A METHODOLOGY THAT

16   YOUR EXPERT CAN PASS DAUBERT ON.

17             I SUPPOSE WE CAN GET YOU THAT FIGURE.  BUT I REALLY DON'T

18   KNOW A WAY THAT IT'S RELIABLE.  I MEAN, YOU NEED SOMETHING ELSE

19   THAN WHAT YOU JUST DESCRIBED TO ME.  BECAUSE YOU'RE JUMPING

20   FROM THE IDEA THAT TIKTOK IS ADVERTISING FOR ITSELF TO THE IDEA OF

21   THEY'RE MAKING MONEY FROM THAT.  BUT THEY DON'T MAKE MONEY

22   FROM ADVERTISING STITCH ITSELF.  THEY MAKE MONEY FROM VARIOUS

23   DIFFERENT MODELS.

24             AND, SO, THAT'S SORT OF THE FUNDAMENTAL, YOU KNOW,

25   TROUBLE WITH YOUR INFRINGER PROFITS THEORY.  AND WHAT YOU'VE

1    ARTICULATED FOR ME AT THIS POINT I STILL DON'T SEE HOW I GIVE ANY

2    DIRECTIVE TO TIKTOK ON HOW THEY CAN MEANINGFULLY PROVIDE YOU

3    SOMETHING RELATED TO AD REVENUE INFORMATION THAT'S GOING TO BE

4    HELPFUL TO YOU  -- A, OBTAINABLE, AND. B, HELPFUL.

5           BECAUSE I STILL DON'T -- THE PREMISE OF YOUR -- OF WHAT

6    YOU JUST SAID DOESN'T TRACK.  SO, ADVERTISING FOR ITSELF YOU CAN'T

7    THEN USE THEIR ADVERTISING REVENUES WITH ALL THESE OTHER THIRD

8    PARTIES AS A PROXY --

9           MR. SKALE:  NO, IT'S NOT -- I'M SORRY.  I DIDN'T MEAN TO

10   INTERRUPT, YOUR HONOR.

11          IT'S NOT THEIR ADVERTISING REVENUE FROM ALL THESE THIRD

12   PARTIES.  IT'S WHAT WOULD THEY HAVE TRIED TO PAY TO HAVE THEIR

13   NAME OF THIS MANY VIEWS IF THEY WERE -- IF THEY WERE A THIRD

14   PARTY.

15          AND, SO, IT' THE VALUE OF BEING ABLE TO HAVE --

16          THE COURT:  SO, YOU'RE –

17          MR. SKALE:  -- THEIR NAME  --

18          THE COURT:  NOW, IT'S LIKE -- NOW IT'S LIKE  -- WELL, NOW,

19   YOU'RE TREATING TIKTOK AS ITS OWN ADVERTISER.  SO, I GUESS MAYBE

20   TIKTOK PAYS OTHER SITES AND OTHER THINGS SOMETHING TO

21   ADVERTISE TIKTOK ITSELF.

22          IS THAT WHAT YOU MEAN?

23          MR. SKALE:  NO, NO.  NO, YOUR HONOR.

24          AGAIN, WE'RE TRYING TO PUT A -- BECAUSE TIKTOK'S VIEW IS

25   THERE IS NO REVENUE.  AND, SO, OUR DAMAGES EXPERT SAYS THAT

1    CAN'T BE THE CASE.  AND, SO, HE'S TRIED TO --

2         THE COURT:  NO, NO, NO.  THEY'RE NOT SAYING THERE'S NO

3    REVENUE.  THEY'RE JUST SAYING THEY DON'T KNOW A WAY TO GET YOU

4    DATA POINTS THAT -- ISOLATE THE USE OF THE STITCH EDITING FEATURE,

5    THE PROMOTION OF THE STITCH EDITING FEATURE TO REVENUES.  AND

6    YOU'RE TRYING TO DO IT THROUGH AD REVENUES --

7         MR. SKALE:  WELL --

8         THE COURT:  -- AT A GROSS LEVEL THAT IS JUST TOO BROAD.

9    AND SO --

10        LOOK, IT MAY BE THAT IT'S  -- YOU CAN ARTICULATE A BETTER

11   WAY TO DEFINE INFRINGER PROFITS.  YOU'RE GOING TO BE, YOU KNOW,

12   HAVING TROUBLE.  BUT I JUST STILL DON'T SEE -- I MEAN,  BUT GO AHEAD.

13   I KNOW I'M –

14        MR. SKALE:  SO  --

15        THE COURT:  BECAUSE I'M NOT UNDERSTANDING.  FIRST, YOU

16   HAD A THEORY THAT THIS IS TIKTOK'S ADVERTISING THINGS THAT IT

17   MIGHT PAY FOR ITS OWN ADVERTISING.  AND THERE I THOUGHT YOU

18   MIGHT BE GOING DOWN A PROMISING TRACK, WHERE MAYBE THERE ARE

19   FIGURES OF WHAT TIKTOK PAYS OTHER SITES TO PROMOTE TIKTOK.  AND

20   MAYBE THERE IS SOME MARKETING FIGURE AROUND THAT.  AND WHAT

21   THEY YIELD IS ON THAT KIND OF EXPENDITURE.

22        I MEAN, I DON'T KNOW.  BUT I MEAN THAT MIGHT BE A LITTLE BIT

23   MORE ON TRACK.  BECAUSE NOW YOU'RE TALKING ABOUT A FEATURE

24   THAT'S PART OF TIKTOK THAT'S BEING PROMOTED.  AND TO WHAT EXTENT

25   THAT DRIVES INCREASED TRAFFIC TO TIKTOK IS SORT OF THE THING THAT

1   WE'RE TRYING TO GET AT.

2          BUT THAT IS DIFFERENT FROM YOU SAYING WE NEED TO GET

3   AVERAGE AD REVENUE FROM ACROSS ALL THEIR DIFFERENT AD REVENUE

4   STREAMS..

5          MR. SKALE:  RIGHT.

6          SO, FIRST OF ALL, WE'RE HAPPY TO GET THOSE FIGURES.  I

7   THINK THAT WOULD -- WE WOULD LOVE TO SEE THOSE AS A MATTER OF

8   DAMAGES I WOULD --

9          THE COURT:  NOW, WHAT FIGURES?

10   I MEAN --

11          MR. SKALE:  I MEAN ANY OF THE MARKETING FIGURES THAT YOU

12   JUST MENTIONED.  SO, YOU SAID WHERE I --

13          THE COURT:  I'M JUST MAKING SOMETHING UP.

14          MR. – MR. KEYES, IS THERE SOMETHING THAT IS -- NOW WE'RE

15   TALKING ABOUT A SLIGHTLY DIFFERENT MODEL.  IT'S TIKTOK AS ITS OWN

16   ADVERTISER, RIGHT.  AND WHAT WOULD IT PAY IN ORDER TO ADVERTISE

17   ITSELF TO DRIVE USERS TO TIKTOK.  AND THEREBY YOU ARE THEREFORE

18   -- YOU KNOW, THEN, YOU'RE DRIVING OBVIOUSLY THROUGH INDIRECT ADS

19   AND OTHER THINGS.  BUT THAT'S HOW YOU GET THE REVENUES.  BUT IT

20   WOULD BE HOW YOU DRIVE TRAFFIC TO YOURSELF AND WHAT YOU PAY IN

21   ORDER TO DRIVE THAT TRAFFIC TO YOURSELF.

22          MR. KEYES:  BUT, YOUR HONOR, THAT OBVIOUSLY IS

23   SOMETHING THAT WE HAVE NOT DISCUSSED WITH --

24          THE COURT:  YEAH, I KNOW.  I'M ARTICULATING THE THEORY

25   FOR THE FIRST TIME HERE ON THIS CALL.  I GET THAT.

1          MR. KEYES:  RIGHT.  SO --

2          THE COURT:   FROM YOUR UNDERSTANDING OF YOUR CLIENT,

3   DOES THAT WORK AS A MODEL?

4          MR. KEYES:  YOUR HONOR, CANDIDLY I DON'T -- I DON'T KNOW.

5          THE COURT:  OKAY.

6          MR. KEYES:  AND I'D LIKE TO POINT OUT ONE OTHER THING.

7          YOUR HONOR, IN TERMS OF THE REVENUE ASSOCIATED WITH

8   THIS STITCH FEATURE.

9          THE COURT:  RIGHT.

10          MR. KEYES:  SO, THERE'S BEEN UNCONTROVERTED 30(B)(6)

11   TESTIMONY ON AUGUST 4TH BY JOHN REGGIO -- AND WE CITED TO THE

12   TRANSCRIPT.  THIS IS WHAT MAKES THIS CLAIM FOR INDIRECT PROFITS

13   THAT MUCH MORE UNTENABLE.  IS THAT TIKTOK GENERATES AD REVENUE

14   IN TWO WAYS, BY RESERVATION AD AND BY AUCTION.  AND MR. REGGIO

15   TESTIFIED AT LENGTH ABOUT BOTH OF THOSE.

16          EITHER WAY, WHETHER IT'S RESERVATION OR AUCTION, AN

17   ADVERTISER CANNOT CREATE A STITCHED AD THAT GENERATES

18   REVENUE TO TIKTOK.  AND THE REASON BEING IS THAT THERE'S ALL

19   SORTS OF RIGHTS ISSUES THAT GO INTO THAT, THAT TIKTOK DOESN'T

20   WANT TO --

21          THE COURT:  I GET THAT.  I MEAN, I GET THAT.  AND THAT'S WHY

22   I'M SAYING -- JUST SAYING GIVE US THE AD REVENUES FROM THOSE TWO

23   STREAMS IS NOT A SUFFICIENTLY PROPORTIONATE REQUEST.

24          BUT THERE ARE ADVERTISERS ON TIKTOK THAT SAY, HEY,

25   STITCH THIS VIDEO TO ONE OF YOUR OTHER VIDEOS.  SO, SHOW

1     YOURSELF RUNNING AND STITCH IT TO THIS NIKE COMMERCIAL, RIGHT.

2           MR. KEYES:  CORRECT.

3           THE COURT:  AND, SO, THE QUESTION IS IN THOSE INSTANCES --

4     I MEAN , THERE I CAN SEE A NEXIS BETWEEN THE STITCH EDITING

5     FEATURE, POTENTIAL REVENUES THAT THAT PROVIDES TO TIKTOK BY

6     VIRTUE OF INCREASED IMPRESSIONS THAT NIKE GETS AS A RESULT OF

7     THE PROMOTION OF STITCH EDITING.

8           SO, WHAT I WAS HOPING FOR WAS SOMETHING FROM MR.

9     SKALE'S EXPERT THAT SAYS, YOU KNOW, WHAT WE'RE LOOKING FOR ARE

10     ADVERTISERS WHO PROMOTE OR ADVERTISE THE STITCH EDITING

11     FEATURE -- UNDERSTANDING THEY DON'T STITCH THEMSELVES.  THAT'S

12     NOT THE POINT.  AND THAT'S WHY, YOU KNOW, USING WHAT THEY DO

13     THEMSELVES IS NOT THE POINT.

14           BUT IT'S HOW THOSE ADVERTISERS ASK YOUR USERS TO USE

15     STITCH THAT CAN FURTHER DRIVE TRAFFIC TO THOSE ADVERTISERS'

16     SITES.  AND BY DOING THAT, THEY GET MORE POTENTIAL REVENUES.

17     THEY GET MORE CPMS.  AND BY GETTING MORE CPMS TO THEM, THAT

18     INCREASES REVENUES TO TIKTOK.

19           THERE'S A LOT OF PREMISES THERE TO GET THERE, RIGHT.  BUT

20     WITHIN THAT UNIVERSE I CAN AT LEAST HEAR AN ARGUMENT FOR HOW

21     YOU GET MAYBE SOME DATAPOINTS THAT ALLOW THEM TO BUILD THAT.

22           BUT UNTIL MR. SKALE COMES UP WITH SOMETHING LIKE THAT,

23     I'M TELLING YOU I GET THAT JUST ASKING FOR THIS GROSS AD REVENUE

24     TYPES OF NUMBERS DOESN'T WORK.

25           ON THE OTHER HAND IT'S NOT – NOW, I DON'T THINK IT'S UN- --

1    YOU KNOW, HARD TO -- IMPOSSIBLE TO IMAGINE.  DIFFICULT BUT

2    IMPOSSIBLE TO IMAGINE.  A THEORY BY WHICH THERE ARE REVENUES

3    THAT ARE BEING INDIRECTLY -- AND THAT'S WHAT ALL INFRINGER --

4    INDIRECT INFRINGER PROFITS ARE ABOUT.

5         AND YOU'LL HAVE YOUR CHANCE TO SAY ALL OF THESE OTHER

6    THINGS THAT HAVE TO BE DEDUCTED FROM THAT AND ALL THESE THINGS

7    MAKE IT AT THE END OF THE DAY THAT THERE IS MAYBE NEAR ZERO NET

8    PROFITABILITY TO US FROM THE USE OF THE STITCH EDITING FEATURE.

9         BUT THAT'S A DIFFERENT QUESTION.

10        ALL WE'RE TRYING TO GET AT IS WHEN ADVERTISERS USE OR

11   PROMOTE THE STITCH FEATURE -- WHEN MAYBE TIKTOK ITSELF USES

12   THAT FEATURE, THAT DRIVES TRAFFIC IN A WAY THAT THEREFORE

13   INDIRECTLY GETS AD REVENUE TRAFFIC UP.

14        THERE'S SOME ATTENUATION THERE WHICH I AM ACCEPTING.

15        SO, I'M NOT PUTTING THE BURDEN ON YOU.  BUT I'M -- I AM

16   SAYING THAT JUST TELLING YOU THAT ADVERTISERS DON'T USE STICH

17   EDITING DOESN'T ANSWER THE QUESTION FOR ME.  OKAY.

18        THAT DOESN'T MEAN THE ANSWER IS EASY, BUT THAT DOESN'T

19   ANSWER THE QUESTION FOR ME.  SO, I'M WITH YOU.

20        YOU CAN'T JUST GO TO AD REVENUES -- QUA -- AD REVENUES

21   AND SAY WHAT'S THE NUMBER.

22        ON THE OTHER HAND, YOU CAN'T JUST SAY BECAUSE

23   ADVERTISERS DON'T USE STITCH EDITING, IT'S ZERO.

24        BUT IT'S NOT YOUR BURDEN TO ARTICULATE THERE INDIRECT

25   INFRINGER THEORY.

1          SO, ONCE MR. SKALE PRESENTS SOMETHING TO ME THAT I CAN

2   SORT OF SEE AT LEAST THE DOTS -- HOW YOU GET FROM DOT A TO DOT B

3   TO DOT C TO DOT D, THE MERITS OF WHETHER THAT WORKS OR NOT IS A

4   DIFFERENT MATTER.  BUT IF HE CAN TELL ME THOSE DOTS, AND I CAN

5   CONNECT THOSE DOTS LOGICALLY, I CAN SAY GET THE DATA POINTS FOR

6   THOSE DOTS.

7          MR. SKALE HASN'T DONE THAT YET.  I -- WE'VE JUST BEEN

8   FLOATING THINGS OUT HERE.   AND I HAZARD A GUESS THAT I'VE DONE IT

9   MORE EXPRESSLY THAN COUNSELS' DISCUSSIONS HAVE BEEN IN TERMS

10  OF TWO DIFFERENT WAYS THAT YOU MIGHT BE ABLE TO MODEL THIS.

11         ONE IS TIKTOK'S OWN WAY IT ADVERTISED ITSELF GENERALLY.

12  AND THEN YOU HAVE TO BACK YOUR WAY OUT AND SAY WELL, HOW MUCH

13  IN  -- OF THAT -- DURING THAT TIME DID THEY PROMOTE STITCH.  AND

14  NARROW THAT DOWN.  AND MAYBE YOU CAN USE SOME KIND OF A

15  RATIONAL ECONOMIC PERCENTAGE BASIS TO FIGURE OUT HOW MUCH

16  YOU COULD ATTRIBUTE THAT TO STITCH EDITING FROM PRE-STITCH

17  EDITING.  OR THIS THEORY ABOUT HOW ADVERTISERS PROMOTE STITCH

18  IN ITS OWN RIGHT SO THAT THAT DRIVES IMPRESSIONS TO THEM AND

19  THEREBY PAYING – THEIR REVENUES TO TIKTOK.

20         BUT, MR. SKALE, YOU'VE GOT TO DO ONE OR MORE OF THESE

21  THINGS.  AND THEN I THINK YOU'RE ON INTELLIGIBLE GROUND WITH MR.

22  KEYES.  BUT UNTIL THEN, YOUR REQUESTS RIGHT NOW DON'T GIVE ME

23  ANYTHING I CAN SINK MY TEETH INTO.

24         MR. SKALE:  SO, AS TO THE SECOND POINT, THIS CATEGORY, WE

25  DID ASK FOR THAT TYPE OF REVENUE FROM TIKTOK BUT WERE DENIED.

1        BUT I WANT TO --

2        THE COURT:  WHAT TYPE OF REVENUE?

3        MR. SKALE:  BUT I WANT TO --

4        THE COURT:  I THINK YOU ALL ARE NOT COMMUNICATING

5    BECAUSE YOU'RE NOT BEING VERY PRECISE.  AND YOU'VE GOT TO SPEAK

6    NOW MARKETING LINGO-EES THAT SOCIAL MEDIA COMPANIES  --

7        MR. SKALE:  UNDERSTOOD.

8        THE COURT:  -- NOT THE LEVEL OF LAWYER ACCOUNTING THAT

9    WE HAVE  -- WHICH IS AWFUL.  RIGHT.

10        MR. SKALE:  WELL, LET ME  -- LET ME QUICKLY GO BACK TO THE

11    CPM JUST FOR A MOMENT.

12        WE'RE ONLY LOOKING FOR THE AVERAGE CPM THAT

13    ADVERTISERS PICK.  SO, WHAT "CPM" MEANS IS --

14        THE COURT:  YOU KEEP SAYING THAT, MR. SKALE, AS IF THAT IS

15    A  -- A METRIC THAT IS IN AND OF ITSELF KEPT.

16        I MEAN, I THINK AT THIS POINT, MR. KEYES, IF YOU WANTED TO,

17    YOU COULD GET YOUR  -- ALL YOUR AD  -- ALL YOUR AD REVENUES FROM

18    YOUR DIFFERENT MODELS, ADD THEM UP, DIVIDE THEM BY A MILLION AND

19    SAY THAT'S THE AVERAGE CPM.

20        MR.  SKALES:  THAT WILL WORK.  WE'LL TAKE THAT.

21        THE COURT:  OKAY.

22        MR. SKALE:  IT'S ACTUALLY  --

23        THE COURT:  -- INTRINSICALLY WE HAVE A FLAWED NUMBER FOR

24    SOME REASON  --

25        MR. SKALE:  WELL, I –

1          THE COURT:  MR. KEYES, IF LITERALLY WHAT THEY'RE ASKING

2    YOU TO DO IS ADD UP ALL YOUR DIFFERENT AD MODELS, DIVIDE IT BY THE

3    NUMBER  -- DIVIDE IT BY THE NUMERATOR -- THE DENOMINATOR AND GIVE

4    US A NUMBER, THEN DO THAT.

5          MR. KEYES:  AND THAT'S EASIER THAN THAT IF I JUST QUICKLY  --

6          SO, THE CPM IS WHAT AN ADVERTISER WILL PAY FOR A

7    THOUSAND VIEWS.

8          SO, IF YOU'RE NIKE AND YOU WANT TO ADVERTISE, TIKTOK WILL

9    SAY IT'S GOING TO COST YOU $8 FOR EVERY THOUSAND VIEWS.

10         THE COURT:  RIGHT.

11         MR. KEYES:  AND, SO, THEY COULD JUST ADD UP ALL THE CPMS

12   FROM ALL THEIR ADVERTISERS THAT THEY'VE EVER PAID BECAUSE THEY

13   DO BY AUCTION.

14         SO, SOMETIMES IT'S $8.  SOMETIMES IT'S 18.  SOMETIMES 30.

15   AND SO THEY --

16         THE COURT:  WELL, THAT'S THE AUCTION MODEL.  BUT THERE'S

17   ALSO A DIFFERENT RESERVATION MODEL AS WELL.

18          MR. KEYES:  -- SURE.

19         THE COURT:  SO  --

20         MR. KEYES:  SURE.

21         THE COURT:  BUT IF YOU'RE SAYING AGGREGATE AND, YOU

22   KNOW, A CONGLOMERATE ALL OF THIS STUFF --

23         MR. SKALE:  YES.

24         THE COURT:  -- IT DOESN'T  -- BUT --

25         MR. KEYES, YOU MAY HAVE A DIFFERENT ARGUMENT AT THE

1    END OF THE DAY WHICH IS WHETHER THEY HAVE A RELIABLE DAMAGES

2    THEORY.  OKAY.

3           BUT AS FAR AS DISCOVERY  -- I GUESS AT THIS POINT IF ALL

4    THEY WANT IS THE AVERAGE NUMBER PER CPM MULTIPLIED ACROSS ALL

5    OF YOUR VARIOUS AD ONES, YOU CAN JUST DO THAT AND PROVIDE THE

6    MAPS.

7           MR. SKALE:  THAT WOULD BE FINE, YOUR HONOR.

8           THE COURT:  YOU WANT TO DO THAT, MR. KEYES?

9           MR. KEYES:  WELL --

10          THE COURT:  I MEAN, THAT'S AS MUCH AS I CAN TELL YOU TO DO.

11          MR. KEYES:  YOUR HONOR, I'VE GOT TO TELL YOU -- AND MAYBE

12   THIS IS MORE JUST MERITS BASED, BUT THIS WHOLE ISSUE WAS

13   DISCUSSED WITH MR. REGGIO.

14          AND MS. CORMIER ASKED HIM ABOUT CALCULATING AVERAGES.

15   AND HE SAID THAT'S GOING TO BE A MEANINGLESS, FRUITLESS EXERCISE

16   BECAUSE  --

17          THE COURT:  WHICH IS RIGHT  --

18          MR. KEYES:  -- EVERYTHING IS SO DYNAMIC --

19          THE COURT:  THAT'S WHAT  --

20          MR. KEYES:  EVERYTHING IS SO DYNAMIC IT'S LIKE IT CHANGES

21   LITERALLY BY THE MINUTE.

22          THE COURT:  SO, LOOK, ALL ACCOUNTING PAPERWORKS HAVE A

23   LIST OF A MILLION DISCLAIMERS EVERY TIME THEY PUT A NUMBER ON THE

24   PAGE.

25          SO, WHAT YOU'RE GOING TO HAVE IS GIVEN THE REQUEST --

1          IS IT AN INTERROGATORY REQUEST AT THIS POINT?

2          MR. SKALE:  KARA, DO YOU REMEMBER WHETHER --

3          MS. CORMIER:  -- MEET AND CONFERS.  IT'S BEEN IN OUR  -- IN

4    OUR LEGAL LETTER TO COUNSEL.

5          THE COURT:  I KNOW.  BUT WHAT IS IT?  IS THE PENDING

6    REQUEST AN INTERROGATORY OR A SET OF INTERROGATORIES?

7          MR. SKALE:  I BELIEVE SO.

8          MS. CORMIER:  IT'S -- I BELIEVE IT'S A NARROW -- IT'S A

9    NARROWED REQUEST FROM OUR -- FINANCIAL REQUESTS ON  --

10          THE COURT:  ALL RIGHT.  SO, LOOK  -- SO, I – AS WE

11    UNDERSTAND THE REQUEST, WE HAVE RESERVATION AD REVENUES,

12    AUCTION AD REVENUES.  AND IF WE JUST ADDED THAT ALL UP TOGETHER

13    AND COME UP WITH AN AVERAGE, THIS IS WHAT IT IS.  THAT'S THE

14    METHODOLOGY WE USED TO WRITE UP THIS NUMBER.

15          YOU'RE NOT CONCEDING ANYTHING.  ADMITTING ANYTHING, MR.

16    KEYES.  YOU'RE JUST SORT OF EXPLAINING.  AS WE'VE INTERPRETED THIS

17    INTERROGATORY THEY WANT THIS FIGURE  -- WHETHER IT'S

18    MEANINGLESS TO THE MARKETING FOLKS, WHETHER IT'S MEANINGLESS

19    TO THEIR DAMAGES EXPERT, NOT YOUR CONCERN.

20          SUBJECT TO  -- I MEAN, WHAT THE METHODOLOGY IS.

21          WE TOOK THE GROSS FIGURE FROM REVENUES FROM

22    RESERVATION AS FROM 2020 TO THE PRESENT.  WE TOOK THE GROSS

23    NUMBER FROM  AUCTION ADS ACROSS ALL OF OUR ADVERTISERS FROM

24    2020 TO THE PRESENT.  WE DIVIDED THAT BY THE NUMBER OF WHATEVER

25    THE CORRECT DENOMINATOR IS THERE.

1          THAT MATH LEADS TO THIS FIGURE.

2          MR. SKALE:  THAT WOULD BE GREAT THEN, YOUR HONOR.

3          THE COURT:  THAT'S IT.

4          MR. KEYES:  YOUR HONOR, I AM  -- OF COURSE HAPPY TO GO

5    BACK TO THE CLIENT AND SEE.

6          I MEAN, I  -- I  -- I'LL ASSUME  --

7          THE COURT:  I DON'T EVEN THINK THAT -- I DON'T NEED THEM TO

8    MAKE SENSE OF THE REQUEST.  I GET WHY THIS BLOWS THE MARKETING

9    PEOPLE'S MINDS.  I GET IT.

10         BUT YOU'RE NOT SAYING ANYTHING THAT THIS IS HOW WE DO

11   ANYTHING AS A MATTER OF BUSINESS.  YOU'RE SAYING THIS IS WHAT

12   THEY'VE ASKED FOR.  ACCEPTING THE PREMISE OF THEIR ASK, THIS IS

13   WHAT WE CAN TELL YOU.  AND YOU DIVIDE IT BY THAT NUMBER.   AND YOU

14   GET THIS NUMBER.

15         IT SEEMS LIKE YOU'VE GOT ALL YOUR DAUBERT ARGUMENTS

16   READY TO GO AS TO THE RELIABILITY OF THAT AS A DAMAGE FIGURE.  BUT

17   THAT'S A DIFFERENT ISSUE.

18         MR. KEYES:  OKAY.

19         THE COURT:  OKAY.  THAT'S WHAT I'M GOING TO ORDER YOU TO

20   DO WITH RESPECT TO THAT LAST CATEGORY OF DAMAGES.  EVERYTHING

21   ELSE, YOU DON'T NEED TO DO.

22         MR. SKALE:  OKAY.

23         THE COURT:  OKAY.

24         THAT WAS DAMAGES.

25         THE THIRD AREA WAS FORM OF PRODUCTION.

1    I GUESS ON THIS ONE -- LET ME START WITH THE HYPERLINK

2    ISSUE.

3    I GUESS, MR. KEYES, AS I LOOKED AT IT, AT THE END OF THE

4    DAY, I THINK WE'RE TALKING ABOUT 30 URLS IN THE DOCUMENT

5    PRODUCTIONS.

6    IS THAT RIGHT?

7    MR. KEYES:  I THINK WE'RE ACTUALLY TALKING ABOUT EVEN

8    FEWER THAN THAT, YOUR HONOR.  BECAUSE  A LOT OF THESE HAVE BEEN

9    PRODUCED.

10    THE COURT:  OKAY.  WELL, FINE.  BUT FOR THOSE THAT HAVEN'T

11    BEEN CHECKED AND PRODUCED, I MEAN, WHY -- WELL, WHY IS THERE

12    EVEN A TEMPEST IN A TEAPOT ABOUT THIS?  CAN  -- IF IT'S A MANAGEABLE

13    NUMBER, GO TO THOSE LINKS.  AND GET WHAT WOULD BE ASSOCIATED

14    WITH THEM  -- WHETHER IT'S A LIVE LINK OR A DEAD LINK AT THIS POINT.

15    MR. KEYES:  OKAY.

16    THE COURT:  I DON'T REALLY CARE.

17    THE POINT IS THAT AT SOME POINT THAT CONTENT OF THAT

18    DOCUMENT WAS IN SOME WAY INCORPORATING BY REFERENCE

19    SOMETHING THAT WAS HYPERLINKED TO THAT LINK.  IT MAY NO LONGER

20    BE LIVE.  BUT WHATEVER THAT DOCUMENT WAS REFERRING TO,

21    PRODUCE IT.

22    AND WE DON'T HAVE TO CALL IT A FAMILY.  AND I DON'T REALLY

23    -- WE DON'T NEED TO GET INTO THOSE DEFINITIONS.

24    YOU HAVE A MANAGEABLE NUMBER OF REMAINING URLS.

25    HAVEN'T BEEN PRODUCED YET.  GO BEHIND THEM.  FIND WHAT THE

1   DOCUMENT THAT WAS INTENDED TO BE LINKED TO THAT DOCUMENT WAS

2   AND PRODUCE IT.

3            MR. KEYES:  OKAY.

4            MS. ROCKETT:  -- YOUR HONOR  -- TO ASCERTAIN WHAT HAS AND

5   HASN'T BEEN PRODUCED AND WHAT IS THE CORRECT WAY TO DOCUMENT

6   INCLUDING, FOR EXAMPLE, WHEN THEY SAY THE UGC STITCH

7   WALK-THROUGH PRODUCED IT BY DAN 0008306 IS THE ONE WHO --

8   ATTACHED TO THIS.

9            WHAT WE NEED  -- SO THERE ARE MULTIPLE LINKS -- UGC

10  STITCH.  WE CAN'T SEE IF THEY'RE THE SAME.  AND WE CAN'T TELL WHICH

11  ONES  --

12           THE COURT:  AND SO  --

13           MS. ROCKETT/XX:  -- THEY'RE  --

14           THE COURT:  AGAIN, YOU NEED TO PRODUCE THEM IN AN

15  ASSOCIATED WAY WITH THE PARENT DOCUMENT FOR LACK OF A BETTER

16  WORD SO THAT THEY KNOW WHAT DOCUMENT IS BEING REFERRED TO.

17           SOMETIMES THE URL WILL HAVE THE FULL URL SO YOU CAN

18  KIND OF PULL OUT OF THERE WHAT THE UNDERLYING  -- IS.  OTHER TIMES

19  IT MIGHT JUST BE A DESCRIPTIVE URL.  IT DOESN'T TELL YOU WHAT THE

20  UNDERLYING DOCUMENT IS.

21           BUT TO THE EXTENT NOT ALREADY DONE  -- FOR DOCUMENTS

22  THAT WERE PRODUCED FROM URLS, REASSOCIATE THEM WITH THEIR

23  PARENT DOCUMENT.  AND FOR ANY NEW URL DOCUMENTS THAT YOU ARE

24  PULLING TOGETHER, MAKE SURE THEY'RE ASSOCIATED WITH THE PARENT

25  DOCUMENT SO THEY DON'T HAVE TO TRY TO PIECE THAT TOGETHER.

1       THAT'S A BURDEN THAT THEY SHOULDN'T HAVE TO BEAR.

2               IT'S EASY TO ASK YOU TO DO THAT BECAUSE WE'RE TALKING

3       ABOUT A MANAGEABLE NUMBER OF URLS.

4               OKAY.

5               MR. KEYES:  UNDERSTOOD, YOUR HONOR.

6               THE COURT:  OKAY.

7               ON THE PRIVILEGE LOG  -- I MEAN, MAYBE THIS DOVETAILS WITH

8       THE COMPLIANCE ISSUES.

9               BUT, MS. ROCKETT, ARE YOU SAYING THAT  -- THAT THEY

10      HAVEN'T PRODUCED A PRIVILEGE LOG THAT THEY'VE PROMISED TO YOU

11      OR, MY GOD, THERE MUST BE A PRIVILEGE LOG SOMEWHERE GIVEN THE

12      SMALL NUMBER OF DOCUMENTS THEY PRODUCED.  BECAUSE IF IT'S THE

13      LATTER, YOU'RE REALLY TALKING ABOUT THE COMPLIANCE ISSUE THAT I

14      WANT TO TALK ABOUT.

15              BUT ON THE PRIVILEGE LOG, FOR THE DOCUMENTS THAT THEY

16      HAVE PRODUCED WITHOUT A PRIVILEGE LOG, YOU KNOW, WITHIN THAT

17      UNIVERSE, IF THERE IS NOTHING PRIVILEGED THAT THEY NEED TO LOG,

18      WHAT DO YOU WANT THEM TO DO?

19              OR ARE YOU REALLY JUST SAYING THEY MUST HAVE SOME KIND

20      OF A HIDDEN SHADOW PRIVILEGE LOG IF THEY'RE NOT SHOWING US

21      GIVEN THE NUMBER OF DOCUMENTS THAT HAVE BEEN PRODUCED?

22              MS. ROCKETT:  OKAY.  LET ME  -- ALL OF THEIR ARGUMENTS

23      FIRST.

24              THE COURT:  UH-HUH.

25              MS. ROCKETT:  THEY CLAIM THAT WE DID NOT ASK FOR ONE.

1    WE, OF COURSE, ASKED FOR ONE IN THE INSTRUCTIONS TO THE FIRST

2    AND SECOND RFPS WHICH WERE THEN INCORPORATED IN TO THE LATER.

3            SO, YES, OF COURSE WE ASKED FOR ONE.

4            THE COURT:  OKAY.

5            MS. ROCKETT:  THEN THEY CLAIM NO PRE-COMPLAINT

6    PRIVILEGE DOCUMENTS EXIST.  AND THAT THE PARTIES AGREED NOT TO

7    PRODUCE A PRIVILEGE LOG FROM AND AFTER THE FILING OF THE

8    COMPLAINT.

9            THE COURT:  OKAY.

10           MS. ROCKETT:  FOR PRE-COMPLAINT PRIVILEGED DOCUMENTS,

11   WE HAVE  -- AND THIS DOES DOVETAIL -- THE MOST RECENT EVIDENCE

12   WE'VE BEEN ABLE TO OBTAIN IS THAT THEY RECEIVED THE CEASE AND

13   DESIST NOTICES IN DECEMBER OF 2000 AND JANUARY OF 2021.  AND THEY

14   DID NOT INSTITUTE A LITIGATION HOLD.  THEY DID NOT SERVE THE CEASE

15   AND DESIST NOTICES ON THE TWO CUSTODIANS --

16           THE COURT:  RIGHT.

17           MS. ROCKETT:   -- THAT  --

18           THE COURT:   NOW YOU'RE GETTING INTO THE FOURTH BUCKET

19   THAT I WANT TO TALK ABOUT.

20           I'M JUST TALKING ABOUT IF THERE IS A PRIVILEGE LOG THAT

21   FOR THE EXISTING PRODUCTIONS SHOULD HAVE BEEN PRODUCED,

22   THAT'S THE ONLY QUESTION HERE.

23           YOU KNOW, IF WE GET TO LARGER PRODUCTIONS LATER WHEN

24   WE TALK ABOUT COMPLIANCE AND THE REASONABLENESS OF THEIR

25   SEARCH AND THE REASONABLENESS OF THEIR PRESERVATION,

1   DIFFERENT ISSUE.  THAT WILL OBVIOUSLY THEN LEAD TO PRIVILEGE

2   ISSUES POTENTIALLY.

3          AND I AGREE WITH YOU THAT A PRIVILEGE LOG HAS TO BE

4   PRODUCED FOR RESPONSIVE DOCUMENTS IF THERE'S ANY THAT ARE

5   PRIVILEGED. OR WORK PRODUCT.  DIFFERENT ISSUE.

6          ALL I'M TALKING ABOUT IS THE FORM OF PRODUCTION FOR

7   EXISTING PRODUCTIONS.

8          AND WHAT I TOOK AWAY ULTIMATELY FROM WHAT YOU WERE

9   SAYING  -- AND THIS IS WHERE THE BLEEDING OF ALL THESE ISSUES IS IS

10  THAT YOU'RE SAYING THAT NOT THAT THEY NEED TO PRODUCE A

11  PRIVILEGE LOG FOR THE -- WHATEVER YOU'RE CLAIMING ARE THE UNIQUE

12  DOCUMENTS  -- 21 -- YOU'RE AGREEING THAT WITH RESPECT TO THAT

13  THERE PROBABLY ISN'T ONE.

14         WHAT YOU'RE NOW SAYING IS THAT THAT CAN'T BE THE

15  UNIVERSE OF PROPERLY PRESERVED, COLLECTED AND SEARCHED

16  DOCUMENTS.  AND ONCE WE GET THERE, OBVIOUSLY, THERE WOULD BE A

17  PRIVILEGE LOG POTENTIALLY AT SOME POINT.  BUT THAT'S A DIFFERENT

18  ISSUE.

19         I'M JUST TALKING ABOUT EXISTING PRODUCTIONS -- FORM OF

20  PRODUCTION.  THAT'S WHAT THE HYPERLINK ISSUE WAS.

21         YOU'RE SAYING IN THE EXISTING PRODUCTION HYPERLINK

22  DOCUMENTS WERE NOT PRODUCED.  I'M SAYING PRODUCE THEM.

23  ASSOCIATE WITH THE PARENT DOCUMENT.

24         PRIVILEGE LOG, AS TO WHAT'S BEEN PRODUCED, MR. KEYES

25  HAS SAID NOTHING THAT IS POST-COMPLAINT RESPONSIVE AND

1   PRIVILEGED EXISTS IN WHAT OUR EXISTING PRODUCTIONS ARE.  PERIOD.

2   NOTHING MORE TO SAY THERE.

3             NOW, WE'RE GOING TO TALK ABOUT THE FOURTH BUCKET.  BUT

4   IF THAT'S WHERE YOU'RE GOING WITH ALL OF THIS, WE CAN MOVE OFF OF

5   THIS.  I'M JUST TALKING IS THERE A PRIVILEGE LOG THAT YOU ARE

6   CLAIMING NEEDED TO BE PRODUCED WITH THE EXISTING PRODUCTIONS

7   TO DATE THAT HAS NOT BEEN GIVEN TO YOU?

8             MS. ROCKETT:  THE ONLY THING IS  -- THESE DOCUMENTS AS

9   PART OF TESTIMONY THAT THERE WERE LEGAL CLEARANCES ENGAGED

10  IN WITH RESPECT TO THE STITCH EDITING FEATURE.  THEY DID PRODUCE

11  DOCUMENTS.  THEY DID PRODUCE WITNESS TESTIMONY.

12            THE COURT:  GOT IT.  GOT IT.  I'M --

13            MS. ROCKETT:  WITH --

14            THE COURT:  -- SO, WE'RE GOING TO TALK ABOUT WHETHER

15  THAT WAS A REASONABLE INQUIRY, WHETHER PROPER STUFF WAS

16  PRESERVED.

17            BUT WHAT YOU'RE TALKING ABOUT ON THE PRIVILEGE LOG,

18  THAT'S THE TAIL TO THIS PROBLEM.

19            IF THERE ARE  -- YOU HAVE EVIDENCE OF COMMUNICATIONS

20  ABOUT A RELEVANT ISSUE THAT MIGHT NATURALLY HAVE CONTAINED

21  SOME PRIVILEGED COMMUNICATIONS.

22            YOU'RE SAYING BECAUSE YOU GOT NOTHING IN THAT UNIVERSE

23  AT ALL, THERE'S NO -- HERE.  AND, THEREFORE, OBVIOUSLY A PRIVILEGE

24  LOG IS PART OF THE REMEDY ON HOW THEY WOULD PRODUCE RELEVANT

25  DOCUMENTS IN THAT UNIVERSE OF TRADEMARK RESEARCH AND OTHER

1    LEGAL CLEARANCE THINGS.

2              MS. ROCKETT:  ACTUALLY, IT'S SLIGHTLY  -- WHAT  HE JUST SAID.

3              HE DID PRODUCE DOCUMENTS.  THEY'RE REFUSING TO

4    PRODUCE ATTACHMENTS OF CLAIMS CLAIMING THAT THEY ARE

5    PRIVILEGED AND THAT WE'RE NOT ENTITLED TO THEM EVEN THOUGH

6    THEY TESTIFIED ABOUT IT  --

7              THE COURT:  OKAY.  NOW, YOU'RE ACTUALLY -- TALKING ABOUT.

8              SO, ON EXISTING PRODUCTIONS, IF YOU ARE WITHHOLDING

9    DOCUMENTS, ATTACHMENTS, ANYTHING, MR. KEYES, ON THE BASIS OF A

10   PRIVILEGE, WHY ISN'T THERE A PRIVILEGE LOG WITH THAT?  EXISTING

11   PRODUCTIONS.

12             MR. KEYES:  YOUR HONOR, I DON'T  -- I DON'T KNOW THAT WE

13   ARE.  I DON'T THINK THAT'S ACCURATE.

14             THE  -- WHAT -- WHAT THE TESTIMONY WAS THAT MS. ROCKETT

15   IS REFERRING TO HERE IS MICHAEL BUZINOVER WAS ASKED DID YOU RUN

16   THE NAME  "STITCH EDITING" BY LEGAL.

17             AND HE SAID, I DIDN'T RUN THE NAME.  BUT I RAN THE CONCEPT

18   BY LEGAL.

19             THE COURT:  ALL RIGHT.

20             MR. KEYES:  OKAY.

21             THE SPECIFIC DISCOVERY REQUESTS ARE REFERENCING

22   TRADEMARK CLEARANCE SPECIFICALLY WITH RESPECT TO THE NAME.

23             AND MR. BUZINOVER TESTIFIED WE DIDN'T RUN THE NAME BY

24   LEGAL BECAUSE IT'S A COMMON SEARCH TERM.

25             THE COURT:  YOU  --

1          MR. KEYES:   A COMMON TERM IS USED  --

2          THE COURT:   -- USED -- THAT DEALS  WITH THE COMPLIANCE

3    ISSUES THAT WE'RE GOING TO TALK ABOUT ON PRESERVATION,

4    REASONABLENESS OF THE SEARCH.  OKAY.

5          I'M ASKING A SIMPLE QUESTION.  IF I'M NOT GETTING A DIRECT

6    ANSWER, I'M JUST GOING TO DENY IT.

7          GIVE ME AN EXAMPLE OF AN EXISTING DOCUMENT PRODUCTION

8    BY TIKTOK WHERE THEY HAVE ALLEGED THE PRIVILEGE OVER A

9    DOCUMENT AND HAVE NOT PRODUCED IT.

10         MS. ROCKETT:  IN THE CHARTS IT IS PART OF THE  -- YOUR

11   HONOR.

12         WE IDENTIFIED THE CHART.  WHEREVER THEY PRODUCED

13   DOCUMENTS BUT NOT --

14         THE COURT:  BUT  -- A DIFFERENT ISSUE.  I JUST RESOLVED THE

15   HYPERLINK ISSUE.

16         MS. ROCKETT:  NO.  IT'S NOT A DIFFERENT ISSUE.

17         ONE OF THEIR OBJECTIONS FOR THE FIRST TIME IN THIS MOTION

18   TO COMPEL TO PRODUCING SOME OF THE LINKS TO THE DOCUMENTS

19   THEY PRODUCE IS THAT THEY RELATE TO THE LEGAL CLEARANCE OF THE

20   STITCH EDITING FEATURE WHICH ARE PRIVILEGED.  AND WE'RE NOT

21   ENTITLED TO.

22         THE COURT:  SO --

23         MS. ROCKETT:  SO, THEY SHOULD GIVE US A LOG.

24         THE COURT:  ALL RIGHT.  SO, YOU'RE REFERRING TO SOME

25   COMMUNICATION THAT PURPORTEDLY EXISTS.

1        MR. HANSEN AND MR. KEYES, WHAT –

2        WHAT IS THAT DOCUMENT THAT YOU'RE REFERRING TO,

3    MS. ROCKETT?

4        MS. ROCKETT:  -- LEGAL REVIEW RESULT ON PAGE 41 OF OUR

5    JOINT STIP, THE TOP OF PAGE 41 -- 0002077 HAS A HYPERLINK.

6        AND THEN ONE DIRECTLY BENEATH THE COMPREHENSIVE

7    REVIEW THE DEFENDANT'S RESPONSE AND OBJECTION TO PRODUCTION

8    OF THESE LINKS IS THAT THEY'RE PRIVILEGED.  AND WE'RE NOT ENTITLED

9    TO THEM.

10       THE COURT:  OKAY.  SO, A DIFFERENT ISSUE NOW.

11       SO, I'VE SAID YOU'VE GOT TO PRODUCE THE HYPERLINKS

12   DOCUMENTS AND ASSOCIATE IT WITH THE PARENT DOCUMENT.

13       IF THERE IS SOME ASSERTED PRIVILEGE OR REQUIRED

14   PROTECTION OVER THAT UNDERLYING DOCUMENT, IT NEEDS TO HAVE A

15   PRIVILEGE LOG ON IT.  BUT --

16       MR. KEYES:  UNDERSTOOD --

17       THE COURT:  -- AT THE TIME YOU WERE NOT PRODUCING IT

18   BECAUSE YOU WERE SAYING IT WAS A BROKEN LINK WHERE THE SYSTEM

19   DID NOT MAINTAIN THAT ASSOCIATION.  THAT'S WHAT I WAS ADDRESSING.

20       OBVIOUSLY, IF THERE IS SOMETHING THAT IS PATENTLY

21   PRIVILEGED, WHETHER IT'S HYPERLINKED OR NOT, WHETHER THE

22   HYPERLINK IS BROKEN OR NOT, HOW IT EXISTS  IN THE SYSTEM IS

23   IRRELEVANT AS TO WHETHER IT IS PRIVILEGED OR NOT.

24       SO, FOR THAT HE HAS TO PRODUCE A PRIVILEGE LOG.  I DON'T

25   THINK THAT ISSUE AT ALL SHOULD BE IN QUESTION.  OKAY.

1          MR. KEYES:  UNDERSTOOD.

2          THE COURT:  SO, TO THE EXTENT THAT YOU HAD AT ALL

3    SUGGESTED THAT ONE OF THE REASONS WHY YOU WERE NOT

4    PRODUCING THE HYPERLINK DOCUMENTS WAS A POTENTIAL PRIVILEGE,

5    YOU INVITED THIS DISPUTE BECAUSE YOU DIDN'T PRODUCE A PRIVILEGE

6    LOG.

7          IF THAT'S NOT WHAT YOU INTENDED, THEN, WE RESOLVED IT BY

8    TELLING YOU TO PRODUCE ALL OF THE HYPERLINK DOCUMENTS,

9    ASSOCIATE THEM WITH THEIR PARENT DOCUMENT.

10          OF COURSE, IN ANY PRODUCTION, IF THERE IS A PRIVILEGE OR

11    WORK PRODUCT COMMUNICATION, YOU'RE ENTITLED TO ASSERT THAT

12    AND PUT IT ON A PRIVILEGE LOG.

13          MR. KEYES:  UNDERSTOOD, YOUR HONOR.

14          THE COURT:  OKAY.

15          SO, NOW, LET'S GET TO THE OTHER  --

16          MR. SKALE:  YOUR HONOR, ONE SHORT QUICK THING.

17          ALL THE OTHER CATEGORIES OF PRIVILEGED DOCUMENTS

18    WOULD BE THE COMMUNICATIONS THAT TIKTOK HAD INTERNALLY WHEN

19    THEY RECEIVED OUR DEMAND LETTER IN DECEMBER OR JANUARY.  THIS

20    WAS PRE-COMPLAINT.

21          THE COURT:  UH-HUH.

22          MR. SKALE:  THERE MUST HAVE BEEN SOME INTERNAL

23    COMMUNICATIONS THAT RELATED TO PLAINTIFF STITCH -- WHICH IS

24    CLEARLY --

25          THE COURT:  AGAIN, YOU ARE GETTING AHEAD OF ME WHICH IS

1   THE FOURTH AREA WHICH IS DID THEY REASONABLY MAKE ADEQUATE

2   SEARCH METHODS.

3          AND YOU'RE SAYING THEY DIDN'T.

4          WHY?  BECAUSE LOGICALLY THEY HAD TO HAVE HAD THESE

5   COMMUNICATIONS, BLAH, BLAH, BLAH.

6          IF THEY DID, WITHIN THAT, MIGHT THERE BE SOME PRIVILEGED

7   DOCUMENTS.  YES.  PROBABLY.  SO, THEN, THEY NEED A PRIVILEGE LOG

8   FOR THAT.  BUT THAT'S DIFFERENT THAN SAYING PRODUCE ME A

9   PRIVILEGE LOG.

10          SO --

11          MR. SKALE:  THE --

12          THE COURT:  -- THE VENN DIAGRAM AGAIN, WHERE ARE WE?

13          ARE WE IN COMPLIANCE?  ARE WE IN SCOPE?  OR ARE WE IN

14   REMEDY?

15          MR. KEYES:  UNDERSTOOD, YOUR HONOR.

16          SO READY WHEN  --

17          THE COURT:  NOW WE'RE ABOUT TO GET INTO COMPLIANCE

18   WHICH THEN DOVETAILS WITH REMEDY BECAUSE WOULD THE NATURE OF

19   THE COMPLIANCE DICTATE THE NATURE OF THE REMEDY IS.

20          OKAY.  AND OBVIOUSLY THE NATURE OF THE COMPLIANCE IS

21   SOMEWHAT DICTATED BY THE SCOPE.

22          SO, YOU HAVE ALL THESE INTERMINGLED THINGS.  BUT WE'VE

23   GOT TO BE VERY CLEAR ABOUT THIS.

24          SO, WITH RESPECT TO THIS COMPLIANCE OF OBLIGATIONS,

25   THERE'S SORT OF TWO SUBSETS.  ONE IS THE 37E ISSUE AS TO WHETHER

1    THERE IS NOW AN ALLEGATION THAT ESI HAS BEEN LOST -- ACTUALLY

2    LOST BECAUSE IT HASN'T BEEN PROPERLY PRESERVED.  THAT'S ONE

3    ISSUE.

4           AND THE OTHER WOULD BE WITHIN WHATEVER THERE IS EITHER

5    BECAUSE THERE IS NO ALLEGATION THE DATA HAS BEEN LOST.  BUT

6    WHATEVER THE RELEVANT UNIVERSE OF POTENTIALLY RESPONSIVE DATA

7    SOURCES ARE, THEY HAVE NOT REASONABLY SEARCHED THAT.  SO,

8    THAT'S DIFFERENT, RIGHT?

9           THE FIRST IS WE THINK THERE'S DATA MISSING BECAUSE THEY

10   DIDN'T PROPERLY PRESERVE.

11          THE SECOND IS WELL, WE DON'T KNOW.  BUT AT THE END OF

12   THE DAY WHATEVER EXISTS THAT IS THIS UNIVERSE OF POTENTIALLY

13   RESPONSIVE MATERIALS THAT SHOULD BE SEARCHED COUNSEL DID NOT

14   PERFORM A REASONABLE INQUIRY AS REQUIRED BY 26(G).

15          AND HERE ARE EXAMPLES FOR WHY WE CAN TELL YOU THAT

16   WE'RE NOT JUST SPECULATING.

17          EXAMPLE THIS.  EXAMPLE THAT.  EXAMPLE THAT.  ALL RIGHT.

18          SO, THOSE ARE AREAS THAT ALLOW US TO THEN INQUIRE DO

19   THEY MAKE A REASONABLE INQUIRY IN RESPONDING TO YOUR REQUEST.

20          THE ANSWER TO SOME OF THOSE THINGS ARE GOING TO BE,

21   ONE, WE DID IT.  BUT WE DIDN'T THINK IT WAS RELEVANT OR RESPONSIVE.

22          WE DIDN'T DO IT BECAUSE WE DIDN'T FEEL LIKE WE HAVE TO

23   BECAUSE THAT CUSTODIAN IS OUT OF SCOPE.

24          WE DIDN'T EVEN TRY BECAUSE THAT'S TOO BURDENSOME

25   BECAUSE OF THE SYSTEMS.

1        THERE ARE DIFFERENT ANSWERS TO THESE THINGS.  AND FOR

2   THIS, YOU ALL JUST NEED TO HAVE A CONVERSATION ABOUT IT.  BUT YOU

3   COULDN'T.  SO, WE'RE GOING TO HAVE IT NOW.  ALL RIGHT.

4        NOW, AS I READ THE BRIEFS, I REALLY THINK THAT WHERE

5   STITCH HAS SOME TRACTION HERE IS ON THE SECOND BUCKET WHICH IS

6   THE REASONABLENESS OF THE INQUIRY IN THE SEARCHES THAT WERE

7   MADE.

8        I DON'T SEE EVIDENCE ENOUGH TO SUGGEST THAT THERE HAS

9   BEEN ESI THAT HAS BEEN LOST SUCH THAT WE NEED AN INVESTIGATION

10   DONE FORENSICALLY TO DISCOVER THE SCOPE OF POTENTIALLY LOST

11   INFORMATION.

12        SO, MY READ ON IT -- AND I'LL BE HEARD ON IT  -- IS I THINK THAT

13   THE ISSUE ABOUT PRESERVATION HAS NOW AT THIS POINT THROUGH

14   OTHER THINGS THAT TIKTOK HAS FILED AND ADEQUATELY ANSWERED,

15   WHETHER THEY PROPERLY AND REASONABLY SEARCHED WHAT THEY

16   PRESERVE.  DIFFERENT QUESTION.  THAT'S WHAT WE'RE GOING TO TALK

17   ABOUT NEXT.

18        BUT I DON'T SEE AN ISSUE HERE, AT LEAST NOT ONE THAT YOU

19   MADE A SUFFICIENT SHOWING TO ME, THAT WE'RE GOING TO NOW HAVE A

20   DISCOVERY ABOUT DISCOVERY SATELLITE DISPUTE AS TO WHETHER

21   THEY PROPERLY PRESERVED EVIDENCE THAT SHOULD HAVE BEEN

22   PRESERVED.

23        I DON'T SEE AN ARGUMENT HERE THAT ESI HAS BEEN LOST.

24   YOUR ARGUMENT IS THE ESI THAT EXISTS HASN'T BEEN PROPERLY

25   IDENTIFIED AND SEARCHED.

1       DO I HAVE THAT RIGHT?

2       MS. ROCKETT:  YES.  SO, CERTAINLY THE – I DO WANT TO POINT

3   OUT SOME  INACCURACIES OR INADEQUACIES OF WHAT THEY FILED IN

4   RESPONSE TO THIS MOTION TO COMPEL BASED ON OUR CONCERNS

5   ABOUT POTENTIAL ESI DESTRUCTION.

6       THE COURT:  OKAY.

7       MS. ROCKETT:  SO, WHAT WE ASKED THEM WHEN WE FOUND

8   OUT FROM DEPOSITION THAT THE DEPONENTS BELIEVED THAT THEY

9   COULD STILL AT WILL DELETE THEIR OWN DATA FROM LARK, FROM GMAIL,

10  FROM DROPBOX, FROM EVERY OTHER DATA SOURCE.  THEY WERE UNDER

11  THE DISTINCT IMPRESSION, AND THE DEFENDANTS APPEAR TO HAVE

12  CONFIRMED IT, EITHER DIRECTLY OR BY NOT DENYING IT, THAT EVERY

13  CUSTODIAN HAS THE ABILITY TO DESTROY DATA AT WILL.

14      THEY ADMIT THAT THE LITIGATION HOLD WAS ISSUED AT SOME

15  POINT AFTER THE SERVICE OF THE COMPLAINT.  THEY DO NOT SAY WHO

16  ON LITIGATION HOLD WAS SENT TO.

17      WHETHER THEY CONFIRMED RECEIPT, WHETHER THERE WERE

18  ANY PROCEDURES IN PLACE TO ENFORCE OR EVEN AN

19  ACKNOWLEDGMENT OF RECEIPT --

20      THE COURT:  BUT ALL OF THAT -- ALL OF WHETHER THEY NEED

21  TO DO THAT REQUIRES A PREDICATE TO SUGGEST THAT THEY HAVE

22  DESTROYED EVIDENCE.  AND YOUR PREMISE FOR THAT IS THE DEPONENT

23  SAID THAT THEY COULD GO IN RIGHT NOW AND DELETE A DOCUMENT IF

24  THEY WANTED TO.

25      MS. ROCKETT:  THAT COMBINED WITH THE ABSOLUTELY ABSURD

1       PALTRY OF PRODUCTION, AGAIN, WHICH --

2               THE COURT:  DIFFERENT ISSUE.

3               MS. ROCKETT:  WE COULD  --

4               THE COURT:  THAT IS NOT A PRESERVATION ISSUE.  THAT IS A

5       REASONABLENESS OF THE SURGE IN PRODUCTION ISSUE.

6               IF ALL YOUR EVIDENCE OF POTENTIAL EVIDENCE SPOLIATION IS

7       IS THAT A CUSTODIAN SAID IN A DEPOSITION THAT THEY COULD DELETE A

8       DOCUMENT RIGHT NOW, THAT DOESN'T DO IT.  EVERYONE CAN DO THAT.

9       THAT'S A BIG SO WHAT.

10              YES, IT'S A VOLUNTARY ENDEAVOR.  WE HAVE TO TRUST THAT

11      THE CUSTODIANS KNEW WHAT COUNSEL AND THEIR INHOUSE COUNSEL

12      HAVE SAID.  DO CUSTODIANS OFTEN IGNORE THAT.  OF COURSE.

13              BUT AT THIS POINT SIMPLY SAYING THAT, YES, I CAN GO THERE

14      TODAY AND DELETE A DOCUMENT DOESN'T TELL ME ANYTHING.  BECAUSE

15      THAT EXISTS IN EVERY CASE.

16              THEY'RE NOT GOING TO FREEZE DOCUMENTS AND ENCRYPT

17      THEM AND PREVENT ANY MANIPULATION.  THEY HAVE AN OBLIGATION

18      THAT THEY HAVE TO EXECUTE.

19              AND THE ONUS IS ON YOU TO GIVE ME SOME REASON TO

20      BELIEVE THAT THERE'S EVIDENCE OF DESTRUCTION HERE.  ALL RIGHT.

21      AND I SEE NONE OF THAT.

22              SO, WITH RESPECT TO ANY REQUEST ON PRESERVATION,

23      OBVIOUSLY WE'RE NOT GOING TO SEND IN A THIRD-PARTY EDISCOVERY

24      EXPERT. THAT NONE OF THAT IS GOING TO HAPPEN.  OKAY.

25              SO, THERE'S NO EVIDENCE THAT YOU'VE PRESENTED THAT

1    GIVES ME ENOUGH REASON TO THINK THAT WE'RE GOING DOWN THE

2    PATH OF LOST ESI, AND WE NEED TO DO 37 EDISCOVERY TO DISCOVER

3    WHAT WAS LOST, WHETHER IT CAN BE RECOVERED, WHETHER THEY

4    TOOK REASONABLE STEPS TO DO ALL THAT.  WE'RE NOT GOING DOWN

5    THAT PATH.

6            BASED ON THE EVIDENCE YOU'VE GIVEN ME, THERE'S NOTHING

7    ABOUT PRESERVATION THAT I SEE HERE.

8            REASONABLENESS OF THE EXISTING SEARCH METHODS.  I HAVE

9    BIG PROBLEMS WITH WHAT TIKTOK DID HERE.  ALL RIGHT.  AND I THINK IN

10   MANY WAYS IT'S SELF-INFLICTED.  AND THAT A LOT OF THESE OTHER

11   EXTRANEOUS DISPUTES THAT WE'RE SORT OF MISLABELING OR PUTTING

12   IN THE WRONG BUCKETS ALL COMES FROM THIS ONE GROUP CONCERN,

13   WHICH IS DID THEY PROPERLY SCOPE CUSTODIANS, DATA SOURCES,

14   DATA TYPES.  OKAY.

15           I'M GOING TO PRESUME THAT THEY PUT IN THE LITIGATION HOLD

16   AT THIS POINT.  NO REASON TO DOUBT COUNSEL'S REPRESENTATION OF

17   THAT.

18           THE FACT THAT DEPONENTS SAY THEY COULD THEORETICALLY

19   DELETE, THAT DOESN'T UNDERMINE THAT ONE BIT.  OKAY.

20           BUT NOW THE QUESTION IS HAVE THEY DONE THAT

21   REASONABLY.  BECAUSE IF YOU DON'T DEFINE THE OUTER BOUNDS OF

22   THE UNIVERSE THAT THEY SHOULD HAVE STARTED WORKING WITH, YOU

23   HAVE THE PROBLEM THAT YOU HAVE NOW.  YOU'RE SAYING THEY

24   EXCLUDED COMMUNICATIONS AFTER THIS.  THEY DIDN'T DO THESE THREE

25   CUSTODIANS.  THEY DIDN'T DO THAT --

1          THAT'S THE BIGGER BUCKET OF PROBLEMS THAT WE'RE GOING

2     TO TALK ABOUT.  AND THAT'S THE ROOT CAUSE HERE OF A LOT OF THIS

3     STUFF.  ALL RIGHT.

4          SO, WHERE YOU HAVE SOME LIMITED REMEDIES HERE IT DEALS

5     WITH THIS ISSUE ABOUT THE 26(G) QUESTION, WHICH IS, UNDER THE

6     CIRCUMSTANCES DID DORSEY & WHITNEY MAKE A REASONABLE INQUIRY

7     IN ORDER TO FULFILL THEIR EXISTING DISCOVERY OBLIGATIONS AND

8     THEN RESPONDING THAT EVERYTHING IS ACCURATE AND COMPLETE AS

9     OF THE TIME IT WAS MADE.

10          AND THEY DID BOTH A POOR JOB IN COMMUNICATING WITH YOU

11     ALL SO THAT IT JUST INEVITABLY LEADS TO MORE QUESTIONS OF

12     SKEPTICISM ON YOUR PART AS TO WHETHER THEY'VE DONE IT ALL.

13          YOU FIND GAPS AND INCONSISTENCIES AND THINGS IN THE

14     PRODUCTIONS THAT YOU DO HAVE WHICH ONLY FURTHER FUELS THE

15     REASONABLE PREMISE THAT THEY HAVEN'T DONE WHAT THEY NEEDED

16     TO DO AT THE BEGINNING.  BECAUSE HAD THEY DONE THAT, WE WOULD

17     HAVE EXPECTED TO SEE THIS, AND WE WOULD HAVE EXPECTED TO SEE

18     THAT.  ALL RIGHT.

19          THIRDLY, THE FACT THAT THE ACTUAL PRODUCTION NUMBER OF

20     DOCUMENTS IS SMALL IS A POINT IN YOUR FAVOR.  IT IS PRIMA FACIE

21     EVIDENCE OF THE POTENTIAL REASON FOR ME TO EXPLORE THIS ISSUE

22     MORE.

23          BY ITSELF THAT'S JUST ON THE QUANTITATIVE ACCESS OF

24     RELEVANT CONCERNS.  THE QUALITATIVE ACCESS IS DIFFERENT.

25          SO, THE NUMBER OF DOCUMENTS PRODUCED COMBINED WITH

1   THE OTHER THINGS THAT WE'VE TALKED ABOUT GIVE ME ENOUGH TO SAY

2   WE NEED TO SOLVE THIS PROBLEM ABOUT WHETHER THEY HAVE

3   PROPERLY SCOPED THIS FROM THE OUTSET, REASONABLY SEARCHED IT,

4   AND PRODUCED WHAT THEY SHOULD HAVE.  OKAY.

5          THAT'S WHERE YOUR STRONGEST ARGUMENT IS AND THAT'S

6   WHAT I'M FOCUSING ON.  BUT YOU'RE DISTRACTING WITH ALL THESE

7   OTHER THINGS OUT THERE THAT JUST WERE NOT FOCUSED ON THAT DAY.

8   ALL RIGHT.

9          SO  -- AND THAT INCLUDES THE PRESERVATION ANGLE.  AGAIN, I

10  DON'T SEE A PRESERVATION PROBLEM HERE.  SO, THERE'S NO FORENSIC

11  EXAMINATION, NO EDISCOVERY THIRD PARTY THAT'S GOING TO COME IN.

12         WITH RESPECT TO THE SCOPE OF THINGS HERE NOW, AT THIS

13  POINT, YOU KNOW, FOR ME, MR. KEYES, THE REASONABLE INQUIRY

14  QUESTION BEGINS IN THIS CASE WITH WHO ARE THE RELEVANT UNIVERSE

15  OF CUSTODIANS.  WHETHER THERE'S OVERLAP WITH THEM I DON'T CARE.

16  WHETHER THERE'S TWO THAT ARE GOING TO BE MORE LIKELY TO HAVE

17  THE BEST ANSWER OR NOT, THAT'S NOT THE QUESTION.  AND IF YOU

18  SCOPED IT THAT WAY, THAT'S INAPPROPRIATE.

19         SO, THE SYSTEMS THAT ARE AT PLAY.  I HAVE HAD MY

20  RESERVATIONS AND NOW IT'S BEEN CONFIRMED BY THE THINGS THAT

21  STITCH IS TELLING ME, THAT WE'RE ONLY LEARNING ABOUT LARK WAY

22  TOO LATE IN THE GAME.  AND THAT GIVES ME A LOT OF CONCERN ABOUT

23  WHAT YOU TOLD COUNSEL -- OR WHAT YOU TOLD THE PARTY, YOU KNOW,

24  WHOEVER IT IS INHOUSE AT TIKTOK TO DO AND HOW THEY DID IT.

25         THE DATA TYPES, WHETHER WE'RE TALKING ABOUT EMAILS,

1    TEXTS, STAND-ALONE DOCUMENTS, ALL THESE THINGS SHOULD HAVE

2    BEEN DISCUSSED EARLY ENOUGH ON SO THAT WE ARE ALL ON THE SAME

3    PAGE ABOUT.  THIS IS THE UNIVERSE OF CUSTODIAN SYSTEMS AND DATA

4    TYPES THAT WE'RE DEALING WITH HERE.  IT'S THE OUTER BOUNDS OF IT.

5         AND IT SOUNDS TO ME LIKE AT A MINIMUM THE PLAINTIFFS ARE

6    SAYING THE OUTER BOUND OF THE POTENTIALLY RELEVANT

7    CUSTODIANS, INCLUDING MR. CHOU, WHO WE'VE NOW SAID YOU CAN

8    DEPOSE, IS THAT THERE MIGHT BE 13 OTHER CUSTODIANS THAT ARE

9    POTENTIAL END-USERS THAT HAVE RELEVANT DATA.

10        IS THAT RIGHT?

11        MS. ROCKETT:  THERE'S A DOCUMENT THAT IDENTIFIES 12

12   SPECIFIC STAKEHOLDERS WITH RESPECT TO THE STITCH EDITING

13   FEATURE.  AND IN ADDITION TO THOSE 12, THERE'S A VERY SMALL

14   DOCUMENT PRODUCTION TO DATE IDENTIFYING DOZENS OF INDIVIDUALS

15   WITH RELEVANT KNOWLEDGE OF THE FACTS AND CIRCUMSTANCES IN THE

16   COMPLAINT --

17        THE COURT:  RIGHT.

18        MS. ROCKETT:  -- WHO --

19        THE COURT:  SO, THE QUESTION AS TO THE REASONABLE

20   INQUIRY THAT MR. KEYES NEEDS TO UNDERTAKE IS SO WHEN YOU'RE

21   STARTING THIS PROCESS -- AND I'M GOING BACK TO 26(F).  26(F) SHOULD

22   HAVE BEEN WHEN THE THINGS THAT ARE IN THE BUZINOVER

23   DECLARATION OR DEPOSITION SHOULD HAVE BEEN DISCUSSED.  WE HAVE

24   LARK, GMAIL, FIGMA, MIGA OR DROPBOX.  THIS IS WHY IT'S ON THE OUTER

25   BOUNDS.  WE THINK THERE ARE 15 PEOPLE THAT MAY HOLD RELEVANT

1    INFORMATION.

2         YOU'RE JUSTIFYING THE OUTER BOUNDS OF WHAT

3    POTENTIALLY THE -- IS.  THE TYPES OF DATA -- TYPES THAT WE MIGHT BE

4    TALKING ABOUT ARE TEXTS, ET CETERA.

5         HAVING DONE THAT, THEN, YOU CAN LOOK AT THE REQUESTS.

6    AND THEN WE CAN WINNOW DOWN TO THOSE THINGS THAT ARE

7    CUSTODIANS.  AT SOME POINT, YES, YOU MAY RUN INTO A REDUNDANT

8    CUSTODIAN OR TWO.  AT SOME POINT EVEN IF A CUSTODIAN HAS

9    RELEVANT INFORMATION IT'S A MORSEL COMPARED TO THE BURDEN

10   THAT IT WOULD BE REQUIRED TO HAVE THEM PRODUCE.  SO, THAT'S A

11   PROPORTIONALITY ARGUMENT.

12        BUT WHAT I MEAN BY THIS, MR. KEYES, IS THAT FACIALLY WHEN

13   YOU TELL ME THAT, A, YOU'RE ONLY KIND OF LEARNING ABOUT THE

14   DETAILS AND LIMITATIONS OF LARK LATE IN THE DAY.

15        NUMBER TWO, THAT ONLY TWO CUSTODIANS' DATA WAS

16   ULTIMATELY SEARCHED BECAUSE YOU DECIDED THAT THAT -- THOSE ARE

17   THE TWO MOST -- NOT JUST RELEVANT BUT THE TWO MOST PERTINENT

18   SALIENT MOST COMPREHENSIVE CUSTODIANS.

19        THREE, THE NUMBER OF DOCUMENTS THAT YOU PRODUCED.

20        FOUR, THE STILL EQUIVOCAL NATURE OF A LOT OF YOUR

21   DOCUMENT PRODUCTION RESPONSES THAT STILL LEAVES PLAINTIFFS

22   WONDERING ARE THEY PRODUCING DOCUMENTS SUBJECT TO THIS

23   OBJECTION.  OR ARE THEY SAYING BECAUSE OF THIS OBJECTION WE'RE

24   NOT PRODUCING DOCUMENTS.  BECAUSE WHEN I WENT THROUGH IT, YOU

25   HAVE OBJECTIONS BUT YOU STILL PRODUCED SOME DOCUMENTS.

1        YOU HAVE SOME OBJECTIONS.  AND THEN YOU DIDN'T

2   PRODUCE DOCUMENTS.

3        YOU HAVE SOME OBJECTIONS.  AND THEN YOU SAY NO

4   RESPONSIVE DOCUMENTS FOUND.

5        AND THEN YOU HAVE SOME OBJECTIONS WHERE YOU SAY

6   WE'RE STILL SEARCHING FOR DOCUMENTS.  AND WE'LL PRODUCE THEM IN

7   DUE COURSE.

8        ALL OF THOSE THINGS THAT I JUST DESCRIBED TO YOU, MR.

9   KEYES, OPENS YOU UP TO THIS WHERE IT CAN REASONABLY BE ASKED

10  HOW REASONABLE WAS YOUR INQUIRY INTO THE CUSTODIAN SYSTEMS

11  DATA TYPES UNDER THE CIRCUMSTANCES.

12       AND YOU KEEP SAYING THE ULTIMATE END DECISION THAT YOU

13  MADE WAS GOOD ENOUGH.

14       MAYBE SO IF THE RESPONSES WERE BETTER AND THE

15  DOCUMENT PRODUCTION NUMBERS WERE BETTER.

16       BUT GIVEN THAT THEY'RE NOT, IT AT LEAST RAISES ENOUGH

17  PRIMA FACIE OF A PROFFER FROM PLAINTIFFS THAT MAKES ME SAY WHAT

18  DO WE NEED TO DO TO MAKE SURE THAT IN THE REMAINING TIME THAT

19  YOU HAVE WE CORRECT ANY DEFICIENCIES IN THE SEARCH --

20  PRESERVATION COLLECTION SEARCH METHODS THAT YOU SHOULD HAVE

21  DONE.

22       AND UNLESS YOU CAN ARTICULATE TO ME THAT THE REASON

23  THAT I DID NOT SEARCH THE OTHER 12 CUSTODIANS IS BECAUSE I

24  CONFIRMED THAT EVERY SINGLE ONE OF THEIR DOCUMENTS WOULD BE

25  DUPLICATIVE OF WHAT WOULD BE PRODUCED WITH THE OTHER TWO

1    DOCUMENTS.

2            AND I MADE THAT INQUIRY.  AND I UNDERTOOK THEM;

3    THEREFORE, I DETERMINED THAT.

4            IT'S NOT GOOD ENOUGH FOR YOU TO TELL ME THAT THESE ARE

5    THE TWO THAT TIKTOK SAYS ARE THE BEST CUSTODIANS.  OKAY.

6            NOW, AT THE END OF ALL OF THIS, AFTER YOU'VE DONE THE

7    REASONABLE INQUIRY, MAYBE WE END UP AT THE SAME PLACE.  I DON'T

8    KNOW.

9             BUT THEY HAVE A REASONABLE CASE TO BE MADE BECAUSE OF

10   THE WAY THAT YOU DID DISCOVERY COMPLIANCE -- EQUIVOCATION,

11   AMBIVALENCE, AMBIGUITY IN YOUR DISCOVERY RESPONSES.

12           NO CLEAR PRODUCTION DEADLINES, WHICH ARE -- ALL OF

13   THESE THINGS ARE IN MY PROCEDURES AND SCHEDULES AND TALK

14   ABOUT HOW WE RESOLVE THIS.  THE FACT THAT THESE SYSTEMS WERE

15   NOT IDENTIFIED EARLY ON IN -- YOU CAN UNDERSTAND IT.  IT'S NOT HIDE

16   AND SEEK.  IT'S SHOW AND TELL.

17           AND, AGAIN, THIS GOES BACK TO ONE OF MY FIRST POINTS, MR.

18   KEYES, IS YOU COULD HAVE CONTROLLED THE NARRATIVE BY SAYING

19   THIS IS THE UNIVERSE OF THINGS THAT WE COULD BE POTENTIALLY

20   DEALING WITH.  IT'S GOING TO GET NARROWED, BUT HERE ARE THE

21   BASES BY WHICH I'M NARROWING IT DOWN.

22           PLAINTIFF'S COUNSEL WILL EITHER AGREE WITH YOU OR NOT

23   AGREE WITH YOU.  IF THEY AGREE WITH YOU, YOU'RE GREAT.  IF THEY

24   DON'T AGREE WITH YOU, I HAVE A LIVE DISPUTE THAT I CAN ACTUALLY

25   LITIGATE.  THEY WOULD SAY THEY'VE IDENTIFIED THESE OTHER THREE

1    CUSTODIANS THAT THEY SAY THEY DO NOT WANT TO INCLUDE WITHIN

2    THE SCOPE BECAUSE THIS, THAT OR THE OTHER.  WE DISAGREE WITH

3    THAT.  SO, WE'D LIKE YOU TO DECIDE WHETHER THOSE THREE

4    CUSTODIANS SHOULD BE ADDED.

5            BUT WHAT YOU HAVE NOW IS YOU JUST LAY OUT ALL THESE

6    CRUMBS.  YOU DON'T MAKE ENOUGH PARENT ASSOCIATION, DOCUMENT

7    ASSOCIATIONS.  YOU SAY YOU'VE DONE IT.  AND YOU KIND OF SAY, WELL,

8    LARK IS A DIFFICULT SYSTEM.  WE'RE ONLY LEARNING THINGS FROM THE

9    CLIENT.  THE CLIENT IS IN CHINA.  THERE'S SOME DIFFICULTIES THERE.

10           I MEAN, ALL THESE THINGS ADDED UP.  YOU SHOT YOURSELF IN

11   THE FOOT.

12           SO, WHAT I'M GOING TO DO HERE IS IT DEPENDS UPON WHAT

13   YOU CAN SAY TODAY, BUT YOU'RE GOING TO HAVE TO MEET YOUR

14   REASONABLE INQUIRY BURDEN UNDER 26(G) BETTER IN SOME WAY,

15   SHAPE OR FORM.  AND WHETHER THAT MEANS ANOTHER CONFERENCE

16   OF COUNSEL.

17           AND WHAT IT'S GOING TO LEAD TO IS IT SOUNDS LIKE YOU DO

18   HAVE AN EDISCOVERY  -- AN INHOUSE EDISCOVERY CUSTODIAN AT

19   TIKTOK?  IT'S NOT MR. BUZINOVER.  BUT YOU HAVE THAT PERSON, RIGHT?

20           MR. KEYES:  HIS NAME IS MR. WARREN SALOW, YOUR HONOR.

21           THE COURT:  YEAH, MR. SALOW.  HE'S NOW BEEN IDENTIFIED.

22           AND  -- SO, WHETHER IT'S INFORMALLY THROUGH MEET AND

23   CONFER OR WE DO IT TODAY, WE'RE GOING TO HAVE A DISCUSSION ON

24   HOW YOU MET YOUR REASONABLE INQUIRY OBLIGATIONS.  HOW YOU

25   IDENTIFIED CUSTODIANS, SYSTEMS, DATA TYPES AND WHEN YOU DID IT.

1          AND AT THIS POINT I'M WILLING TO SAY THAT EVEN IF IT'S

2     LATE – AND EVEN IF IT'S DISCLOSED LATE.  ALL RIGHT.  THAT MIGHT

3     DICTATE MAYBE SOME MONETARY SANCTIONS -- MIGHT BE WARRANTED.

4          BUT AT THIS POINT I'M NOT SO WORRIED ABOUT SLAPPING YOU

5     ON THE WRIST BECAUSE YOU DIDN'T DO SOMETHING YOU SHOULD HAVE

6     DONE.  I THINK THERE ARE A LOT OF THINGS THAT YOU DIDN'T DO THAT

7     YOU SHOULD HAVE DONE.  OR YOU DID IT, BUT YOU DIDN'T DO A GOOD

8     JOB EXPLAINING HOW YOU DID IT.  AND THEREFORE INVITED THIS

9     CURRENT DISPUTE.

10          BUT WHATEVER IT IS, WE CAN TALK ABOUT THE SANCTION

11     REMEDY SEPARATELY.  BUT YOU NEED TO ESTABLISH FOR ME, FOR THE

12     PLAINTIFFS TO THEIR SATISFACTION A BETTER UNDERSTANDING OF HOW

13     YOU SCOPED YOUR REASONABLE INQUIRY INVESTIGATIONS TO THE

14     CLIENTS.  THEN WE CAN UNDERSTAND WHAT THEY DID.  AND THEN WE

15     CAN DETERMINE WHETHER THAT WAS A REASONABLE SEARCH OR NOT.

16          NOW, THE ANSWER CAN'T BE IT WOULD HAVE LED TO

17     DUPLICATIVE PRODUCTIONS.  THAT'S NOT WHAT I CARE ABOUT RIGHT

18     NOW.  YOU KNOW, YOU DON'T GET THE BENEFIT ABOUT THAT ANYMORE

19     BECAUSE OF WHERE WE ARE NOW.  SO, YOU'VE GOT TO MAKE THE BEST

20     CASE THAT YOU'VE MET YOUR REASONABLE INQUIRY OBLIGATIONS.

21          AND THEN FROM THAT, IF THERE ARE ANY GAPS LEFT, IF THERE

22     ARE ANY CUSTODIANS THAT NEED TO BE SEARCHED, WE WILL DO SO.

23     AND THAT WOULD BE THE REMEDY THAT YOU'VE GOT TO TAKE CARE OF

24     WITHIN THE REMAINING TIME.

25          AND IF SOMETHING SEEMS KIND OF BAD ENOUGH, MAYBE SOME

1   MONETARY SANCTIONS TO COVER FOR ATTORNEY'S FEES IS THE

2   APPROPRIATE SANCTION.

3         BUT WE'RE NOWHERE NEAR ADVERSE INFERENCES.  WE'RE

4   NOWHERE NEAR EXCLUSION OF EVIDENCE.  WE'RE NOWHERE NEAR

5   BRINGING IN A FORENSIC EXAMINER TO DO ALL THIS WORK.

6         BUT IT MEANS IT'S TIME TO DO MUCH MORE SHOW AND TELL,

7   MR. KEYES.  AND IT'S ACTUALLY IN YOUR INTEREST IF YOU CAN DO IT

8   BETTER.  BUT IF -- THE MORE FORTHCOMING YOU ARE, YOU MEET YOUR

9   26(G) OBLIGATION BETTER.  AND IT'S GOING TO YIELD EITHER SOME MORE

10  SEARCHING AND PRODUCTION THAT NEEDS TO BE DONE.  IT WILL NOW BE

11  DONE CONSISTENT WITH SOME OF THE OTHER THINGS THAT WE'VE

12  DISCUSSED TODAY.  AND IT WILL GET DONE WITHIN THE EXISTING

13  DISCOVERY DEADLINE.

14        IF YOU STILL NEED MORE TIME, THEN, YOU CAN GO TO JUDGE

15  BLUMENFELD AND SAY, HEY, WE NOW AGREE WITH PLAINTIFFS THAT WE

16  MIGHT NEED ANOTHER TWO WEEKS, THREE WEEKS, WHATEVER TO DO

17  EVERYTHING.  AND MAYBE YOU'LL HAVE A DIFFERENT POSTURE GOING

18  INTO JUDGE BLUMENFELD.

19        BUT THAT'S MY SPEECH TO YOU.

20        AND AT THIS POINT I DON'T WANT TO QUIBBLE WITH THE

21  PARTICULARS OF WHERE I MAY HAVE THE FACTS WRONG ABOUT WHAT

22  YOU DID.

23         I AM ALSO NOT SUGGESTING IN ANY WAY, SHAPE OR FORM

24  THAT YOU DID NOT DISCHARGE YOUR OBLIGATIONS.  OKAY.

25        BUT WHAT I'M SAYING IS YOU LEFT OPEN THIS WIDE RANGE OF

1    ACCUSATIONS BECAUSE OF ALL THESE DIFFERENT THINGS THAT YOU DID

2    OR DIDN'T DO.   AND IT'S NOW PUT YOU IN THIS POSITION WHEREAS AS A

3    RESULT YOU'RE GOING TO HAVE TO DEFEND YOURSELF MORE.

4            MR. KEYES:  UNDERSTOOD.  AND I'M -- I'M PREPARED TO DO SO,

5    YOUR HONOR, IF YOU'LL HEAR FROM ME --

6            THE COURT:  SO, HOW DO YOU -- YEAH.  SO, HOW DO YOU --

7            SO, HOW DO YOU WANT TO DO THIS?

8            MR. KEYES:  YEAH.  SO -- LET ME -- LET ME SAY THAT DORSEY &

9    WHITNEY – I'M  -- LOOK, THIS IS  -- THIS IS MY SHOW.  AND I'M LEAD TRIAL

10   COUNSEL FOR -- FOR TIKTOK.

11          THE COURT:  RIGHT.

12          MR. KEYES:  AND, SO, ALL OF THIS ULTIMATELY RESTS WITH ME.

13          MR. HANSEN AND I WERE RETAINED IN APRIL OF THIS YEAR.  SO,

14   WE WEREN'T -- WE WEREN'T INVOLVED AT THE OUTSET OF THE -- THE

15   LITIGATION.

16          THE COURT:  I REMEMBER –

17          MR. KEYES:  SO, WE CAME INTO DISCOVERY PART-WAY

18   THROUGH.

19          SO, WHAT WE HAVE – WHAT WE HAVE LEARNED -- AND WE

20   TALKED ABOUT THIS A LITTLE BIT, YOUR HONOR, DURING THE JULY 5TH

21   HEARING, THE INFORMAL DISCOVERY CONFERENCE -- THE LARK ISSUE.

22          AND I'M NOT -- I'M NOT GETTING INTO THE SPECIFICS HERE TO --

23   TO PINPOINT WHAT WAS RIGHT AND WHAT WAS WRONG.

24          BUT LARK AS MR. SALOW INDICATED IN HIS -- IN HIS

25   DECLARATION, IT WAS A PROPRIETARY SYSTEM.  IT WAS ACTUALLY A

1    PROPRIETARY SYSTEM DEVELOPED BY BYTEDANCE WHEN BYTEDANCE

2    WAS A VERY, VERY SMALL COMPANY.  IT HAD NO FORETHOUGHT THAT IT

3    WAS GOING TO BE USING THIS SYSTEM-WIDE WITH A COMPANY THAT

4    EXPLODED IN GROWTH FIVE YEARS AGO OR WHATEVER IT WAS.  IT WAS

5    RELATIVELY A HANDFUL A NUMBER OF YEARS AGO.

6            SO, BECAUSE OF THAT -- AND IT HAS CONTINUED TO USE THIS

7    LARK SYSTEM  -- LARK HAS BEEN EXCEEDINGLY DIFFICULT TO PULL

8    DOCUMENTS FROM.  IT'S JUST ARCHITECTED INTO THE PROGRAM ITSELF

9    AS MR. SALOW INDICATED.

10           SO, LARK IS A DOCUMENT MANAGEMENT SYSTEM.  THERE'S

11   ALSO DOCUMENTS ARE STORED THERE.  IT'S PROPRIETARY FORMATS.

12           AND THE PRIMARY MODE OF COMMUNICATION INTERNALLY AT

13   TIKTOK IS NOT EMAIL.  IT IS IN THESE LARK CHATS.

14           THE COURT:  RIGHT.

15           MR. KEYES:  AND -- SO, HOW -- HOW IT ACTUALLY IS

16   STRUCTURED IS IT'S LIKE A SERIES OF TEXT MESSAGES, RIGHT -- THAT

17   EVERYBODY THAT'S INVOLVED WILL CONTRIBUTE TO IT.  IT'S A

18   CLOUD-BASED COMMUNICATIONS PLATFORM.

19           AND, SO, YOU HAVE ALL OF THESE VARIOUS TEXT-LIKE

20   MESSAGES IS THE -- IS THE BEST WAY TO ANALOGIZE IT IN MY OPINION --

21           THE COURT:  SOME OF WHICH YOU HAVE RECENTLY PRODUCED

22   OR ARE IN THE MIDST OF PRODUCING.

23           MR. KEYES:  ABSOLUTELY.  WE ARE, YOUR HONOR.

24           WE HAVE -- WE HAVE RIGHT NOW -- AT DORSEY & WHITNEY WE

25   HAVE THESE LARK CHATS.

1        NOW, THIS MAY GET TO PART OF THE PRIVILEGE ISSUE THAT

2   MS. ROCKETT WAS MENTIONING IS THOSE LARK CHATS LITERALLY WERE

3   JUST PRODUCED OUT OF LARK WITHIN THE LAST HANDFUL OF DAYS.

4        AND THE REASON BEING IS MR. SALOW INDICATED IN HIS

5   DECLARATION THAT HE STRUGGLED MIGHTILY INTERNALLY TO CREATE A

6   SOFTWARE SOLUTION THAT COULD ACTUALLY EXPORT THEM TO THE

7   POINT WHERE THEY WERE -- THEY WERE READABLE -- THAT THEY WERE --

8   ANYBODY COULD MAKE HEADS OR TAILS OF THEM.

9        SO, IT'S BEEN A VERY HEAVY LIFT.

10       NOW, I KNOW THAT SOUNDS INSANE.  BUT THAT --

11       THE COURT:  NO.  I -- I DO --

12       MR. KEYES:  BUT THAT HAS HAPPENED --

13       THE COURT:  -- EVEN TO BELIEVE THAT.  BUT THE POINT OF IT IS

14   IS THAT'S WHY LARK HAD TO HAVE BEEN DISCUSSED SIX MONTHS AGO.

15       MR. KEYES:  I UNDERSTAND --

16       THE COURT:  ALL RIGHT.

17       MR. KEYES:  I UNDERSTAND THE COURT'S POINT.

18       THE COURT:  AND YOU DON'T BEAR ALL THE RESPONSIBILITY

19   FOR THAT.  BUT YOU DO BEAR ENOUGH OF IT THAT LARK HADN'T BEEN

20   DISCUSSED.

21       BUT SEPARATE FROM LARK -- THAT'S A SYSTEM QUESTION.

22       WHY IN TERMS OF DEFINING THE NUMBER OF CUSTODIANS --

23   THESE OTHER 12 CUSTODIANS THAT THEY'RE MENTIONING, WHY ARE

24   THEY NOT  -- WHY WAS THEIR DATA OR HOW WAS THEIR DATA

25   APPROACHED AND DETERMINED TO BE IN SCOPE OR OUT OF SCOPE?

1          MR. KEYES:  SO, THE INITIAL DECISION IN TERMS OF DECIDING

2    ON THOSE TWO CUSTODIANS AS OPPOSED TO SOME OF THESE OTHER

3    TANGENTIAL FOLKS IS THAT ALL OF THE – IT WAS THE TWO FOLKS.  IT WAS

4    THE PRODUCT MANAGER MR. MICHAEL BUZINOVER WHO IS ULTIMATELY

5    RESPONSIBLE FOR THE STITCH FEATURE.  HE CONCEPTED THE IDEA AND

6    -- AND WORKED WITH OTHER TEAM MEMBERS.

7          AND THEN IT WAS MIWA TACHIBANA WHO WAS ESSENTIALLY

8    INVOLVED WITH THE ROLLOUT OF THE FEATURE.

9          THE COURT:  UH-HUH.

10         MR. KEYES:  AND IT WAS DECIDED EARLY ON THAT THOSE TWO

11   CUSTODIANS -- GIVEN THE NATURE OF HOW LARK WORKS AND THE CHATS

12   THAT WOULD BE GOING BACK AND FORTH, THAT THEY WOULD HAVE

13   ACCESS TO THE ENTIRE DOCUMENT SYSTEM -- ALL – ALL OF THE LARK

14   DOCUMENTS, ALL OF THE LARK CHAT -- ALL OF THE LARK CHATS  -- THAT

15   THOSE TWO WOULD BE THE ONES THAT WOULD HAVE EVERYTHING.

16         AND THAT'S WHAT WE WERE --

17         THE COURT:  WELL, BUT THAT -- BUT THAT'S WHERE, YOU KNOW,

18   YOUR FIRST STUMBLE IS.  ALL RIGHT.

19         IN TODAY'S WAY OF WORKING AND USING, THERE IS NO

20   UNIVERSE IN WHICH THERE ARE TWO PEOPLE AT THE COMPANY THAT

21   HAVE EVERYTHING.

22         THEY MAY BE YOUR TWO BEST WITNESSES.  THEY MAY BE THE

23   TWO THAT HOLD MOST OF THE EXECUTIVE-LEVEL DECISIONS ABOUT

24   STITCH.  THAT'S A DIFFERENT ISSUE FROM WHETHER YOU PROPERLY

25   DEFINE THE CUSTODIANS WHOSE DATA AT LEAST NEEDED TO BE

1    ACCOUNTED FOR.

2           AND, SO, WHAT I'M ASKING IS FROM EARLY ON, THAT IT WAS

3    DECIDED.  AND YOU PUT IT VERY CAREFULLY IN THE PAST TENSE.  AND

4    MAYBE IT WAS DECIDED BY TIKTOK INHOUSE PEOPLE.  BUT THE "IT WAS

5    DECIDED" IS THE PROBLEM.  ALL RIGHT.

6           YOUR REASONABLE INQUIRY DUTY SAYS IT'S NOT WHO WOULD

7    HAVE EVERYTHING.  IT'S WHAT'S THE UNIVERSE OF PEOPLE THAT WILL

8    HAVE ANYTHING.  AND THEN FROM THERE WE'LL WHITTLE OUR WAY

9    DOWN.

10          ALL RIGHT.  SO, THE FIRST POINT IS THERE ARE 12 OTHER

11   PEOPLE THAT PLAINTIFFS HAVE IDENTIFIED WHO HAVE TOUCHED STITCH

12   IN SOME WAY, SHAPE OR FORM.

13          THE QUESTION IS WERE INQUIRIES MADE AS TO THEIR -- HOW

14   THEY WORK, WHAT OTHER SYSTEMS THEY MAY HAVE USED -- PHONES.  IF

15   THEY USED CHAT A LOT THAT MEANS THAT THEY'RE USING PHONES.

16          IF THERE ARE SHARED REPOSITORIES LIKE WIKIS THAT THEY

17   USE, THAT'S ONE THING.

18          THEY MUST HAVE SOME STAND-ALONE DOCUMENTS.  AND

19   MAYBE IT WON'T YIELD ANYTHING, BUT THEY MUST HAVE SOME.

20          JUST AS A MATTER OF INQUIRING AND MAKING SURE THAT THAT

21   AREA HAS BEEN EXPLORED.  AND YOU MAY COME BACK AND THEY'LL SAY

22   WE'VE GOT NOTHING THERE.

23          ALL RIGHT.  AND THAT'S FINE.  BUT THAT'S WHAT THE

24   REASONABLE INQUIRY QUESTION IS.

25          NOT HAVING DONE THAT AND NOT HAVING FULLY EXPLAINED

1    THAT TO PLAINTIFFS, YOU'RE NOW -- YOU'RE SUFFERING DEATH BY A

2    THOUSAND CUTS.

3          EVERY TIME THEY COME UP WITH SOMETHING THAT

4    REASONABLY LOOKS LIKE AN AREA THAT YOU SHOULD HAVE EXPLORED

5    OR HAD AN EXPLANATION FOR HOW YOU EXPLORED IT AND RULED IT OUT

6    IS THE PROBLEM.

7          AND, SO, ONE WAY OR THE OTHER YOU NEED TO LAY THIS OUT.

8    AND IT PROBABLY THEN ENDS WITH SOME KIND OF DEPOSITION OF MR.

9    SALOW.

10         AND AT THE END OF THAT -- WHICH WE'VE GOT TO DO QUICKLY --

11   THAT MAY THEN TELL US WHAT, IF ANY, ADDITIONAL DISCOVERY NEEDS

12   TO BE DONE AND PRODUCED.  THAT'S THE COMPELLING REMEDY.  WHAT

13   POTENTIAL MONETARY SANCTIONS MIGHT NEED TO BE AWARDED TO THE

14   PLAINTIFFS TO COMPENSATE FOR THE FACT THAT IT REALLY SHOULDN'T

15   HAVE BEEN THIS HARD.

16         I SUPPOSE THERE'S AN OUTSIDE CHANCE THAT THAT WILL

17   REVEAL LOST ESI OR SOME KIND OF MALFEASANCE THAT'S SO BAD THAT

18   THEN YOU GET INTO THE LAND ABOUT ADVERSE INFERENCE

19   INSTRUCTIONS, TERMINATING SANCTIONS -- MAYBE EVEN A FORENSIC

20   EXAMINER TO DETERMINE THE SCOPE OF DESTROYED EVIDENCE.

21         I'M NOT SAYING THAT'S OFF THE TABLE FOREVER.  BUT I'M

22   SAYING THAT'S NOT -- I DON'T HAVE A CASE FOR THAT NOW.

23         BUT THE THING THAT WE'VE GOT TO DO NOW WITHIN THE NEXT

24   TWO DAYS IS YOU HAVE TO SIT DOWN AND DO IT WITH MR. SALOW AND SIT

25   DOWN WITH PLAINTIFF'S COUNSEL AND HAVE THE 26(F) THAT YOU

1    SHOULD HAVE HAD.

2              AND, YOU KNOW, I HAVE AN ESI CHECKLIST ON MY WEBSITE

3    THAT HAS SOME THINGS THAT YOU COULD USE AS A HELPFUL CHECKLIST.

4              I MEAN, LOCATION AND TYPES OF SYSTEMS.  IT SAYS,

5    IDENTIFICATION OF SYSTEMS.

6              DESCRIPTION THAT WILL HAVE POTENTIALLY DISCOVERABLE

7    INFORMATION.

8              HOW THAT POTENTIALLY DISCOVERABLE INFORMATION IS

9    STORED.

10              ALL OF THESE, YOU KNOW, GO TO THOSE THINGS THAT YOU'RE

11    DISCOVERING, MR. KEYES, WHICH IS THAT IT IS STORED IN X, Y, Z

12    PROPRIETARY FORMAT TO EXPORT THAT INTO A PRODUCIBLE FORMAT

13    WILL REQUIRE THIS OR THE OTHER.  OKAY.

14              IF THERE IS A BURDEN ASSOCIATED TO IT, WHAT KIND OF

15    SEARCH METHODOLOGY YOU ARE USING IT.

16              WHICH CUSTODIANS YOU'VE IDENTIFIED BY NAME.  YOU -- ALL

17    THEIR ESI CHECKLIST.  THIS IF DONE SOONER WOULD AT LEAST HAVE

18    ALLOWED US TO BE TEED UP WITH AN ACTUAL CONCRETE DISPUTE RIGHT

19    NOW AS TO CERTAIN AREAS -- LIKE THIS CUSTODIAN NEEDS TO BE

20    DEPOSED.  THIS SYSTEM NEEDS TO BE SEARCHED.  THIS DATA TYPE

21    NEEDS TO BE PRODUCED.

22              BUT AS IT IS, I'VE GOT YOU ALL -- I'VE GOT PLAINTIFFS FUMBLING

23    IN THE DARK WITH A ROD OF SMOKE THAT SUGGESTS THERE MIGHT BE

24    FIRE.  AND YOU JUST KIND OF CONSTANTLY JUST FLOATING BACK AND

25    NOT JUST SIMPLY SAYING, LOOK, THIS IS HOW I MADE MY INQUIRY.  THIS

1    WAS THE SCOPE.  THIS WAS THE OUTER BOUNDS OF IT.  AND THIS IS HOW

2    I GOT HERE.

3            AND I COULD -- WHEN YOU DO THAT EXERCISE, YOU'RE GOING

4    TO FIND THAT THERE WERE GAPS -- THAT THERE WERE STILL SOME

5    CUSTODIANS THAT YOU STILL NEEDED TO AT LEAST SEARCH AND

6    DETERMINE WHETHER EVERYTHING THAT THEY HAD WAS REDUNDANT --

7    REASONABLY.

8            I'M NOT SAYING A DOCUMENT-BY-DOCUMENT LOOK.  BUT

9    THERE'S A WAY IN WHICH YOU SHOULD SATISFY FOR YOURSELF THAT

10   CUSTODIAN Y HAD EVERYTHING THAT WE WOULD BE NEEDING FROM THE

11   TWO THAT WE ALREADY GOT.

12           ONCE YOU MAKE THAT REPRESENTATION, YOU'VE DONE YOUR

13   26(G) CERTIFICATION.  AND ABSENT SOME OTHER EVIDENCE, I CAN'T KEEP

14   MAKING YOU GO BACK TO THE WELL AND TRY TO GET BLOOD FROM A

15   STONE.

16           SO, WHAT I'M PROPOSING IS WITHIN THE NEXT 48 HOURS YOU

17   ALL HAVE A ZOOM CONFERENCE.  LOOK AT MY MODIFIED PROCEDURES

18   AND SCHEDULES LIST AGAIN.  LOOK AT MY ESI CHECKLIST AGAIN.

19           GO BACK IN TIME AND DESCRIBE WHAT YOU DID.  AND, NOW,

20   MAYBE WITH THE BENEFIT OF MY HINDSIGHT WHAT YOU SHOULD HAVE

21   DONE.  AND WHAT FROM THAT CAN NOW BE DONE IN THE REMAINING TIME

22   THAT YOU HAVE.

23           BECAUSE WE HAVE TO ALL OPERATE, FOLKS, ON THE

24   ASSUMPTION THAT YOUR DISCOVERY CUTOFF IS IN TWO WEEKS.  THAT'S

25   WHY I ADVANCED THE CUTOFF DEADLINE.  I DON'T KNOW IF HE'S GOING

1    TO GIVE YOU ANY MORE TIME THAN –

2    MAYBE FROM THAT DISCUSSION YOU MAY ACTUALLY HAVE AN

3    AGREEMENT ON A CERTAIN AMOUNT OF LIMITED TIME -- NOT AS MUCH AS

4    90 DAYS THAT PLAINTIFF WANTS BUT SOMETHING MORE THAN THE ZERO

5    THAT DORSEY & WHITNEY THINKS IS NEEDED  -- THAT YOU ALL CAN THEN

6    GO INTO.

7    AND I GUARANTEE YOU.  JUDGE BLUMENFELD WILL BE MORE

8    INCLINED TO THEN SAY, IF THEY NEED THREE MORE WEEKS, THAT'S A

9    REASONABLE AMOUNT OF TIME AFTER THIS HEARING.  AND YOU ALL CAN

10   FINISH THINGS UP.

11   BUT I THINK 90 DAYS IS PROBABLY GOING TO BE TOO MUCH.

12   AND I THINK ZERO IS PROBABLY UNREASONABLE JUST TO TAKE TO JUDGE

13   BLUMENFELD.

14   ALL RIGHT.

15   SO, I THINK THAT THERE IS ENOUGH PRIMA FACIE EVIDENCE

16   THAT THERE IS A QUESTION AS TO THE THOROUGHNESS,

17   COMPREHENSIVENESS AND REASONABLENESS OF THE SEARCH

18   INQUIRIES THAT COUNSEL MADE FROM THE BEGINNING OF THE CASE TO

19   NOW.

20   AS A RESULT OF THAT, THERE NEEDS TO BE A 26(F)-TYPE

21   CONFERENCE.

22   PUT A COURT REPORTER IN THE ROOM IF YOU NEED TO.

23   AND IT'S -- USE MY CHECKLIST AS A GUIDE.  BUT IT'S -- DEFINE

24   FIRST THE OUTER BOUNDS OF POTENTIALLY RELEVANT PEOPLE, DATA

25   SOURCES, DATA TYPES.  THAT INCLUDES GMAIL BECAUSE GMAIL IS

1     MENTIONED BY MR. BUZINOVER.  FIGMA, MIGA, ET CETERA.

2              I GET THE CHATS ARE NOTORIOUSLY HARD TO EXTRACT AND

3     THEN PRODUCE IN A FORMAT THAT'S EASILY READ.

4              BUT WE CAN'T BE HAVING THAT DISCUSSION TWO WEEKS

5     BEFORE THE DISCOVERY CUTOFF.  SO, NOW, WE'VE GOT TO FIGURE OUT

6     HOW TO MAKE UP ALL THAT LOST TIME.

7              BUT CUSTODIANS, SYSTEMS, DATA TYPES, DATE RANGES -- I

8     THINK THE DATE RANGE IS SEPTEMBER 1, 2020 TO THE PRESENT DAY.

9              AND, SO, WHEN WE TALK ABOUT SYSTEMS YOU'VE GOT AT

10    LEAST ACCOUNT FOR FIGMA, MIGA, DROPBOX.

11             DROPBOX IS GOING TO HAVE STAND-ALONE DOCUMENTS.  YOU

12    KNOW, THAT'S NOT A PROPRIETARY SYSTEM AT ALL.

13             AND IF CUSTODIANS USE DROPBOX, IT MAY HAVE RELEVANT

14    DOCUMENTS.

15             NOW, IS IT PROPORTIONATE.  IS IT PRIVILEGED.  ALL THOSE

16    THINGS WILL FLOW FROM ONCE YOU'VE LOOKED.  BUT WE'VE GOT TO GET

17    PAST THE HAVE-YOU-LOOKED QUESTION.  AND THAT'S WHAT MS.

18    ROCKETT IS CONSTANTLY AND WITH JUSTIFIABLE REASON SUSPICIOUS

19    OF.

20             SO, IT'S TIME FOR YOU TO PROVE YOUR CASE.

21             AND, NOW, I'M TELLING YOU AS FAR AS I SEE IT, THE BURDEN IS

22    ON YOU TO PROVE YOUR CASE BECAUSE UNLIKE THE PRESERVATION

23    ISSUE ABOUT DESTRUCTION OF EVIDENCE, THERE'S ENOUGH PRIMA

24    FACIE STUFF HERE THAT MAKES ME WORRIED ABOUT THAT.

25             AN ASSOCIATED REMEDY WILL THEREFORE BE  -- ALSO, YOU

1       NEED TO AMEND YOUR RESPONSES AND MAKE CLEAR WHEN YOU'RE

2       GOING TO PRODUCE THINGS THAT ARE RESPONSIVE, WHAT YOU ARE NOT

3       PRODUCING THAT'S SUBJECT TO A PRIVILEGE, WHAT YOU ARE NOT

4       PRODUCING SUBJECT TO A SPECIFIC OBJECTION, AND WHAT YOU ARE

5       PRODUCING THAT IS RESPONSIVE BUT MAYBE LESS THAN THE ENTIRETY

6       OF WHAT PLAINTIFFS ARE ASKING FOR.

7               ONCE YOU DO THAT THERE'S CONCRETE DISPUTES ALL ACROSS

8       THE BOARD.  BUT YOU'VE GOT TO AMEND YOUR RESPONSES TO MAKE

9       THAT CLEAR.

10              FOLKS, I CANNOT EMPHASIZE ENOUGH THAT WHAT WE USED TO

11      DO THE -- I'M GOING TO LIST EVERY OBJECTION.  SUBJECT TO AND

12      WITHOUT WAIVING THOSE OBJECTIONS, DEFENDANTS WILL CONDUCT A

13      REASONABLE SEARCH AND PRODUCE DOCUMENTS.

14               TO THE EXTENT THAT THEY ARE NOT PRIVILEGED OR WORK

15      PRODUCT, YOU MIGHT AS WELL HAVE SAID NOTHING.  AND WHEN YOU DO

16      THAT YOU INVITE THIS DISPUTE.

17              YOU HAVE TO SAY WE'RE OBJECTING TO THIS BECAUSE IT'S NOT

18      PROPORTIONATE.  WHAT IS PROPORTIONATE WOULD BE THE FOLLOWING

19      SUBSET OF DOCUMENTS WHICH WE WILL PRODUCE WITH A PRIVILEGE

20      LOG.

21              ANYTHING BEYOND THAT, TAKE IT TO THE JUDGE.

22              THEY CAN COME IN AND SAY WE THINK THERE'S A REASONABLE

23      AREA BEYOND THAT.  BUT THEY CAN'T DO THAT RIGHT NOW.  AND THAT'S

24      WHY THIS THING -- SO, I ACTUALLY THINK THAT ALL OF THIS WILL NOT

25      YIELD A LOT.

1          BUT IT'S MOSTLY A SHOWING THAT, MR. KEYES, YOU'RE GOING

2    TO HAVE TO MAKE ON THE RECORD WITH A COURT REPORTER IN YOUR

3    26(F) DISCOVERY CONFERENCE.  AND YOU NEED TO DO IT IN THE NEXT 48

4    HOURS BY ZOOM.

5          IF APPROPRIATE, THAT SHOULD LEAD TO A DEPOSITION OF MR.

6    SALOW.

7          AND THEN HOPEFULLY FROM THAT YOU'LL HAVE EITHER

8    AGREEMENTS ON WHAT TIKTOK IS STILL GOING TO DO.

9          YOU'LL HAVE AGREEMENT ON WHEN YOU GET AMENDED

10   RESPONSES.

11         YOU'LL HAVE AN AGREEMENT ON WHEN YOU HAVE ANY

12   REMAINING PRODUCTIONS TO BE DONE.

13         AGREEMENT ON PRIVILEGE LOGS.

14         AGREEMENT ON FAMILIES OF DOCUMENTS THAT WILL BE

15   PRODUCED AND WHETHER YOU ALL WILL THEN AGREE TO SOME KIND OF

16   REASONABLE STIPULATION THAT'S MUTUALLY AGREEABLE RATHER THAN

17   TAKING A -- A DISPUTED APPROACH IN FRONT OF JUDGE BLUMENFELD.

18         DOES THAT GIVE YOU ALL A ROADMAP?

19   MR. KEYES:  YES.

20   THE COURT:  MS. ROCKETT?

21   MS. ROCKETT:  YES, IT DOES, YOUR HONOR.

22   THE COURT:  I MEAN, I KNOW YOU'RE THE ONE THAT'S BEEN

23   MOST FRUSTRATED BY THIS.  AND I GET IT.

24         AND, SO, I WANT TO MAKE SURE THAT I COVER THE BASIS ON.

25         WHAT I CAN'T REALLY DO AT THIS POINT, FOLKS, IS JUST

1    COMPEL.  LIKE I DON'T KNOW WHAT I WOULD -- WHAT I'M EVEN SHOOTING

2    AT.  RIGHT?

3           AND I CAN'T JUST SORT OF AUTOMATICALLY GO TO WHAT WE

4    KNOW, THAT THEY'VE DESTROYED EVIDENCE.  SO, NOW, LET'S THROW IN

5    A FORENSIC EXAMINER, WHICH EVEN IF WE DID, THERE'S NO WAY THAT'S

6    GOING TO BE DONE IN TWO WEEKS ANYWAY.

7            ALL RIGHT.

8           AND WE'RE NOT AT THE TIME AND THE PLACE WHERE WE'RE

9    READY TO DO ADVERSE JURY INSTRUCTIONS.

10          BUT WE DO NEED TO REWIND THE CLOCK.  ALL RIGHT.  AND GET

11   BACK THERE.

12          AND I AM SAYING THAT I THINK PROBABLY AT THE END OF THIS

13   EXERCISE WITHOUT CASTING ANY ASPERSIONS ON MR. KEYES THERE

14   MAY BE SOME MONETARY SANCTIONS THAT PLAINTIFFS SHOULD GET AS A

15   RESULT OF THIS AS ONE REMEDY FOR THIS.  OBVIOUSLY, COMPLETED

16   DISCOVERY IS THE OTHER REMEDY FOR ANYTHING THAT'S STILL

17   OUTSTANDING.

18          AND THEN SUBJECT TO WHAT'S DISCOVERED, I'M NOT

19   FORECLOSING THE IDEA OF SOMETHING THAT'S MUCH MORE SEVERE.

20   BUT YOU'VE GOT TO COME FORWARD WITH A BETTER SHOWING TO ME

21   THAN JUST A LOT OF HEAT BUT NO LIGHT.

22          AT THIS POINT WE'RE GOING TO GIVE MR. KEYES A CHANCE

23   WITH THE UNDERSTANDING THAT HE'S IN THE HOT SEAT.  AND IT'S HIS

24   BURDEN TO MAKE THE SHOWING THAT HE'S GOT TO MAKE FOR A 26(G)

25   CERTIFICATION.  AND IF HE CAN'T DO THAT WELL ENOUGH OR

1   ADEQUATELY ENOUGH, IT WILL DICTATE THE KIND OF OTHER SANCTIONS

2   THAT WE MIGHT NEED TO IMPOSE.

3         BUT HOPEFULLY AT THE END OF THIS ALL WE'RE LEFT WITH IS

4   OUR SUPPLEMENTAL PRODUCTIONS THAT WILL BE MADE IN TIME WITH

5   AMENDED RESPONSES, PRIVILEGE LOGS, DOCUMENTS PRODUCED IN

6   ASSOCIATED FAMILY WITH MAYBE SOME AMOUNT OF TIME THAT YOU GET

7   FROM JUDGE BLUMENFELD AND MAYBE A REASONABLE REQUEST FOR

8   SOME ATTORNEY FEE RECOVERY THAT THE PLAINTIFFS SHOULD GET.

9   BECAUSE I AGREE THAT IT SHOULDN'T HAVE GOTTEN TO THIS POINT.

10        ALL RIGHT.

11        MS. CORMIER OR MR. SKALE, ANYTHING ELSE?  I MEAN --

12        MS. CORMIER:  THE --

13        THE COURT:   -- DO WE HAVE ENOUGH CLEAR OF A BLUEPRINT?

14        BECAUSE I'M WORRIED ABOUT YOU FOLKS BECAUSE THE

15   REASON -- WHEN I HAVE DONE THIS LEVEL AT AN IDC, I NEVER GET A

16   DISCOVERY MOTION ON THE SAME SUBJECTS.  BUT NOW I'VE GOTTEN

17   MULTIPLE REQUESTS FOR IDC FROM YOU ALL.  AND THEN AND NOW A

18   DISCOVERY MOTION.

19         SO, I'M NOT DOING ANYTHING OFF THE RECORD ANYMORE.  AND

20   I'M NOT GOING TO DO IT ON A NON-NOTICED MOTION ANYMORE.

21        BUT I HOPE I CAN -- I WAS ABLE TO ADDRESS PROPERLY ALL THE

22   VARIOUS DISPUTES.

23        SO, JUST TO RECAP, CHOU DEPOSITION WITHIN THE WEEK.

24        SOMEPLACE THAT YOU ALL MUTUALLY AGREE TO AT PLAINTIFF'S

25   REASONABLE EXPENSE AT COACH AIRFARE.

1        DAMAGES:  MORE OR LESS MR. SKALE IS GOING TO HAVE TO

2   FIGURE OUT A WAY TO REALLY LIMIT THE SCOPE OF THESE THINGS AND

3   GET SOMETHING FROM MR. KEYES.

4        AND SO LONG AS IT'S VERY WELL LIMITED AND TAILORED.

5        EVEN IF YOUR SOCIAL MEDIA AND MARKETING FOLKS CAN'T

6   MAKE SENSE OF THE SIGNIFICANCE OF THAT METRIC, MR. KEYES,

7   PROVIDE THE RESPONSE WITH THE NECESSARY CAVEATS AND

8   DISCLAIMERS.  BUT GIVE THEM THE NUMBER THAT THEY THINK THEY

9   WANT.

10       MS. ROCKETT:  YOUR HONOR --

11       THE COURT:  PRIVILEGE LOG, THERE'S NO EXISTING PRIVILEGE

12   LOG THAT NEEDS TO BE PRODUCED.

13       BUT, OF COURSE, WITH ANY SUPPLEMENTAL PRODUCTIONS, AS

14   NECESSARY, A PRIVILEGE LOG SHOULD BE PRODUCED.

15       HYPERLINK DOCUMENTS, ANY -- DOCUMENTS FROM ANY

16   DOCUMENT FAMILY SHOULD BE PRODUCED TOGETHER AND ASSOCIATED

17   FOR EXISTING PRODUCTIONS AND FOR FUTURE PRODUCTIONS.

18       AT THIS POINT WITHOUT PREJUDICE, ANY OF THE REQUESTED

19   RELIEF ON A 37-E MOTION FOR DESTRUCTION OF EVIDENCE, IT'S DENIED

20   WITHOUT PREJUDICE.

21       AS TO THE 26(G) MOTION FOR PROOF THAT THEY HAVE

22   REASONABLY CONDUCTED THE SEARCH THAT THEY SHOULD HAVE DONE

23   – I'M PROVIDING THE REMEDIES NOW WHICH IS A MEET AND CONFER WITH

24   A COURT REPORTER IN THE ROOM BY ZOOM WITHIN 48 HOURS TODAY.

25       AND THEN TIMELY PRODUCTIONS TO BE MADE CONSISTENT

1    WITH THE RULES, MY DISCOVERY GUIDELINES AND MY ESI CHECKLIST,

2    WHICH IF YOU WILL REFER TO, WILL HELP.

3            AND THEN BASED ON THAT, IF ANYTHING IS LEFT, YOU OUGHT

4    TO SEE WHETHER THAT CAN BE BROUGHT BEFORE ME OR IT NEEDS TO BE

5    BROUGHT BEFORE JUDGE BLUMENFELD OR NOT.

6            BUT AT SOME POINT, ALSO, IF THE CLOCK RUNS OUT, AND

7    NOBODY GIVES YOU OVERTIME, THE CLOCK IS GOING TO RUN OUT.

8            ALL RIGHT.  IS THERE ANY OPEN QUESTIONS THAT ARE STILL

9    LEFT?

10            MS. CORMIER:  YES, YOUR HONOR.  WE – WE DO HAVE A FEW.

11            THE COURT:  OKAY.

12            MS. CORMIER:  ONE OF THEM RELATES TO THE DAMAGES

13    METRIC.  AND THAT IS SPECIFICALLY FOR THE CALCULATION OF

14    REASONABLE ROYALTIES --

15            THE COURT:  YES.

16            MS. CORMIER:   -- HAS REQUESTED REVENUE IN THE U.S. AND IN

17    THE U.K.   AND THAT WAS INFORMATION THAT –

18            THE COURT:  REVENUE IN THE U.S. AND U.K. FROM WHAT

19    ACTIVITY?

20            MS. CORMIER:  FROM -- FROM -- SPECIFICALLY FROM THE TIKTOK

21    PLATFORM.

22            THE COURT:  OKAY.  SEE, THIS IS THE PROBLEM.

23            YOUR REQUESTS EITHER IN WRITING OR ORALLY

24    COMMUNICATED HAVE THAT DIMENSION TO THEM.

25            REVENUES FROM THE U.S. AND U.K. FROM THE TIKTOK

1   PLATFORM, THAT AIN'T GOING TO CUT IT.

2          MS. CORMIER:  IF -- IF I COULD EXPLAIN, YOUR HONOR.

3          SO, THE PROBLEM IS THAT DEFENDANT'S POSITION IN THIS CASE

4   IS THAT THERE IS NO REVENUE ATTRIBUTABLE TO THE STITCH-EDITING

5   FEATURE BECAUSE IT'S A FREE FEATURE ON A FREE APP.

6          SO, OUR EXPERT NEEDS TO TAKE A PROPORTION OF THE

7   NUMBER OF VIEWS THAT ARE ATTRIBUTABLE TO THE STITCH FEATURE

8   AND APPLY -- APPLY THAT PROPORTION --

9          THE COURT:  BUT NOW YOU'RE TALKING MORE SPECIFICS --

10          MS. CORMIER:   -- THAN --

11          THE COURT:  NOW YOU'RE TALKING MORE SPECIFICS. WHICH IS

12   WHAT I CAN GET BEHIND.

13          SO, THAT'S WHY I TALKED ABOUT THE CONNECT-THE- DOTS

14   PART WITH MR. SKALE.

15          MS. CORMIER:  YEAH.  SO, WE'RE --

16          THE COURT:  IF YOU ARE ABLE TO SAY THE ADVERTISERS WHO

17   PROMOTED STITCH IN SOME WAY BY SAYING, STITCH, YOUR VIDEOS TO

18   US.  AND FROM THAT DETERMINE THE NUMBER OF VIEWS THAT WERE

19   GENERATED FROM THAT.

20          AGAIN, I SHOULDN'T HAVE TO BE CONNECTING THESE DOTS FOR

21   YOU.  YOU HAVE TO THEN CONNECT THOSE DOTS.

22          YOU KEEP SPEAKING IN SUCH GENERALITIES.  AND I HONEST TO

23   GOD, I THINK THAT'S PARTLY AN EXPRESSION OF THE WEAKNESS OF

24   YOUR DAMAGES THEORY ON THIS.  BUT I'M NOT PREJUDGING THAT.

25          BUT I'M SAYING TO THE EXTENT THAT YOU WANT DISCOVERY

1    FOR THEM, PART OF THE REASON MR. KEYES IS HAVING TO TRAVEL IS

2    THAT YOU ALL ARE ARTICULATING A THEORY THAT THEY DON'T HAVE A

3    WAY IN WHICH THEY PULL METRICS FOR THAT.  OKAY.  THAT'S FINE.  I'M

4    NOT SAYING THAT LETS THEM OFF THE HOOK.  BUT YOU'VE GOT TO DRAW

5    BETTER CONNECTIONS.

6            AND, SO, IF YOU COULD START ARTICULATING IN THE U.S. AND

7    U.K. FOR THOSE ADVERTISERS BETWEEN SEPTEMBER 1, 2020 AND THE

8    PRESENT WHEN THE STITCH FEATURE WAS ACTIVE, WHO PROMOTED

9    EITHER HASHTAG STITCH OR SAID YOU, STITCH, THE NUMBER OF VIEWS

10   THAT WOULD HAVE BEEN GENERATED FROM THOSE AD CAMPAIGNS

11   REASONABLY ESTIMATED AS NECESSARY, AND THEN THE ESTIMATE OF

12   THE REVENUES THAT WOULD HAVE BEEN CREATED FROM THOSE VIEWS  -

13   - NOW YOU'RE TALKING MY LANGUAGE.

14           MS. CORMIER:  I UNDERSTAND, YOUR HONOR.  AND I

15   APPRECIATE YOUR HONOR'S MODEL.

16           IF I COULD EXPLAIN FROM THE DEPOSITION TESTIMONY OF MR.

17   REGGIO.  HE TESTIFIED THAT THERE WAS A CERTAIN NUMBER THAT THEY

18   HAVE FOR INVENTORY OF ADVERTISEMENTS.  THAT INVENTORY IS

19   DETERMINED BY THE NUMBER OF VIEWS THAT THERE ARE ON THE APP.

20   AND IT'S TAKEN AS A PERCENTAGE OF THE NUMBER OF VIEWS.

21           AND, SO, WHEN YOU HAVE A PERCENTAGE OF THE NUMBER OF

22   VIEWS THAT ARE ATTRIBUTABLE TO VIDEOS CREATED USING THE STITCH

23   EDITING FEATURE, YOU CAN TAKE THAT PERCENTAGE AND APPLY IT TO

24   THE  -- TO THE REVENUE IN ORDER TO DETERMINE WHAT IS

25   ATTRIBUTABLE TO THE VIEWS THAT WERE OF VIDEOS CREATED USING

1    THE STITCH EDITING FEATURE.

2         SO, WE ARE GOING BASED OFF OF THE DEPOSITION TESTIMONY

3    OF MR. REGGIO BASED ON THE ADVERTISING INVENTORY THAT IS -- THAT

4    IS STATED TO BE --

5         THE COURT:  OKAY.  ALL RIGHT.

6         MS. CORMIER:   -- A --

7         THE COURT:  SO, USING THAT AS -- AS A SCAFFOLDING, MR.

8    KEYES, IS THAT A METRIC THAT YOU CAN PROVIDE?

9         MR. KEYES:  I DON'T EVEN UNDERSTAND, YOUR HONOR,

10   EXACTLY WHAT THAT METRIC IS THAT SHE'S REFERENCING.  I REALLY

11   DON'T.

12        MS. CORMIER:  SO, THE METRIC ITSELF WOULD BE THE

13   REVENUE.  AND WE WOULD TAKE THE NUMBER OF VIEWS THAT HAVE

14   BEEN PROVIDED BY TIKTOK IN A LETTER -- WHICH IS ANOTHER ISSUE.  WE

15   WOULD LIKE TO HAVE THOSE IN A VERIFIED DECLARATION.

16        BUT TAKING THE FIGURES FOR WHAT THEY ARE IN THE LETTER

17   OF THE NUMBER OF VIEWS OF VIDEOS CREATED USING THE STITCH

18   EDITING FEATURE, WE --

19        THE COURT:  ALL RIGHT.  LET ME JUST PAUSE THERE.

20        MR. KEYES:  WE -- WE --

21        THE COURT:  LET ME JUST PAUSE THERE.

22        CAN YOU DETERMINE FROM SEPTEMBER 2020 TO THE PRESENT

23   THE NUMBER OF VIDEOS THAT WOULD HAVE BEEN POSTED ON THE APP IN

24   THE U.S. AND THE U.K. USING THE STITCH FEATURE?

25        MR. KEYES:  YES.  AND WE'VE PRODUCED THAT INFORMATION,

1    YOUR HONOR.

2              THE COURT:  OKAY.  ALL RIGHT.

3              SO, NOW, WE HAVE THAT.  ALL RIGHT.

4              STEP TWO:  WHAT IS THE -- NOW, YOU'VE GOT THAT DATA POINT.

5              WHAT IS THE NEXT NUMBER THAT YOU THINK YOU WANT?

6    DESCRIBE IT TO ME.

7              MS. CORMIER:  SO, IT WOULD BE THE VIEWS -- NOT JUST THE

8    POSTS.

9              THE COURT:  OKAY.

10             MS. CORMIER:   THE VIEWS.  AND WE HAVE THAT.

11             THE COURT:  ALL RIGHT.  SO, NOW, YOU'RE TALKING --

12             MS. CORMIER:  AND WE --

13       `     THE COURT:   -- VIEWS.  NOW, YOU'VE GOT THE VIEWS.

14             THAT'S -- OF THAT LARGER NUMBER, YOU NOW HAVE THE

15   NUMBER OF VIEWS BY CONSUMERS OF THAT IN THE U.S. AND THE U.K.?

16             MS. CORMIER:  CORRECT.

17             THE COURT:  OR IS IT WORLDWIDE VIEWS OF THOSE VIDEOS

18   THAT WERE GENERATED IN THE U.S. OR U.K.? -- BECAUSE WE HAD THAT

19   QUESTION LAST TIME.

20             I DID SORT OF AGREE THAT YOU COULD HAVE SOMEBODY IN

21   SINGAPORE VIEWING A STITCH EDITED VIDEO FROM THE UNITED STATES.

22   AND THAT MIGHT STILL BE A NEED FOR A METRIC.

23             BUT WE'VE IDENTIFIED THE NUMBER OF VIEWS OF THAT LARGER

24   NUMBER.

25             YOU HAVE NOW THAT SECOND NUMBER.

1          MS. CORMIER:  WE HAVE THAT.

2          THE COURT:  OKAY.  ALL RIGHT.

3          NUMBER THREE, WHAT IS THE THIRD NUMBER YOU ARE ASKING

4    FOR?

5          MS. CORMIER:  SO, THE THIRD WOULD BE PROBABLY HOW THEY

6    ALLOCATE AND HOW THEY DETERMINE THE INVENTORY FOR

7    ADVERTISEMENTS BASED ON THE NUMBER OF VIEWS.

8          MR. REGGIO DID NOT HAVE THAT INFORMATION.

9          BUT THAT WOULD -- THAT WOULD BE HELPFUL AND IMPORTANT

10   FOR US TO BE ABLE TO APPLY A PERCENTAGE TO TIKTOK'S TOTAL

11   REVENUE THAT IS TIED --

12         THE COURT:  DON'T GET AHEAD OF ME.  DON'T TELL ME THE --

13   THE FINAL EQUATION THAT YOU THINK YOU'RE TRYING TO CREATE.

14         MS. CORMIER:  OKAY.

15         THE COURT:  RIGHT.  I JUST WANT TO GET THE VARIABLES.

16         NUMBER ONE, YOU'VE GOT THE TOTAL NUMBER OF U.S.- AND

17   U.K.-CREATED VIDEOS WITH THE STITCH EDITING FEATURE.

18         MS. CORMIER:  CORRECT.

19         THE COURT:  FROM 2020 TO THE PRESENT.

20         NUMBER TWO, OF THAT NUMBER, YOU HAVE THE NUMBER OF

21   VIEWS THAT HAVE BEEN MADE OF THOSE VIDEOS.

22         MS. CORMIER:  CORRECT.

23         THE COURT:  NUMBER THREE, WHAT IS THE THIRD VARIABLE?

24         MS. CORMIER:  IT IS THE RATIO OF TOTAL VIEWS THAT ARE --

25         THE COURT:  TOTAL VIEWS --

1          MS. CORMIER:  -- THAT ARE ADVERTISEMENTS.

2          THE COURT:  TOTAL VIEWS OF WHAT?  TOTAL VIEWS OF THE

3    FIRST NUMBER?

4          MS. CORMIER:  SO, OUR UNDERSTANDING IS THAT TIKTOK SETS

5    THE NUMBER OF ADVERTISEMENTS THAT ARE THERE  -- I WOULDN'T CALL

6    THAT INVENTORY -- BASED ON THE --

7          THE COURT:  SEE, LOOK, I -- I DON'T WANT TO  -- BUT, YOU KNOW,

8    REMEMBER WHAT TRADEMARK INFRINGEMENT IS ABOUT.

9          THE BEST PART  -- EYE ON THE BALL.

10         YOU ARE TALKING ABOUT WHETHER YOU CAN PROVE THAT

11   CONSUMERS WHO ARE USING THE STITCH EDITING FEATURE IN TIKTOK

12   THINK THEY'RE USING SOMETHING THAT WAS PROVIDED BY YOUR CLIENT

13   STITCH EDITING VERSUS SOME FEATURE THAT WAS UNIQUELY BEING

14   PRESCRIBED BY TIKTOK.

15         ALL RIGHT.  WHEN YOU START GETTING INTO ALL OF THESE

16   REVENUE MODELS THAT YOU THINK YOU'RE GOING TO GET INTO, I'M NOT

17   FOLLOWING WHERE YOU'RE GOING.

18         AND YOU'VE GOT TO DO IT ONE OF TWO WAYS.  EITHER GIVE ME

19   AN EQUATION THAT EVERYONE CAN UNDERSTAND -- AND YOU HAVEN'T

20   DONE THAT -- OR DO IT VARIABLE BY VARIABLE -- WHICH IS WHAT I WAS

21   JUST TRYING TO DO.

22         AND THE FACT THAT YOU CAN'T DO IT CLEARLY TO ME EXPOSES

23   THE PROBLEM.  ALL RIGHT.

24         YOU SAID YOU HAD VARIABLE ONE.  YOU HAD VARIABLE TWO.

25   GIVE ME VARIABLE THREE.

1          AND IF IT'S UNDERSTANDABLE -- MAYBE THE ANSWER IS HARD

2    TO GET.  I DON'T CARE.  IF THAT'S A REASON.  THAT'S NOT A REASON TO

3    SAY NO.

4          BUT IF YOU UNDERSTAND VARIABLE THREE, I GET IT.

5          ALL RIGHT.  THEN YOU SAY DIVIDE THAT BY VARIABLE Y.

6          WHAT IS VARIABLE Y THAT WE NEED.

7          AND THEN YOU DO THAT.  AND THEN THEY WILL EITHER IN SOME

8    WAY, SHAPE OR FORM PROVIDE YOU THOSE NUMBERS.  AND THEN YOUR

9    EXPERT'S EQUATION IS WHAT IT IS.  BUT STOP GOING TO WE

10   UNDERSTAND THAT TIKTOK MAKES MONEY THIS WAY.

11         THE WAY THAT THEY MAKE MONEY AT THE END OF THE DAY IS

12   NOT A HERE NOR THERE AS TO THE TRADEMARK INFRINGEMENT ISSUE

13   FOR INDIRECT INFRINGEMENT PROFITS OR REASONABLE ROYALTY.

14         SO, THE FACT -- AND I DON'T WANT TO HAVE MORE OF THIS.

15         THE FACT THAT YOU KEPT - COULDN'T GIVE ME THE VARIABLES

16   AT THIS POINT IS A  -- THE PROBLEM.

17         SO, I SEE --

18         MR. SKALE:  WE UNDERSTAND, YOUR HONOR.

19         THE COURT:  -- MR. SKALE NOW HAS THE OPPORTUNITY TO DO

20   IT.  BUT THAT'S THE LEVEL OF SPECIFICITY AT WHICH YOU'VE GOT TO DO

21   IT.

22         MR. SKALE:  THANK YOU, YOUR HONOR.

23         THE COURT:  DEFINE YOUR VARIABLES.

24         MR. SKALE:  THE LAST -- THE LAST -- IS TOTAL REVENUE.

25         SO, WE KNOW THE PERCENTAGE -- WHICH WAS LIKE 1 PERCENT.

1   AND THEN WE NEED TOTAL REVENUE.  AND THEN THAT'S PERCENTAGE OF

2   REVENUE BASED ON THE VIDEOS -- OF VIEWS OF STITCH BECAUSE IF YOU

3   LOOK AT ALL THE TIKTOK'S VIDEOS --

4           THE COURT:  RIGHT.  BUT THAT -- OKAY.  BUT THAT'S NOT AN

5   EASY -- SO, YOU'RE TRYING TO SAY, OKAY.  SO NOW OF THOSE STITCH

6   VIDEOS THAT WERE VIEWED  --

7           MR. SKALE:  ALL THOSE --

8           THE COURT:  GIVEN -- GIVEN THE ADS THAT WOULD HAVE ALSO

9   BEEN VIEWED AS A RESULT OF THOSE VIDEOS BEING VIEWED, HOW CAN

10   WE DECIDE WHAT AMOUNT OF THAT OR ESTIMATE WHAT AMOUNT OF

11   THAT AD REVENUE WAS UNIQUELY GENERATED BY THE STITCH FEATURE

12   VERSUS JUST SIMPLY THE VIDEO ITSELF.

13           THAT'S EASY --

14           MR. SKALE:  BUT --

15           THE COURT:   -- ENOUGH TO DESCRIBE.  NOW WE GO DOWN TO

16   HOW DO WE DEVELOP THE VARIABLES TO GIVE US THOSE METRICS.

17   OKAY.

18           MR. SKALE:  ALL --

19           THE COURT:  AND, SO, THERE ISN'T -- YOU KNOW, I DON'T KNOW.

20   THIS IS YOUR EXPERT'S JOB ON FIGURING OUT AT THAT POINT --

21           MR. SKALE:  SURE.

22           THE COURT:   -- HOW DO YOU TAKE -- I DON'T SEE AN OBVIOUS

23   WAY BASED ON WHAT I KNOW THAT YOU'RE GOING TO BE ABLE TO SAY

24   BASED ON THE NUMBER OF VIEWS THAT THESE STITCH EDITED VIDEOS

25   HAD, THAT THERE'S JUST ONE STEP AWAY FROM THAT YOU CAN

1    DETERMINE THE REVENUES THAT WOULD HAVE BEEN ATTRIBUTABLE

2    FROM ADS BECAUSE OF THAT STITCH EDITING.  I GET THAT THAT'S THE

3    END POINT THAT YOU WANT TO GET TO.  BUT THERE'S A LOT OF DOTS

4    BETWEEN THAT AND THAT.  OKAY.

5          MR. SKALE:  THE ONLY VARIABLE WE NEED IS TOTAL REVENUE.

6    THAT'S ALL -- EVERYTHING ELSE WE HAVE.

7          THE COURT:  TOTAL REVENUE OF WHAT?

8          MR. SKALE:  THAT -- THAT TIKTOK MADE IN -- TIKTOK MADE IN

9    THE U.S. AND THE U.K. BECAUSE NOW WE CAN TAKE --

10         THE COURT:  NOW WE'RE BACK TO THE THING THAT I TOLD YOU

11   TO DO, MR. KEYES, IS PROVIDE THEM.  TAKE THE AD REVENUES OVER A

12   CERTAIN AGGREGATE NUMBER OF TIME FROM ALL SOURCES

13   REGARDLESS OF WHAT, YOU KNOW, WHAT THE CAMPAIGN WAS AND

14   DIVIDE IT BY THE NUMBER.  AND YOU HAVE YOUR AVERAGE.

15         THAT'S THE NUMBER THEY WANT, MR. KEYES.

16          WITHOUT ADMITTING OR DENYING WHAT THAT NUMBER MEANS,

17   GIVE THEM THAT NUMBER.

18         MR. KEYES:  YOUR HONOR, I THINK WE HAD – WE HAD TALKED

19   ABOUT THIS EARLIER IN THE DAY.

20         THE COURT:  YES, WE DID.

21         MR. KEYES:  THEY WANT TO TAKE REVENUE --

22         THE COURT:  SO, I WOULD  --

23         MR. KEYES:   -- DIVIDE BY --

24         THE COURT: MS. CORMIER IS COMING BACK AT ME AS IF TO

25   SUGGEST THERE'S MORE WE NEED TO TALK ABOUT ON THAT.  AND I

1    THOUGHT WE HAD TALKED ABOUT THIS.

2             MS. CORMIER:  I DO THINK IT'S -- I DO THINK IT'S A LITTLE BIT

3    DIFFERENT BECAUSE THE CPM IS – IS GOING TOWARDS --

4             THE COURT:  OKAY.  THEN YOU AND MR. SKALE NEED TO HAVE A

5    CONVERSATION FIRST.

6             MR. SKALE:  WELL –

7             THE COURT:  UNTIL YOU CAN DEFINE FOR ME THE VARIABLES,

8    THERE'S NO MORE I NEED TO DISCUSS ABOUT THIS ON THIS ISSUE.

9             YOU ALL FIGURE OUT THE VARIABLES.

10            AND YOU AND MR. SKALE GET ON THE SAME PAGE.

11            WHAT'S THE NEXT ISSUE?  YOU SAID YOU HAVE SEVERAL, MS.

12   CORMIER, WHICH, AGAIN, IT SCARES ME  --

13            MS. CORMIER:  WELL -

14            THE COURT:   -- THAT AFTER THIS AMOUNT OF TIME YOU ALL ARE

15   STILL ASKING ME SEVERAL QUESTIONS.

16            MS. CORMIER:  SORRY, YOUR HONOR.  THIS IS THE LAST ONE

17   THAT I HAVE.

18            AND THAT IS THAT WE HAD ASKED FOR DOCUMENTS

19   SUPPORTING PUNITIVE DAMAGES, OUR REQUEST FOR PUNITIVE DAMAGES

20   IN THIS CASE.

21            AND --

22            THE COURT:  UH-HUH.

23            MS. CORMIER:  -- WE NARROWED OUR REQUEST TO TWO YEARS'

24   WORTH OF BALANCE SHEETS WHICH IS CONSISTENT WITH CASE LAW.

25            AND WITH THE DEFENDANTS HAVE REFUSED TO PRODUCE IT.

1          THAT IS ALL THAT WE ARE ASKING FOR IN CONNECTION WITH

2     THAT.

3          THE COURT:  I MEAN, I FEEL LIKE I DEALT WITH THIS ALSO AT THE

4     JUNE HEARING, TOO, WITH MR. SKALE IN TERMS OF THE SCOPE OF

5     FINANCIALS THAT NEEDED TO BE DISCLOSED.

6          I CAN'T REMEMBER OFF THE TOP OF MY HEAD.

7          BUT DO WE --

8          MR. SKALE:  THE --

9          THE COURT:  -- REMEMBER --

10         MR. SKALE:  I REMEMBER.

11         MS. CORMIER:   -- THE DAMAGES AT ALL, YOUR HONOR.  WE

12    WERE TALKING ABOUT THOSE IN THE CONTEXT OF THE LANHAM ACT.

13         AND YOU WERE THINKING ABOUT IN THE CONTEXT OF THE  --

14    PROFITS  -- BUT WE WERE TALKING ABOUT THIS IN THE CONTEXT OF OUR

15    CLAIM FOR PUNITIVE DAMAGES WHICH WE PLEADED AND WHICH THEY DID

16    NOT MOVE TO STRIKE.

17         AND I KNOW THEY'RE GOING TO ARGUE THE MERITS, BUT WE

18    HAVE A COLORABLE BASIS TO SEEK PUNITIVE DAMAGES.  AND HOW WE'RE

19    ENTITLED -- WE BELIEVE THAT WE'RE ENTITLED TO BRING  --

20         THE COURT:  ALL RIGHT.  SO, THEN, WHAT IS THE ASK?  IT'S THE

21    BALANCE SHEETS FROM WHAT FOR WHAT PERIOD OF TIME?

22         MS. CORMIER:  THE BALANCE SHEETS FROM DEFENDANTS FOR

23    THE PRIOR TWO YEARS.  AND THAT IS SUFFICIENT UNDER THE CASE LAW

24    TO SHOW ASSETS --

25         THE COURT:  OF WHICH ENTITY?

1          MS. CORMIER:  I BELIEVE THE ENTITY WOULD BE TIKTOK, INC.

2     BUT WE HAVEN'T HAD A CHANCE TO DEPOSE THEIR 30(B)(6)

3     REPRESENTATIVES TO DETERMINE THAT IT IS TIKTOK, INC. THAT WOULD

4     BE THE ENTITY THAT WE WOULD NEED IT FROM.

5          THE COURT:  ALL RIGHT.  SO, IF YOU'RE TALKING ABOUT TIKTOK,

6     INC., TWO YEARS' WORTH OF BALANCE SHEETS, MR. KEYES.

7          MR. KEYES:  YEAH.  YOUR HONOR, IT IS SO FAR OFF THE MARK.

8          PUNITIVE DAMAGES -- THIS IS A TRADEMARK INFRINGEMENT

9     CASE OVER THE TINY LITTLE STITCH BUTTON INSIDE THE APP.

10          IN ORDER TO ALLEGE EVEN A COLORABLE CLAIM FOR PUNITIVE

11     DAMAGES -- I MEAN, IT'S DICTATED BY STATUTE.  IT'S GOT TO BE

12     EGREGIOUS, WANTON, FREAKISH CONDUCT THAT WOULD SHOCK THE

13     CONSCIENCE OF A REASONABLE PERSON.

14          HERE WE'RE TALKING ABOUT --

15          THE COURT:  THAT'S FINE.  BUT I GUESS WHAT I'M SAYING IS YOU

16     DIDN'T MAKE AT WHATEVER TIME YOU'RE GOING TO MAKE THE ARGUMENT

17     THAT THAT SHOULD BE STRICKEN ON ITS FACE BECAUSE IT'S FACIALLY

18     ABSURD.  YOU'VE LOST THAT OR YOU NEVER MADE THE ARGUMENT.

19          GIVEN WHERE YOU ARE NOW WITH -- UNTIL PRETRIAL

20     CONFERENCES WHERE THINGS ARE GOING TO BE NARROWED DOWN, YOU

21     HAVE A PUNITIVE DAMAGES PRAYER FOR RELIEF.

22          WITH RESPECT TO THAT, THERE'S SOME FINANCIALS THAT THEY

23     WANT.  HOW DO YOU WANT TO LIMIT YOUR FINANCIALS?  I CAN'T

24     REMEMBER EXACTLY WHAT I SAID AT THE FIRST ONE.

25          BUT I MEAN EVEN IF IT WAS RELATED TO LANHAM ACT

1   DAMAGES, I THINK THE OPERATIVE PRINCIPLES I GAVE THEN SHOULD

2   STILL HOLD.

3           DO YOU REMEMBER --

4           MR. KEYES:  WE – WE AGREE, YOUR HONOR.

5           I MEAN, THEY ASKED SPECIFICALLY FOR BALANCE SHEETS --

6           THE COURT:  UH-HUH.

7           MR. KEYES:   -- IN THAT JUNE 1ST HEARING.  THAT'S EXACTLY THE

8   – THE IDENTICAL ASK HERE.

9           THE COURT:  AND WHAT DID I SAY THOUGH THAT -- WHAT --

10  WHAT KIND AND FORM OF FINANCIAL INFORMATION DID I SAY YOU

11  SHOULD PRODUCE?

12          MR. KEYES:  WHAT YOU SAID IS YOU GUYS NEED TO GET

13  TARGETED AND SPECIFIC.  GIVE THEM METRICS IN TERMS OF -- YOU

14  KNOW, WE TALKED ABOUT IT AT LENGTH.  AND IT'S MORE OR LESS ALONG

15  THE SAME LINES OF WHAT YOU'RE TALKING ABOUT TODAY.  THEY NEEDED

16  TO GET VERY SPECIFIC GRANULAR AND TARGETED IN TERMS OF THE

17  METRICS THAT THEY'RE LOOKING FOR.

18          THE COURT:  OKAY.  ALL RIGHT.

19          MR. KEYES:  I MEAN, THE PUNITIVE DAMAGES  --

20          THE COURT:  SO --

21          MR. KEYES:   -- CLAIM  -- I MEAN, THIS  -- THIS WOULD OPEN UP

22  ANY TRADEMARK CASE TO A CLAIM FOR PUNITIVE DAMAGES.

23          THE COURT:  OKAY.

24          MR. KEYES:  IT JUST – IT MAKES NO SENSE.

25          THE COURT:  ALL RIGHT.  BUT BASED ON THE CURRENT

1      SHOWING, I FIND THAT THE REQUEST FOR TWO YEARS' WORTH OF

2      BALANCE SHEETS IS NOT PROPORTIONATE TO THE REQUEST.

3              IF YOU CAN NARROW IT -- IT'S WITHOUT PREJUDICE TO

4      NARROWING IN SOME WAY THAT'S AGREEABLE TO TIKTOK -- BUT JUST

5      GETTING THEIR BALANCE SHEET FOR THE PAST TWO YEARS IS DENIED.

6              ANYTHING ELSE?

7              MS. CORMIER:  YOUR HONOR, WE CAN -- WE CAN NARROW IT TO

8      ASSETS AND LIABILITIES -- WHICH IS THE INFORMATION THAT IS IN THE

9      BALANCE SHEET THAT IS RELEVANT TO FINANCIAL STANDING AND

10     PUNITIVE DAMAGES ANALYSIS.

11             THE COURT:  IF YOU WANT TO GIVE THEM THE GROSS ASSETS

12     AND LIABILITIES FIGURES, THEN, YOU CAN PROVIDE IT FOR TIKTOK.

13             THEN THAT'S FINE IF MR. KEYES --

14             CAN YOU DO THAT, MR. KEYES?

15             MR. KEYES:  I DON'T KNOW, YOUR HONOR.

16             THE COURT:  ALL RIGHT.  WELL, CHECK IT OUT.  AND SEE IF YOU

17     CAN DO THAT.

18              WITHOUT DISCLOSING THE ACTUAL UNDERLYING DOCUMENTS,

19     IF YOU CAN PROVIDE IN RESPONSE TO INTERROGATORY-STYLE

20     QUESTIONS  -- WHAT IS THE TOTAL NUMBER OF ASSETS AS OF THIS POINT

21     IN TIME, THE LIABILITIES AS OF THIS POINT IN TIME.

22             PICK AN ENTITY -- TIKTOK, INC.

23             MR. KEYES:  OKAY.

24             THE COURT:  IF THEY HAVE --

25             MS. CORMIER:  THE --

1          THE COURT:   -- A SPECIFIC QUESTION THAT THEY CAN ASK YOU,

2    AND YOU CAN PROVIDE THAT IN RESPONSE TO INTERROGATORY -- DON'T

3    ASSESS ITS RELEVANCE -- IF THEY'RE JUST ASKING FOR AUDITED OR

4    UNAUDITED BLANKET FINANCIAL STATEMENTS, I GET WHERE THERE'S A

5    PROBLEM WITH THAT.

6           BUT IF THEY DO ASK FOR SPECIFIC THINGS -- IT GOES BACK TO

7    THE OTHER QUESTION.   DON'T WORRY ABOUT WHAT IT WILL BE USED FOR

8    OR HOW WELL IT WILL BE USED.

9          YOU HAVE A --

10         MS. CORMIER:  THE --

11         THE COURT:   -- ORDER IF NECESSARY.  BUT JUST PUT IN THE

12   NUMBER OF ASSETS AND ALL THAT GOES.  WHATEVER THEY ASK FOR --

13   SPECIFIC.

14         MS. CORMIER:  AND JUST A POINT OF CLARITY, YOUR HONOR, DO

15   WE HAVE TO DO THIS WITH A FORMAL INTERROGATORY THAT IS

16   RESPONDED TO IN 30 DAYS?  OR CAN WE PROVIDE THEM --

17         THE COURT:   -- DON'T HAVE 30 DAYS.  YOU HAVE 24 HOURS.  IF

18   YOU HAVE IT, GET AN INTERROGATORY OVER THAT.

19          BUT, AGAIN, THIS GOES BACK TO THE RFAS.  I FEEL LIKE I

20   TALKED ABOUT THIS AT THE JUNE HEARING THAT WHEN IT COMES TO

21   FINANCIALS, IF YOU'RE SPECIFIC WITH INTERROGATORIES, YOU HAVE A

22   GOOD CASE TO BE MADE.  AND IT'S NOT MR. KEYES' JOB TO DETERMINE

23   HOW RELEVANT IT IS OR HOW PERSUASIVE.  THAT WILL BE USED AS

24   EVIDENCE.

25          BUT BLANKET -- I WANT BALANCE SHEETS FOR THIS ENTITY FOR

1    THE PAST YEARS.  THAT WAS THE KIND OF THING WHERE WE SAID ABSENT

2    SOME MORE COMPELLING SHOWING, YOU CAN'T JUST GET THAT BY

3    SAYING WE ALLEGE PUNITIVES.

4         THAT WAS DISCUSSED AGO.  SO, I'M FRUSTRATED THAT WE'RE

5    DISCUSSING IT AGAIN.

6         ALL RIGHT.  WHAT ELSE?

7         MR. SKALE:  YOUR HONOR, ONE OTHER LAST THING.

8         TOMORROW IS THE DEADLINE TO EXCHANGE EXPERT REPORTS.

9         GIVEN WE'VE GOT THIS UPCOMING DISCOVERY AND THE  -- IS

10   THERE A WAY WE CAN MAYBE MOVE THAT DEADLINE?

11        THE COURT:  NO.  THAT'S JUDGE BLUMENFELD'S.  I CAN'T MOVE

12   HIS DEADLINES.

13        MR. SKALE:  OKAY.

14        THE COURT:  YEAH.

15        MR. SKALE:  MAYBE WE'LL --

16        THE COURT:  -- A ROCK AND A HARD PLACE.  I MEAN, IT'S -- I

17   MEAN, WHAT I ORDERED TO YOU SHOULD BE ABLE TO -- YOU KNOW,

18   YOU'RE GOING TO HAVE TO PLAN TO DO IT WITHIN THE NEXT 14 DAYS.

19        MR. SKALE:  OKAY.  WILL THE --

20        THE COURT:  -- THE 26(F) CONFERENCE, SUPPLEMENTAL

21   PRODUCTIONS, ALL THE PRIVILEGE LOG, ET CETERA – RESPONSES,

22   ADVICE -- MOST OF THIS STUFF IS STUFF THAT TIKTOK IS GOING TO NEED

23   TO DO.

24        MR. SKALE:  MAYBE WE'LL JUST SUPPLEMENT THE EXPERT

25   REPORTS THEN.

1          THE COURT:  I MEAN, I CAN'T SPEAK TO JUDGE BLUMENFELD'S

2    THINGS.  BUT I MEAN IT SOUNDS TO ME LIKE GIVEN THE OUTCOME THAT

3    YOU ALL HAVE NOW, I CAN'T IMAGINE WHY YOU ALL COULDN'T AGREE TO

4    SOME BETTER AMOUNT OF ADDITIONAL TIME THAT WOULD BE AGREEABLE

5    TO EVERYBODY.

6          I THINK IF YOU FOUND A HAPPY MEDIUM, YOU'D FIND A MUCH

7    BETTER AUDIENCE IN JUDGE BLUMENFELD.

8          MR. SKALE:  I THINK WE CAN DO THAT.

9          THE COURT:  YES.

10          AND IF SO, I WOULD SUGGEST YOU DO THAT SOONER RATHER

11    THAN LATER --

12          MR. SKALE:  WITHIN 48 HOURS, YOUR HONOR.

13          THE COURT:  DO THAT AND ASK HIM FOR THAT TO GIVE

14    YOURSELF SOME SENSE OF REALITY ABOUT WHAT YOU'RE GOING TO TRY

15    AND DO.

16          ANYTHING ELSE?

17          MR. SKALE:  NO, YOUR HONOR.

18          MR. KEYES:  NOT AT THIS TIME.

19          THE COURT:  ALL RIGHT.  I DON'T THINK I HAVE TIME TO SEE YOU

20    ALL AGAIN UNLESS YOU GET A LOT MORE TIME.

21          SO, I'M NOT SURE WHERE I CONTINUE TO DROP THE BALL, BUT I

22    SEEM TO SAY THINGS.  AND YOU ALL NOD YOUR HEAD.  BUT THEN YOU

23    LEAVE WITH A TOTALLY DIFFERENT IMPRESSION OF WHAT YOU THEN

24    NEED TO DO.  AND THEN YOU ALL ARGUE ABOUT IT.

25          LIKE, SO, IF YOU HAVE SOME NAGGING DOUBT THAT YOU GUYS

| | |
|---|---|
| 1 | STILL ARE NOT ALL ON THE SAME PAGE, SPEAK NOW. |
| 2 | MR. SKALE:  I THINK WE'RE ON THE SAME PAGE, AT LEAST FROM |
| 3 | PLAINTIFF'S SIDE. |
| 4 | THE COURT:  NOW, MR. SKALE, YOU ARE THE ETERNAL |
| 5 | OPTIMIST.  AND YOU HAVE SAID THAT TO ME SINCE JUNE.  AND I |
| 6 | APPRECIATE YOUR ATTITUDE.  BUT THE OUTCOME HAS NOT PROVEN |
| 7 | YOUR OPTIMISM TO BE WARRANTED. |
| 8 | MR. SKALE:  WELL, I HOPE IT IS THIS TIME. |
| 9 | THE COURT:  ALL RIGHT.  OKAY.  ANYTHING ELSE? |
| 10 | MR. KEYES:  NOTHING FURTHER, YOUR HONOR. |
| 11 | MR. SKALE:  NO, YOUR HONOR. |
| 12 | THE COURT:  THANK YOU, EVERYBODY. |
| 13 | OH, I'M SORRY.  THE SEALING.  I DON'T -- I THINK IT'S FINE TO |
| 14 | SEAL MR. REGGIO'S DEPO. |
| 15 | BUT I DON'T KNOW WHY WE NEED TO SEAL MR. BUZINOVER'S |
| 16 | DECLARATION. |
| 17 | SO, I DON'T KNOW -- I FORGET HOW YOU PRESENTED THAT APP |
| 18 | TO ME.  IS IT AN ALL OR NOTHING?  OR CAN WE JUST GRANT IT AS TO |
| 19 | REGGIO'S DEPOSITION BUT NOT AS TO THE BUZINOVER DEPOSITION? |
| 20 | MR. KEYES:  YOUR HONOR, I THINK THAT -- THAT SHOULD BE |
| 21 | FINE. |
| 22 | THE COURT:  OKAY.  SO, CONNIE, ON THE SEALING APP, IT'S |
| 23 | GRANTED IN PART AS TO THE SEALING OF INFORMATION FOR MR. |
| 24 | REGGIO'S DEPOSITION. |
| 25 | AND THEN DENIED AS TO – |

1          IS IT A -- IS IT A DEPO TRANSCRIPT?  A DECLARATION?  OR

2     WHAT?  WHAT IS IT FOR BUZINOVER?

3          MR. SKALE:  IT'S A DEPO TRANSCRIPT, YOUR HONOR.

4          THE COURT:  YEAH.

5          BUT THAT IT'S DENIED AS TO THE DEPOSITION TRANSCRIPT FOR

6     MR. BUZINOVER.

7          SO, TO THE EXTENT THAT THE PARTIES NEED IT TO BE PART OF

8     THIS RECORD, IT NEEDS TO BE FILED IN AN UNSEALED FORMAT.

9          OKAY.

10          I WANT TO MAKE SURE.  DID I MISS ANY OTHER HOUSEKEEPING

11     MATTERS?

12          GARREN  -- ACTUALLY, MY LAW CLERK IS ON THE LINE.

13          DID I MISS ANY HOUSEKEEPING MATTER?

14          (PAUSE IN PROCEEDINGS.)

15          THE COURT:  GARREN.

16          (PAUSE IN PROCEEDINGS.)

17          THE COURT:   I'M NEVER USING ZOOM AGAIN, CONNIE.

18          WE'RE DOING IT IN PERSON -- WE'RE DOING IN PERSON

19     FOREVER AND EVER AGAIN.

20          ALL RIGHT.  I THINK THAT'S IT.

21          I MEAN, LOOK, FOLKS, I ADVANCED THE THING TWO WEEKS TO

22     GIVE YOU ALL TIME TO TRY TO GET THE STAFF A CHANCE TO DO IT.

23          SO, PLEASE TAKE MY DIRECTIONS AND DIRECTIVES AND THEN

24     DO WHAT YOU NEED TO DO.

25          ALL RIGHT.  THANK YOU.

1          MR. SKALE:  THANK YOU, YOUR HONOR.

2          MR. KEYES:  THANK YOU, YOUR HONOR.

3          MS. ROCKETT:  THANK YOU, YOUR HONOR.

4          TRANSCRIPT, YOUR HONOR?

5          THE COURT:  I'M SORRY?

6          MS. ROCKETT:  -- A TRANSCRIPT --

7          THE COURT:  THAT'S UP TO YOU AND THE COURT REPORTER.

8          MS. ROCKETT:  WE ARE FORMALLY REQUESTING ONE RIGHT

9   NOW IF THE COURT REPORTER CAN HEAR US.

10          THE COURT:  OH, DOES SHE NEED AN ORDER FROM ME FOR IT

11   TO BE EXPEDITED, CONNIE?

12          I THINK IF YOU PAY FOR IT, THEY'LL DO IT EXPEDITED.  I DON'T

13   THINK THEY NEED AN ORDER FROM ME.

14          THE CLERK:  THERE'S NO COURT REPORTER.  IT'S RECORDED.

15          THE COURT:  WHY DON'T YOU -- THEN SENT TO THE COURT

16   REPORTER THOUGH.

17          THE CLERK:  YES.  BUT THERE'S INFORMATION ON THE COURT'S

18   WEBSITE AS FAR AS HOW TO ORDER THAT.

19          THE COURT:  YEAH.  AND IF YOU -- I THINK IF YOU PAY FOR

20   EXPEDITED, YOU GET EXPEDITED.  YOU DON'T NEED MY ORDER.

21          BUT I'LL PUT IT ON.  TO THE EXTENT NECESSARY, I WILL HAVE

22   THE REQUEST FOR EXPEDITED BE GRANTED AT WHATEVER THE

23   REPORTER'S COSTS ARE.

24          ALL RIGHT.  THANK YOU.

25          MR. SKALE:  THANK YOU.

1              MR. KEYES:  HAVE A GOOD DAY.

2              (PROCEEDINGS ADJOURNED.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    TRANSCRIBER'S CERTIFICATE

3                              DISCLAIMER

4        THE INTEGRITY OF THIS TRANSCRIPT IS ADVERSELY AFFECTED

5            DUE TO MUFFLED AND UNCLEAR AUDIO TRANSMISSION.

6

7            I, Dorothy Babykin, attest that the foregoing proceedings provided to me

8    electronically were transcribed by me to the best of my ability.

9            I further attest that I am not a relative or employee to any attorney or

10   party nor financially interested in this action.

11                      /s/  *Dorothy Babykin*

12

13                    Dorothy Babykin

14

15   Date:   8/31/22

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25