```
                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                 (WESTERN DIVISION - LOS ANGELES)



STITCH EDITING LTD,            ) CASE NO: 2:21-cv-06636-SB-SKx
                               )
              Plaintiff,       )           CIVIL
                               )
     vs.                       )     Los Angeles, California
                               )
TIK TOK, INC, ET AL,           )     Monday, December 5, 2022
                               )
              Defendants.      )   (11:02 a.m. to 12:49 p.m.)


   HEARING RE: MOTION FOR CONTEMPT AND SANCTIONS [ECF.NO.168]


                BEFORE THE HONORABLE STEVE KIM,
                UNITED STATES MAGISTRATE JUDGE
```

**APPEARANCES:**            SEE PAGE 2


Court Reporter:            Recorded; CourtSmart


Courtroom Deputy:          Connie Chung


Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**


For Plaintiff:               ANDREW D. SKALE, ESQ.
                             RANDY K. JONES, ESQ.
                             Mintz Levin Cohn Ferris, et al.
                             3580 Carmel Mountain Rd.
                             Suite 300
                             San Diego, CA 92130

                             COURTNEY R. ROCKETT, ESQ.
                             Mintz Levin Cohn Ferris, et al.
                             919 Third Avenue
                             39th Floor
                             New York, NY 10022

                             KARA M. CORMIER, ESQ.
                             Mintz Levin Cohn Ferris, et al.
                             One Financial Center
                             Boston, MA 02111


For Defendants:              J. MICHAEL KEYES, ESQ.
                             CONNOR J. HANSEN, ESQ.
                             Dorsey & Whitney
                             Columbia Center
                             701 5th Avenue
                             Suite 6100
                             Seattle, WA 98104

                             POONAM KUMAR, ESQ.
                             Gibson Dunn & Crutcher
                             333 S. Grand Ave.
                             53rd Floor
                             Los Angeles, CA 90071

3

1 <u>**Los Angeles, California; Monday, December 5, 2022; 11:02 a.m.**</u>

2       <u>**(Remote appearances)**</u>

3        **(Call to Order)**

4    **THE CLERK:**  Please come to order.  This United States

5 District court is now in session, the Honorable Steve Kim,

6 United States Magistrate Judge, presiding.

7    All attendees are reminded that by participating in

8 this hearing, they have read, understood and accepted the

9 banner warning presented at log-in prohibiting any recording,

10 streaming, broadcasting or screen-capturing.  The court has

11 measures to detect unauthorized recording of any kind and

12 sanctions may be imposed for those found in violation.

13    Calling Case Number CV 21-6636, *Stitch Editing versus*

14 *TikTok.*

15    Counsel, please state your appearances for the record

16 starting with Plaintiff.

17    **MS. CORMIER:**  Good morning, Your Honor.  My name is

18 Kara Cormier with Mintz Levin and with me are my Co-counsel

19 Andrew Skale, Courtney Rockett and Randy Jones.

20    **MR. KEYES:**  Good morning, Your Honor, Mike Keyes of

21 Dorsey and Whitney on behalf of the Defendants.  With me is my

22 colleague from Dorsey, Connor Hansen and our Co-counsel from

23 Gibson Dunn, Poonam Kumar.

24    **THE COURT:**  All right.  Is that everybody we're

25 expecting?

1          **MR. SPEAKER:**  Yes, Your Honor.

2          **THE COURT:**  All right.  We're here for the -- well, I

3     should warn you in advance.  I'm losing my voice a little bit.

4     So I'm not sick but for some reason, my voice is starting to

5     leave.  So it's not the audio.  It's probably my voice going in

6     and out but I'll do my best and I'm sure you'll help me keep

7     all my words to a minimum during this hearing today.

8          So we're here on the motion for sanctions.  It's been

9     quite a journey for you all to get to this place.  Let me ask

10    just sort of a couple of questions at the outset.  Right now

11    trial is set for when?  I just want to reorient myself to the

12    general case posture.

13         **MS. CORMIER:**  Yes, Your Honor.  The trial is

14    currently scheduled for February 6th.  The Court has already

15    considered the summary judgment motions --

16         **THE COURT:**  Yeah.

17         **MS. CORMIER:**  -- before trial and we are set to go to

18    trial on February 6th.

19         **THE COURT:**  Okay.  What is left in the case to do?

20    Is there expert discovery happening?

21         **MS. CORMIER:**  Well, expert discovery has closed

22    although --

23         **THE COURT:**  Okay.

24         **MS. CORMIER:**  -- we may -- if further information

25    were to be produced, we'd ask to supplement our expert reports.

1    But we have a mediation that's scheduled for December 12th and

2    then after that, pretrial disclosures are happening and the

3    trial will commence on February 6th.

4            **THE COURT:**  All right, got it.  So that sort of leads

5    to my next sort of natural question, Ms. Cormier, is that the

6    motion that you all filed, am I reading it correctly that,

7    sure, if you could unwind the clock and go back in time, maybe

8    there are different things you might want to actually ask to be

9    produced or redone or depositions to be done.  But where you

10   are now in the case, given the realities of where you are with

11   scheduling with Judge Blumenfeld, am I reading this correct

12   that it's essentially some yet uncalculated amount of monetary

13   sanctions that you're seeking and attorneys' fees costs and --

14           **MS. CORMIER:**  Yes, Your Honor -- sorry, Your Honor.

15   Yes, our first ask is that we be compensated for what we deem

16   to be unnecessary fees that we have incurred.

17           **THE COURT:**  Right.

18           **MS. CORMIER:**  The Court has expressed that -- the

19   Court -- Judge Blumenfeld has expressed his desire that the

20   parties continue to work together and reduce the amount of

21   motion practice to happen in this case.  And so we're hesitant

22   to seek additional briefing on the issue of the amount of the

23   fees.  We'd like --

24           **THE COURT:**  No, no, no.  But I guess this is the

25   general category.  At this point, we're not talking about

1    shorter production of evidence, more depositions, even

2    terminating sanctions or adverse jury instructions or evidence

3    preclusion.  What you're talking about are compensation for the

4    unnecessarily incurred attorneys' fees and costs as a result of

5    the discovery violations that you have catalogued?

6          MS. CORMIER:  That's correct, Your Honor.  We are

7    also asking the Court to issue a daily sanction for what we

8    view as Defendants' noncompliance with this Court's orders.

9    And so that would necessarily hopefully resolve production of

10   assets and liabilities and eventually resolve the production of

11   information in compliance with the Court's order.  We --

12         THE COURT:  I'm sorry.  I'm sorry.  Say that again,

13   daily what?

14         MS. CORMIER:  We do believe that a daily sanction for

15   noncompliance with the Court's orders is warranted here, that

16   would ultimately result in the production of assets and

17   liabilities and responses to RFAs.

18         THE COURT:  Okay.  So you are asking for more stuff,

19   not just monetary sanctions?

20         MS. CORMIER:  We are asking that they comply with the

21   -- with your prior orders, yes, if possible.

22         THE COURT:  Which relates -- so it could relate to

23   things like their financial information?

24         MS. CORMIER:  Specifically, assets and liabilities

25   which they were ordered to produce but didn't, answers to our

1    RFAs concerning existing ad agency and music label customers,

2    data-testing information and mitigation-measure information

3    that was not produced.

4              **THE COURT:**  And you're saying that's stemming from a

5    contempt finding?

6              **MS. CORMIER:**  Correct.

7              **THE COURT:**  Okay.  I mean, before we get into the

8    details of all this, this case has been plagued by literally

9    how not to do discovery in Federal court from start to finish.

10   And if there were two big themes that I would sort of hone in

11   on -- I mean, I have now spent before we even get to today

12   nearly five hours with you all on on-the-record hearings.

13   That's not including the amount of time that I've read --

14   reading different papers.

15             The problem -- and Mr. Skale knows this because we

16   had our very first hearing which was with him and Mr. Keyes,

17   which I remember well, and I thought that I had done a decent

18   job of sort of getting people to understand sort of everyone

19   runs their courts a little differently and understanding sort

20   of the way that I run which was very practical, pragmatic and I

21   don't like to reflexively sanction attorneys for fees and costs

22   because I remember what it's like to be a litigator and there's

23   always a level of sharp elbows that just kind of has to occur.

24             Okay.  But there's a line that starts to get crossed

25   and from the beginning, the problem I've had, Ms. Cormier, with

1  the -- with your approach and your answer right now sort of

2  exemplifies this -- is that everything with the Plaintiffs is a

3  blunderbuss approach.  You shoot for the moon and then you

4  expect me to find the earth underneath it.

5          And even at the last hearings, I remember I was

6  trying to ask what you want with this and then with every

7  question, it was an expansion and leading to another question

8  and leading to other things.

9          And so here, I was trying to figure out whether you

10  are seeking further evidence of some kind of just evidentiary

11  monetary sanctions because discovery is not closed.  And so I

12  thought I had your answer and you said you're seeking monetary

13  sanctions which might be significant for the catalogue of

14  discovery abuses that we're just about to talk about.

15          But it is really the technical error that you all

16  keep making when you cannot figure out how to be proportionate

17  and just as a matter of substance and procedure, I could take

18  issue with a lot of the way that you all approach this.  It's

19  just a matter of persuasion.  I mean, your brief reads like a

20  kitchen-sink shotgun approach to every possible thing under the

21  discovery rules and it doesn't even provide a framework for me

22  which I'm going to now impose myself on how I reach a decision.

23          You don't even outline for me the amount of monetary

24  fees that you think you want but at the end of your answer to

25  my last question, you basically just said, I want fees for

1    everything and I want everything that hasn't been produced

2    produced.  I mean, there has to be some issue selection that

3    you all need to focus on and that was always the problem with

4    all of your discovery requests, too.

5            Now, on the other hand, Mr. Keyes, I can't conceive

6    of a case in which I have given more leash to a corporate

7    Defendant to get their act together.  And because of how you

8    viewed the merits of the case or demerits of the case and how

9    you consistently underestimated the strength of the Plaintiff's

10   allegations that you've now realized by losing on summary

11   judgment, letting your in-house counsel dictate what's

12   relevant.

13           Time and time again when I try to reign in the

14   Plaintiffs to get them to be focused, I gave you chance after

15   chance after chance after chance to get it right but you did

16   everything through the lens of this case has no merit;

17   therefore, we're going to determine what we think we need to

18   produce.  And it was the most obtuse approach to discovery

19   compliance that I have ever seen after four and a half hours

20   with me where you know that that's not the way that I work.

21           So those are the two extreme dynamics that have been

22   at play in this case from day one and I don't want any of this

23   to lead to ethical violation allegations internally or

24   externally.  I don't want it to lead to malpractice allegations

25   from clients to its attorneys.

1          And I don't want it to have to lead to evidentiary

2     hearings where I have to start looking at privileged

3     communications in order to figure out whether and to what

4     extent the attorneys are acting in good faith in requesting

5     discovery that's relevant and proportionate to this case and

6     responding to discovery requests with the relevant rebel of

7     reasonable inquiry and certification that's required.

8          And you all have failed miserably on this front.

9     When all is said and done, where I am today is I think that in

10    an amount to be determined, a significant amount of fees and

11    costs need to be paid to the Plaintiffs for all this needless

12    discovery violation that Mr. Keyes and his client had a chance

13    to avoid.

14         I don't find enough here to find contempt that would

15    result in me then taking an additional pound of flesh from

16    people.  And if we could have just figured out a way on the

17    Plaintiff's side for you to focus -- you have so much

18    persuasive evidence here to present to me for monetary

19    sanctions and yet you don't focus.  You don't target.  You want

20    the sun, the moon and the stars and when I don't give that to

21    you, you want the entire planet.

22         And when I now look at the record, which I didn't

23    have as we were proceeding through, I am aghast at the way that

24    TikTok handled their discovery and essentially created self-

25    inflicted wounds.

1            So here's the way that I want to sort of frame the

2    discussion today.  Despite the parties' best efforts to keep it

3    very confusing for me and to make me try to rule on everything

4    under the sun, I sort of see three or four sort of issues that

5    I want to try to get us focused on.  Okay.

6            One is fairly discrete which deals with the Rule 30

7    depositions and Mr. Chou in particular and as to how that

8    deposition came about, cost and fees associated with that.

9    It's kind of its own discrete little creature.  How that went

10   out is -- there's a similar theme there but that's fairly

11   discrete.

12           The second area are the Defendants' obligations under

13   Rule 26(a)(1) and 26(f).  Those are the obligations that you

14   have to engage in to make your disclosures of witnesses and

15   documents and to engage in the necessary planning of discovery

16   at the 26(f) stage so that you can represent to Mr. -- or Judge

17   Blumenfeld what he did which was, this is all the discovery

18   time that we need and what you all did to fulfill those

19   obligations.

20           The third area is document productions, Rule 34 and

21   how Defendants complied with their obligations to respond and

22   produce as required by Rule 34.

23           Those are the three areas that I'm going to focus on

24   as areas of, what were the duties that the Defendants had, what

25   is the evidence that they did not comply with those

1   obligations, what if anything is the appropriate remedy for any

2   failures under those three areas?  Rule 30 depositions, initial

3   disclosures and the initial discovery commanding, if done

4   properly, could have at least forestalled, if not mitigated, a

5   lot of the problems we had and then the way that Defendants

6   respond to Rule 34 doc requests and productions.  Okay.

7          So the obligation, what happened, remedy.  Now,

8   within each of those areas, there are three overlapping duties

9   that are critical to keep in mind and that's how I think about

10  these things.  And that's the duty to inquire, the duty to

11  preserve and the duty to supplement.

12         All those three things come into play in all of these

13  areas, document requests and production responses, initial

14  disclosures and discovery planning and Rule 30 depositions.  So

15  when we talk about what did or did not happen right, the things

16  that I care about are the things that go to duty to inquire,

17  duty to preserve and duty to supplement.

18         Things that are not ideal practice pointers or things

19  that you all were annoyed with each other about, that's par for

20  the course in litigation and you all need to just accept that.

21  So I don't like to hear in evidence all of the things about he

22  said, she said, this and that.  I mean, all those things don't

23  matter to me except as they are relevant to those three

24  overlapping duties.

25         All those things work together because in order to

13

1  comply with your obligations, you have to inquire, preserve and
2  supplement and those things all work together because at the
3  beginning, a reasonable inquiry may still not lead to
4  everything and so you may need to expand scope of preservation
5  and then you may need to supplement.
6        But here's where people go really, really off the
7  reservation and this is where -- a lot of where TikTok's
8  problems happened is that you thought that the duty to
9  supplement was a right to produce answers, disclosures and
10 documents whenever you wanted as long as it's before the cutoff
11 date.
12        It's not a right to supplement.  It's a duty to
13 supplement for things that you did not know with reasonable
14 inquiry at the time that you made your initial disclosures.
15 Otherwise, the duty to inquire and preserve are meaningless if
16 all you have to do is at the end of the day, drop a bucket of
17 things the day before cutoff and say, well, 26(e) allows me to
18 supplement.  So I did it all then.
19        And your discovery responses all exemplify that,
20 Mr. Keyes.  They say, boilerplate general objections subject to
21 and without waiving those objections, we will produce any non-
22 privileged responsive information after a reasonable inquiry to
23 the extent that they exist.  Then eventually maybe in some
24 cases, you'll produce some things; in other cases, you won't.
25 And then evidence starts surfacing that clearly documents that

14

1   hatched but existed before aren't produced until late making

2   those discovery responses invalid.

3          So somewhere in the duty to inquire or to preserve or

4   to supplement, you've hit.

5          **MR. KEYES:**  Your Honor, if I may, may I respond?

6          **THE COURT:**  No, you may not because I need to set the

7   stage first because I don't want this hearing to go off the

8   rails.  I need you all to be focused on these areas and that's

9   where I'm going to start with.  Okay.

10         So I'm going to start with 26(a)(1) and (f) -- well,

11  actually let's deal with the Herman Chou deposition because

12  that's probably the easiest.  So I guess here the issue is

13  there were two depositions that maybe you didn't get to do but

14  certainly the Chou deposition you did it but under really

15  strange circumstances.

16         When I ordered the Chou deposition, I was under the

17  impression, Mr. Keyes, that he had never come to the United

18  States or at least had not come lately post-pandemic.  And you

19  said that sending him to the US because of the strict lockdown

20  and the zero COVID policies, it would have been unduly

21  burdensome.  And so we tried to address those problems by both

22  having something be done in Asia and cost-shifting.

23         And now we learn that before then in two weeks in

24  July when they noticed his deposition, he was in the United

25  States and probably meeting with his United States counterparts

15

1   to talk about this case.  So what am I to do with those facts

2   as to the accuracy of your representation that he could not be

3   deposed in the United States when he was originally noticed?

4        MR. KEYES:  Your Honor, thank you.  Yes, Mr. Chou was

5   in the United States this summer.  When they originally noticed

6   the deposition, we had objected to it saying Mr. Chou does not

7   have any relevant information --

8        THE COURT:  That's not your call to make, Mr. Keyes,

9   and if it was, you needed to seek a protective order.  We are

10  now doing 2020 Monday-morning quarterbacking.  I'm not

11  re-litigating these things.  All I want you to answer the

12  following.  They noticed a proper deposition.  In the absence

13  of a motion for a protective order or stipulations where you

14  all agree, you're obligated to produce him.

15       He was here in July when they noticed the deposition

16  for but later when this thing finally came to a head and they

17  had to move to compel Chou's deposition, none of this was

18  mentioned to me about the fact that he was in July in the

19  United States at the time that the deposition was noticed and

20  then you didn't move for a protective order.

21       What I want to understand is how was that information

22  not given to me at the time that I ordered his deposition in

23  Asia with costs to be transferred to the Plaintiffs?

24       MR. KEYES:  Your Honor, Mr. Chou -- the situation in

25  China was very fluid in terms of the lockdowns.

16

1          **THE COURT:**  Did you tell me in the opposition to

2    their motion to compel Mr. Chou's deposition that he had been

3    in the United States in July of 2021 around the time that their

4    deposition had been noticed?  Did you tell me that?  I don't --

5    I -- if you did, I missed it.  Did you tell me that?

6          **MR. KEYES:**  I don't believe I did, Your Honor.

7          **THE COURT:**  Yeah.  And you certainly left me with the

8    impression that he had not come to the United States of late,

9    post 2020 anyway, and because of the stringent COVID policies

10   in China, bringing him to the United States was too onerous of

11   a burden.  And yet we know that he could have come, he did come

12   and you made me cost-shift.

13          So at a minimum, don't you think that I need to

14   reverse that cost-shifting order?

15          **MR. KEYES:**  Your Honor, that's perfectly acceptable

16   to us --

17          **THE COURT:**  Okay.

18          **MR. KEYES:**  -- if you would like to do that.  We

19   haven't actually submitted those costs to Plaintiff.  And so we

20   won't plan to do that.

21          I will tell you, Your Honor, I in no way intended to

22   mislead the Court or in any way not disclose what was relevant

23   information.  I can tell you throughout the course of this

24   case, the parties have noticed depositions for certain dates

25   and then we have objected or we've said, well, let's meet-and-

17

1    confer over it.  And that's happened time and time again in

2    this case.

3            I've noticed multiple depositions and they've said,

4    no, we're not going to do it then.

5            **THE COURT:**  I understand --

6            **MR. KEYES:**  I understand the protective order and I

7    didn't stick them with that at all.

8            **THE COURT:**  I understand that.  I understand that and

9    so with respect to the deposition issue, I'm not concerned with

10   these other two depositions that didn't happen but I think,

11   number one, I don't like the way that things were presented to

12   me about the Chou deposition because it was presented to me as

13   a case of a Chinese citizen to whom it would be extremely

14   burdensome to come to the United States when we know that he is

15   a businessperson for TikTok who came to the United States in

16   July and presumably he could come for business reasons at other

17   times.

18           And I don't like COVID to have been used as the cover

19   to make it more difficult than it needed to be to allow the

20   deposition of Mr. Chou.  And your first answer to me reveals

21   the recurrent theme which was that you keep saying to me, we

22   did not think Mr. Chou had relevant information.  That wasn't

23   your call to make.  He was certainly relevant enough to allow

24   the deposition and whether the weight of that evidence was

25   going to lead to anything is a totally different matter.

1          And it wasn't a disproportionate request given his

2     role as a businessman here in the TikTok case.  You failed and

3     made the mistake of deciding that your relevance call allowed

4     you to be more resistant of their discovery request and force

5     me to labor under the misapprehension that he was under a

6     strict China COVID policy that made it burdensome for you to do

7     a deposition.

8          So here's what I'm going to say.  The time that the

9     Plaintiff's counsel spent in meeting and conferring about the

10    Chou deposition after they objected to it, the time spent in

11    doing the deposition and all the costs associated with his

12    deposition are to be borne by the Defendant TikTok.

13         Ms. Cormier or Mr. Skale, is there anything with

14    respect to the Chou deposition?

15         **MR. SKALE:**  No, Your Honor, thank you.

16         **THE COURT:**  Anything else with respect to just

17    deposition violations?

18         **MS. CORMIER:**  No, Your Honor, thank you.

19         **THE COURT:**  Okay.  So now let's go to --

20         **MR. KEYES:**  Your Honor, if I may just briefly?

21         **THE COURT:**  Yes, sir.

22         **MR. KEYES:**  Again, I just want to reiterate, Your

23    Honor.  I in no intended to mislead the Court or not provide

24    relevant information whatsoever.  I -- again, when I said

25    relevancy with respect to Mr. Chou, what I should have really

19

1    said when I was explaining it to you is, this is going to be

2    cumulative.  It's not something that we think that it makes

3    sense to produce him.

4         **THE COURT:**  Mr. Keyes, if this were a case where you

5    had ultimately produced about 50 deponents and you had produced

6    10,000 documents and mounds and mounds of interrogatory

7    responses, I could entertain a cumulativeness objection but

8    from the beginning of this -- and we're just about to get to

9    it, 26(a)(1) and 26(f), you all decided how you were going to

10   artificially strategically funnel this case into the most bare

11   minimum possible into doing it into a hide-and-seek-type

12   discovery practice.

13        So the cumulativeness stuff may be credible if you

14   had done five or six or ten depositions but you didn't have

15   that many depositions.  There were people's depositions that

16   ultimately didn't even get done.  So at least by title at least

17   here to have pertinent, relevant information and I bet they

18   were on the litigation hold, Sharaz (phonetic) Amin (phonetic)

19   and Mike Minko (phonetic).  I mean, those depositions didn't

20   even happen.

21        So, anyway, enough with that.  And, Mr. Keyes, I said

22   from the beginning I'm not wanting this hearing to be fodder

23   for ethical lapses or anything that would cause trouble between

24   attorney and client but you're going to need to fall on your

25   sword and take your lumps with the monetary sanctions or else

1   we're going to delve into evidentiary hearings about what

2   really people intended or didn't intend with their

3   communications with in-house counsel and the representations

4   that were made.

5         And I don't know that that's where any of us want to

6   go.  So I take your point.  I don't suggest that anyone

7   intentionally misled me or else but at the end of the day, a

8   discovery violation is a discovery violation and here the

9   violation is the following.

10        Absent a protective order, you're required to produce

11  them when noticed.  You didn't do that.  The reasons that you

12  gave for not doing that and how you wanted that to be

13  alternatively accommodated were done under a set of facts that

14  turned out to not be a hundred-percent material to the

15  determination I needed to make.

16        As a result, I gave too much weight to Mr. Chou's

17  interest and not enough weight to Plaintiffs.  I'm now

18  rectifying that by requiring you to pay the attorneys' fees

19  incurred in litigating and meeting and conferring with you

20  about the Chou deposition after you objected to it, the time

21  that they spent at the Chou deposition and the cost incurred in

22  connection with that deposition.

23        So, Plaintiffs, you all really need to keep a running

24  list of this and provide me these actual numbers when it's time

25  for me to impose the order but that's kind of Category 1.  All

1    right?

2         **MR. SKALE:**  Thank you, Your Honor.  One point of

3    clarification, litigating the Chou deposition, we presume you

4    meant the motion to compel the cost that we incurred when we

5    were compelled.

6         **THE COURT:**  Right.

7         **MR. SKALE:**  Thank you, Your Honor.

8         **THE COURT:**  The way I will always look at these

9    sanctions is if things went as the parties' obligations should

10   have been taken, costs that would not have been incurred with

11   probably a smidgen in there for deterrents and other things

12   because I'm constantly taken to task by colleagues that I don't

13   deter attorneys' discovery mischief enough.  So I guess I'm

14   trying to make up for that.  I'm not.  I'm kidding but I think

15   that needs to be done as well.

16        So now we get to 26(a)(1) and 26(f), the discovery

17   plan.  What I don't understand here are two big problems.

18   Number one is at least as of April 2021, you had sent out a

19   litigation hold at TikTok to approximately 25 people presumably

20   because they have potentially relevant information.  And, yet,

21   did any of those 25 people show up on your initial disclosures?

22        **MR. KEYES:**  Michael Buzzenover (phonetic) did, Your

23   Honor.

24        **THE COURT:**  I'm sorry, say it again.

25        **MR. KEYES:**  Yes, it was Michael Buzzenover.

1          **THE COURT:**  No, no, no.  No, you deposed Buzzenover

2   and Miti (phonetic) Tachibana (phonetic).

3          **MR. KEYES:**  Correct.

4          **THE COURT:**  But what about the other 24 or 23 people

5   that you sent litigation hold notices to?

6          **MR. KEYES:**  No, they were not on the initial 26(a)

7   disclosure.

8          **THE COURT:**  Right.

9          **MR. KEYES:**  Your Honor, I -- again, this is --

10  predates --

11         **THE COURT:**  I know that was before you with other

12  counsel which I think they're still co-counsel but they're not

13  here.  Right?  I mean, they didn't withdraw.  They are still

14  co-counsel, right?

15         **MR. KEYES:**  Correct, and they're still co-counsel.

16         **THE COURT:**  Yeah.  So this is why.  I mean, you're

17  going to have to stand in for them.  I know Gibson Dunn came in

18  recently but -- so you're going to have to stand in for them.

19  I'm just trying to figure out, why were those names not

20  disclosed at the time of the initial disclosures or raised at

21  the 26(f) conference?

22         **MR. KEYES:**  Well, I believe for two reasons, Your

23  Honor.  First off, Michael Buzzenover was the project manager

24  for Stitch.

25         **THE COURT:**  I know why Buzzenover and Tachibana were

revealed and why they ended up being the focus of your discovery.  What I'm asking about is different.  26(a) requires you to disclose witnesses that may have discoverable information.  It doesn't mean disclosure is different from meaning that they're going to be the subject of depositions, that they're going to be the subject of intensive doc requests.

It just means they need to be disclosed precisely because as you go through the history of this case, the Plaintiffs were constantly grasping and trying to figure out who you interviewed, who might have relevant documents and who else might have relevant information.  And if they had been disclosed at 26(a)(1), you could have had a discussion and a debate about who should really be pursued and who should not be.  You could have had the discussions about who's cumulative and who's not cumulative.

But you disabled anyone from doing that by simply not making that disclosure.  And that then leads to all of these late preservation letters and these late productions of documents.  So I'm just asking a simple question.  I know because I've heard it too many times now why Buzzenover and Tachibana are the key people that you keep saying matter.

I'm now doing something else.  We are now auditing your discovery compliance and when we go back to 26(a)(1) and 26(f), if you had disclosed the witnesses to whom you had sent litigation holds, that would be the starting point for a

24

1    discussion about whose custodian's data needs to be preserved,

2    possibly searched, produced and all your arguments for why we

3    sent a litigation hold to this person because in an abundance

4    of caution that they would be tangential.

5          You could have had all of that but because none of

6    these names were disclosed, we continue to have fight after

7    fight after fight later about who you actually even asked about

8    whether they had discovery of information, whether you

9    preserved it or not and then whether you went and supplemented

10   it later or not.

11         And all roads just seem to lead back to in-house

12   counsel telling you that these are the two people that will

13   have 99 percent of the information.  Okay.  We're going to talk

14   about that but, clearly, that answer did not leave you in a

15   good position today.  All right.

16         So it wasn't disclosed in 26(a)(1), the people to

17   whom you sent litigation holds, all of them, only Buzzenover

18   and Tachibana.  And then in the discovery planning in 26(f),

19   when you all are scoping discovery, why are these names not

20   being raised if for no other reason to say, listen, here's the

21   relevant universe of potentially relevant custodians but I

22   don't want to have a fight about this for the next five hours

23   with Judge Kim over the next two years.

24         So I want to sort of focus and tell you that here are

25   ten that we think aren't going to matter, here are four that

1   aren't going to matter and at the end of the day, it's

2   Tachibana and Buzzenover.

3           Plaintiffs may say, well, let's test that.  I want to

4   see what these other two or three people have and then we can

5   decide that.  But that whole sort of give-and-take that would

6   normally happen was totally short-cut because you never

7   disclosed these other people even in 26(f).  Why was that not

8   done?

9           **MR. KEYES:**  Your Honor, it wasn't done because there

10  was not the understanding that any of those individuals would

11  be used by Defendants in support of their claims or defenses.

12  Mr. Buzzenover and Ms. Tachibana are the individuals that --

13          **THE COURT:**  Could they be used in the Plaintiff's

14  claims or defenses to your counterclaims?

15          **MR. KEYES:**  Your Honor, no, we don't believe so.

16          **THE COURT:**  Why did you send them litigation holds

17  then?

18          **MR. KEYES:**  Well, like at the outset of any case, I

19  think you try to scope it and make sure you're covering

20  everybody that could conceivably have discoverable information

21  and --

22          **THE COURT:**  Right.

23          **MR. KEYES:**  -- then after you have discussions with

24  in-house counsel and you interview the witnesses, you realize,

25  okay, well, that --

1        **THE COURT:**  Right.  But you prevent any of that

2   happening in any cooperative, good-faith manner because you

3   don't disclose it.  It doesn't mean that these people are going

4   to testify at trial.  There are pretrial disclosures that you

5   all are now getting to about who's going to be actual

6   witnesses.  It's because you decide to do all this in a way

7   that prevented any reasonable transparency to the Plaintiffs

8   that allowed them to make any reasonable accommodations to you.

9        And time and time again, that approach kept getting

10  you into trouble and time and time again, I told you, don't do

11  that.  I mean, eventually I tell you to do a real 26(f)

12  conference on the record and even that was more or less kind of

13  a waste of time.  So I don't see where the identities of

14  relevant custodians were properly disclosed at 26(a)(1) stage

15  or at 26(f) stage.

16       Now, categories of documents.  As early as -- I don't

17  know when it was.  It would have had to have been the

18  scheduling conference that you had with Judge Blumenfeld.  You

19  make some general mention about document requests being hard

20  maybe with cross-discovery issues.  But I want to know why

21  there's no mention of Lark at all until I think you all kind of

22  maybe see me in July of 2022.

23       So starting in April 2021 when you sent out

24  preservation letters, you start doing your own investigation,

25  Lark, which has turned out to be one of the most hotly debated

27

1    things about what it is, how much data is on there, how do you

2    extract data out of there, how difficult could it be?  In other

3    words, every question that you would want to raise at a 26(f)

4    was never raised until later.

5              And maybe I would need to take judicial notice of

6    this but I cannot believe that this is the first time that

7    TikTok has been involved in litigation where their proprietary

8    Lark document management system would need to be the subject of

9    discovery requests and yet it was presented to me as if Lark

10   was the first time that you ever learned about this thing was

11   in July of 2022.  How is that possible?

12             **MR. KEYES:**  Your Honor, a couple of things.  It was

13   -- I believe it was in June of 2022 about the discussions that

14   Dorsey and Whitney had with Plaintiff about Lark.

15             **THE COURT:**  Right.  That was -- but what I'm getting

16   at is way before then when you are setting the schedule with

17   Judge Blumenfeld about discovery, when you actually mention

18   cross-discovery as potentially an issue that needs to be

19   considered when thinking about discovery plan, if Lark was this

20   proprietary system that would require custom scripts in order

21   to get chats, that would require customization in order to

22   produce documents in a producible format, that's an obvious

23   candidate for something that you would raise in 26(f) and

24   certainly something you would raise in the Rule 16 scheduling

25   hearing with Judge Blumenfeld.

1          The failure to do that resulted in all kinds of

2     debates later about how complete and how quickly you could do

3     your Lark searches.  What I'm asking, we're still at just

4     26(a)(1), 26(f) obligations.  You have the duty to inquire, the

5     duty to preserve.  Those are the operative duties that you have

6     under 26(g) and 26.37, I guess.

7          That's what's happening.  When you have this list

8     that is the primary repository of relevant information, as you

9     told me later, I'm trying to figure out why it wasn't brought

10    up in 2021 when it should have been so that a lot of these

11    issues could have been fronted.  Document productions wouldn't

12    have been so stymied, delayed or late.

13          I'm just focusing on that narrow inquiry.  How can it

14    be that Lark is not robustly discussed until you bring it to me

15    and I order you to get the Lark person most knowledgeable on a

16    meet-and-confer and then later order you to have a 26(f)

17    conference on the record?  That shouldn't have happened and so

18    that's what I'm talking about.  If this had been done properly,

19    you had fulfilled your duty to inquire and preserve (inaudible)

20    and understand Lark at the 26(f) stage, needless costs would

21    not have been incurred.

22          So tell me something that I don't know about why you

23    can only learn about Lark in June of 2022 in a case that was

24    filed in what?  April of 2021 if not earlier?

25          **MR. KEYES:**  Your Honor, a couple of things in

1    response to that.

2            During the initial 26 -- Rule 26 conferences with

3    opposing counsel, I know that Mr. Heavner brought up the issue

4    of the technological problems associated with the Defendants'

5    systems.  It was discussed during the ESI order negotiating

6    it --

7            **THE COURT:**  Right.

8            **MR. KEYES:**  So --

9            **THE COURT:**  But you also didn't mention anything

10   about Lark in the ESI protocol that I approved.  I mean, you

11   know, the level of complexity and depth and complications that

12   you later cited as the reasons for being unable to timely

13   produce things is of such a magnitude that you should have been

14   fronting that in the ESI stipulation, at the latest, but it

15   still comes back to, are you telling me that this is the first

16   time TikTok has been in litigation where Lark has needed to be

17   a source of information for discovery?

18           **MR. KEYES:**  Your Honor, believe it or not, that's my

19   understanding.  There's one other instance where they've had to

20   do something similar that required the software engineers to go

21   in and try to extract data.

22           **THE COURT:**  Okay.

23           **MR. KEYES:**  This is the case where they've been faced

24   with tremendous discovery hurdles associated with --

25           **THE COURT:**  But that's what 26(a)(1) and 26(f) is

**EXCEPTIONAL REPORTING SERVICES, INC**

1   designed to bring to the surface so that you never find

2   yourself in this position.  We have categories of chats with

3   these emails and other documents that are inside a proprietary

4   database called Lark.  We have only had one other remotely

5   similar litigation where we have had to extract data from this.

6   We've investigated and we realized that that's going to take a

7   lot of work to extract data from.  Had the conversation been

8   had among counsel before Judge Blumenfeld in the ESI protocol,

9   every one of those are missed opportunities that resulted in

10  then later problems that we have with the other document

11  production.  So I'm just trying to go through this

12  sequentially.  That's the problem.

13          Again, I'm not implying bad faith.  I'm not implying

14  negligence, but I'm saying at the end of the day, the discovery

15  rules were changed in 2015 to make this a collaborative,

16  cooperative effort to a degree to precisely avoid these

17  problems.  And then by the time you met with me, you certainly

18  knew because I told you to meet in July 2022 with the Lark

19  custodian and work out a protocol but that degenerated so that

20  they filed a motion to compel almost weeks later.

21          But part of that, Mr. Keyes, was because they didn't

22  know who your other relevant witnesses were because they

23  weren't disclosed.  You didn't really have a good description

24  of the document categories and you continued to do this

25  hide-and-seek thing or play obtuse in a way that just invited

1    the Plaintiffs to be increasingly skeptical and suspicious.

2    But probably they didn't need to be.  You could have just

3    simply come forward and said, Here's our issues.  And when you

4    do that and if Plaintiffs run reasonable, I would have sniffed

5    that out in an instant in the first motion to compel but you

6    didn't.  You kept trying to unilaterally determine how you were

7    going to handle discovery without the collaborative effort you

8    needed to through these disclosures that could have prevented

9    all of this.  So I'm really at a loss and I'll let you make the

10   record for me if you want; again, not bad faith but as a

11   technical violation as far as I see it.

12            I don't see how TikTok complied with their initial

13   disclosure obligations in their 26(f) discovery planning

14   obligations in terms of disclosing the relevant universe of

15   custodians and the relevant potential data sources and systems

16   at play such that you could then come up with a meaningful

17   discovery plan.  You decided and jumped the gun and said, Well

18   none of these people are going to have evidence that could be

19   admitted at trial.  That's not the way the inquiry goes.  You

20   put it on the table so that you and Mr. Skale can have a

21   discussion about what kind of plan and what kind of custodians

22   need to be searched; but by not doing that, not doing that, you

23   put yourself in this position.

24            So tell me what I'm missing about the record as to

25   the fact of the matter is, custodians were given litigation

32

1  holds but they were not disclosed in 26(a)(1).  The Lark system

2  was in existence and it was known at some point in 2021 and

3  early 2022 that it would present discovery challenges but it

4  was not presented as a subject of 26(f) discussions.

5          Do I have at least those basic facts wrong?

6          **MR. KEYES:**  Your Honor, I don't believe you have them

7  wrong.  I think that, again, there was discussion early on in

8  the case.  At the outset, there was going to be issues

9  associated with document production given the proprietary

10  system.

11          **THE COURT:**  Understood, understood and that's why I

12  said I don't want to get into all the tit for tat that you all

13  had as attorneys in trying to litigate your case; and by the

14  same token, that's why I'm telling you this is not a contempt

15  case.  I'm not going there with this but fact of the matter is,

16  TikTok wanted to conduct discovery a particular way, it was

17  overly aggressive, and it put you in this position and this is

18  the second set of area where -- and this is an important one

19  because these foundational discovery flubs here set the stage

20  for the document production problems we're about to talk about

21  next.  So I find that the Defendants did not properly comply

22  with their Rule 26(a)(1) disclosures and the Rule 26(f)

23  discovery planning disclosures.

24          Now, as far as remedy, as far as sanctions,

25  Ms. Cormier or Mr. Skale, do you have a way in which I identify

1   attorney expenses and fees that would not have been incurred as

2   a result of this discovery violation?  And remember, it's

3   tricky because if you get things late and you still got it,

4   that's a different issue from costs that you wouldn't have had

5   to incur otherwise.

6          Unlike the Chou deposition, I'm still okay with them

7   paying the costs of your time deposing him because of the

8   unique circumstances of that violation in how Chou was

9   proposed.  With respect to these foundational discovery

10  violations -- and you don't have to answer me yet -- I need you

11  to be much more surgical in thinking about how you parse the

12  time expended unnecessarily as a result of this foundational

13  set of discovery violations.  I don't see it's everything that

14  you have done in discovery from 2021 to now so please, please,

15  please do not even ask me for that.  But you make the right set

16  of factual proffers about costs that reasonably would not have

17  been incurred as a result of these foundational discovery

18  violations, I'm going to hear you out.

19         This is going to sting but it's not meant to provide

20  you some massive amount of settlement leverage or trial

21  leverage in this case.  We're dealing with the violations, we

22  will remedy them proportionally, and it should take care of

23  these costs that reasonably we can assess should not have been

24  incurred by you, okay?  So let's put a pin in that remedy

25  question for now.

```
 1          MR. SKALE:  That's very good.  I have some ideas --

 2          THE COURT:  Okay.

 3          MR. SKALE:  -- if the Court wants to hear them;

 4  otherwise, we can --

 5          THE COURT:  We'll do it later.

 6          MR. SKALE:  -- (indisc.).

 7          THE COURT:  So now we get to the Rule 34 document

 8  responses and productions.

 9          Rule 34 is clear on the specificity of objections and

10  responses that need to be made and the timelines for

11  productions that need to be made.  Many, if not most of the

12  objections that I have read in their document responses from

13  TikTok, have all of the impermissible things that the rules

14  forbid; but if you look at my modified procedures and schedule

15  notes, I put that out there because this is the most commonly

16  misunderstood or mistaken provision where we continue to go by

17  these templates that were in use when I was an associate.

18          The general objections.  And at the beginning of

19  every single specific document request you incorporate without

20  objection the general objections.  Then you add some more

21  boilerplate objections, and then you add vague, ambiguous,

22  burdensome, and then you say "subject to and without waiving

23  these objections, we will produce responsive non-privileged

24  documents after a reasonable inquiry to the extent that they

25  exist."
```

35

1          Folks, I don't know how we expunge that practice but

2     I saw that time and time and time again and it didn't even

3     matter to me at some point whether they were on material

4     document requests anymore, Mr. Keyes, because by doing that you

5     do the very thing that Rule 34 says that you can avoid; which

6     is, leaving everyone in the dark as to what you have, what

7     you're not producing that you have, subject to a specific

8     objection, so that then we can have a legitimate fight about

9     the things that are not being withheld.  But you leave everyone

10    in the dark.  "Well what do they have?"  "Have they now

11    produced everything that they have?"  We'll never know because

12    they've reserved their right to produce anything at any time.

13    Time and time again that happened with your discovery

14    responses.

15          Discovery productions.  Absent agreement by the

16    parties, you have to produce documents by the deadlines set

17    forth in the document requests.  Obviously, you're supposed to

18    negotiate those deadlines but there really didn't seem to be

19    any negotiation of those deadlines, it was just a open-ended,

20    "I will produce documents if and when we have them."  "We've

21    looked, we don't think that there's anything more but we'll

22    look again."  You produce something and then you say, "Well,

23    okay, but that's all it is.  Scouts honor, we're really square

24    this time."

25          It's exactly that cascade of discovery problems that

36

1    are meant to be avoided by doing two simple things.  Making

2    specific objections, saying what you're withholding, subject to

3    those specific objections, and then saying what you're

4    producing and by when.  Then you don't have fights about time.

5    If there are things that are reasonably subject to debate about

6    whether it should be properly objected to or not, the

7    Plaintiffs have a way to litigate that.  They can say, "We

8    don't think that's a valid objection for this category of

9    documents," then we know what we're talking about.  But often

10   what the motion to compel is about is, We ask for everything

11   under the moon, the sun and the earth, they gave an objection

12   that says, "We don't have to do anything, don't call us, we'll

13   call you, please compel them to give us everything."  And then

14   the Defendants say "But everything can't be relevant".  Well of

15   course.  That's the mindless, time-consuming, wasteful trial

16   activity that we engage in when all you have to do is give

17   specific responses, specific objections, say what you're

18   withholding and what you're producing and by when.

19          Rule 34 requires that for all your document

20   productions, subject to agreement with the parties.  But you

21   have to set the stage for that and to set the stage for that

22   the Plaintiffs have to know what you're withholding on what

23   objection so they can decide whether it's valid or not and

24   whether they want to move to compel or not.

25          If you discuss that we're going to need an additional

1  two weeks for a rolling production, Plaintiffs can't come in

2  here and say they violated the deadline in the document

3  request, but none of those things can happen if you don't do

4  the basic things that Rule 34 requires; and so by not doing

5  those things, we have this incessant fight.

6          So what I want to know is what is the answer to --

7  and we had separate conferences where I talked about how you

8  need to supplement or revise your Rule 34 discovery responses.

9  What is the answer to, Why document responses and productions

10 were not made in compliance with Rule 34 with specific

11 responses and objections and clearer timelines about when

12 things would be produced and whether everything has been

13 produced and we're not in the dark.  Why were those things not

14 done?

15         **MR. KEYES:**  Your Honor, are you -- is there something

16 in specific or just in general that you're referring to?

17         **THE COURT:**  Well both I guess.  I don't -- I would be

18 hard pressed to find an instance of your document responses in

19 which it's not some version of "subject to and without waiving

20 such and such, we will produce non-privileged documents based

21 upon a reasonable inquiry to the extent that they exist."

22 Maybe later you'll then produce something, maybe in an email

23 you'll tell counsel that's it, but that's pretty much kind of

24 the state of affairs.  So we're always left guessing, is there

25 something more here, is there not?  That's the state of affairs

38

1    that resulted so I'm trying to figure out why didn't you

2    prevent that state of affairs by assiduously complying with the

3    Rule 34 requirements?

4         **MR. KEYES:**  Your Honor, when it came to production of

5    documents, I mean there obviously were different categories of

6    information that was requested.

7         When it came to the product documents, for example,

8    with respect to the creation and the marketing and the

9    promotion of the Stitch feature, those documents were produced.

10   They were produced.  You know, we had significant technological

11   limitations associated with the production of those documents

12   but they were ultimately -- ultimately produced.

13        **THE COURT:**  I know (inaudible) --

14        **MR. KEYES:**  (inaudible).

15        **THE COURT:**  I know, Mr. Keyes, that you produced what

16   you ultimately produced.  The state of affairs though that

17   we're left with at the end of this journey is that we're still

18   unsure whether there's more or not.  Time has kind of run out

19   so the Plaintiffs have only a certain set of limited options

20   that they can pursue, and we still don't really know, even

21   based on your responses -- which you haven't supplemented by

22   finally saying, "Everything that was produced to you in October

23   2022 is now everything that we have that's responsive and we

24   have nothing more."  I don't even know if those supplemental

25   disclosure supplemental responses have been made so that we can

39

1    close the loop on this.

2              **MR. KEYES:**  Your Honor, they have been made.  We

3    did -- we did produce --

4              **THE COURT:**  No, no, no, supplemental --

5              **MR. KEYES:**  (indisc.) final (indisc.).

6              **THE COURT:**  Supplemental discovery responses so that

7    for all the discovery responses that you left open ended,

8    supplemental responses that would say, "There's nothing left

9    here," that would require you to file a response that's based

10   upon reasonable inquiry and certify that to the best of your

11   abilities that everything is now complete, and that's what

12   26(e) is for, to close the loop on this.  26(e) is not the

13   license to produce whenever you want to.  26(e) is the duty to

14   supplement things that you couldn't discover with reasonable

15   inquiry earlier.  So to the extent that it looks like you had

16   one or two or three or four of those things, have you now

17   supplemented your discovery responses to say, "With the final

18   production that was made on such and such date, we have now

19   searched for and produced all non-privileged responsive

20   documents that have not been properly objected to and provided

21   that response" so that we no longer have a question has that

22   been done.

23             **MR. KEYES:**  Your Honor, I believe we have complied

24   with that requirement.  That was something that you had told us

25   to do back in -- pursuant to your August 31st order.  And so we

40

1  did go back through, we supplemented our discovery responses

2  and also collected documents from the additional 12 custodians

3  that you ordered us to produce doc -- or to search --

4         **THE COURT:**  All right.  So now you're bringing me to

5  the last sort of related issue which is, how am I supposed to

6  believe that the responses that were made at the time they were

7  made were based on a reasonable inquiry if 12 or 13 additional

8  people are getting litigation holds for the first time in

9  August 2022 after a hearing from me, and at least eight out of

10  12 of those custodians produced additional documents?  Because

11  up to this point, remember, you're on the record saying that

12  Tachibana and Muchinoux (phonetic) were all going to have

13  everything.  And so much so that there were 12 people that

14  didn't even get a litigation hold, that they didn't get a

15  litigation hold till later; and then of those people, they had

16  documents that were produced.  How is that not supposed to beg

17  the question that reasonable inquiry wasn't done at the time of

18  the initial discovery responses, it wasn't done even after the

19  multiple hearings that we had, and it was only done basically

20  in the 11th hour on October 2022.  Isn't that evidence of that?

21         **MR. KEYES:**  Well, I don't believe so, Your Honor, and

22  here's why.

23         **THE COURT:**  Okay.

24         **MR. KEYES:**  The custodians that were served with the

25  additional litigation hold on August 31st, those are the

1   individuals that were referenced in what's called the "PRD," a

2   product requirements document.  Those -- it's  essentially

3   eight different departments within the company or within the

4   set of companies; for example, the trust and safety team, the

5   content programming team.  Those are the individuals who you --

6   who we provided the notice to out of an abundance of caution at

7   -- on August 31st.

8          They did, after searches were completed and my

9   colleague, Mr. Hansen, oversaw the search and worked directly

10  with each one of those document custodians, there were some

11  documents that were produced.  There were 29 of them as a

12  result of doing that search with those additional custodians.

13  But the vast majority of all the documents that Mr. Hansen

14  reviewed with those witnesses were in fact Lark documents and

15  Lark chats that were already produced in this matter.  But

16  there was a small subset, I must admit, of documents that were

17  in the possession of these custodians that we ultimately

18  collected and produced.

19          **THE COURT:**  And under (inaudible) other

20  circumstances, I might be satisfied with that as an answer

21  except that when we go back to -- and this is why it all

22  relates together -- the Rule 26(a)(1) and the 26(f)

23  obligations, you know, we don't even learn till later that

24  despite representations, Buzzenover and Each Nava (phonetic)

25  only have access to the documents that they would have gotten

42

1    or sent on Lark.  But you were led to believe that anything

2    related to the project that they were working on, including

3    from other custodians, would have also been preserved on Lark

4    which was why you said, you didn't need anyone other than

5    Buzzenover and Tachibana to be searching for things because it

6    wasn't custodian specific, it was subject-matter inclusive but

7    that clearly was wrong.  And once you discover that that's

8    wrong, I don't see this rush to supplement and correct for that

9    until it's somehow kind of forced in August 2022 and then you

10   provide the evidence that shows that that wasn't true.

11          Again, at the end of the day maybe we would have

12   ended up where we are now, Mr. Keyes.  That's a prejudice

13   question and that's a different question that goes to whether I

14   find contempt or other different kinds of sanctions but that

15   doesn't change the fact that we had needless, needless

16   discovery fights because this stuff wasn't done sooner, wasn't

17   done better, wasn't done more transparently.  That's what I'm

18   trying to rectify here, okay?  Not whether there was prejudice

19   or not.

20          At this point discovery cutoff is closed.  They won

21   summary judgment or they survived summary judgment without any

22   more discovery but the question still remains that because of

23   all of this stuff, we had a heck of a lot of discovery fights

24   that we shouldn't have had to have had if all this stuff was

25   just done as the rules require.

43

1        And I don't think you can get around the fact that

2   abundance of caution or not, if 12 more people are getting

3   litigation holds, there was some kind of failure in discovery

4   management in that many number of people getting it that late.

5   And then not to mention the email that we discover about after

6   the cease-and-desist letter that shows that they were talking

7   about other potential names other than Stitch in light of the

8   litigation.

9        Now, I get that, so far, discovery has not revealed

10  that you had any knowledge of Stitch Editing perhaps pre-launch

11  of the Stitch Editing feature on the TikTok platform but

12  certainly you had stuff post cease and desist.  There's

13  communications about that.  Maybe some of it would have been

14  privileged but why are Plaintiffs learning so late about this

15  obviously relevant category of discussions about the naming of

16  the plat -- of the feature in light of the lawsuit?  It's

17  coming in in October 2022.

18        As an example --

19        **MR. KEYES:**  Your Honor, you're right.  And as

20  hindsight being 20/20, those -- those document custodians

21  probably should have been searched earlier on in the process

22  and they weren't.

23        **THE COURT:**  And that's all ultimately that Plaintiffs

24  were asking me time and time and time again.  And because I had

25  no rational basis to discern, are these relevant custodians or

44

1  not?  And they were not getting straight answers in the

2  transcript that I read from you about how you decided who to

3  give litigation holds to.  I mean not only did you not make

4  those disclosures at 26(a)(1), you wouldn't even disclose it to

5  them in the context that I wanted you to disclose it to give

6  you the chance to remedy this.  And so you didn't.

7          So again, Rule 34 document productions were not made

8  in compliance with Rule 34.  The responses were deficient,

9  productions were not done timely, and the certifications that

10  were made could not have been done with reasonable inquiry

11  because of the way that subsequent information is found later.

12  So for that set of violations there is another amount of

13  needless discovery litigation that the Plaintiffs had to churn

14  about that they shouldn't have had to churn about.  Okay?

15          So that's where I'm left with at the end of the day.

16  If the Plaintiffs have other things they want to address with

17  me, I'm happy to take it up but I don't find them to be weighty

18  or meritorious enough to make into a big issue today given

19  where we're at.  But for those three categories of violations

20  with the Rule 30 depositions, Rule 26 initial discovery

21  disclosures and discovery planning obligations, and violations

22  of Rule 34 document productions and responses, there's quite a

23  bit of considerable Plaintiff's attorneys' fees and costs that

24  should not have been incurred but for those discovery

25  violations.

45

1          Again, not implying bad faith, not implying

2    negligence, not implying anything intentional, Mr. Keyes, but

3    for good, bad or the ill -- and I don't know whether it's

4    inhouse counsel that decide that this is how they want to do

5    discovery -- but an inhouse counsel telling you that they have

6    99 percent of the data in two people, it may work if it ends up

7    being true but if subsequent discovery reveals that to have

8    been a mistaken proposition as all of the subsequent events

9    have now shown, there's going to have to be a consequence to

10   that and that is going to have to be try to replace the monies

11   that the Plaintiffs needlessly expended on things that should

12   not have been expended with just proper discovery hygiene

13   starting with Rule 26(a)(1).

14          So before we talk about remedies, that's how I sort

15   of assess Plaintiff's motions and what I intend to do as a

16   matter of direction and then we need to settle on the final

17   amounts.  But is there anything else that Plaintiffs need to

18   raise with respect to their motion with me?  By implication

19   what I'm suggesting to you is everything else you're requesting

20   is denied but I'll hear you out.

21          **MR. SKALE:**  (indisc.) but --

22          **MS. ROCKETT:**  Your Honor --

23          **MR. SKALE:**  Go, go Courtney.

24          **MS. ROCKETT:**  Just with respect to back to the

25   26(a)(f) and what led to the court reporter taking part in our

1   interview sessions, I just want to touch quickly on the

2   systems.

3            So you saw that the initial preservation letter

4   didn't just include Lark identified as Lark.  It included G

5   Suite products and Dropbox, et cetera.  Those other systems

6   were used and were known to have been used by the relevant

7   witnesses and they were not disclosed or searched until we

8   discovered them by taking depositions.  I believe that while

9   Lark might have been a primary system and it might not have

10   been sufficiently clear from the filings, there were systems

11   that we didn't learn about until that September 2022 recorded

12   conference that were critical to the merits of this case,

13   including the Libra System that was an entire system used for

14   beta testing, Your Honor.  So you'll recall and I'm sure you're

15   sick of hearing it that we were told for at least a year that

16   there was no beta testing.  And not only was there beta

17   testing, there's an entire system used for it, not identified

18   and not searched.  And when Mr. Solo (phonetic) attempted to

19   disclose it to us during those hearings, he was shushed and

20   moved along.

21            At a later deposition, even further after that, there

22   were -- the person who was identified was 30(b)(6) to testify

23   about where we could find relevant information on damages

24   disclosed further systems that we didn't know about.  And we

25   told that expert about a system that Mr. Solo had identified

1   that the expert they -- the 30(b)(6) witness they put forward

2   didn't know about and didn't have the data from.

3          So again, not suggesting intentional wrongdoing or

4   fault but diligence should have discovered from day one the

5   existence of these systems, inquiring where this information

6   would be, and disclosing it to us would have put this case in

7   an entirely different place, most likely for an earlier

8   settlement.  So the amount of litigation that's taken place

9   because of these failures is enormous, not just motions to

10  compel and harm.  We had to file a motion for summary judgment

11  and (inaudible) oppositions to summary judgment with what was

12  one of the largest 56(d)'s because of where we were.

13         And I know you mentioned preservation and I know that

14  you don't see fire but we do want to make sure that the Court

15  has taken notice that not only did the initial preservation

16  notice turn out not to have been received by most of its

17  recipients, there was no action taken by the Defendants with

18  respect to that.

19         The representation made about preservation on the

20  Lark system that auto delete had been turned off was a

21  misrepresentation as to what that actually meant.  Mr. Solo

22  admitted that all that meant was that items that people deleted

23  in Lark wouldn't automatically be flushed, the delete boxes

24  wouldn't be automatically flushed or further deleted

25  permanently deleted.  There was never any preservation efforts

48

1    taken.  No systems were put in place to prevent deletion on

2    Lark, G Suite, Dropbox or any of these other vehicles.  And in

3    fact, we have presented the Court with proof that there was a

4    memo encouraging destruction of documents.  So when now we have

5    even when Mr. Chou finally was deposed, he admitted he deleted

6    documents.

7            And at this point, in light of the volume of

8    documents produced or the lack thereof, in light of the

9    admissions by the Defendants with respect to the truth about

10   preservation, and having to serve another preservation notice

11   on August 31st of 2022, these weren't newly discovered folks,

12   Your Honor.  Most of them were the stakeholders from the one

13   internal document that was worth something produced early in --

14   early on in the case identifying the stakeholders and were

15   people that we identified in our motion to compel as critical

16   witnesses with sometimes thousands of hit counts, unlike

17   Ms. Tachibana who wasn't even employed during most of the

18   relevant time and Mr. Buzzenover.

19           So I understand Your Honor does not see fire but

20   there is --

21           **THE COURT:**  Well what are you getting -- are you

22   getting at like a Rule 37 spoliation sanction?  Is that what

23   you're getting at?

24           **MS. ROCKETT:**  Yes.

25           **THE COURT:**  Okay well I mean the problem with the

1   Rule 37 is it's not just enough to not preserve, right?  You

2   have to show that the data can't be replaced, you've got to

3   show bad faith or prejudice and those kinds of things.  And so

4   maybe with additional time or different situations you may have

5   been able to uncover that but I don't think that that, you

6   know, is supported by the record here, not because you

7   necessarily couldn't have developed it but it just doesn't

8   exist here.

9           But materially that doesn't change, I think, what

10  monetary attorneys' fees and other things that you will

11  recover.  I don't think that it's necessary for that.

12          Now, if you're asking something different which is

13  that you think as a result of that there needs to be

14  evidentiary or instructional consequences at trial, that's

15  something you can take up with Judge Blumenfeld.  I'm not sure

16  where you're going on that with me but that's -- it's tricky

17  and it's difficult for me to sort of get to that issue.

18          I don't think you're foreclosed from it but 37(e) or

19  whatever it is, for better or worse was intentionally modified

20  so that the duty to preserve, while an important ingredient in

21  all of these inquiries that we talked about, the failure to do

22  that does not by itself equal spoliation and sanctions.

23  There's a lot of things that they added in there.

24          So some of the things like, "I did delete things, I

25  hit delete," that is a very common thing that can happen and is

50

1    not evidence of spoliation.  Now, did you have some other

2    things that I certainly did not like to see?  Of course.  But

3    that is how I'm factoring into all of my other analysis about

4    the reasonableness of their inquiry because learning the things

5    that they do, the reasonableness of their inquiry and

6    importantly the reasonableness of their duty to supplement.

7    Once they learned these things was not really executed and

8    that's where they have failed time and time again.

9          So failure to properly inquire which resulted in a

10   failure to properly preserve, and then when you failed to learn

11   about these things and then the failure to properly supplement

12   as appropriate, are all things that are coursing through the

13   violations at 26(a), at 26(f), at 30 and at 34.  I'm with you

14   but I don't know that that gets to the spoliation sanction

15   motion because they would, frankly, have an opportunity to show

16   that lost data could be recovered or replaced and then that's

17   like it's a whole new set of can of worms that we need to

18   open.

19         So I'm not minimizing the conduct that you're

20   describing or ignoring it, it's all factored in to how I want

21   to tailor the monetary sanctions here.  All I'm saying is I

22   don't think that that opens up the door on this record to all

23   of the much more serious things which could be as far as

24   terminating, adverse jury instructions, or even evidentiary

25   preclusion things.  Again, if you think you have that, you

51

1   could make that at the time of pretrial with Judge Blumenfeld

2   because that's very much instrumental to the trial preparation

3   stuff.  But I don't see a record for that to support those

4   kinds of remedies but the conduct supporting sanctions in a

5   monetary form for all this discovery that just didn't need to

6   be this difficult, the transcripts that's transcribed 26(f)

7   conference, you know, it shouldn't have required that but thank

8   God we did because that's when we started producing evidence of

9   what's going on, right?

10          **MS. ROCKETT:**  Yes.

11          **THE COURT:**  I agree with you that's the kind of

12   thing.  So I don't see this being a insubstantial monetary

13   award, all right?

14          **MS. ROCKETT:**  Okay.

15          **THE COURT:**  I just want you to be very -- in light of

16   what I said at the beginning, be persuasive and tactical with

17   me and make the case very strongly so that we are not being

18   unduly punitive but we are dealing with the proper things about

19   remedying violations, deterring future violations,  That kind

20   of conduct is what we're trying to remedy here.  We're not here

21   to take a pound of flesh from attorneys.

22          And unless Mr. Keyes fights me in a different way, I

23   don't think this needs to go to an evidentiary hearing about

24   the actual reasonableness of their inquiries inhouse because

25   that's where we'd have to go if that's where they really want

52

1   the fight to be.  I think that there's plenty of evidence to

2   show that those duties were not properly discharged sufficient

3   to warrant the sanctions here.  If they want to really

4   challenge that, then the only way to test that is with an

5   evidentiary hearing where I'm going to need to start looking at

6   in-camera communications and then have an evidentiary hearing

7   in some way that lets me figure out what inhouse counsel was

8   told, what they told others, what those inquiries were, to

9   figure out the reasonableness of all of these things that

10  you're hinting at.

11          I'm assuming that that's not an area that TikTok

12  would want to go into but that would be the only other natural

13  remedy to this.  But I think there's plenty in the record to

14  show that these duties were not properly discharged, these

15  rules were violated, the rules authorize reasonable attorneys'

16  fees and expenses, and we need to put you all as best and in

17  approximate position as we can about the needless discovery

18  disputes and motions and hearings and conferences that you had

19  to have as a result of this cascade of violations.  That's my

20  approach.

21          **MS. ROCKETT:**  Understood, Your Honor.

22          **THE COURT:**  All right.

23          **MS. ROCKETT:**  Thank you.

24          **THE COURT:**  All right.  Yes?

25          **MR. SKALE:**  Thank you.  One small thing I would ask

1    is, we would like to see that Defendants can't complain about

2    documents and information they didn't produce.  So if they

3    didn't produce the assets and liabilities,  they can't at trial

4    say, Well you don't have any assets and liabilities so such and

5    such.

6         **THE COURT:**  Well I assume that's going to be taken

7    care of at in limine motions and pretrial hearings with Judge

8    Blumenfeld, right?

9         **MR. SKALE:**  Right.  I just wanted to bring that to

10   see if that was something Your Honor wanted to address at all.

11        **THE COURT:**  I don't think I need to address it but I

12   think it should go without saying that at some point, Judge

13   Blumenfeld is not going to allow any party to rely on documents

14   that they did not produce timely in discovery.

15        **MR. SKALE:**  Very good.  Then I just have one other --

16        **THE COURT:**  If you need me to say -- I think it's

17   pretty black letter but if you need me to say it, I agree with

18   the proposition that documents that were not properly and

19   timely disclosed during the discovery window cannot suddenly

20   just be generated and expect to be introduced into evidence

21   without at least some kind of an objection or ruling that the

22   evidence should not be excluded.  It would have to be quite

23   extraordinary for that kind of relief to occur but that's your

24   pretrial stuff.

25        **MS. ROCKETT:**  I think -- I think that one question we

54

```
 1   have for you, Your Honor, is that we're probably going to need
 2   as a predicate from you, a statement on today's record as to
 3   what you did or did not order them to produce in terms of
 4   assets and liabilities.  The Plaintiffs understood you ordered
 5   them to produce one statement of assets and liabilities, total
 6   assets and liabilities, and an answer to our RFAs as to whether
 7   or not they do business with our customers, clients.
 8            And again, we had a discussion as to what the law was
 9   for the overlapping consumers.  It's not just the people who
10   pay you, it's the people who use your services, select you,
11   et cetera.  And we did go through a painstaking process to
12   generate that RFA with the music labels, musicians and
13   advertising agencies and directors with whom our clients work,
14   have worked, expect to continue to work.  And the Defendants
15   merely refused to answer those saying we're only going to say
16   whether we work with the 12 people or however many people paid
17   Sweet Lick (phonetic) according to our production.
18            So in terms of those questions so obviously assets
19   and liabilities goes to punitive damages but the overlap in our
20   customers, users, consumers, is important for trial with
21   respect to likelihood of confusion and we've been deprived of
22   that, what we believe is in violation of your order.  So being
23   that we're going to need to seek relief on those issues from
24   Judge Blumenfeld, I think it would help us if you were able to
25   clarify the record, now that you see the two disputed sides of
```

55

1    those two orders.

2          **THE COURT:**  All right.  Mr. Keyes, you want to talk

3    to me about that?

4          **MR. KEYES:**  In the July 1st hearing, as you will

5    recall, you had suggested instead of getting an entire list of

6    music labels and ad agencies that Defendants work with, send

7    them an RFA and ask, "Do you work with the same clients that we

8    work with?"  It wasn't, you know, any clients or potential

9    clients.

10         They sent us a list of 2,000 entities in putting

11   together their RFAs.  That's not --

12         **THE COURT:**  I recall at a subsequent hearing we

13   raised that it was 2000 and that they -- we said they needed to

14   pare that down.

15         **MR. KEYES:**  It never happened.  It never happened.

16   They sent us RFAs after the August 31st hearing, 2000, 2000

17   (inaudible) --

18         **THE COURT:**  Well unless I'm now dreaming about this

19   case, I feel like that inquiry came up at one of our hearings

20   and I said we should pare that down so --

21         **MS. ROCKETT:**  Your Honor, yeah.  No, what actually

22   happened, Your Honor, is that we had asked them -- you were

23   recalling it correctly the beginning.  We had asked them to --

24   first we had asked them to produce their contracts with record

25   labels and advertising agencies and they said no.

56

1          **THE COURT:**  Right.

2          **MS. ROCKETT:**  And you agreed that was burdensome.  We

3    said okay.  So then we requested just identify the companies

4    you have contracts with who are record labels, advertising

5    agencies, et cetera, customer overlap.  And they said, no,

6    that's still too burdensome.  So you said to us at the very

7    last hearing, You guys identify your customers, clients,

8    consumers and they have to admit whether or not they do

9    business with them or not.

10         **THE COURT:**  Well, let me pause there for a second.  I

11   don't remember saying customers, clients, consumers.  I think

12   it was Stitch Editing that you (indisc.) companies, clients.

13         **MS. ROCKETT:**  I think we included Stitch UK and

14   Stich US, and we had a discussion on the record as to what the

15   relevant law is in terms of overlap for customer confusion.  So

16   for instance --

17         **THE COURT:**  But if you're asking me to hold them to

18   what you thought your understanding of the law is, that's a

19   different question as to what I was ordering.

20         I agree that I did not expect that order to result in

21   a list of 2,000 names that the Defendants would have needed to

22   answer.  I mean, I don't know why there -- I mean, what I was

23   looking for were the custo -- the clients of Stitch Editing's

24   that you believed might be overlapping customers or clients of

25   the TikTok platform.

1          I agree it's not necessarily because of the way that

2    the affiliate advertising and things work.  It's not literally

3    the end brand, per se, it's advertisers and things in between.

4    But that all said, that they would be a list of your clients

5    that would overlap with theirs so that they could say, Yes,

6    those are also our clients or, No, those are not our clients.

7    So I don't know how that would have resulted in a list of

8    2,000.  Whether you thought the law supported that or not is a

9    different matter but if you're asking me to say they violated

10   an order, all I'm saying is I imagined a list of maybe no more

11   than 50 to a hundred, something in the three figures of clients

12   of Stitch Editing's and that you would say, Are these your

13   clients too.  So --

14          **MS. ROCKETT:**  I think that's --

15          **THE COURT:**  -- (inaudible) as far as I would have

16   gone.  Now, with that understanding, what then happened?

17          **MS. ROCKETT:**  Yeah.  So again, how our -- our client

18   base actually is that large and it's because we are the largest

19   most -- the most successful editing company in the UK with

20   substantial work done in the United States.

21          So the way that editors are selected includes when,

22   say for a commercial -- and I'm explaining this in detail

23   because I actually used to be in advertising.  So the company,

24   the brand advertising, okay, may have input.  The advertising

25   agency has input.  The media buyer has input, the creatives

58

1    have input, the art director, the copyrighter, et cetera, as to

2    who is going to direct and edit the product so --

3              **THE COURT:**  And you are counting all of those as your

4    list of customers, consumers and clients?

5              **MS. ROCKETT:**  So we gave just our actual clients who

6    are brands, agencies, directors, et cetera.

7              **THE COURT:**  Directors of what?

8              **MS. ROCKETT:**  And for music videos --

9              **THE COURT:**  Directors of what?

10             **MS. ROCKETT:**  Of videos.  They -- directors often

11   have a lot of input in who to select as the editing company.

12             So for the music labels for the music videos, we

13   included only clients that we worked with who are music labels

14   or artists.  And I'll let Kara jump in here because I didn't

15   formulate the actual document myself as opposed to guide and we

16   asked for only this information from our clients.

17             **THE COURT:**  At the end of the day that still yielded

18   a list of 2,000 entities or names?

19             **MS. CORMIER:**  I want to say that there were about --

20   so we had I believe three RFAs.  One was directed at existing

21   advertising agency clients, one was directed at existing music

22   label and musician clients and the third, which we didn't move

23   to compel and was prospective or potential ad agency clients.

24             **THE COURT:**  Okay.

25             **MS. CORMIER:**  And I don't know exactly the number.  I

59

1    could find out but there's probably at least 300 on each of the

2    existing lists.  They are a large list.

3           **THE COURT:**  Okay but I mean I'm okay with that.  That

4    last list of prospective, if you exclude that and you are left

5    with something like 300, that's with me not knowing anything

6    about anything assuming that that's a reasonable amount of

7    clients that they can look for.

8           So this goes to other things.  Why -- is it 2000 or

9    is it 300?  If you all care about this enough, give me the

10   specific number of who are the entities that need to be

11   answered and it should just be a yes or no.  And if it's 300,

12   then answer yes or no.  But if it was 2000 and that was the

13   source of the fight then fine, I didn't contemplate 2000

14   either.

15          But at the end of the day, do we have a list of 300

16   existing clients of Stitch Editing to which Mr. Keyes, you can

17   go to your client and you can just simply say, Yes, they are a

18   client or no, they are not a client.

19          **MS. CORMIER:**  Your Honor, I brought up the number.

20   It's 525 for existing agencies and 198 for the music label

21   existing.

22          **THE COURT:**  Okay.

23          **MS. CORMIER:**  We did not -- like I said, we did not

24   move on the potential.  The potential is the one that was 1300.

25          **THE COURT:**  Okay.  So we're talking about six to 700.

60

1    I guess that's where you got to the 2,000, Mr. Keyes.  There

2    was 1300 on the prospective list but forget about the

3    prospective list.  You're left with like six to 700 now for

4    existing clients.  Granted, I mean that's not the smallest

5    number in the world but it's not like it's an impossible thing

6    to look at a spreadsheet of 600 clients and figure out who

7    these are our clients or not and just answer that question.

8              **MR. KEYES:**  Your Honor, this is exactly what we did.

9              There's two sets of customers here.

10             **THE COURT:**  Okay.

11             **MR. KEYES:**  There's the licensee, the US licensee's

12   customers.  And he testified in his deposition that over --

13   since 2014, he's had approximately 180 customers, clients that

14   he works with.  We took that list.

15             We also took the US customer list of Stitch Editing,

16   Limited, the UK company.  It testified in its 30(b)(6)

17   deposition that it has worked with (inaudible) 17 US based

18   companies since 2014.

19             **THE COURT:**  (inaudible)

20             **MR. KEYES:**  (inaudible) we took those -- that's what

21   we did in -- as a compromise as opposed to them providing --

22             **THE COURT:**  Well apparently it was not an agreed-to

23   compromise.  It's a compromise that you thought that you had

24   unilaterally made and you thought you could follow; and again,

25   it's the same thing.  Like unless you had a written agreement

61

1    that that was how you were going to approach the RFAs, as it

2    stood, they had a list that they wanted you to say yes or no to

3    as a compromise for me to prevent you from affirmatively

4    disclosing all kinds of client lists and certainly customer

5    (indisc.) agreements which I don't think are in scope.  But

6    just trying to identify where are our overlapping clients,

7    setting aside prospective, if it was 700 then yes or no.  Why

8    is that so hard?

9           I mean, okay, fine, the prospective ones added 1300

10   to the mix.  Where we are now is I'm saying there are 700

11   existing ones.  Can you get a yes or no to those 700?

12          **MR. KEYES:**  If that's what the Court is --

13          **THE COURT:**  Well I'm going to ask you to do that.

14   Those other two lists, answer them yes or no.  It's just RFAs.

15   I mean RFAs are a weird hybrid discovery thing where they can

16   kind of come into play after the cutoff but at any rate,

17   setting aside the 1300, those 700 or so, say yes or no.

18          Okay.  Then the other issue --

19          **MR. SKALE:**  (indisc.) Your Honor?

20          **THE COURT:**  Yes?

21          **MR. SKALE:**  Can you give a deadline just because

22   we're coming up on trial.

23          **THE COURT:**  Well how long can that take you,

24   Mr. Keyes?

25          **MR. KEYES:**  I'm sure we can turn to it -- we'll turn

62

1   to it right away today.

2          **THE COURT:**  So I will say, I feel like I've put you

3   on other really short deadlines and you've ultimately blown a

4   lot of them but why don't you get that done by the end of this

5   week at the latest.

6          **MR. KEYES:**  Okay.

7          **THE COURT:**  All right.  Okay, the financials.  I

8   remember this too but like, again, I'm (indisc.) by what we're

9   arguing about.  So where are we?

10         So I think I said that formal financials like assets

11  and liabilities because it's going to have a lot of information

12  of TikTok, especially globally, they don't need to disclose

13  that.  But there were certain financial information datapoints

14  that the Plaintiffs wanted that an interrogatory or document

15  request form or otherwise I asked you to provide even if it's

16  not kept in the ordinary course of your finances because you

17  can't have it both ways.  You can't say that we can't get that

18  information unless we keep it in the ordinary course but we

19  also can't give you the documents that we keep in our ordinary

20  course because it has too much information in it.  So the

21  compromise was when they asked you pointed questions about a

22  particular financial metric that they wanted, you needed to

23  produce or answer that.

24         So where's the remaining dispute on that?  Mr. Keyes?

25         **MR. KEYES:**  Yes.  So a couple of limitations here.

1          This was for TikTok, Inc.  And in the record it's

2   quite clear that it related to one entity.  They served us with

3   discovery with respect to every entity but with respect to

4   TikTok, Inc., TikTok, Inc. doesn't keep that information, it

5   doesn't aggregate it.  It's not something --

6          **THE COURT:**  What is the -- and tell me, what is the

7   specific financial information they were asking for?

8          **MS. CORMIER:**  Your Honor, we were asking for assets

9   and liabilities because that's what the law requires for a

10  showing of net worth on punitive damages.

11         **THE COURT:**  Okay.

12         **MR. KEYES:**  Your Honor, that's -- that's not what you

13  ordered.

14         **THE COURT:**  Okay.

15         **MR. KEYES:**  It said,  if you want -- and this is

16  directly from your prior hearing, your prior hearing.

17         "Once you give them gross assets liability figures

18          then see if you can provide it for TikTok, Inc.

19          Check it out and see if you can do that."

20         **THE COURT:**  Right.  I think you were saying that you

21  don't keep those balance sheets for TikTok, Inc.  Is that what

22  you were saying?

23         **MR. KEYES:**  That's correct, that's our understanding

24  after having spoken with Mr. Andrew Maddox (phonetic) about it.

25         **THE COURT:**  So but that didn't mean that you then

64

1    needed to go up to the entities that you fold up into and

2    figure out what the reasonable approximation of your assets and

3    liabilities are as to TikTok, Inc.  I mean, yes, it may have

4    required you to figure that out and you needed a CPA to do it

5    but I was allowing you to not have to disclose of your upper

6    entities all of their global or other larger balance sheets

7    because it's going to have a lot of information.  Somewhere in

8    there and in some way, shape or form, the assets and

9    liabilities of TikTok, Inc. are folded in there somehow.  So

10   somebody needs to go in there and pull that information out and

11   provide it in a discovery response.

12           MR. KEYES:  Your Honor, that was not our

13   understanding as to what the Court had ordered.

14           THE COURT:  Well, read what you just said.

15           MR. KEYES:  You said:

16           "If you want to provide -- if you want to give them

17           gross assets and liability figures, then you can

18           provide it for TikTok, Inc."

19           And then this is a separate part of the transcript.

20           "Check it out and see if you can do that."

21           THE COURT:  Right.

22           MR. KEYES:  "And indicate it if you can provide it in

23   response to interrogatory-styled questions."  Again, it's not

24   something that is kept.  It would take --

25           THE COURT:  No, no, no, no, no, no, no.  The premise

1   of our discussion was that that's not kept in that way in the

2   ordinary course.  Otherwise, why would I ask you to go check it

3   out?

4          The premise of the whole problem was you don't keep a

5   segregated set of balance sheets for TikTok, Inc., okay?  But

6   they're absorbed and folded in somewhere and you needed to

7   somehow pull that information out.  That's what I meant for you

8   to go and look and then provide that in response to.  Otherwise

9   you're not doing anything so that's the thing that you should

10  have done.  Can you do that now?

11         **MR. KEYES:**  Your Honor, I want to make sure I'm clear

12  on what exactly it is that you're asking us to do.  You're

13  asking us --

14         **THE COURT:**  The assets and liabilities of TikTok,

15  Inc., if it cannot be produced in an audited or unaudited

16  financial document that they would ordinarily keep in their

17  business, the information that is the equivalent of their

18  assets and liabilities should be pulled from other documents

19  that do exist to provide the assets and liability information

20  to the Plaintiffs.

21         **MR. KEYES:**  And Your Honor, my understanding after

22  our discussion with Mr. Maddox is that that -- that is not

23  something that's readily and easily doable.

24         **THE COURT:**  I know but is it unknowable?  It's

25  unknowable.  So when they have business discussions and they

66

1   need to discuss the net worth TikTok, Inc., it would be

2   unknowable for them to ever figure out what the assets and

3   liability pictures look like for TikTok, Inc.?

4          **MR. KEYES:**  I don't know that.

5          **THE COURT:**  That's what you need to find out.  And so

6   it's not about what you keep and what's readily available and

7   what you can punch a button and push out.

8          **MS. CORMIER:**  Your Honor, we do have an admission

9   from them made in a filing from India of the net worth of

10  TikTok but we --

11         **THE COURT:**  TikTok, Inc.?

12         **MS. CORMIER:**  It wasn't specified to be TikTok, Inc.,

13  no.

14         **THE COURT:**  Because that's always the question you

15  wanted TikTok, Inc.

16         **MR. SKALE:**  Well and they have to file US taxes so

17  TikTok, Inc. has to have this information at some level if --

18         **THE COURT:**  Yeah, it has to exist so I'm not talking

19  about what's readily available.  All of these squishy

20  definitions that either inhouse counsel or others at TikTok are

21  construing to their favor.

22         I accepted the proposition that you may not have an

23  existing balance sheet for TikTok but the information that

24  would be there, need to pull that out from whatever their

25  higher level sheets that it's folded into to provide that

1    information so that they can assess the net worth of TikTok,

2    Inc. for purposes of damages.

3              Do that by the end of the week, sir.

4              **MR. KEYES:**  Okay.

5              **THE COURT:**  All right.

6              **MR. SKALE:**  I do have one idea which you had said to

7    put a pin on.  The --

8              **THE COURT:**  Are we now talking about damages?

9              **MR. SKALE:**  We're ready --

10             **THE COURT:**  I'm sorry, not damages, the monetary

11   sanctions?

12             **MR. SKALE:**  We're ready from Plaintiff's side.

13             **THE COURT:**  Okay.  Mr. Keyes, anything else from your

14   side?

15             **MR. KEYES:**  Not at this time.

16             **THE COURT:**  All right.  Ms. Rockett, anything else on

17   the discovery stuff?

18             **MS. ROCKETT:**  No, Your Honor.

19             **THE COURT:**  All right.  So knowing the categories of

20   violations that we've got, you obviously need some kind of

21   declaration with some backup on the fees and costs incurred

22   unnecessarily because of these violations.  So Mr. Skale, I'm

23   all ears to your proposal.  And let's set aside Chou because I

24   think that's discreet enough that we've talked about that.

25   We're really talking about 26(a) and Rule 34 and 26(f)

68

1  violations.

2        **MR. SKALE:**  I think, Your Honor, you said it best

3  when you said this would have avoided needless discovery

4  fights.

5        **THE COURT:**  Right.

6        **MR. SKALE:**  So we propose the money that Plaintiff

7  had to spend on the discovery fights, the meet-and-confers,

8  filing these motions, complying with the judge's order -- Your

9  Honor's orders, and so all money not, as you said, not on all

10  discovery, just on the discovery (inaudible) aspect to it.

11        **THE COURT:**  So that would mean we're talking about

12  formerly, you requested a -- are you including time spent at

13  the hearing?

14        **MR. SKALE:**  The time of the hearing as well, Your

15  Honor.

16        **THE COURT:**  So you're talking about the June 1

17  conference, the July 5th conference, the first motion to compel

18  on August 31 or August 16th maybe but it was in August, the

19  first motion to compel; then the second motion to compel filed

20  on September 14th, so it would be the meet-and-confers, the

21  fees to brief those matters, to attend the hearings and to --

22  what else?  Is that it?

23        **MR. SKALE:**  Deal with the compliance.  So for

24  example, having let subsequent hearing we were meeting where we

25  had it transcribed.

1        **THE COURT:**  Okay.  I think that sounds sensible and

2   rational enough.  Mr. Keyes?

3        **MR. KEYES:**  In light of the Court's order, I would

4   agree.  I mean conceptually I think that sounds --

5        **THE COURT:**  Okay.  All right.  So by the end of this

6   week -- I don't know how much time you all need -- submit the

7   declaration for your attorneys' fees and costs would be

8   appropriate backup or other declarations you need to provide

9   verification of the actual incurred fees and costs.

10        **MS. CORMIER:**  Your Honor, if I could clarify.

11        Does this also include the fees for bringing this

12   motion and this hearing?

13        **THE COURT:**  This motion and this hearing.  No, I

14   don't think so because I think you were all sort of styling

15   this as like an omnibus discovery sanctions motion so let's not

16   include the prep and hearing for today.

17        **MS. ROCKETT:**  And are redacted invoices to preserve

18   attorney-client privilege acceptable with some form of formula?

19        **THE COURT:**  Yes, yes.

20        **MS. ROCKETT:**  Thank you.

21        **THE COURT:**  I do not want this to be the fee dispute

22   that you may have at the end of the case or whatever to come to

23   that.  I just need enough backup that Mr. Keyes and I can look

24   at and we can all reasonably assess that, yes, this is actual

25   incurred costs or fees that are reasonable to the discovery

1    disputes that we were talking about.

2         **MR. SKALE:**  One additional category.  We had filed a

3    Rule 26(g) as part of our summary judgment.  Can that be

4    included because that was all about these discovery issues.

5         **THE COURT:**  Rule 26(g) --

6         **MS. ROCKETT:**  Rule 26 --

7         **MR. SKALE:**  56 -- 56.

8         **MS. ROCKETT:**  -- 56(d), Your Honor.  The fact that we

9    had to oppose a fully briefed summary judgment motion with them

10   asserting that we lacked any evidence of x, y and z and had to

11   prepare 56(d) declaration with all of the reasons why we lacked

12   the evidence that it was noncompliance with discovery that got

13   us there.  The outstanding orders from you were still pending.

14   They still hadn't produced documents, et cetera.

15        **THE COURT:**  Well just put that as a separate category

16   in your declaration and I'll take a look at it.

17        **MR. SKALE:**  Sounds very good, Your Honor.

18        **THE COURT:**  So submit that by Friday.

19        Mr. Keyes, by the following Tuesday, if you want to

20   file any response to that, not about the propriety of awarding

21   the sanctions other than possibly the 56(d) question.  If

22   there's something about the reasonableness of the amount that

23   you want to bring to my attention, I'll certainly hear you out

24   on that but we're not relitigating the propriety of the

25   sanctions themselves.  But if you want to file a response or

71

1  objections to the reasonableness of the amount of the fees

2  requested and to this 56(d) component as to whether that should

3  be included or not, I'll hear you out on that.

4          **MR. KEYES:**  Understood.  Thank you, Your Honor.

5          **THE COURT:**  All right.  Anything else we need to

6  discuss today?

7          **MS. ROCKETT:**  Your Honor, you're not contemplating

8  having an attorneys' fees reasonableness expert as part of

9  this?  I'm not sure that would be possible between now and

10  Friday.

11          **THE COURT:**  No.  I mean I'll hear what Mr. Keyes has

12  to say but I can make my independent assessments about what's

13  reasonable or not.

14          **MR. SKALE:**  And we don't need another hearing, right,

15  Your Honor?

16          **THE COURT:**  This is not going to be an exact science.

17  You know, again, this is not meant to be punitive, it is meant

18  to be compensatory and that's the lens through which I will be

19  looking at it, understanding that I know you all must be very,

20  very expensive attorneys for your clients and that's just par

21  for the course I guess.

22          And I don't need -- I'm not expecting and I do not

23  want all this stuff about industry standard reasonable rates.

24  I'm assuming that all your rates that you have charged to your

25  clients are perfectly reasonable.  I'm just talking about hours

72

1    spent and expended on these particular things.  So yes, please

2    do not -- I don't want to see things like this associate does

3    not deserve to bill out at that hourly rate.  It's a good

4    reminder.  That's not what I want to talk about but certainly

5    if there was way too much time spent on something, I'll hear

6    that out but hours -- the hourly rates themselves, I assume you

7    all have very valid and reasonable hourly rates.

8              MR. SKALE:  Good.  Thank you, Your Honor, that's all

9    the Plaintiff has.

10             THE COURT:  Mr. Keyes?  Ms. Kumar, I know you're new

11   to the case.  I don't know if this is meant to be an

12   introduction to me but hopefully this will be the last that I

13   ever have to see of you with (indisc.) --

14             MS. KUMAR:  Yes, Your Honor, it was just meant for us

15   to be able to participate but nothing else.  Thank you.

16             THE COURT:  Yeah, all right.  Well so good luck to

17   you on trial and good luck to you at the settlement conference.

18   You're going back with Judge Guilford?

19             MS. KUMAR:  Judge Morrow, Your Honor.

20             THE COURT:  Oh, Judge Morrow, Judge Morrow, okay.

21             MS. KUMAR:  Judge Guilford wasn't available so it's

22   Judge Morrow.

23             THE COURT:  Well, you lose one and you win with the

24   other.  I don't know how you could really be losing so best of

25   luck to you-all.  I, for what it's worth, it's probably a good

73

1    idea to settle the case but I will leave that to you-all.

2              **MR. SKALE:**  Thank you, Your Honor.

3              **THE COURT:**  Okay, all right.  Thank you everybody.

4         **(Attorneys thank the Court)**

5         **(Proceeding adjourned at 12:49 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

74

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>December 7, 2022</u>

           Signed                                          Dated


*TONI HUDSON, TRANSCRIBER*