GIBSON, DUNN & CRUTCHER LLP
Nicola T. Hanna (130694)
  nhanna@gibsondunn.com
Blaine H. Evanson (254338)
  bevanson@gibsondunn.com
Elizabeth K. McCloskey (268184)
  emccloskey@gibsondunn.com
Poonam Kumar (270802)
  pkumar@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Defendants TikTok Inc., TikTok LLC, TikTok Ltd., and ByteDance Ltd.*

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO P.C.
Andrew D. Skale (SBN 211096)
  adskale@mintz.com
Randy K. Jones (SBN 141711)
  rjones@mintz.com
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone: (858) 314-1500
Facsimile: (858) 314-1501

*Attorneys for Plaintiff Stitch Editing Ltd.*

[Additional counsel listed on following and signature pages]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA,
## WESTERN DIVISION

| | |
|---|---|
| STITCH EDITING LTD.,<br>        Plaintiff,<br><br>v.<br><br>TIKTOK INC., TIKTOK LLC, TIKTOK LTD., and BYTEDANCE LTD.,<br><br>        Defendants. | Case No. 2:21-CV-06636-SB-SK<br><br>**JOINT SUPPLEMENTAL MEMORANDUM RE DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF EXTRATERRITORIAL CONDUCT**<br><br>Date:  February 3, 2023<br>Time:  9:30 a.m.<br>Courtroom: 6C<br><br>Case assigned to Hon. Stanley Blumenfeld, Jr., |

GIBSON, DUNN & CRUTCHER LLP
Howard H. Hogan (*pro hac vice*)
  hhogan@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Defendants TikTok Inc., TikTok LLC,*
*TikTok Ltd., and ByteDance Ltd.*

DORSEY & WHITNEY LLP
J. Michael Keyes (SBN 262281)
  keyes.mike@dorsey.com
Connor J. Hansen (*pro hac vice*)
  hansen.connor@dorsey.com
701 Fifth Avenue, Suite 6100
Seattle, WA 98104
Telephone: 206.903.8800
Facsimile:  206.903.8820

*Attorneys for Defendants TikTok Inc., TikTok LLC,*
*TikTok Ltd., and ByteDance Ltd.*

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Courtney Rockett (*pro hac vice*)
  crockett@mintz.com
Kara M. Cormier (*pro hac vice*)
  kmcormier@mintz.com
One Financial Center
Boston, MA  02111
Telephone:  (617) 542-6000
Facsimile:  (617) 542-2241

*Attorneys for Plaintiff Stitch Editing Ltd.*

**DEFENDANTS' POSITION**

## I.   INTRODUCTION

Pursuant to the Court's Order on Motions *In Limine* (Dkt. 385 at 5), Defendants submit this supplemental memorandum and accompanying appendix.  The appendix identifies the specific evidence and statements Defendants seek to exclude, along with each party's position on each disputed statement, in compliance with Part (1) of the Order. *See id.*  This memorandum addresses Parts (2) and (3) of the Order.  *See id.*  As explained below, the Court should exclude evidence and argument regarding: (A) wholly foreign alleged infringement and Defendants' global finances, (B) Plaintiff's use of the alleged marks outside the U.S., and (C) Defendants' Turkish trademark filings.

## II.   ARGUMENT

**A.   Evidence Of Entirely Foreign Alleged Infringement And Defendants' Global Finances Should Be Excluded**

The Court should exclude evidence and argument of wholly foreign conduct and Defendants' global finances.

### 1.   Evidence Of Wholly Foreign Conduct Should Be Excluded

Defendants seek to exclude evidence and argument of allegedly infringing conduct occurring ***entirely*** outside the U.S.  Specifically, Defendants seek to exclude evidence and argument of:  **(1)** the number of global views of videos created using TikTok's Stitch tool (Evanson Decl., Ex. 1 at 2; Ex. 2 at 2; Ex. 4 at 1); **(2)** the number of videos created using the Stitch tool in the U.K. (Ex. 2 at 3; Ex. 3 at 2 (Topic 14, third bullet)); **(3)** the number of videos created using the Stitch tool outside the U.K. that have been viewed in the U.K. (Ex. 2 at 3; Ex. 3 at 2 (Topic 14, third bullet)); **(4)** the number of views by U.K. users of videos created using the Stitch tool in the U.K. (Ex. 2 at 4); **(5)** the number of views by U.K. users of videos created using the Stitch tool outside the U.K. (Ex. 2 at 4); **(6)** the total number of views by U.K. users of videos created using the Stitch tool (Ex. 3 at 1 (Topic 11, third bullet); Ex. 11 at 48:16–49:3); **(7)** the number of videos created using the Stitch tool outside the U.S. that were viewed by U.K. users

Gibson, Dunn &
Crutcher LLP

(Ex. 2, Ex. B)[1]; **(8)** the percentage of all TikTok videos viewed in the U.K. that were created using the Stitch tool (Ex. 2 at 4; Ex. 3 at 2 (Topic 15, third bullet)); **(9)** the number of users in the U.K. who have used the Stitch tool (Ex. 2 at 4; Ex. 3 at 2 (Topic 16, third bullet); Ex. 10 128:1-14); and **(10)** the total number of views on TikTok globally and in the U.K. (Ex. 13 at 8-9, Ex. 9; Ex. 14 at 11, Ex. 9).[2]  This evidence and argument is inadmissible, as Plaintiff cannot carry its "burden" to show the Lanham Act may apply to *entirely* foreign conduct here.  *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 972 (9th Cir. 2016).

The Act may apply extraterritorially only if three elements are met:  (1) "the alleged violations must create some effect on American foreign commerce," (2) "the effect must be sufficiently great to present a cognizable injury to the plaintiffs under the Lanham Act," and (3) "the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority."  *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 613 (9th Cir. 2010); *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir. 1985) (calling criteria "requirements" and "element[s]").  The Ninth Circuit has *never* applied the Act to entirely foreign conduct in a case filed by a foreign plaintiff, and the Act's extraterritorial reach is a legal question for the Court.  *Star-Kist*, 769 F.2d at 1395; *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016, 1040 (10th Cir. 2021).

***The third element is dispositive.***  It "considers international comity," and "gives effect to the rule that [courts] construe statutes to avoid unreasonable interference with other nations' sovereign authority."  *Trader Joe's*, 835 F.3d at 972.  It counsels against applying the Act extraterritorially when there is a "*possibility* of a conflict between the

---

[1]  Defendants do *not* seek to exclude evidence of the number of videos created using the Stitch tool in the U.S., even if those videos were created outside the U.S.  Thus, Defendants do not seek to exclude evidence of the number of videos created in the U.S. that were viewed in the U.K. (Ex. 2, Ex. B at 5 (Row 96, Column 3)), but do seek to exclude the number of views of those videos in the U.K.  *Id.* (Row 96, Columns 4-5).

[2]  Defendants do *not* seek to exclude evidence of the number of U.S. views of videos created using the Stitch tool, even if those videos were created outside the U.S.

law or policy of the [U.S.] and the law or policy of another nation"—even if there is no "*present* and *direct* conflict between the laws of two nations." *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 555 n.2 (9th Cir. 1992); *see Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 429 (9th Cir. 1977) ("[a] difference in law or policy is one likely sore spot"). "Courts typically find a conflict with foreign law or policy when there is an ongoing trademark dispute or other proceeding abroad." *Trader Joe's*, 835 F.3d at 973; *see Wells Fargo*, 556 F.2d at 428–29 ("existence of a conflict with foreign trademark registrations" weighs against extraterritoriality).

In *Star-Kist*, the defendant used the plaintiff's marks on canned fish purchased "either in the [U.S.] or abroad, primarily in Japan, and res[old] in the Philippines." 769 F.2d at 1395. The defendant "brought an action in the Philippine Patent Office to cancel [the plaintiff's] registration of the trademarks," and the plaintiff sued for trademark infringement and false designation of origin. *Id.* at 1394–95. The district court enjoined the defendant "from using the [plaintiff's] trademarks on canned fish sold within the [U.S.] or exported from the [U.S.] to either the Philippines or any other country." *Id.* at 1394. In doing so, the district court "exclude[d] evidence of wholly foreign commerce" (*id.* at 1395)—namely, evidence of the defendant's "shipments to the Philippines from other foreign nations" (*id.* at 1394).

The Ninth Circuit affirmed the exclusion of wholly foreign evidence based solely on the third element. Although both parties were California entities (769 F.2d at 1394), "the interests of and links to American foreign commerce are [in]sufficient to justify the extraterritorial application of the Lanham Act" (*id.* at 1395). The defendant's "petition to cancel [the plaintiff's] Philippine registration of the trademarks is currently pending in the Philippine Patent Office," and "[a]pplication of the Lanham Act to *wholly foreign* Philippine commerce *could create a conflict* with Philippine patent and trademark law and with pending proceedings in that country." *Id.* at 1396 (emphases added). Moreover, "[t]he effect on [U.S.] commerce from the alleged illegal use of the trademarks in trade between the Philippines and other foreign countries is relatively

insignificant compared to the effect on Philippine commerce." *Id.* at 1396.  By contrast, "the significant interest of the Philippines in restricting the extraterritorial application of the Lanham Act … preclude[s] extension of the Act to wholly foreign commerce in this case." *Id.*  The Ninth Circuit found none of the other "considerations … mandate[d] a contrary result," and "conclude[d] the district court acted in accordance with principles of international comity and fairness in excluding wholly foreign commerce." *Id.*

The same reasoning applies here to exclude evidence of wholly foreign alleged infringement.  Plaintiff—a U.K. company headquartered in London (Dkt. 1 ¶ 14)—seeks to hold Defendants liable for wholly foreign conduct.  *See Star-Kist*, 769 F.2d at 1395 ("the nationality … of the parties and the locations or principal places of business of corporations" is "relevant").  To do so, Plaintiff seeks to introduce evidence relating to the number of videos created using the Stitch tool in the U.K. and viewed outside the U.S., and the number of views by U.K. users of videos created using the tool outside the U.S.  *Supra*  at 1–2 & n.1–2.  But as Plaintiff admits (Dkt. 274-1 at 8:6-8), ***there are ongoing proceedings in the U.K.*** concerning Plaintiff's trademark application for "Stitch"—the same word Plaintiff seeks through this U.S. action to prevent Defendants from using in the U.K. and around the world.  Owen Decl. ¶¶ 2–9.  Plaintiff applied to register "Stitch" as a trademark on October 28, 2020 (one month *after* the Stitch tool launched), Defendants' U.K. affiliate opposed the application in May 2021, and the UKIPO denied Plaintiff's application on August 24, 2022.  Ex. 17 at 17–18, 20, 26; Owen Decl. ¶¶ 2–7.  On September 21, 2022, Plaintiff appealed the UKIPO decision to the High Court, and that appeal is currently pending.  Owen Decl. ¶¶ 8–9.

"[I]t would be an affront to the [U.K.'s] sovereignty" to apply the Act in the U.K. since "[D]efendant[s] [have] a legal right to use the [alleged "Stitch"] mark[]" in that country.  *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503–04 (9th Cir. 1991).  And given the status of the proceedings in the U.K., applying the Act "to wholly foreign [U.K.] commerce could create a conflict with [U.K.] … trademark law and with pending proceedings in that country." *Star-Kist*, 769 F.2d at 1396.  If Plaintiff obtains a mark to

"Stitch" in the U.K., "the relief sought [in this case] would be unnecessary, as [P]laintiff could use the full force of [the U.K.'s] trademark laws to [remedy] [D]efendant[s'] allegedly infringing activities in that country." *Gallup, Inc. v. Bus. Research Bureau (Pvt.) Ltd.*, 688 F. Supp. 2d 915, 923 (N.D. Cal. 2010). But if Plaintiff's appeal in the U.K. fails, then permitting Plaintiff to seek relief here for conduct in the U.K. "would significantly interfere with [D]efendant[s'] right to use ["Stitch"] lawfully in [the U.K.]. In sum, there is a *substantial* risk of conflict with foreign law." *Id.* at 923–24.

Moreover, "[t]he effect on [U.S.] commerce from the alleged illegal use of the [asserted "Stitch" mark] in trade between the [U.K.] and other foreign countries is relatively insignificant compared to the effect on [U.K.] commerce." *Star-Kist*, 769 F.2d at 1396. After all, Defendants do *not* seek to exclude evidence concerning the number of (i) U.S. views of videos created abroad or (ii) videos created in the U.S. viewed abroad, but rather seek to exclude evidence concerning wholly foreign conduct involving foreign consumers—and "[f]ederal courts ordinarily do not have an interest in protecting foreign consumers from confusion." *Trader Joe's*, 835 F.3d at 974; *see Am. Circuit Breaker Corp. v. Or. Breakers, Inc.*, 406 F.3d 577, 584 (9th Cir. 2004) ("ultimate issue in a trademark infringement suit" is the "likelihood of confusion of U.S. customers"); *McBee v. Delica Co.*, 417 F.3d 107, 126 (1st Cir. 2005) ("there is no [U.S.] interest in protecting *Japanese consumers*."); 5 McCarthy § 29:59 ("[t]here is no American interest in preventing deception in foreign countries"). And any interest the U.S. might have in regulating Defendants' use of "Stitch" in the U.K. "is not nearly as significant as [the U.K.'s] interest in (not) regulating" such use "in the [U.K.]" *Love*, 611 F.3d at 611.

***The first and second elements also preclude extraterritoriality.*** "The first two criteria may be met … where all of the challenged transactions occurred abroad, and where injury would seem to be limited to the deception of consumers abroad," *only if* "there is monetary injury in the United States to an American plaintiff." *Love*, 611 F.3d at 613. In *Love*, the Ninth Circuit held a U.S. plaintiff (a musician) could not pursue Lanham Act claims for conduct occurring entirely in Great Britain, because he failed to

1  "present[] evidence that the complained of actions caused him monetary injury in the
2  [U.S.]." *Id.*  Although he said "his ticket sales in the [U.S.] were lower," the court held
3  "it is too great of a stretch to ask us, or a jury, to believe that such confusion overseas
4  resulted in the decreased ticket sales in the [U.S.]" *Id.*

5       The case for extraterritorial application of the Act is even weaker here.  "[A]ll
6  relevant acts" and potential consumer confusion covered by Defendants' Motion
7  "occurred abroad."  *Love*, 611 F.3d at 613.  The only Plaintiff in the case is a U.K.
8  company, not an American company.  Dkt. 1 ¶ 14.  And there is no evidence any alleged
9  confusion abroad "directly caused [Plaintiff] monetary injury in the [U.S.]" (*Trader*
10  *Joe's*, 835 F.3d at 972), much less revenues that "would have flowed into the U.S.
11  economy but for Defendants' conduct."  *Hetronic*, 10 F.4th at 1045.  To the contrary,
12  Plaintiff's profits *increased* after the Stitch tool's release.  Dkt. 218-3 at Ex. 3.1.

13       Plaintiff has said "[r]eputational harm is enough to satisfy prong 1."  Dkt. 305 at
14  9.  But *Trader Joe*'s recognized that "reputational harm to an *American plaintiff* may
15  constitute 'some effect' on American commerce" (835 F.3d at 971 (emphasis added)),
16  not that reputational harm to a *foreign plaintiff* may do so.  In any event, there is no non-
17  speculative evidence of harm to Plaintiff's reputation.  *See* Dkt. 379 at 22; *e.g.*, *Love*,
18  611 F.3d at 613; *Levy v. adidas AG*, 2018 WL 5942000, at *5 (C.D. Cal. Nov. 13, 2018)
19  ("Plaintiff's *ipse dixit* that his brand has been harmed is not enough" absent "details that
20  link Defendant's foreign infringement to monetary or reputational harm in the [U.S.]").

21       Plaintiff also has made a half-hearted waiver argument, suggesting Defendants
22  agreed to litigate U.K. conduct because they produced metrics for the U.K.  *See*
23  1/27/2023 Hr'g Tr. at 37:25–39:22.  Plaintiff's contention is belied by its own statement
24  that Judge Kim "was very clear that Plaintiff does **not** need to prove that the Lanham
25  Act will reach extraterritorially to every jurisdiction simply to obtain discovery."  Dkt.
26  269-6 at 2; *see also* 6/1/2022 Hr'g Tr. at 23:19–24:20 (Judge Kim declining to address
27  the Act's extraterritorial reach in ordering discovery).  There is no waiver.

28       The Court stated that Defendants' prior motion "ignores the digital nature of the

services at issue in this case.  For example, it is not clear on this record that a customer in the [U.S.] is less likely to be confused by a 'stitched' TikTok video created in the U.K. than a similar video created in the [U.S.]" Dkt. 385 at 4.  Defendants respectfully submit that, unless "federal courts are willing to take on the task of being the global court[s] of commerce," the digital nature of the services at issue does not change the analysis.  5 McCarthy § 29:58; *e.g.*, *Levy*, 2018 WL 5942000, at *2, 5 (applying generally applicable Ninth Circuit test at pleading stage to reject argument that "infringement that takes place on the internet is actionable no matter the country where the infringing website is based"); *Gallup*, 688 F. Supp. 2d at 917, 922, 925 (declining to apply Act extraterritorially over foreign "website accessible in English to the American market").  That is especially so here, given the nature of the data available and the evidence that is and is not at issue in this Motion.  As stated, Defendants conservatively seek to exclude only evidence of wholly foreign conduct (e.g., number of U.K. views of videos created in France, and number of videos created in the U.K.), but do not seek to exclude evidence concerning the number of (i) U.S. views of videos created abroad or (ii) videos created in the U.S. that were viewed abroad.  Thus, any difficult questions that could arise when applying the *Love* test to the digital context are not present here.

### 2. Evidence Of Defendants' Global Finances Should Be Excluded

Plaintiff has designated testimony from the depositions of Andrew Maddox and Herman Chou concerning Defendants' global revenues.  *See* Ex. 11 at 70:24–72:3; Ex. 12 145:5-19.  Plaintiff also seeks to admit three third-party exhibits depicting TikTok's global revenues that Plaintiff's damages expert Jeff Anderson relied on in forming his reasonable royalty opinion:  **(1)** Ex. 7 at 7-8, 51 (providing annual revenue estimates and annual advertising revenue and data); **(2)** Ex. 8 at 2 (projecting that TikTok will earn $12 billion in revenue in 2022); and **(3)** Ex. 9 at 1 (stating ByteDance Ltd.'s valuation was $275 million in 2022).  Defendants seek to exclude the designated deposition testimony, as well as the three identified exhibits and any testimony based on them.

***Irrelevant.***  Evidence of Defendants' global revenues is irrelevant.  Plaintiff seeks

a reasonable royalty award, but "the financial standing of the defendant is inadmissible as evidence in determining the amount of compensatory damages to be awarded." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). And any reasonable royalty award must be tethered to the actionable acts of alleged domestic infringement. "Trademark remedies are guided by tort law principles," under which "the infringer-tortfeasor is liable for all injuries caused to plaintiff by the wrongful act[s]" at issue. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F. 2d 1400, 1407 (9th Cir. 1993). In other words, there must be a causal nexus between the alleged conduct at issue and damages sought.

In *Lindy*, the defendant infringed the plaintiff's mark for use on pens "in the telephone order market" but not "in the major retail markets." 982 F.2d at 1404–05. Nonetheless, the district court "found that an award of damages was inappropriate because" the plaintiff failed to "isolate its own telephone order sales from total pen sales," causing its "calculations [to] contain[] items in which no [actionable] likelihood of confusion existed." *Id.* at 1404, 1407. The Ninth Circuit affirmed because the plaintiff failed to "subdivide its data into the category of telephone order sales," and explained that "[i]t would have been error for the district court" to award damages based on the broader sales figures. *Id.* at 1408; *see Rolex Watches, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) (rejecting damages based on *all* of defendant's sales).

Relying on *Lindy* and *Rolex*, the court in *Wyatt Tech. Corp. v. Malvern Instr., Inc.*, 2010 WL 11505684, at *4–5 (C.D. Cal. Jan. 25, 2010), precluded the plaintiff's damages expert from testifying on lost profits that were "not limited to [the defendant's] alleged wrongdoing" at issue or to the defendant's "sales in the relevant 'protein' market, where [the defendant's] alleged misconduct occurred." The court also excluded "evidence of damages based on [the defendant's] total sales," reasoning the plaintiff may recover only "damages 'attributable' to [the defendant's] wrongdoing," and "evidence of [the defendant's] total sales would be both misleading and irrelevant." *Id.* at *10.

Here, too, Defendants' global revenues and finances are irrelevant because Plaintiff may not pursue claims for foreign infringement and may not recover damages

Gibson, Dunn &
Crutcher LLP

attributable to such foreign conduct.  *Supra* at Part II.A.  Rather, Plaintiff may present evidence only of Defendants' U.S. revenues attributable to alleged U.S. infringement.

Plaintiff has suggested ByteDance Ltd.'s valuation is relevant to the amount of punitive damages, but that is wrong.  For starters, TikTok Inc. is the only Defendant that operates the TikTok platform in the U.S. (Dkt. 142-2 at 10), and only the wrongdoing defendant's financial condition is relevant to punitive damages.  *See* Cal. Civ. Code § 3295(d); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1282–83 (1994).  And a party seeking punitive damages must present evidence of a defendant's *assets* and *liabilities* (*Baxter v. Peterson*, 150 Cal. App. 4th 673, 680 (2007)) "at the time of trial" (*Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165, 195 (2015)).  A defendant's *valuation* one year before trial is irrelevant because it provides "minimal insight into [a company's] actual assets or liabilities" and "ability to pay punitive damages."  *Greenlight Sys., LLC v. Breckenfelder*, 2021 WL 2651377, at *16 (N.D. Cal. June 28, 2021).  Testimony and evidence of ByteDance's valuation should be excluded.

**Hearsay.**  The three exhibits (Exs. 7–9) also are inadmissible hearsay because they are third-party publications that Plaintiff intends to introduce for their truth.  *See AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1070 (C.D. Cal. 2015) ("newspapers articles are by their very nature hearsay"); *Asetek Danmark A/S v. CMI USA, Inc.*, 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014) (same); *Green v. Baca*, 226 F.R.D. 624, 637–38 (C.D. Cal. 2005) (same).  Plaintiff also has no way to authenticate and introduce the documents at trial.  Fed. R. Evid. 901.

**Unfairly prejudicial.**  Permitting Plaintiff to present evidence of Defendants' global finances would be unfairly prejudicial because it risks biasing the jury to artificially inflate any damages award.  Fed. R. Evid. 403.  This Court ordered bifurcation because presenting the amount Plaintiff seeks in disgorgement "risk[s] prejudicing Defendants."  Dkt. 379 at 20.  And the Supreme Court has recognized "the presentation of evidence of a defendant's net worth creates the potential juries will use their verdicts to express biases against big business, particularly those without strong

local presences." *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994); *e.g.*, *Doe v. Rose*, 2016 WL 9150617, at *1 (C.D. Cal. July 27, 2016) ("[e]vidence of Defendants' income, assets, and net-[worth] could improperly influence the jury's determination of liability and compensatory damages"); *Wyatt Tech.*, 2010 WL 11505684, at *10 (same).

### 3.    The Implications

Regardless of the Court's decision on the motion *in limine*, Defendants' proposed modifications to the model jury instructions making clear Plaintiff may pursue claims only for alleged infringement in the U.S. should be adopted.  Dkt. 356 at 11-12, 16, 18.

Defendants respectfully submit the Court should grant the motion and exclude the challenged exhibits concerning Defendants' global user metrics and finances.  If the Court does so, Plaintiff's damages expert Mr. Anderson should not be permitted to testify on non-U.S. metrics and global finances in connection with his reasonable royalty and disgorgement opinions.  *See* 1/27/2023 Hr'g Tr. at 29:17-23 (flagging impact on Plaintiff's damages models).  As to his reasonable royalty opinion, Mr. Anderson should not be permitted to testify on the global and U.K. metrics or finances provided in his September 1, 2022 Expert Report (Ex. 13) on pages 8 (Figures 1-2), 9 (Figure 3), 10 (Figure 5), and Exhibits 2, 5-9, and in his January 13, 2022 Supplemental Report (Ex. 14) on pages 10 (Figure 2), 11 (Figures 3-4), 12 (Figure 6), and Exhibits 2, 5-9.  Mr. Anderson may testify only on U.S. metrics and revenues.  For instance, Mr. Anderson may explain how he calculated "Total Views on TikTok in the US," but he may not explain how he calculated "Total Global Views on TikTok During the Damages Period" or "Total Views on TikTok in the UK."  Ex. 13 at 8 (Figure 2).  Nor may he testify on "TikTok Global Revenue" or "Views in the US and UK as a Percentage of Total Global Views on TikTok," but he may provide his estimation of "TikTok US … Revenue" (adjusted to remove amounts attributable to the U.K.).  *Id.* at 9 (Figure 3).  And in providing his calculations, Mr. Anderson may not rely on "TikTok Revenue – US and UK," but may rely on the revenue he says is attributable to the U.S.  *Id.* at 10 (Figure 5).

As for his unjust enrichment opinion, Mr. Anderson should not be permitted to

Gibson, Dunn &
Crutcher LLP

testify on global and U.K. metrics and finances provided in his September 1, 2022 Expert Report (Ex. 13) on pages 12 (Figure 7), and Exhibits 2 and 4, and in his January 13, 2022 Supplemental Report (Ex. 14) on pages 14 (Figure 8), and Exhibits 2 and 4.  To calculate unjust enrichment (to the extent the Court permits his to testify at all on this theory of damages, Dkt. 379 at 20), Mr. Anderson may rely only on views in the U.S.

## B. Evidence Of Plaintiff's Use Of The Alleged Marks Outside The U.S. Should Be Excluded

Defendants seek to exclude evidence of (1) the number of views Plaintiff received on its YouTube channel (and related data) outside the U.S. (Ex. 5); and (2) the number of users outside the U.S. who follow Plaintiff on LinkedIn (Ex. 6).  Plaintiff seemingly intends to introduce these exhibits to show Plaintiff's asserted marks have achieved secondary meaning or market recognition around the world.  But permitting Plaintiff to do so would violate the "territoriality principle"—which is "basic to trademark law." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1097–98 (9th Cir. 2004).  It recognizes that "trademark rights gained in other countries are governed by each country's own set of laws" (*Grupo*, 391 F.3d at 1098), and that "foreign use is ineffectual to create trademark rights in the [U.S.]" (*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985)).  For example, a descriptive mark may be well-established in a foreign country, but that mark is not protectable or strong under the Act if it has no secondary meaning or consumer recognition ***in the U.S.***  *See Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1153–55 (C.D. Cal. 2009) (no secondary meaning where evidence of international recognition and sales did "not concern perceptions *in the United States*"); *cf. Aureflam Corp. v. Pho Hoa Hiep Inc.*, 2005 WL 1562933, at *5 (N.D. Cal. June 27, 2005) (requiring "secondary meaning in the United States" to assert "the famous-mark exception to the territoriality principle").  Thus, "foreign activities of a party are not relevant evidence in a trademark dispute concerning U.S. rights" (5 McCarthy § 29:2), and it is "error to admit evidence of the parties' foreign trademark practices," "usage[,] and occurrences." *Fuji*, 754 F.2d at 599–

600; *see Grupo*, 391 F.3d at 1093, 1097–98 (citing *Fuji*); 5 McCarthy § 29:2 n.8.

Plaintiff previously conceded it does not seek to prove the existence of any U.S. rights based on evidence of its foreign use of the alleged marks or recognition by non-U.S. consumers.  Dkt. 274-1 at 9.  Rather, Plaintiff says it intends to introduce such evidence "to provide general background."  *Id.*  But the number of views and followers Plaintiff has on YouTube and LinkedIn, respectively, has nothing to do with Plaintiff's background.  And any minimal probative value this data has is substantially outweighed by the danger of confusing the issues, delay, and misleading the jury into believing Plaintiff's foreign use of the alleged marks—and, in particular, "Stitch"—is relevant to whether Plaintiff has obtained any rights to the unregistered term in the U.S.  Fed. R. Evid. 403; *see*, *e.g.*, *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1030 (9th Cir. 2018) (evidence of mark used in Canada more confusing than probative).

Regardless of the Court's decision on the motion *in limine*, the Court should adopt Defendants' modifications to the model jury instructions making clear that Plaintiff must prove secondary meaning in the U.S. among U.S. consumers.  Dkt. 356 at 11-12, 16, 18.

## C.  Evidence of Defendants' Turkish Trademark Filings Should Be Excluded

The Court should exclude the entirety of Defendants' objection to Plaintiff's Turkish trademark application (Exs. 15-16, 18), including the statements identified in the appendix that Plaintiff says are "party admissions."  Dkt. 251 at 4 (first five bullets).

***The filing is inadmissible under the territoriality principle.***  The territoriality principle recognizes that "trademark rights exist in each country solely according to that country's statutory scheme."  *Grupo*, 391 F.3d at 1093.  "What one must do to acquire trademark rights in one country will not always be the same as what one must do in another," and a term of art (e.g., "trademark") may mean one thing under one country's statutory regime and mean another thing under another country's regime.  *Id.* at 1098.

Relying on the territoriality principle, courts have excluded the ***entirety*** of foreign trademark filings without parsing whether isolated statements within the filings may be admissible as party admissions or otherwise.  In *Pinkette*, for example, the plaintiff

obtained a Canadian registration for its "LUSH" trademark.  894 F.3d at 1019.  The defendant later filed its own trademark application for the term in Canada, and the application was rejected "for being confusingly similar" to the plaintiff's mark.  *Id.* at 1020.  The defendant then commenced a cancellation proceeding against the plaintiff's Canadian registration, and that action was successful.  *Id.*  Before trial, the defendant "moved in limine to exclude … any reference to its Canadian trademark registration application and cancellation petition."  *Id.*  The plaintiff argued the defendant's "actions in Canada demonstrated its *knowledge* of the likelihood of confusion between the two companies' marks and, hence, its *bad faith* in continuing to use the LUSH mark in the [U.S.]"  *Id.* (emphases added).  The district court excluded the *entire* application and cancellation petition (*id.*), and the Ninth Circuit affirmed even though the plaintiff sought to introduce the defendant's statements to show *knowledge*—not to show the marks were, in fact, "confusingly similar," or for another purpose that implicated Canadian or U.S. trademark law or the concerns addressed by the territoriality principle.  According to the Ninth Circuit, "[e]vidence of the LUSH mark in Canada was not relevant," and its "probative value was substantially outweighed by dangers of confusing the issues, misleading the jury, and causing undue delay."  *Id.* at 1029–30.

In *Moroccanoil, Inc. v. Golan*, 2012 WL 12885683, at *1 (C.D. Cal. Oct. 30, 2012), the court granted the plaintiff's motion *in limine* to "preclude Defendants from offering evidence of Plaintiff's trademark application filed in Israel"—even though isolated statements in the application arguably would be party admissions, and the defendants argued the application was relevant to "the likelihood of confusion between Plaintiff and Defendants' respective products."  The court explained that "Defendants' alleged infringement and the validity of Plaintiff's trademark center on facts and events occurring within the borders of this country, not another," and that "the introduction of foreign trademark law will only tend to confuse the jury, and therefore any probative value … is outweighed by its potential to unfairly prejudice the jury."  *Id.* at *2.

The same reasoning applies here.  Plaintiff says it seeks to introduce the filing to

prove Defendants "use STITCH as a *mark* and that the term has become part of their *trademark* family," and that Defendants' "use of STITCH is *confusingly similar* to Plaintiff's" use of the term. Dkt. 274-1 at 10 (emphases added). But that is exactly what the territoriality principle prohibits, as each italicized term in the prior sentence carries its own meaning and requirements under each nation's trademark regime. *See Gallup*, 688 F. Supp. 2d at 916 ("The [U.S.] trademark system is one of many in the world."). Indeed, whether any Defendant uses "Stitch" as a "mark" outside the U.S. (under other nations' laws) or any consumer outside the U.S. associates the term with TikTok says nothing about whether any Defendant uses "Stitch" as a "mark" in the U.S. (under U.S. law) or any U.S. consumer associates the term with TikTok. And whether there is a likelihood of confusion among consumers in Asia and Europe is irrelevant to whether there is a "likelihood of confusion [among] U.S. customers." *Am. Circuit*, 406 F.3d at 584. Plaintiff incorrectly *assumes* "trademark" and "confusion" mean the exact same thing in every nation in the world (Dkt. 304 at 5), even though *Grupo* recognized that there is no "uniform trademark regime across international borders." 391 F.3d at 1098.

Moreover, the filing is entirely attorney argument to a Turkish tribunal, and is no different than a brief filed before a U.S. court with citations to statutes and discussion of other authorities. Ex. 15 at 1, 5, 9, 11, 15–17. But neither attorney argument nor a legal memorandum is admissible evidence. *E.g.*, *Perez v. VITAS Healthcare Corp. of Cal.*, 2017 WL 5973294, at *1 (C.D. Cal. Mar. 29, 2017); Ninth Cir. Model Jury Instr. 1.10.

Further, the danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay substantially outweighs any probative value. Fed. R. Evid. 403. If all or part of the filing is admitted, Defendants would have to explain: (i) the nature of the proceedings in Turkey; (ii) the differences between U.S. and Turkish trademark law; (iii) that ByteDance Ltd. filed the opposition in Turkey, while TikTok Inc. is the only Defendant that operates the TikTok platform in the U.S.; (iv) that ByteDance did not object on the grounds of "Probability of Confusion" (Ex. 15 at 1), even though Plaintiff seeks to introduce the document to show confusion; and (v) that ByteDance did not say

it uses "Stitch" as a mark as opposed to "a description of the[] feature's function." Dkt. 202 at 13.  Explaining all this to jury will create an unnecessary side show over the proceedings in Turkey—all without having the benefit of an expert on Turkish law—further increasing the danger of misleading and confusing the jury in a case that is about the alleged infringement of Plaintiff's asserted service marks in the U.S.

**The filing is inadmissible under Rule 902.**  Plaintiff has no witness who can testify as to the authenticity of the Turkish filing based on their personal knowledge. Fed. R. Evid. 602; Fed. R. Evid. 901(b).  Plaintiff intends to introduce the filing through the declaration of Plaintiff's counsel in Turkey, who avers that her office oversaw the translation of the filing to English.  Ex. 18.  But the declaration is insufficient to authenticate this foreign document, as the Turkish filing is not "accompanied by a final certification that certifies the genuineness of the signature and official position of [a] signer or attester" who "is authorized by a foreign country's law to do so."  Fed. R. Evid. 902(3).  Nor is the document accompanied "by a certification of the [filing's] custodian" that is "signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed."  Fed. R. Evid. 902(11)–(12).

**Isolated statements should not be admitted.**  The entire document may not be admitted as stated above, and the statements Plaintiff cherry picks out the lengthy filing and labels "party admissions" certainly may not be admitted either.  *See* App. at No. 15.

The Court's MIL Order (at 5) cites *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005), a patent case, for the proposition that party admissions might be admissible.  Defendants respectfully submit that *Gillette* is inapposite.  *Gillette* did not address the territoriality principle (or analogous doctrine in patent law).  It did not cite any authority in support of its reliance on the defendant's foreign admission. And besides this Court, no court has ever cited *Gillette* for the proposition that purported admissions in foreign trademark filings may be submitted to a U.S. jury.  Indeed, *Gillette* arose in the context of the district court's denial of a motion for a *preliminary injunction*—not a jury trial—and involved the construction of certain patent claim terms

(*id.* at 1368)—not the construction of terms of art under U.S. or foreign patent law.

By contrast, the statements Plaintiff seeks to admit are littered with terms of art that cannot be understood without an education in Turkish trademark law.  Indeed, every statement Plaintiff seeks to introduce uses "trademark" or "mark"—even though the requirements to obtain a trademark "in one country will not always be the same as … in another."  *Grupo*, 391 F.3d at 1098.  The Court stated that the statements' relevance appears to "depend on whether they refer to Defendants' use of 'stitch' as a *mark globally* or only in Turkey."  Dkt. 385 at 5 (emphasis added).  Respectfully, there is no such thing as a "global mark" (*see Grupo*, 391 F.3d at 1098), and that the filing does not refer to Defendants' use of "Stitch" *in the U.S.* renders the document entirely irrelevant.

The Court also directed the parties to address (i) who decides whether the statements Plaintiff seeks to introduce are ambiguous, (ii) whether the statements are ambiguous, and (iii) whether ambiguous statements may be admitted.  1/27/2023 Hr'g Tr. 35:5–36:14.  The answer to each question counsels against admitting the statements.

*First*, the Court should decide whether any statements are ambiguous, since "[t]he court must decide any preliminary question about whether … evidence is admissible."  Fed. R. Evid. 104(a).  After all, courts typically decide whether written documents, such as contracts, are ambiguous.  *Cf. Travelers Comm. Ins. Co. v. Jennifer A.*, 699 F. App'x 607, 609 (9th Cir. 2017) ("contractual ambiguity is a question of law for the court").

*Second*, every statement Plaintiff seeks to introduce is ambiguous.  Each statement uses "trademark" or "mark," and it will be unclear to a U.S. audience how the term is being used and defined in the filing before a Turkish tribunal.  The jury will be instructed on the meaning of, and requirements to obtain, a "service mark" for purposes of U.S. law, but will not be given similar instructions for purposes of any other nations' law.  The statements also refer to the author's "client"—ByteDance—which is not the same entity that operates the TikTok platform in the U.S.  And the statements do not actually say ByteDance uses "Stitch" as a trademark.  One statement says "the phrase STITCH … has become a phrase identified with our client and TIKTOK trademarks" (Tr. Ex. at

9)—not that the phrase "STITCH" has become a TikTok trademark.  Another statement says the mark Plaintiff seeks to register "is confusingly similar to the STITCH used as a TIKTOK *feature*" (*id.* at 15)—not that "STITCH" is used as a TikTok *trademark*, or that there is a "likelihood of confusion" under the *Sleekcraft* factors applicable here.

*Third*, the statements' ambiguity renders them confusing, misleading, and unfairly prejudicial under Rule 403.  The outcome would, perhaps, be different if the statements contained purely factual content, such as when the Stitch tool launched.  But each statement Plaintiff seeks to introduce is inextricably intertwined with Turkish trademark law, and the statements' introduction will confuse the issues, mislead the jury into believing ByteDance's Turkish practices are relevant when they are not, result in a waste of time as the parties provide their own interpretation of statements made by Turkish counsel to a Turkish tribunal, and cause unfair prejudice to Defendants as a result.  And while Rule 106 provides that the entire document may be introduced to avoid misleading the jury (*United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996)), Defendants respectfully submit juror confusion is unavoidable if *any* part of the filing is admitted.

## III.   CONCLUSION

The Court should exclude the cited evidence (and related testimony and argument) concerning wholly foreign alleged conduct and Defendants' global finances, Plaintiff's use of the alleged marks outside the U.S., and Defendants' Turkish trademark filings.

1  **PLAINTIFF'S POSITION**

2      Defendants are improperly seeking to exclude evidence on two categories of

3  documents (1) videos created outside the US and viewed in the UK; and (2) videos

4  created in the UK and viewed outside the US (collectively the "UK Videos").  Given a

5  key part of Defendants' infringement occurred in the UK, Plaintiff is seeking to enforce

6  its **US trademark *in the UK***, which they have the right to do under the Lanham Act.[3]

7  Defendants' claims fail procedurally and substantively.

8      I.    **Defendants' Extraterritoriality Motion *in Limine* Fails Procedurally**

9      First, this was an issue that was resolved many months ago that Defendants are

10 now inappropriately attempting to re-litigate.  During the parties July 5, 2022 informal

11 discovery conference with Judge Kim, the parties discussed how best to approach this

12 issue.  After much discussion, the parties agreed that Defendants would produce both

13 the US and UK video metrics given its business interests in both countries, and Plaintiff

14 would forgo seeking metrics on any other countries.   The Parties reiterated their

15 agreement on July 25, 2022 that the US and UK was in the case, but other countries were

16 out.   However, when new counsel entered this matter they materially changed the

17 position of an issue that had been resolved.  Defendants actions of deciding to produce

18 metrics concerning the UK videos and Plaintiff forgoing all other countries, speaks

19 volumes that this has been a resolved issue.

20     Second, Defendants never moved on this legal issue.  As has happened on several

21 issues since Defendants retained new counsel they are attempting re-litigate what they

22 had an opportunity raise, but failed to do so.  *See* Dkt. 379 at 17.  Simply, any strategic

23 decisions Defendants did or did not make during early briefing does not get a "do-over"

24 because they now have retained new counsel.  *See Kassa v. BP W. Coast Prod., LLC.*,

25 2010 WL 726791, at *2 (N.D. Cal. Mar. 1, 2010).  And this is an issue that can be

26  ───────────────

27 [3] Defendants admit that they are not challenging views of:  (i) videos created outside the US, but viewed in the US; and (ii) videos created in the US, but viewed outside the US,

28 as both of these categories implicate basic US Lanham Act issues.

Gibson, Dunn &
Crutcher LLP

waived—Defendants did not raise extraterritoriality as an affirmative defense "nor did they move for summary judgment prior to the dispositive motion cut-off. At this juncture, and considering the court's prior warnings, in order for defendants to raise this defense in this action, they must first demonstrate 'good cause' pursuant to Fed. R. Civ. P. 16(b) to permit (1) amendment of their answers and (2) leave to file a dispositive motion for summary judgment on the issue." *Medical Benefits Dministrators of Md., Inc. v. Sierra R.R. Co.*, 2010 U.S. Dist. LEXIS 124686, at *2-3 (E.D. Cal. Nov. 23, 2010); *see also Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (a party may not "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.").

Third, Defendants are wrong – Plaintiff owns a UK registration for STITCH EDITING (UK Reg. No. UK00913076906). It is Plaintiff's trademark for STITCH that Defendants contested before a single UK administrator, and that issue has been appealed to the UK courts. But there is no question Plaintiff owns UK trademark rights in the UK.

Fourth, Defendants incorrectly argue that considering UK views will create a conflict with UK law, essentially saying a court can never look into foreign conduct. Yet this argument ignores the principle of extraterritoriality whereas the "Supreme Court has determined that the Lanham Act may reach extraterritorial conduct." *MGM Resorts Int'l v. Unknown Registrant of www.imgmcasino.com,* 2015 WL 3730697, at *2 (D. Nev. June 15, 2015) (citing *EEOC v. Arabian Am. Oil Co*., 499 US 244, 252 (1991)). As discussed below, the Ninth Circuit (as well as other courts) have established a framework for situations exactly like this, where an entity has a US trademark, that brand is extensively used in the US and abroad, and another party infringes that US brand. In short, Plaintiff has ***two*** causes actions (infringement of UK trademark rights and infringement of US trademark rights), but only elected to pursue one in this case – US infringement. As commentators have noted, this type of foreign conduct results in a "double whammy," lost UK revenue and "the risk of potential reputational harm back in

the [US] as well, with a corresponding risk of lost domestic sales." McCarthy § 29:57 (discussing Lanham Act to extraterritorial conduct). But legally, there is no conflict – if the actions in the UK infringe the US trademark, the UK trademark rights are immaterial as that can be decided separately.

Finally, that the Supreme Court has granted certiorari in *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016, 1041 (10th Cir. 2021), *cert. granted sub non. Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 143 S. Ct. 398 (2022), does not change the analysis. Until the Court decides that case, the Ninth Circuit's precedent on this issue still controls. *See Knapp v. Reid*, 2016 U.S. Dist. LEXIS 17761, at *3 (W.D. Wash. Feb. 12, 2016) ("Court acknowledges that Ninth Circuit law remains controlling . . . until the Supreme Court issues a decision").

## II.   Defendants' Extraterritoriality Motion in Limine Fails Substantively

At trial, Plaintiff will present evidence demonstrating that Defendants' conduct has (1) created an effect on American foreign commerce; (2) the effect resulted in an injury to the Plaintiff under the Lanham Act; and (3) the links to American foreign commerce are strong enough to justify extraterritorial authority. *See Trader Joe's Co.*, 835 F.3d at 969; *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 613 (9th Cir. 1976) (The *Timberlane* test, adopted by the Ninth Circuit provides that the Lanham Act applies extraterritorially if the three prongs are met). Plaintiff will present evidence showing that Defendants' conduct has created an effect on American foreign commerce; that this effect is substantially great to present a cognizable injury to Plaintiff; and that the interests of and links to American foreign commerce are sufficiently strong in relation to those of the UK to justify an assertion of extraterritorial authority over Defendants' infringing conduct in the UK.

Importantly, the first two criteria may be met "even where all of the challenged transactions occurred abroad, and where 'injury would seem to be limited to the deception of consumers' abroad, as long as 'there is monetary injury in the United States' to an American plaintiff." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601,

613 (9th Cir. 2010). The first two prongs are satisfied here as the Defendants "organized and directed [the deception] from the United States." *Id*. And Defendants are plainly harming Plaintiff here. Plaintiff has a US licensee that uses the US registered trademark (and US common law trademark) extensively in the US; the licensee's use of these trademarks all inures to Plaintiff's benefit. *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1246 n.4 (9th Cir. 2022) ("Under the Lanham Act, legitimate use of a trademark 'by related companies . . . inure[s] to the benefit of the registrant.'") (quoting 15 USC. § 1055).

"The third requirement, that the interests of and links to American foreign commerce be sufficiently strong in relation to those of other nations to justify extraterritorial application of the Lanham Act." *Aristocrat Techs., Inc. v. High Impact Design & Ent.*, 642 F. Supp. 2d 1228, 1236 (D. Nev. 2009). The third *Timberlane* prong "considers international comity" and "gives effect to the rule that [courts] construe statutes to avoid unreasonable interference with other nations' sovereign authority where possible." *See Soylent Nutrition, Inc. v. Jue*, 2020 WL 8459139, at *4 (D. Nev. Oct. 13, 2020) (quoting *Trader Joe's Co.*, 835 F.3d at 972). Defendants' acts in the UK meets all three prongs.

## A. Prong One – Defendants' Actions Aboard Harmed Plaintiff

Here, the evidence will show Defendants' action created an effect on American foreign commerce as the Stitch feature was accessible and heavily used in the UK. *See Pinkberry, Inc. v. JEC Int'l Corp.*, 2011 WL 6101828, at *3 (C.D. Cal. Dec. 7, 2011) ("where a defendant directs acts committed abroad from within the United States that have harmed a US corporation, there is some effect on US foreign commerce"). As a threshold, "the sales of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction." *New Name, Inc. v. The Walt Disney Co.*, 2008 WL 5587486, at *7 (C.D. Cal. July 25, 2008). Here, millions of videos used the Stitch feature in the UK. The heart of this argument is that if the Stitch feature was not available in the UK, Plaintiff would not have been harmed. *See Van Doren Rubber*

*Co. v. Marnatech Enterprises, Inc.*, 1989 WL 223017, at *4 (S.D. Cal. Oct. 17, 1989) ("unlawfully selling its products in Saudi Arabia, [the defendant] diverted sales from the plaintiff . . . . Merely because the consummation of the unlawful activities occurred on foreign soil is of no assistance to the defendant.") (internal citations and quotations omitted).

In fact, about 50% of all Stitch video views in the UK are of US Stitch videos. There are more US Stitch videos viewed in the UK than there are UK Stitch videos (about 10.2 billion views of US videos compared to about 8.3 billion UK videos). Clearly, this activity has strong ties to the US.

This case shares important similarities to *Best W. Int' v. 1496815 Ont., Inc.* where the defendants held out their out their hotel as a Best Western, "without adhering to the quality standards, without payments of fees or dues, and all the while diverting customers from authentic Best Western members." 2007 WL 779699, at *5 (D. Ariz. Mar. 13, 2007). In that case, the court held that the defendants "had damaged the reputation and good will associated with Best Western." *Id.* Similarly here, Plaintiff is alleging Defendants had damaged the reputation of Plaintiff because of the quality and type of videos on the Stitch feature. In sum, "Defendants' actions have restricted Plaintiff['s] ability to engage in foreign commerce." *Pinkberry, Inc.,* 2011 WL 6101828, at *3; *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503 (9th Cir. 1991) ("sales of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction.").

## B. Prong Two – Plaintiff Suffered an Injury from Defendants' Feature

Defendants actions have "effectively preclude[d] Plaintiffs from expanding and selling their product . . . thereby causing Plaintiffs to lose business." *Pinkberry, Inc.,* 2011 WL 6101828, at *4. At trial, Plaintiff will be alleging facts that Defendants have, and continue to, harm its reputation and have caused economic injury to Plaintiff. *Trader Joe's Co.*, 835 F.3d at 971 ("Courts have held that reputational harm to an American plaintiff may constitute 'some effect' on American commerce."); *Gucci Am.,*

*Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 143 (S.D.N.Y. 2011) ("It is well-settled that a showing of . . . harm to plaintiff's goodwill in the United States is sufficient to demonstrate a 'substantial effect on United States commerce.'") (quoting *Steele v. Bulova Watch Co.*, 344 US at 286); *see also* 15 USC. §§ 1114, 1125 (making actionable conduct that is likely to cause future harm). The fact is Plaintiff will continue to suffer a tarnished reputation from Defendants' acts in the US and UK. *Trader Joe's Co.*, 835 F.3d at 971.

In response to Plaintiff's arguments Defendants will likely cite to *Love*, to argue that Prong 2 is not satisfied. *See* 611 F.3d at 613. Defendants will likely argue Plaintiff has failed to present evidence that they suffered monetary injuries in the U.S. *Id*. However, the present situation is quite distinguishable because here, the relevant acts here occurred both in the United States and abroad. *Id*. ("it is undisputed that ***all relevant acts occurred abroad***") (emphasis added).

Here, it is important to remember that the Lanham act applies as Defendants' actions caused injury in ***both*** the US and UK. *See id*; *see also McBee v. Delica Co.*, 417 F.3d 107, 118 (1st Cir. 2005) ("the domestic effect of the international activities may be of lesser importance and a lesser showing of domestic effects may be all that is needed"). As Chief Judge Gutierrez stated in *Pinkberry*, a "loss of current and prospective business opportunity is a cognizable injury under the Lanham Act." *Pinkberry, Inc.,* 2011 WL 6101828, at *3.

## C. Prong Three – Substantial Links to American Foreign Commerce

The third prong is divided into seven components: "(1) degree of conflict with foreign law; (2) nationality of the parties; (3) extent to which enforcement is expected to achieve compliance; (4) relative significance of effects on the United States as compared to elsewhere; (5) explicit purpose is to harm United States' commerce; (6) foreseeability of such effect; (7) relative importance of violations within the United States." *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503-04 (9th Cir. 1991). In addition the "district court is not required to apply these factors in a rigid fashion or

find that the factors unanimously favor extraterritorial application of the Lanham Act." *MGM Resorts Int'l v. Unknown Registrant of www.imgmcasino.com,* 2015 WL 5674374, at *4 (D. Nev. July 8, 2015), report and recommendation adopted, 2015 WL 5682783 (D. Nev. Sept. 23, 2015).

### 1. *There is No Conflict with Foreign Law*

Defendants are likely to argue that there is a conflict with foreign laws because of the on-going trademark application in the UK. However, this argument fails. First, it is undisputed Plaintiff owns a UK trademark registration for STITCH EDITING, that is not being challenged. Second, there is **_no_** existing trademark infringement litigation occurring in the UK. In fact, the only issue Defendants point to is a trademark application for the word STITCH, for which findings by the UK administrative body are being appealed to the UK courts. Defendants admit this:

THE COURT: Incidentally, is the UK decision final?

MR. EVANSON: My understanding is that it has been appealed and that those proceedings are ongoing.

Pg. 31:10-13 January 27, 2023 transcript. The 9th Circuit has held there is no conflict when litigation has yet to conclude. *See Reebok Int'l, Ltd. v. Marnatech Enters.*, 970 F.2d 552, 555 (9th Cir. 1992) ("it is clear that at the time the district court granted the preliminary injunction, the Mexican litigation presented no conflict with the district court's order because the litigation in Mexico had not yet been concluded"). Regardless, there is an existing STITCH EDITING trademark that has not been challenged and thus there is no conflict.

Finally, the Ninth Circuit recognizes that "the Lanham Act provides a broad jurisdictional grant that extends to all commerce which may lawfully be regulated by Congress." *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503 (9th Cir. 1991). The fact is "the sale of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction." *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1130 (C.D. Cal. 1998) (citations and quotations omitted). With

there being no litigation and an existing, unchallenged trademark registration for STITCH EDITING, there is just no conflict with foreign law.

### 2. *Nationality of the Parties*

"The second factor examines the nationality or allegiance of the parties and the locations or principal places of business of any corporations involved in the action." *Pinkberry, Inc.,* 2011 WL 6101828, at *6. Here, TikTok is a US platform, operated here in the US, with its headquarters in Los Angles, by the Defendants. Defendants' employees and witnesses in this case are also out of Los Angeles. Plaintiff is a British company with a registered US trademark and operates a US business out of its licensee's offices also here in Los Angeles. As both parties operate here in the District, this factor heavily supports Plaintiff. *Aristocrat Techs., Inc. v. High Impact Design & Ent.*, 642 F. Supp. 2d 1228, 1237 (D. Nev. 2009) ("Because all but one of the parties have significant contacts to the United States, the second factor weighs in favor of extraterritorial application of the Lanham Act.").

### 3. *Achieving Compliance*

"The third factor requires us to consider the remedy sought and the extent to which the trial court will be able to enforce its order." *Trader Joe's Co.*, 835 F.3d at 974. Courts have noted "the Lanham Act does not conflict with UK law, all of the parties have substantial ties to California," and Defendants' "substantial US assets make an award readily enforceable here." *Winterland Concessions Co. v. Fenton*, 835 F. Supp. 529, 531 (N.D. Cal. 1993). Defendants' own ***the most popular website in the world***. Thus, their revenue and assets show they are more than capable of supporting a substantial judgment. Moreover, in the meet and confer on this issue, Defendants' MIL, their trial brief, and their Memorandum of Contentions of Fact and Law, they never raised any differences between the US and UK trademark law.

### 4. *Significance of Effects on the US as Compared to Elsewhere*

The fourth *Timberlane* factor examines "the relative significance of effects on the United States as compared with those elsewhere." *MGM Resorts Int'l*, 2015 WL

Gibson, Dunn & Crutcher LLP

5674374, at *5.  Here, while TikTok has no boundaries, a substantial portion of the platform takes place in the United States.  *Davis v. ESS Worldwide Corp.*, 2010 WL 11508841, at *9 (S.D. Cal. Jan. 5, 2010) ("Because Defendants maintained a website that was used to market their products in the United States, Defendants' infringing actions were directed at the United States, and thus had an effect on US commerce."). About half of all infringing views in the UK are of US Stitch videos (more than UK videos).  That being said, while Plaintiff has deep ties to the US, its business is also well-known in the UK and Defendants actions also have the ability to mislead these customers.  *Trader Joe's Co.*, 835 F.3d at 974.

### 5. and 6.    *Defendants Harm was Foreseeable*

The fifth and sixth factors "require the Court to consider whether the defendant's purpose is to harm American commerce or whether such harm was foreseeable." *Sound N Light Animatronics Co. v. Cloud B, Inc.*, 2017 WL 3081685, at *11 (C.D. Cal. Apr. 7, 2017).   This Court has held that "[i]ntentional and unauthorized use of a US corporation's trademark abroad amounts to an explicit purpose to harm US commerce." *Pinkberry, Inc.,* 2011 WL 6101828, at *7.  Here, Defendants admit they failed to run a prior trademark search and did nothing in response to demand letters -- they also admit the parties have 76 overlapping customers.  *See Sound N Light*, 2017 WL 3081685, at *11 ("[A] company will likely be harmed if a defendant takes that company's proprietary information, produces a similar product, and sells that product in the same market served by the company.").  Fundamentally, the harm Plaintiff suffered was foreseeable when Defendants decided not to run a trademark search.[4]  *See Zest Anchors, LLC v. Geryon Ventures, LLC*, 2022 WL 16838806, at *2 (S.D. Cal. Nov. 9, 2022) (Defendants did not need to harm Plaintiff as long as "at a minimum, that such harm was foreseeable").

### 7.  *Importance of Conduct within US as Compared to Abroad.*

---

[4] Defendants also could have easily foreseen the effects on American commerce as evidenced by their attempts to avoid confusion with other purported global competitors, like Facebook and Instagram.

Gibson, Dunn & Crutcher LLP

The final factor focuses on the "relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Reebok Int'l, Ltd.*, 970 F.2d at 557. This factor is likely neutral for both parties as Plaintiffs' claims are based on actions that occurred both in the US and UK. *See Aristocrat Techs., Inc. v. High Impact Design & Entertainment,* 642 F. Supp. 2d 1228, 1238 (D. Nev. 2009) ("it is difficult to determine whether actions in either location were more significant to Plaintiffs' claims than the actions in the other"). Yet one part of this factor that weighs in favor of Plaintiff is that the Stitch feature was developed and is managed in the US. *Pinkberry, Inc. v. JEC Int'l Corp.*, 2011 WL 6101828, at *7 (C.D. Cal. Dec. 7, 2011) (holding factor neutral, but highlight the fact that "Defendants directed these acts from the United States.").

Thus, the UK conduct supports exterritorialy of the Lanham Act.

### III.    The Admissions in the Turkish Filings Are Relevant

Although the Court directed the parties to brief the admissibility of the admissions contained in the Turkish filing as part of their briefing on extra-territoriality, Plaintiff maintains that so long as these statements are relevant, they are admissible regardless of where they were made. *See* Dkt. No. 385 at 5 (citing *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (considering the interpretation of a patent term advanced by a party in the European Patent Office as an admission that supports the court's construction in the United States action).

Plaintiff seeks to introduce the following admissions from the filing that ByteDance Ltd. ("ByteDance") made in Turkey: (1) "'Stitch' has become a phrase identified with [TikTok] and TİKTOK trademarks as a result of widespread use and promotional activities"; (2) "Stitch" "brings to mind [TikTok] and its trademarks"; (3) "STITCH is [] a phrase that has become a part of [TikTok]'s trademark family as a result of use, and it immediately brings [TikTok] to mind"; (4) "the consumer who sees or hears the trademark [STITCH] . . . will immediately associate this trademark and the goods with [TikTok]"; and (5) STITCH "is confusingly similar to the STITCH [mark]

used as a TIKTOK feature." If these admissions concern Defendants' use of the mark in the US/UK, they are plainly relevant to Defendants' fair use defense, which is inapplicable if Defendants are using "Stitch" as a brand.

## IV. The Admissions are Not Ambiguous Because They Concerned Defendants' *Global* Use of the "Stitch" Mark

These admissions unambiguously relate to Defendants' ***global*** use of the word "Stitch" for a feature that is available everywhere in the world that TikTok is available. This is readily clear from ByteDance's own statements in the same filing.

*First*, ByteDance specifically and frequently references its global trademark portfolio. It asserts, among other things, that:  (1) TikTok "is one of the most important and well-known companies in the sector in which [it] operates, the well-known TIKTOK trademarks all over the world belong to our client, our client uses commonly the phrase STITCH, and this phrase has become a phrase identified with our client and TikTok trademarks … it brings to mind our client and its trademarks; (2) "TikTok trademarks belonging to our client have reached HIGH RECOGNITION *all over the world*…"; (3) "TIKTOK … was the most downloaded in 2018 on iOS and Android and the number of users was 500,000,000" (with no Turkey-specific delineation on number of Turkish users); and (4) "The number of downloads of TikTok in the world exceeds 2 BILLION." *See* Skale Exhibit A at STITCH_00027269-72.

*Second*, the filing makes frequent reference to the use of the term "stitch" in technology, camera, and social media around the world. *See id.* (citing, among other things: (1) a Wikipedia entry for "Image stitching"; (2) an excerpt from instructions from Adobe Spark Video; (3) a screenshot from a Google search of "Image Stitch" with an indication that the search yielded 83.8 million results; (4) a non-Turkish website's description of the meaning and use of the term "image/video stitching"; (5) a broad summary of the results of the search "image/video stitch" on Google (with no indication of a narrowing to Turkish results); (6) a screenshot of Google Image results for "image stitch" (with no indication of a narrowing to Turkish results); a broad summary of the

use of the term "Stitch" "by everyone in the fields of video and photo editing") (Emphasis added).

*Third*, the description from ByteDance's counsel in the "our client and their trademarks" section relies primarily on global data, with only a few references to Turkish-specific data. ByteDance asserts, among other things, that: (1) "ByteDance company's products are available in more than ***150 countries in international markets*** (such as China, Japan, South Korea, North America, Europe, Latin America, Southeast Asia, and India)"; (2) "The TikTok mobile application, which has achieved great recognition ***around the world***, is one of the most downloaded applications of 2018, 2019 and 2020…"; (3) "TikTok was the most downloaded application in 2021" (with no indication that this was true in Turkey specifically); (4) "TikTok has become ***the world's*** most popular online application, surpassing Google…"; and (5) TikTok ranks 6th among the most used social media applications ***all over the world***." *Id.* at STITCH_00027269-72.

As a result, there can be no ambiguity these admissions are relevant to this case.

**V.      Even if the Admissions Were Ambiguous, That Goes to Weight, Not Admissibility; Ambiguities Should be Resolved by the Jury, not the Court**

It does not appear that any courts in this Circuit have addressed whether the Court or the jury resolves ambiguities in purported party admissions in civil matters.  During the parties' meet and confer, Defendants suggested that the Court should resolve any ambiguities in the first instance, borrowing from contract law. But even under contract law, "[i]f the terms of the contract are ambiguous or uncertain, ... determining the contract's terms is a question of fact for the trier of fact (here the jury), based on 'all credible evidence concerning the parties' intentions.'" *Indigo Grp. USA, Inc. v. Polo Ralph Lauren Corp.*, 2012 WL 12884634, at *2 (C.D. Cal. Aug. 29, 2012); *Artem Stoliarov v. Marshmello Creative, LLC*, 2021 WL 2514156, at *4 (C.D. Cal. Apr. 8, 2021), *aff'd sub nom. Stoliarov v. Marshmello Creative, LLC*, 2022 WL 819800 (9th Cir. Mar. 17, 2022) ("In California, the meaning of a contract ... is a question of law,

unless it is ambiguous and there is 'conflicting extrinsic evidence' from which a jury could resolve the ambiguity in favor of either party.").

Another analogous source to draw upon is how courts deal with purported ambiguities in adoptive admissions. "Following an 'initial evidentiary determination' to be made by the trial court, any 'ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess." *Phipps v. Comprehensive Cmty. Dev. Corp.*, 2005 WL 287413, at *13 (S.D.N.Y. Feb. 2, 2005) (citing *U.S. v. Tocco*, 135 F.3d 116, 129 (2d Cir.1998), *cert. denied*, 523 U.S. 1096 (1998)); *see also Guffey v. Subia*, 2009 WL 6055849, at *15 (S.D. Cal. Aug. 28, 2009), *report and recommendation adopted*, 2010 WL 987015 (S.D. Cal. Mar. 17, 2010) (same).

For example in *Guffey*, a defendant ("Gehrke") argued that a co-defendants' ("Smith") statements "did not constitute adoptive admissions by him because Smith's use of the word 'we' was ambiguous and might not have referred to him, in which case he would have had no reason to object or to deny any involvement in the murder." 2009 WL 6055849, at *15. The Southern District of California rejected that argument, stating "Smith's choice of terminology … goes to the weight rather than the admissibility of his statements. In light of the evidence … the jury could reasonably conclude that Smith's use of the word 'we' referred to Smith and Gehrke." *Id.*

Similarly, here, as shown above, there is sufficient evidence for the Court to allow any ambiguity in ByteDance's admissions to go to the weight of the admission and not its admissibility. This would leave for the jury, the decision of how much weight to accord the evidence of these admissions.

Gibson, Dunn &
Crutcher LLP

DATED: February 1, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Blaine H. Evanson*
Blaine H. Evanson

GIBSON, DUNN & CRUTCHER LLP
Nicola T. Hanna, SBN 30694
  *nhanna@gibsondunn.com*
Blaine H. Evanson, SBN 254338
  *bevanson@gibsondunn.com*
Elizabeth K. McCloskey, SBN 268184
  *emccloskey@gibsondunn.com*
Poonam Kumar, SBN 270802
  *pkumar@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Howard H. Hogan (*pro hac vice*)
  *hhogan@gibsondunn.com*
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

DORSEY & WHITNEY LLP
J. Michael Keyes, SBN 262281
  *keyes.michael@dorsey.com*
Bruce R. Ewing (*pro hac vice pending*)
  *ewing.bruce@dorsey.com*
Connor J. Hansen (admitted *pro hac vice*)
  *hansen.connor@dorsey.com*
701 Fifth Avenue, Suite 6100
Seattle, WA 98104

*Attorneys for Defendants and Counterclaim Petitioners TikTok Inc., TikTok LLC, TikTok Ltd., and ByteDance Ltd.*

Gibson, Dunn &
Crutcher LLP

1    Dated:  February 1, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  MINTZ LEVIN COHN FERRIS
     GLOVSKY AND POPEO, P.C.

By: */s/ Andrew D. Skale*

Andrew D. Skale, SBN 211096
Randy Jones, SBN 141711
Courtney Rockett (*Pro Hac Vice*)
Kara Cormier (*Pro Hac Vice*)

*Attorneys for Plaintiff Stitch Editing Ltd.*

## **MEET AND CONFER CERTIFICATION**

I certify that the parties met by videoconference on January 29, 2023, thoroughly discussed each and every issue raised in the motion, and attempted in good faith to resolve the motion in whole or in part.

*/s/ Blaine H. Evanson*
Blaine H. Evanson

Gibson, Dunn & Crutcher LLP

1

## **LOCAL RULE 11-6.1 CERTIFICATE OF COMPLIANCE**

2

      The undersigned, counsel of record for Defendants TikTok Inc., TikTok LLC,

3

TikTok Ltd., and ByteDance Ltd., certifies that its portion of the brief contains 6,409

4

words, which complies with the word limit of L.R. 11-6.1.

5

6
                                     */s/ Blaine H. Evanson*
                                     Blaine H. Evanson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

SUPPLEMENTAL BRIEF RE EXTRATERRITORIALITY – CASE NO. 2:21-CV-06636-SB-SK

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 1, 2023, a true and correct copy of the foregoing was served on counsel for Plaintiff via electronic mail.

*<u>/s/ Blaine H. Evanson</u>*
Blaine H. Evanson